## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE ASSAD, directly on behalf of himself and all others similarly situated, and derivatively on behalf of GO ACQUISITION CORP., <br><br>      Plaintiff, <br><br>   v. <br><br> GO ACQUISITION CORP., <br><br>      Nominal Defendant, <br><br>   v. <br><br> GO ACQUISITION FOUNDER LLC., NOAM GOTTESMAN, M. GREGORY O'HARA, JEREMY ISAACS, GILBERT AHYE, AND NORMA CORIO, <br><br>      Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) **CASE NO. _____** <br> **JURY TRIAL DEMANDED** |

## VERIFIED DIRECT AND DERIVATIVE COMPLAINT FOR
## BREACH OF THE INVESTMENT COMPANY ACT OF 1940

George Assad ("Plaintiff") brings this action as a holder of common stock of Nominal Defendant GO Acquisition Corp. ("GO Acquisition," or the "Company"), a Delaware corporation, on behalf of the Company and on behalf of himself and all others similarly situated against GO Acquisition Founder LLC ("Sponsor" or "Sponsor Defendant"), Noam Gottesman and M. Gregory O'Hara (together with Gottesman, the "Founder Defendants"), and Jeremy Isaacs, Gilbert Ahye, and Norma Corio (the "Independent Director Defendants").

Plaintiff seeks a declaratory judgment, damages, and rescission of contracts whose formation and performance violate the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1 *et seq.* ("ICA"). In support thereof, Plaintiff alleges as follows:

## I.   NATURE AND SUMMARY OF THE ACTION

1.      GO Acquisition is a half-billion-dollar special purpose acquisition company, or "SPAC."

2.      This case arises because GO Acquisition qualifies as an "investment company" as that term is defined in the ICA. The ICA is a key federal law that regulates the rights of an investment company's shareholders and the form and amount of its managers' compensation. By telling the world that GO Acquisition is not an investment company as that term is defined in the ICA, Defendants have structured the Company so as to charge its public investors what amounts to more than $100 million dollars in compensation. Under the ICA, the form and amount of this compensation is illegal.

3.      Under the ICA, an investment company is an entity whose primary business is investing in securities. And investing in securities is basically the only thing that GO Acquisition has ever done. From the time of its formation, GO Acquisition has invested all of its assets in securities.

4.      In 1940, Congress passed the ICA to protect investors from Depression-era "abuses [that] stemmed from the control of investment companies by banking, brokerage, or dealer interests."[1]   Because investment companies had no employees or resources of their own, they were especially vulnerable to exploitation by outside financial advisers, who sometimes called themselves "sponsors" and who controlled the investment companies that they established and managed. Congress expressed concern that "control [of investment companies would be] exercised

---

[1] Note, *The Investment Company Act of 1940*, 50 YALE L. J. 440, 441-442 (1941) (citing *Hearings Before Subcomm. of Sen. Comm. on Banking and Currency*, S.3580, 76th Cong., 3d Sess. 34, 783 (1940)).

to benefit the sponsor[s]" of investment companies, exposing the companies' investors to risks of confusion and abuse.[2]

5.      In response, Congress passed the ICA and its sister statute, the Investment Advisers Act. Together, these statutes impose a comprehensive regulatory regime to address abuses that arise when outsiders dominate an investment company. The law regulates the capital structure of an investment company, as well as the rights and powers of investors and the kind and amount of compensation that sponsors, investment advisers, directors, and officers can be paid. The law also grants shareholders private rights of action to seek damages and to rescind agreements that violate these statutes.

6.      In addition to popular investment vehicles such as mutual funds and exchange-traded funds, or "ETFs," the ICA also covers a broad scope of other types of companies to accomplish its goal of protecting investors. The ICA applies to any company that satisfies the statute's definition of an "investment company," which includes any entity that is "engaged primarily" "in the business of investing, reinvesting, or trading in securities."

7.      GO Acquisition is an investment company under the ICA because its primary business is to invest in securities. Indeed, investing in securities is all the Company has ever done. From the moment of its IPO, the Company has invested effectively all of its assets in securities of the United States government and shares of money market mutual funds.

8.      Additionally, the way the Defendants have structured the Company poses the precise dangers the ICA sought to address. The Founder Defendants who control the Company are professional managers of investment funds. Through their affiliates, they already operate a series of hedge funds and private equity funds and they have structured GO Acquisition as an extension

---

[2] *Id.*, at 442.

of this existing business. As with their other investment funds, the Defendants and their affiliates completely dominate GO Acquisition from the outside. They have arranged the Company's affairs so that the Company has no full-time employees or other operational resources of its own, rendering it entirely dependent on the resources—and control—of the Defendants. Indeed, the very same individual investment professionals who operate the Founder Defendants' other investment funds also operate GO Acquisition. GO Acquisition is thus merely the latest addition to an existing line of investment fund products.

9.     The Defendants have used their dominance over the Company to extract tremendous value at the direct expense of public shareholders and in violation of federal law. Rather than pay reasonable fees and structure them in the standardized and transparent ways required by the law, the Company has paid Defendants in a special class of shares, unavailable to the general public, that gives Defendants nearly total control of the Company as well as an economic interest equal to at least 20% of the Company's outstanding equity—and possibly much more. Defendants received all this for a purchase price of just $25,000. The potential value of this compensation could exceed $100 million. This is hardly the arm's-length bargain between an investment company and an outside manager that the ICA demands.

10.     The Defendants suggest that they can avoid the ICA because, they say, GO Acquisition is not an investment company but a SPAC. They say that the Company's primary purpose is not to invest in securities but instead to acquire an operating business. However, investing in securities is all the Company has ever done since its IPO. Wherever the line between an investment company and an operating company is located, there can be no doubt that GO Acquisition is on the investment-company side of it.

11.     Accordingly, Plaintiff respectfully requests that this Court enter a declaratory judgment stating that the Company is an investment company under the ICA.

12.     Plaintiff also requests that this Court enter an order rescinding certain elements of the Defendants' compensation for having breached the ICA.

13.     Plaintiff further requests that this Court enter an order for damages reflecting the Defendants' breach of their fiduciary obligations under the ICA and such other relief as this Court may deem just and proper.

## II.     <u>JURISDICTION AND VENUE</u>

14.     This Court has jurisdiction over this action pursuant to ICA Sections 36(b), 44, and 47(b). 15 U.S.C. §§ 80a-35(b), 80a-43, 80a-46(b).

15.     Section 36(b) of the ICA "grant[s] individual investors a private right of action for breach of fiduciary duty" related to any payment of a material nature received by any investment adviser or director of a registered investment company. *Jones v. Harris Assoc. L.P.*, 559 U.S. 335, 340 (2010) (citing 15 U.S.C. § 80a-35(b)). Federal courts have exclusive jurisdiction over any such claim. 15 U.S.C. § 80a-35(b)(5).

16.     ICA Section 47(b) confers "an implied private right of action for rescission" of contracts that violate the ICA. *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 102 (2d Cir. 2019). The ICA provides the "district courts of the United States" with jurisdiction over such suits. 15 U.S.C. § 80a-43.

17.     This Court has personal jurisdiction over each of the Defendants because each of the Defendants transacts business within the state of New York and/or is a resident of New York. Among other things, the principal offices of the Company and the Sponsor Defendant are in New York and Defendants have sent numerous communications regarding the Company to and from New York.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2).

## III.     THE PARTIES

19.     Plaintiff George Assad has held shares of GO Acquisition at all times relevant hereto, continues to hold GO Acquisition shares, and will continue to hold shares through this litigation.

20.     Nominal defendant GO Acquisition is a Delaware corporation organized on June 12, 2020.

21.     GO Acquisition Founder LLC ("Sponsor" or "Sponsor Defendant") is a Delaware limited liability company.  On information and belief, it is owned by Defendants Gottesman and O'Hara either directly or through their family offices and other affiliates. Defendants Gottesman and O'Hara are also the managers of the Sponsor.

22.     Noam Gottesman is Co-Chief Executive Officer of the Company and a member of the Company's Board of Directors (the "Board").

23.     M. Gregory O'Hara is Co-Chief Executive Officer of the Company and a member of the Board.

24.     Jeremy Isaacs is a member of the Board.

25.     Gilbert Ahye is a member of the Board.

26.     Norma Corio is a member of the Board.

27.     Defendants Gottesman and O'Hara are referred to herein as the "Founder Defendants."

28.     Defendants Isaacs, Ahye, and Corio are referred to herein as the "Independent Director Defendants."

## IV.    FACTUAL ALLEGATIONS

### A.    Origins of the Company

29.    The Company began its life when it was incorporated in Delaware on June 12, 2020. At the time of its formation, it had no assets and no plans for operating a company. Its primary business was to invest in securities.

30.    On June 30, 2020, the Company filed a Form S-1 registration statement with the SEC in preparation for raising capital through an offering of securities to the public. It filed an updated prospectus pursuant to that registration on August 4, 2020. In the prospectus, the Company described itself as a "blank check company." It planned to invest all of its IPO proceeds in securities and then eventually to complete what the Company called an "Initial Business Combination."[3]   Companies like GO Acquisition are commonly referred to as Special Purpose Acquisition Companies, or SPACs.

31.    Under the terms of the Company's amended and restated certificate of incorporation (the "Certificate of Incorporation"), the Company has a lengthy period of time to complete its Initial Business Combination. The Certificate of Incorporation provides up to "24 months from the closing of the [IPO]" to complete a combination with a target.[4] This Initial Business Combination may be completed through a "merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination."[5]

32.    In the IPO, the Company offered a combination of securities in what the Company called "Units" (each, an "IPO Unit"). Each IPO Unit was sold for $10 and consisted of one share

---

[3] GO Acquisition Corp., Prospectus, at 2 (August 4, 2020) (hereinafter, the "Prospectus").

[4] GO Acquisition Corp., Current Report (Form 8-K), at Ex. 3.1, § 9.1(b) (Aug. 10, 2020) (hereinafter, the "Certificate of Incorporation").

[5] *Id*., Art. II.

of Class A common stock and 1/3 of a warrant (a "Common Warrant"). Each Common Warrant provided its holder with the right to purchase a share of Class A common stock at $11.50 per share during the period commencing 30 days after the Initial Business Combination and expiring five years after the Initial Business Combination.[6]

33.    The Company's Class A common stock carries a right to redemption. Prior to completing the Initial Business Combination, each holder of a Class A share will be given the option to redeem at a price per share equal to the aggregate amount then on deposit in the trust account divided by the number of shares outstanding.[7]

34.    Although the warrants and shares of common stock were sold together as units, investors were later given the option to trade the warrants and stock separately on the New York Stock Exchange.

35.    After hiring underwriters to market the IPO Units, the Company consummated its IPO on August 7, 2020. The Company sold 50 million IPO Units at a price of $10 each.[8] On September 21, 2020, the Company sold an additional 7,500,000 IPO Units pursuant to its underwriters' full exercise of their over-allotment option, thereby bringing the Company's total gross IPO Proceeds to $575,000,000.[9]

36.    At about the same time as it completed its IPO, the Company sold 9,000,000 warrants ("Sponsor Warrants") to the Sponsor Defendant in a private placement at a price of $1.50

---

[6] Prospectus, at 122-23.

[7] *Id*., at 90.

[8] GO Acquisition Corp., Current Report (Form 8-K), at 1 (Aug. 10, 2020).

[9] GO Acquisition Corp., Current Report (Form 8-K), at 1 (Sept. 25, 2020).

per Sponsor Warrant, thereby raising $13,500,000.[10]   The Sponsor Warrants have rights substantially similar to the Common Warrants. The purchase of the Sponsor Warrants was contracted through an agreement between the Company and the Sponsor Defendant dated August 4, 2020 (the "Sponsor Warrant Purchase Agreement").[11]

### B.   The Company Invests Its IPO Proceeds in Securities

37.   After the IPO, the Company invested the proceeds it raised in securities. In a report filed with the SEC after the IPO, the Company explained that "[a] total of $575,000,000 . . . of the net proceeds from our initial public offering and private placement was placed in a trust account . . . and has been invested only in U.S. 'government securities' . . . having a maturity of 185 days or less, or in money market funds . . . which invest only in direct U.S. government treasury obligations."[12]

38.   Accordingly, of the $588.5 million raised by the Company through its IPO and the sale of the Sponsor Warrants, $575 million was immediately invested in securities. And as of the time of the Company's most recent quarterly filings, this money remained invested in securities. Out of the Company's $576,496,557 in total assets, $575,326,407 continues to be invested in securities.[13]  All of the Company's income has come from its investments in securities.[14]

39.   The Company thus has no operations and will have no operations or operating revenue until after its Initial Business Combination.

---

[10]  GO Acquisition Corp., Amended Annual Report (Form 10-K/A), at 3 (May 25, 2021) (hereinafter, the "Amended Annual Report").

[11]  GO Acquisition Corp., Current Report (Form 8-K), at Ex. 10.4 (Aug. 10, 2020).

[12]  Amended Annual Report, at 3; GO Acquisition Corp., Current Report (Form 8-K), at Ex. 10.3 (Aug. 10, 2020) (Investment Management Trust Agreement).

[13]  GO Acquisition Corp., Quarterly Report (Form 10-Q), at 1 (Aug. 17, 2021).

[14]  Id., at 2, 5.

### C.    The Founder Defendants Completely Control the Company

40.    From the moment of its founding, the Company has been completely dominated and controlled by the Founder Defendants and has been completely reliant upon the Founder Defendants and their affiliates in the same manner that other types of investment companies are commonly dominated by their sponsors and advisers.

41.    The Founder Defendants formed the Sponsor Defendant and are its managers. On information and belief, they also directly or indirectly own its equity.

42.    On June 22, 2020, the Founder Defendants caused the Sponsor Defendant and the Company to enter into a Subscription Agreement for Class B shares (the "Class B Share Subscription Agreement"), pursuant to which the Company issued to the Sponsor Defendant 14,375,000 shares of Class B common stock of the Company (the "Class B shares").[15]

43.    In July 2020, the Sponsor Defendant transferred 25,000 shares of these Class B shares to each of the Independent Director Defendants. The Sponsor Defendant transferred these shares at the same nominal price the Sponsor Defendant originally paid for the shares.[16]

44.    The Class B shares carry the exclusive right to appoint and remove members of the Board until the Company completes its Initial Business Combination.[17]

45.    The Board also has the power to issue up to 1,000,000 shares of preferred stock and fix their voting rights, designations, powers, preference, and rights without approval by the Company's common stockholders.[18]

---

[15] Prospectus, at 76.

[16] *Id.*

[17] Certificate of Incorporation, § 9.8.

[18] Prospectus, at 122.

46.     In addition to being effectively controlled by the Sponsor Defendant, the Company is also completely reliant upon the Sponsor Defendant and its affiliates for the Company's operational resources. In its prospectus, the Company stated that "We do not intend to have any full-time employees prior to the completion of our initial business combination."[19] Instead, the Company relies entirely on investment professionals who are supplied and compensated from the outside by the Founder Defendants and their affiliates.

47.     The Company has three executives other than the Founder Defendants: Guy Weltsch, Spencer Marsden, and Alejandro San Miguel.

48.     Weltsch and San Miguel are employed by Defendant Gottesman's family office, TOMS Capital LLC ("TOMS Capital"). San Miguel is also employed by Defendant Gottesman's investment fund management firm, TOMS Capital Investment Management LP ("TCIM").

49.     Marsden is employed by Defendant O'Hara's family office, Clementine Investments. He is also employed by Defendant O'Hara's investment fund management firm, Certares Management LLC ("Certares").

50.     Weltsch, Marsden, and San Miguel have not been paid directly by the Company for their work at the Company and will not receive any payments directly from the Company prior to the Initial Business Combination.[20] On information and belief, Weltsch, Marsden, and San Miguel will instead be paid by Defendants Gottesman and O'Hara or their family offices, investment fund management firms, or other affiliates for the work that Weltsch, Marsden, and San Miguel perform on behalf of the Company.

---

[19] *Id.*, at 49.

[20] *Id.*, at 107.

51.     The Company operates out of the office of Defendant Gottesman's family office, TOMS Capital.

52.     On information and belief, the Company entered into an administrative services agreement with TOMS Capital at the time of the Company's registration of securities pursuant to which TOMS Capital provided office space and administrative support services to the Company.[21]

53.     Besides the Founder Defendants and Marsden, Weltsch, and San Miguel, the only other people with significant involvement in the affairs of the Company are the three Independent Director Defendants.

54.     The relationship between the Founder Defendants and the Company thus resembles the standard pattern that characterizes relationships between investment companies and their advisers and sponsors more generally. In this pattern, a business that specializes in giving investment advice (the investment "adviser" or "sponsor") separately incorporates or organizes another business (the investment "company" or "fund") for the purpose of investing in securities. The sponsor then recruits other investors to invest in the company and profits from the company by charging it a fee or otherwise taking payments for the sponsor's services.

55.     At the time the sponsor establishes the investment company, the sponsor puts in place governance arrangements that allow it to dominate the company and control its affairs. The investment company typically has no employees or other operational resources of its own, relying instead on the sponsor to supply all of the professionals, office space, and other operational resources the company requires to operate. The sponsor may repeat this relationship with other investment companies.

---

[21] GO Acquisition Corp., Amended Prospectus (Form S-1/A), at Ex. 10.9 (July 31, 2020) (Form of Administrative Services Agreement with unnamed affiliate of Sponsor Defendant).

56.     This pattern appears across the investment fund advisory industry and in almost every type of business the ICA is designed to regulate, including registered investment companies such as mutual funds, closed-end funds, and ETFs, as well as private funds that would be required to register as investment companies under the ICA if they sold securities to the public, such as private equity funds, hedge funds, and venture capital funds.

57.     Indeed, this pattern is so characteristic of the investment fund management industry that it even appears in the businesses of the Founder Defendants. Defendants O'Hara and Gottesman are seasoned investment fund managers and in addition to owning and operating the family investment offices that own the Sponsor Defendant, they also own and operate large and established investment advisory firms that specialize in the management of investment funds.

58.     Defendant O'Hara is the Founder, Senior Managing Director, and 50% owner of Certares, a registered investment adviser that operates three private equity funds that invest in the travel and hospitality industry.[22]

59.     Defendant Gottesman is a principal owner of TCIM, as well as the senior member, managing member, or principal partner of a series of entities that control TCIM.[23] TCIM is a registered investment adviser to a series of six hedge funds.[24] Three of these funds concentrate on investing in the securities of SPACs.[25]

60.     By virtue of their position as investment advisers, Certares and TCIM dominate the affairs of the funds they manage in much the same way that they dominate the affairs of GO Acquisition.

---

[22] Certares Management LLC, Form ADV Brochure Part 2 (Feb. 2021), at 2.

[23] TOMS Capital Investment Management LP, Form ADV Brochure Part 2 (Mar. 26, 2021), at 1.

[24] *Id.*, at 2.

[25] *Id.*, at 3.

61.     As is common among advisers of investment funds and investment companies, the Founder Defendants each manage their investment funds and investment companies as part of a single, integrated operation. For each Founder Defendant, this integrated investment fund management operation includes GO Acquisition. As observed above, all of GO Acquisition's officers are supplied to the Company by the Founder Defendants' family offices.  Marsden and San Miguel are also supplied to the Company by the investment fund management firms that manage the Founder Defendants' other investment funds. Marsden and San Miguel manage GO Acquisition alongside these other investment funds.

62.     GO Acquisition is thus merely the latest addition to the Founder Defendants' existing portfolio of investment funds.



FIGURE 1: ORGANIZATION OF GO ACQUISITION AND AFFILIATED ENTITIES

**D.    The Defendants' Compensation**

63.    For their service as directors and officers of the Company, the Company has compensated the Defendants by issuing them securities worth an extraordinary and excessive amount of money.

64.    The Company compensated the Founder and Independent Director Defendants by issuing the Class B shares to the Sponsor Defendant. The Sponsor Defendant transferred some of the Class B shares directly to the Independent Director Defendants. And, on information and belief, the Sponsor Defendant will ultimately send the profits from the Class B shares to the Founder Defendants because the Sponsor Defendant is ultimately owned, either directly or indirectly through affiliates, by the Founder Defendants.

65.    The Class B shares represent an enormous payment to the Founder and Independent Director Defendants. The number of Class B shares issued to the Sponsor Defendant is equal to 25% of the total number of shares of Class A common stock issued to the public in the IPO or (equivalently) 20% of the total number of both classes of common stock outstanding immediately after the IPO.

66.    Upon completion of the Initial Business Combination, the Class B shares will convert to shares of Class A common stock.[26] The ratio of the conversion will be at least one to one, which will guarantee that the Sponsor Defendant will receive a number of shares equal to at least 25% of all the Class A shares issued at the time of the IPO or (equivalently) 20% of the total number of shares of common stock outstanding at the time of the IPO. The conversion ratio further ensures that if the Company issues new shares to third-party investors to finance the Initial Business Combination and these new shares exceed the number of shares redeemed in connection with the Initial Business Combination, the Sponsor Defendant will receive additional shares of Class A common stock equal to 25% of the net increase.[27]

---

[26] Certificate of Incorporation, § 4.3(b).

[27] For purposes of this calculation, the tally of new shares includes "all shares of Class A Common Stock issued or issuable (upon the conversion or exercise of any equity-linked securities or otherwise), in each case by the Corporation, related to or in connection with the consummation of the Initial Business Combination (net of the number of [initial public] Offering Shares redeemed

67.     The guarantee that the Sponsor Defendant will receive at least 25% of all the Class

A shares issued at the time of the IPO creates the possibility that the Sponsor Defendant may end

up holding an even larger portion of the Company's common stock after the Initial Business

Combination. If more than 75% of the Class A common stock issued in the IPO gets redeemed in

connection with the Initial Business Combination—a not infrequent occurrence among SPACs[28]—

the Sponsor Defendant could end up holding more shares of Class A common stock at the time of

the Initial Business Combination than all other shareholders of the Company combined.

68.     The Class B shares could thus turn out to be worth a tremendous amount of money.

Given that the Company raised $575 million through the issuance of the IPO Units, the Class B

shares could potentially come to represent a claim on $115 million in assets.

69.     For this extraordinary amount of value, the Sponsor Defendant paid almost nothing.

As the Company acknowledged in its prospectus, "[o]ur sponsor paid $25,000, or approximately

$0.002 per [Class B] share."[29] By contrast, the Company's public investors paid $10 each for the

IPO Units in the IPO.

---

in connection with the initial Business Combination and excluding any securities issued or issuable
to any seller in the initial Business Combination and any private placement warrants issued to GO
Acquisition Founder LLC (the "Sponsor") or its affiliates upon conversion of loans to the
Corporation." Certificate of Incorporation, § 4.3(b)(ii).

[28] Michael Klausner, Michael Ohlrogge, & Emily Ruan, *A Sober Look at SPACs* 10 (Stan. L. &
Econ. Olin Working Paper No. 559, 2021).

[29] Prospectus, at 56.

## V.   GO ACQUISITION IS AN INVESTMENT COMPANY UNDER THE ICA

70.     The activities and organization of GO Acquisition all point to the legal conclusion at the heart of this action: the Company is an investment company as defined by the ICA.

71.     The ICA defines an investment company as a company that invests in securities. And investing in securities is all the Company has ever done or proposed to do with the great majority of its assets.

72.     The key definition of an investment company appears in section 3(a)(1)(A) of the ICA. That section provides:

> (a)(1) When used in this subchapter, "investment company" means any issuer which—
> (A) is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities . . . .[30]

73.     Investing in securities is the Company's primary business because that is all the Company has ever done with its assets. Since the time of its IPO, the Company has invested nearly all of its assets in securities of the U.S. government and securities of money market mutual funds. Of the $576,496,557 in assets the Company owned as of June 2021, it invested fully $575,326,407 in these two kinds of securities.[31]  These instruments are the only source from which the Company has ever received any income.[32]

74.     Government securities and shares of stock in money market mutual funds are "securities" within the meaning of ICA Section 3(a)(1)(A). Section 2(a)(36) of the ICA expressly

---

[30]  15 U.S.C. § 80a–3(a)(1)(A). Prior to the passage of the National Securities Markets Improvement Act of 1996, § 3(a)(1)(C) was designated as § 3(a)(1). *See* National Securities Markets Improvement Act of 1996, Pub. L. No. 104-290, 110 Stat. 3416, 3435.

[31]  GO Acquisition Corp., Quarterly Report (Form 10-Q), at 1, 8 (Aug. 17, 2021).

[32]  *See id.*

defines the term "security" to include, among other things, any share of "stock" (which covers the Company's shares of stock in money market funds) and any "bond, debenture, [or] evidence of indebtedness" (which covers the Company's holdings of government bonds). The ICA definition of a security also includes "any interest or instrument commonly known as a 'security,'" which covers both the Company's shares in money market funds and its holdings of government bonds.[33]

75.     The courts and the SEC have said many times that both U.S. government bonds[34] and shares of common stock in money market funds[35] are unambiguously "securities," not only under the ICA generally, but also specifically within the meaning of section 3(a)(1)(A).

## VI.     THE CONTRACTS BETWEEN THE COMPANY AND THE DEFENDANTS VIOLATE THE ICA

76.     The ICA contains many regulations that ensure the transparency, procedural fairness, and reasonableness of compensation an investment company pays to the outside sponsor

---

[33] 15 U.S.C. § 80a-2(a)(36).

[34] *See, e.g.*, *SEC v. Am. Bd. of Trade, Inc.*, 751 F.2d 529, 536 (2d Cir. 1984) (holding an issuer that invested solely in government securities to be an investment company under § 3(a)(1)(A)). *See also* Letter to Baker, Watts & Co. from the U.S. Sec. & Exch. Comm'n Div. of Investment Management, Fed. Sec. L. Rep. 77,225, 1982 WL 29238, at *1 ("[A]n issuer could invest exclusively in Government securities, thereby owning no investment securities, and yet be an investment company under section 3(a)(1)[A] of the Act."); Letter to Credit Suisse First Boston Corp. from the U.S. Sec. & Exch. Comm'n Div. of Investment Management, 1998 WL 799305, at *3 (Sept. 9, 1998) ("If a trust is engaged primarily in the business of investing in securities, it is an investment company even if it holds only government securities."); Letter to Financial Funding Group, Inc. from the U.S. Sec. & Exch. Comm'n Div. of Investment Management, 1982 WL 28965, at *1 (March 3, 1982) ("The fact that these securities may also be United States Government securities is irrelevant for purposes of section 3(a)(1)[A]."); Letter to Arizona Property Investors, Ltd. from the U.S. Sec. & Exch. Comm'n Div. of Investment Management, 1979 WL 14220 (Aug. 9, 1979) (treating as an investment company under section 3(a)(1)(A) a company that planned to temporarily invest solely in government securities while waiting to acquire interests in real estate); J.D. Gillespie, Tr. for Cleo George, 13 S.E.C. 470, 475 n.4 (1943) ("The broader term 'securities' used in section 3(a)(1)[A] obviously includes Government obligations.")

[35] Letter to Willkie Farr & Gallagher from the Office of Chief Counsel, U.S. Sec. & Exch. Comm'n Div. of Investment Management, at 7 (Oct. 23, 2000).

or investment adviser that dominates it. The compensation arrangements between the Company and the Defendants violate these regulations in several ways.

77.     The contracts that violate the ICA include the Class B Share Subscription Agreement by which the Sponsor Defendant purchased the Class B shares and the Company's Certificate of Incorporation to the extent it creates and establishes the economic and voting rights of the Class B shares. Collectively, these contracts between the Company, the Sponsor Defendant, and the Founder and Independent Director Defendants are referred to herein as the "Illegal Contracts." The formation and performance of these Illegal Contracts violated the ICA in several ways, including but not limited to the following.

78.     *First*, the Illegal Contracts all violate the ICA because they involve sales of securities without proper registration under the ICA by the Company. Section 7(a)(1) of the ICA provides that unless an investment company has duly registered with the SEC as an investment company under section 8 of the ICA, the investment company may not "offer for sale, sell, or deliver after sale, by the use of the mails or any means or instrumentality of interstate commerce, any security or any interest in a security, whether the issuer of such security is such investment company or another person."[36]  Because the Illegal Contracts involve the issuance of warrants  or shares of stock that qualify as "securities" and because the Company entered these contracts at a time when it had not registered with the SEC as an investment company under section 8 of the ICA, these contracts are illegal.

79.     *Second*, the Illegal Contracts violate sections 22(a) and 23(b) of the ICA, which prohibit an investment company from issuing shares of common stock for less than their net asset value. The Class B shares were issued to the Sponsor for just $0.002 per share even though shortly

---

[36] 15 U.S.C. § 80a-7(a)(1).

thereafter the IPO Units were issued to the public for $10 per unit. When the Class B shares convert to shares of Class A stock upon the Initial Business Combination, the effective price of the issuance of the Class A shares will be lower than the Company's net asset value.

80.     **Third**, the Founder and Independent Director Defendants entered the Illegal Contracts by virtue of positions they hold illegally. The Founder and Independent Director Defendants are all directors of the Company and the Illegal Contracts were designed to compensate them for their service as such.

81.     ICA section 16(a) provides, however, that "No person shall serve as a director of a registered investment company unless elected to that office by the holders of the outstanding voting securities of such company."[37] The Founder and Independent Director Defendants are all directors of the Company, but they were never elected by the holders of the shares of Class A common stock, even though these shares are "outstanding voting securities" of the Company. The Founder and Independent Director Defendants were elected solely by the Sponsor Defendant, which, by virtue of its status as the sole holder of the Class B shares, has the exclusive right to elect and remove the Company's directors prior to the Company's initial business combination.

82.     **Fourth,** the elements of the Certificate of Incorporation that establish these unequal voting rights for the Class B shares are illegal. Section 18(i) of the ICA requires that "every share of stock . . . issued" by an investment company like the Company "shall be a voting stock and have equal voting rights with every other outstanding voting stock."[38]

83.     **Finally**, all of the Illegal Contracts were made for illegal consideration. Sections 22(g) and 23(a) of the ICA provide that "[n]o registered [open- or closed-end] company shall issue

---

[37] 15 U.S.C. § 80a-16(a).

[38] 15 U.S.C. § 80a-18(i).

any of its securities . . . for services. . . ."[39]  Because the Defendants paid only a nominal amount for the securities they received from the Company, it is clear that these securities were paid to the Defendants as compensation for the services to be provided by the Defendants.

## VII.    THE PAYMENTS MADE TO THE DEFENDANTS BREACH THE DEFENDANTS' FIDUCIARY DUTIES

84.    The Founder and Independent Director Defendants have also breached their fiduciary duties with respect to the compensation and payments they have received from the Company. Section 36(b) of the ICA provides:

> For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.  An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.[40]

85.    This fiduciary duty is enforceable by an express private right of action.[41] This private right of action reaches any "compensation for services, or . . . payments of a material nature" granted to an "any . . . person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments."[42]

---

[39] 15 U.S.C. §§ 80a-22(g), 23(a).

[40] 15 U.S.C. § 80a-35(b).

[41] *Id.*

[42] *Id.*

86.     The persons enumerated in subsection (a) of section 36 include any "officer" or "director" of an investment company. Section 36(b) therefore applies to compensation paid and payments made to the Founder and Independent Director Defendants by virtue of their status as officers and directors.

87.     The payments made to the Independent Director Defendants include the issuance of the Class B shares to the Sponsor, which transferred those shares to the Independent Director Defendants for the same nominal price that the Sponsor Defendant originally paid to the Company to purchase the Class B shares.

88.     The payments made to the Founder Defendants also include the issuance of the Class B shares to the Sponsor, which the Founder Defendants will benefit from by virtue of their direct or indirect ownership of the Sponsor.

89.     The Founder and Independent Director Defendants each owe a fiduciary duty to the Company regarding compensation and payments received from the Company by virtue of section 36(b) of the ICA and their status as officers and directors of the Company under the common law of agency and the Delaware General Corporation Law.

90.     According to the Supreme Court and the Second Circuit, the fiduciary duty in section 36(b) prohibits any payment "that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."[43]

91.     The payments made by the Company to the Founder and Independent Director Defendants bear no reasonable relationship to the services rendered and could not have been the

---

[43] *Jones*, *supra*, at 346; *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 928 (2d Cir. 1982).

product of arm's length bargaining. Through the Sponsor, the Founder and Independent Director Defendants have received Class B shares or interests in Class B shares that could end up being worth more than a hundred million dollars for just two years of work and a nominal payment of just $25,000.

92.     The services provided by the Founder and Independent Director Defendants do not justify such an extraordinary level of compensation. Since its IPO in 2020, the Company has performed poorly. The Company has announced no material activities in more than a year. And the price of the Company's Class A common stock on the NYSE has underperformed the rest of the stock market, falling below the IPO price even though the public shareholders know they may eventually redeem for more than the IPO price and even though the S&P 500 index has risen since the Company's IPO by about 32%.[44]

### VIII.     HARM TO GO ACQUISITION INVESTORS; DAMAGES

93.     Each of the Illegal Contracts has injured the Company, the Plaintiff, and all other holders of Class A common stock and enriched the Defendants by granting the Defendants compensation and payments worth more than $100 million dollars.

94.     The Defendants collectively own shares that will constitute at least 20% of the total shares of common stock of the Company outstanding at the time of the Initial Business Combination and possibly far more. The Defendants' acquisition of these shares for a mere $25,000 represents a massive dilution of what the fair market value of 20% of the Company should be.

---

[44] These values reflect closing prices of the S&P 500 index and the GO Acquisition Class A common stock on August 19, 2021.

95.     The Class B shares were issued at the expense of the public Class A common stockholders of the Company. As the Company acknowledged in its prospectus, the holders of the Class A common stock "will experience immediate and substantial dilution" due to the issuance of the Class B shares.[45]

96.     The effect of all this dilution will be profound. Once the Company completes an Initial Business Combination, the value of the Company's investment must increase by 20% before the public shareholders even cover the cost of the Class B Shares—let alone the underwriting fees, the dilution from private stock offerings, the Sponsor Warrants, the Common Warrants, and the many other costs with which the Company will be burdened.

## IX.     DEMAND FUTILITY ALLEGATIONS

97.     Plaintiff is a current shareholder of the Company, was a shareholder of the Company at the time of the Defendants' wrongdoing alleged herein, and has been a shareholder of the Company at all times relevant herein.

98.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

99.     Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants because such demand is excused.

100.     Under section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), Plaintiff is entitled to bring this Action on behalf of the Company in the Plaintiff's right as a securityholder of the Company to redress the Defendants' breaches of their fiduciary duties with respect to the compensation and payments they have received from the Company. A claim brought under Section 36(b) of the ICA

---

[45] Prospectus, at 56.

does not require a complaining stockholder to make a demand on a company's board. *Daily Income Fund v. Fox*, 464 U.S. 523, 527-542 (1984).

101.    Under section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), Plaintiff is entitled to bring this action derivatively in the right and for the benefit of the Company to rescind the Illegal Contracts for having been made and performed in violation of the ICA.

102.    Demand upon the Board would be a futile and useless act with respect to section 47(b) and is therefore excused because each of the members of the Board is personally conflicted with respect to the institution of this suit.

103.     Demand would be a futile and useless act with regard to the Founder Defendants because of their interest in the Class B shares and the Sponsor Warrants. If this action is successful, the Founder Defendants stand to lose the value of their Class B shares.

104.     Demand would also be a futile and useless act with regard to the Independent Director Defendants because of their ownership of Class B shares. If this action is successful, the Independent Director Defendants stand to lose the value of their Class B shares.

105.    Demand on the Independent Director Defendants would also be a futile and useless act because the Independent Director Defendants are controlled by the Founder Defendants and reliant upon the Founder Defendants for their compensation. By virtue of the Sponsor's ownership of the Class B shares and their control over the Sponsor, the Founder Defendants may remove the Independent Director Defendants from the Board at any time. The Independent Director Defendants also received all of their compensation directly from the Sponsor Defendant in the form of the Class B shares granted to them by the Sponsor Defendant for nominal consideration. The Sponsor Defendant is controlled and directly or indirectly owned by the Founder Defendants.

## X.    CLASS ALLEGATIONS

106.    In addition to asserting derivative claims on behalf of the Company, Plaintiff, a stockholder in the Company, brings this action under section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), individually and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all record and beneficial holders of GO Acquisition Class A common stock, who hold such shares at the time of the filing of this action (except the Defendants herein, and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants) to redress the Defendants' breaches of fiduciary duties and other violations of law.

107.    This action is properly maintainable as a class action.

108.    A class action is superior to other available methods of fair and efficient adjudication of this controversy.

109.    The class is so numerous that joinder of all members is impracticable.  The number of class members is believed to be in the thousands, and they are likely scattered across the United States.  Moreover, damages suffered by individual class members may be small, making it overly expensive and burdensome for individual class members to pursue redress on their own.

110.    There are questions of law and fact which are common to all class members and which predominate over any questions affecting only individuals, including, without limitation:

> (a)    whether GO Acquisition is an investment company within the meaning of the ICA;
>
> (b)    the proper remedy for GO Acquisition's violations of the ICA;
>
> (c)    whether the Illegal Contracts have violated the ICA; and
>
> (d)    the existence and extent of any injury to the class or Plaintiff caused by any violations.

111.    Plaintiff's claims and defenses are typical of the claims and defenses of other class members and Plaintiff has no interests antagonistic or adverse to the interests of other class members.  Plaintiff will fairly and adequately protect the interests of the class.

112.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

113.    Defendants have acted in a manner that affects Plaintiff and all members of the class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the class as a whole.

114.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

### COUNT I
### DECLARATORY JUDGMENT

115.    Plaintiff realleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

116.    As a result of the facts described above, an actual, present, and justiciable controversy exists between Plaintiff and Defendants.

117.    Accordingly, Plaintiff seeks a declaration that the Company is an investment company within the meaning of the ICA.

## COUNT II
## <u>VIOLATION OF 15 U.S.C. § 80a-35(b)</u>

118.    Plaintiff realleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

119.    Plaintiff asserts this claim on behalf of the Company in the Plaintiff's right as a securityholder of the Company.

120.    Under section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the issuance of the Class B shares constitutes a breach of fiduciary duty with respect to the receipt of compensation for services or of payments of a material nature paid by the Company or its securityholders to the Founder and Independent Director Defendants.

121.    The Independent Director Defendants are liable for violations of ICA § 36(b) because they are directors of the Company.

122.    The Founder Defendants are liable for violations of ICA § 36(b) because they are directors and officers of the Company.

123.    The Class B shares constitute excessive compensation for services because they grant the Founder and Independent Director Defendants compensation that may be worth more than $100 million. The compensation represented by the Class B shares is so disproportionately large that it bears no reasonable relationship to any services rendered by the Founder and Independent Director Defendants and could not have been the product of arms'-length bargaining.

124.    The windfall to the Founder and Independent Director Defendants comes at the direct expense of the Company's Class A public shareholders.

125.    The Class B shares possessed by the Founder and Independent Director Defendants or their affiliates accordingly constitute a breach of the Founder and Independent Director Defendants' fiduciary duty.

## COUNT III
## <u>VIOLATION OF 15 U.S.C. § 80a-46(b)</u>

126.    Plaintiff realleges and incorporates the allegations of the paragraphs above as if fully set forth herein.

127.    Plaintiff asserts this claim derivatively, on behalf of the Company.

128.    Plaintiff also asserts this claim directly, in his capacity as a holder of the Company's Class A common stock, on behalf of himself and all record and beneficial holders of GO Acquisition Class A common stock, who hold such shares at the time of the filing of this action (except the Defendants herein, and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants).

129.    Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), provides:

(1) A contract that is made, or whose performance involves, a violation of this subchapter, or of any rule, regulation, or order thereunder, is unenforceable by either party (or by a nonparty to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this subchapter or of any rule, regulation, or order thereunder) unless a court finds that under the circumstances enforcement would produce a more equitable result than nonenforcement and would not be inconsistent with the purposes of this subchapter.

(2) To the extent that a contract described in paragraph (1) has been performed, a court may not deny rescission at the instance of any party unless such court finds that under the circumstances the denial of rescission would produce a more equitable result than its grant and would not be inconsistent with the purposes of this subchapter.

(3) This subsection shall not apply (A) to the lawful portion of a contract to the extent that it may be severed from the unlawful portion of the contract, or (B) to preclude recovery against any person for unjust enrichment.

130.    The Company is an "investment company" within the meaning of section 3(a)(1)(A) of the ICA.

131.    The Illegal Contracts are contracts whose making and performance involve violations of the ICA, including but not limited to sections 7(a)(1), 16(a), 18(i), and 22(g) or 23(a) of the ICA.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for a judgment as follows:

A.  Declaring that GO Acquisition is an investment company within the meaning of the ICA;

B.  Rescinding the Class B Share Subscription Agreement;

C.  Enjoining the Defendants from converting any Class B shares into Class A shares;

D.  Enjoining the Defendants from exercising any voting rights associated with their Class B shares;

E.  Rescinding the elements of the Certificate of Incorporation that establish the rights of the Class B shares;

F.  Ordering the return of all Class B shares to the Company;

G.  Declaring the Class B shares void and unenforceable;

H.  Awarding the Company damages for all compensation paid or payments of a material nature made by the Company to the Sponsor Defendant and the Founder and Independent Director Defendants in breach of the fiduciary duties owed by the Founder and Independent Director Defendants to the Company;

I.  Awarding the Company, the Plaintiff, and the plaintiff class pre-judgment and post-judgment interest, as well as reasonable attorneys' and expert witness' fees and other costs; and

J.  Awarding such other relief as this Court deems just and proper.

Dated: New York, New York
August 20, 2021

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

*/s/ Mark Lebovitch*

Mark Lebovitch
Daniel E. Meyer
Joseph W. Caputo (Bar Admission Pending)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1519
Facsimile: (212) 554-1444
E-mail: MarkL@blbglaw.com

Gregory V. Varallo
500 Delaware Avenue
Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3601
E-mail: Greg.Varallo@blbglaw.com

**SUSMAN GODFREY L.L.P.**

Shawn J. Rabin
Stephen Shackelford
Cory Buland
Beatrice Franklin
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
E-mail: SRabin@susmangodfrey.com

**BUZIN LAW, P.C.**

Robert J. Jackson, Jr. (*pro hac vice forthcoming*)
John Morley (*pro hac vice forthcoming*)
111 Broadway, Suite 1204
New York, NY 10006
Telephone: (914) 819-7527
E-mail: john.morley@yale.edu

**RM LAW, P.C.**

Richard A. Maniskas
1055 Westlakes Dr., Ste. 300
Berwyn, PA 19312
Telephone: (484) 258-1585
Facsimile: (484) 631-1305
E-mail: rm@rmclasslaw.com