**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| GEORGE ASSAD, directly on behalf of himself and all others similarly situated, and derivatively on behalf of GO ACQUISITION CORP., <br><br>                Plaintiff, <br> v. <br><br> GO ACQUISITION CORP., <br><br>              Nominal Defendant, <br> v. <br><br> GO ACQUISITION FOUNDER LLC, NOAM GOTTESMAN, M. GREGORY O'HARA, JEREMY ISAACS, GILBERT AHYE, AND NORMA CORIO, <br><br>            Defendants. | Case No. 1:21-cv-07076-JPC-JPL |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

**<u>TABLE OF CONTENTS</u>**

**Page**

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND .............................................................................................................. 2

      A.     GO Acquisition Holdings ................................................................................2

      B.     GO's Capital Structure ...................................................................................3

      C.     GO's Trust Account Holdings .........................................................................4

      D.     GO's Pursuit Of A Business Combination ......................................................5

      E.     Plaintiff's Claims ...........................................................................................6

ARGUMENT ................................................................................................................... 6

I.     ALL OF PLAINTIFF'S CLAIMS MUST BE DISMISSED AS UNTIMELY ..................... 6

II.    ALL OF PLAINTIFF'S CLAIMS MUST BE DISMISSED BECAUSE THE
       COMPLAINT DOES NOT PLAUSIBLY PLEAD THAT GO IS AN INVESTMENT
       COMPANY UNDER SECTION 3(A)(1)(A) ......................................................... 10

      A.     GO Is Not An Investment Company Under The Plain Language Of  Section
                  3(a)(1)(A) ...................................................................................................10

      B.     Application Of The SEC's *Tonopah Mining* Factors Further Demonstrates
                  That GO Is Not "Primarily" Engaged In The Business Of "Investing,
                  Reinvesting, Or Trading Securities" ............................................................13

III.   PLAINTIFF'S SECTION 47(B) CLAIM MUST BE DISMISSED FOR LACK OF
       STANDING AND FAILURE TO PLEAD PREDICATE ICA VIOLATIONS .................. 20

      A.     Plaintiff Cannot Pursue His Claims For Rescission Directly .....................20

      B.     Plaintiff Does Not Have Derivative Standing ...........................................20

            1.    Plaintiff Fails To Plead Contemporaneous Ownership ................................ 20
            2.    Plaintiff Fails To Specifically Plead Demand Futility ................................. 21

      C.     Plaintiff Fails To Adequately Plead Predicate Violations of the ICA ......................23

IV.  PLAINTIFF'S SECTION 36(B) CLAIM MUST BE DISMISSED FOR FAILURE
       TO PLEAD DISPROPORTIONATE FEES ........................................................ 25

CONCLUSION.............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*118 E. 60th Owners v. Bonner Props.*,
   677 F.2d 200 (2d Cir. 1982)......................................................................................................9

*AHW Inv. P'ship v. Citigroup, Inc.*,
   806 F.3d 695 (2d Cir. 2015).....................................................................................................20

*In re AllianceBernstein Mut. Fund Excess. Fee Litig.*,
   2006 WL 74439 (S.D.N.Y. Jan. 11, 2006) ...............................................................................7

*Bailey v. United States*,
   516 U.S. 137 (1995)................................................................................................................12

*In re Bank of N.Y. Deriv. Litig.*,
   320 F.3d 291 (2d Cir. 2003)..............................................................................................20, 21

*Beam v. Stewart*,
   845 A.2d 1040 (Del. 2004) .....................................................................................................23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................................6, 17

*Bellikoff v. Eaton Vance Corp.*,
   481 F.3d 110 (2d Cir. 2007)....................................................................................................25

*Blatt v. Merrill Lynch, Pierce, Fenner & Smith*,
   916 F. Supp. 1343 (D.N.J. 1993) .............................................................................................9

*Brookfield Asset Mgmt. v. Rosson*,
   2021 WL 4260639 (Del. Sep. 20, 2021) .................................................................................20

*Burks v. Lasker*,
   441 U.S. 471 (1979)................................................................................................................20

*Chevron Corp. v. Naranjo*,
   667 F.3d 232 (2d Cir. 2012)....................................................................................................10

*In re Gartenberg*,
   636 F.2d 16 (2d Cir. 1980)........................................................................................................7

*Geller Biopharm, Inc. v. Amunix Pharm., Inc.*,
   2021 WL 4155015 (S.D.N.Y. Sept. 13, 2021).........................................................................2

*In re GM Class H S'holders Litig.*,
    734 A.2d 611 (Del. Ch. 1999)..............................................................................22

*In re GoPro, Inc. S'holder Deriv. Litig.*,
    2020 WL 2036602 (Ch. Apr. 28, 2020)................................................................22

*Harris v. Mills*,
    572 F.3d 66 (2d Cir. 2009)....................................................................................6

*Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co.*,
    677 F.3d 178 (3d Cir. 2012)................................................................................10

*Kahn v. Kohlberg, Kravis, Roberts & Co.*,
    970 F.2d 1030 (2d Cir. 1992)............................................................................8, 9

*Kamen v. Kemper Fin. Servs.*,
    500 U.S. 90 (1991)..............................................................................................22

*Keene Corp. v. United States.*,
    508 U.S. 200 (1993)............................................................................................12

*Kermanshah v. Kermanshah*,
    580 F. Supp. 2d 247 (S.D.N.Y. 2008).................................................................10

*Krinsk v. Fund Asset Mgmt., Inc.*,
    1986 WL 205, (S.D.N.Y. May 9, 1986) ................................................................7

*Krinsk v. Fund Asset Mgmt., Inc.*,
    875 F.2d 404 (2d Cir. 1989)..................................................................................7

*Menowitz v. Brown*,
    991 F.2d 36 (2d Cir. 1993)....................................................................................8

*Mgmt. Assistance Inc. v. Edelman*,
    584 F. Supp. 1021 (S.D.N.Y. 1984).....................................................................16

*Moses v. Black*,
    1981 WL 1599 (S.D.N.Y. 1981).....................................................................12, 13

*Northstar Fin. Advs. v. Schwab Invs.*,
    904 F.3d 821 (9th Cir. 2018) ..............................................................................10

*Oxford Univ. Bank v. Lansuppe Feeder, LLC*,
    933 F.3d 99 (2d Cir. 2019)..............................................................................23, 24

*Phoenix Four, Inc. v. Strategic Res. Corp.*,
    2006 WL 399396 (S.D.N.Y. Feb. 21, 2006).......................................................8, 9

*Ruiz v. New Avon LLC*,
  2019 WL 4601847, at *10 (S.D.N.Y. Sept. 22, 2019) ............................................2

*Ryan v. Gursahaney*,
  2015 WL 1915911 (Ch. Apr. 28, 2015) ..............................................................22

*SEC v. Fifth Ave. Coach Lines, Inc.*,
  289 F. Supp. 3 (S.D.N.Y. 1968), *aff'd*, 435 F.2d 510 (2d Cir. 1970) ..................11, 14, 16, 17

*SEC v. Fiore*,
  416 F. Supp. 3d 306 (S.D.N.Y. 2019) ........................................................13, 16, 18

*SEC v. Nat'l Presto Indus., Inc.*,
  486 F.3d 305 (7th Cir. 2007) ...................................................................... *passim*

*Tilden v. Cunningham*,
  2018 WL 5307706 (Del. Ch. Oct. 26, 2018) .......................................................23

*Ucar Int'l v. Union Carbide Corp.*,
  2004 WL 137073 (S.D.N.Y. Jan. 26, 2004) ........................................................21

*United Food & Commer. Workers Union v. Zuckerberg*,
  2021 WL 4344361 (Sep. 23, 2021) ...............................................................21, 22

*United States v. Zukerman*,
  897 F.3d 423 (2d Cir. 2018) ...........................................................................13

*In re WorldCom, Inc. Sec. Litig.*,
  294 F. Supp. 2d 431, (S.D.N.Y. 2003) ................................................................9

*Zamora v. FIT Int'l Grp. Corp.*,
  834 F. App'x 622 (2d Cir. 2020) .....................................................................17

**Exemptive Orders and No-Action Materials**

*Fla. First Equities Corp.*,
  SEC No-Action Letter, Fed. Sec. L. Rep. P 76,703, 1980 WL 14869 (Sept. 11,
  1980) .................................................................................................18

*In re Daxor Corp.*,
  Investment Co. Act Release No. 29417, 2010 WL 3615547 (Sept. 17, 2010) ........................19

*In re Lyft, Inc.*,
  Release No. IC – 33442, 2019 WL 1529627, (April 8, 2019) ................................18

*In re Snowflake, Inc.*,
  Release No. IC – 34049 (October 9, 2020) .............................................................18

*In re Snowflake, Inc.*,
  Release No. IC – 34085 (November 4, 2020)..........................................................18

*In re Tonopah Mining Co. of Nev.*,
  Investment Co. Act Release No. 1084, 26 SEC Docket 426 (July 22, 1947)........13, 14, 16, 19

*Int'l Mining Corp.*,
  SEC Investment Co. Act Release No. 2872, May 1, 1959 ...............................18, 19

*Medidentic Mtge. Investors*,
  SEC No-Action Letter, Fed. Sec. L. Rep. P 77,665, 1984 WL 45320 (May 23,
  1984) ...........................................................................................................................17

*Peavey Commodity Futures Fund I, II, III*,
  Fed. Sec. L. Rep. ¶ 77,511, 1983 WL 28438 (June 2, 1983)..................................16

*Upstart Holdings Inc.*,
  Release No. IC – 34124, 2020 WL 7054861 (Dec. 1, 2020)....................................18

*Willkie Farr & Gallagher*,
  SEC No-Action Letter, 2000 WL 1585635 (Oct. 23, 2000)....................................11

**Statutes and Regulations**

15 U.S.C. § 80a ...............................................................................................*passim*

17 C.F.R. § 274.11A ................................................................................................3

28 U.S.C. § 1658(b) .................................................................................................9

Investment Advisers Act of 1940 .............................................................................8

Investment Company Act of 1940 ..................................................................*passim*

Securities Act of 1933...........................................................................................7, 8

**Other Authorities**

Federal Rule of Civil Procedure 23.1 ...............................................................20, 21

Sen. Rep. No. 1775, 76th Cong., 3d Sess. 6 (1940)...............................................13

GO Acquisition Corp. ("GO" or the "Company"), GO Acquisition Founder LLC ("Sponsor"), Noam Gottesman, M. Gregory O'Hara, Jeremy Isaacs, Gilbert Ahye, and Norma Corio (collectively, "Defendants") respectfully submit this brief in support of their motion to dismiss Plaintiff George Assad's Verified Direct and Derivative Complaint ("Complaint").

## PRELIMINARY STATEMENT

Plaintiff asserts the novel legal theory that GO—a special purpose acquisition company, or SPAC—is an "investment company" under the Investment Company Act of 1940 ("ICA"). In the past twenty years, the Securities and Exchange Commission ("SEC")—which enforces the ICA—has declared effective the registration statements of well over one thousand SPACs (including GO) and reviewed the proxies and/or registration statements for hundreds of SPAC business combination transactions, without once concluding that the SPAC should have registered as an "investment company." The reason is clear: SPACs like GO are not primarily engaged in the investment business. Plaintiff cannot plausibly plead otherwise.

GO raised money from public investors to pursue a business combination with a private operating company, thereby taking the operating company public. This is GO's *raison d'être*. While it pursues a business combination, GO is required by the New York Stock Exchange to hold public investors' assets in a "trust account." Like many SPACs, GO holds its investors' money in government securities—185-day maturity Treasuries—pending its business combination.

Plaintiff ignores GO's stated business purpose and contends that GO is an investment company because "investing in securities is basically the only thing [GO] has ever done." Compl. ¶¶ 3, 7, 10, 71. Plaintiff then asks the Court to invalidate GO's Class B share structure—the shares issued to GO's Sponsor and founders—because such equity compensation arrangements (common for SPACs) are "excessive" for investment companies (which GO is not).

Plaintiff's claims fail for multiple reasons.  ***First***, as a threshold matter, all of Plaintiff's claims are untimely under the applicable one-year statutes of limitations because Plaintiff did not file this action until August 20, 2021, more than one year after the purportedly excessive compensation was received and all operative facts were fully disclosed to investors, including Plaintiff, through GO's August 4, 2020 IPO Prospectus.

***Second***, all of Plaintiff's claims are subject to dismissal because Plaintiff has not plausibly pleaded that GO is an ICA investment company.  The statute's plain language and its interpretation by courts and the SEC confirm that a SPAC like GO that holds itself out as being engaged in the business of identifying a prospective acquisition target is *not* an investment company.  Nor does temporarily parking IPO proceeds in a NYSE-required trust account holding government securities for a finite period until it consummates an initial business combination—the central basis for Plaintiff's claim—transform GO into one.  No reasonable investor would mistake such holdings as an investment vehicle, let alone conclude that managing them is GO's primary business.

***Finally***, Plaintiff fails to state ICA §§ 47(b) and 36(b) claims for a multitude of reasons.  His Section 47(b) claim for rescission is quintessentially derivative, and, having purchased his shares *after* the purportedly excessive compensation was fully disclosed, Plaintiff has failed to plead contemporaneous ownership and demand futility.  Moreover, he has failed to plead facts sufficient to show predicate violations of the ICA for either Section 47(b) or 36(b).

## **BACKGROUND**[1]

### A.   **GO Acquisition Holdings**

GO (referred to in the Complaint as the "Nominal Defendant") was incorporated in

---

[1]  The following background is taken from the Complaint, publicly available materials, and documents cited, quoted, or referenced in the Complaint, all of which may be considered on a motion to dismiss.  *See, e.g.*, *Geller Biopharm, Inc. v. Amunix Pharm., Inc.*, 2021 WL 4155015, at *1 (S.D.N.Y. Sept. 13, 2021); *Ruiz v. New Avon LLC*, 2019 WL

Delaware on June 12, 2020 as a special purpose acquisition company ("SPAC").  *Id.* ¶¶ 20, 29.

GO filed its Registration Statement ("RS") with the SEC on June 30, 2020 and an initial public

offering Prospectus ("Prospectus") on August 4, 2020.  Compl. ¶ 30; Ex. 1 (GO RS), Ex. 2 (GO

Prospectus).[2]  GO's RS was filed on Form S-1, not on a special form used for investment company

registration.  *See, e.g.*, 17 C.F.R. § 274.11A.  The SEC declared GO's RS effective on August 4,

2020, and the Company began trading on the New York Stock Exchange ("NYSE") under the

symbol "GOAC" on August 5, 2020.  *See* Ex. 3 (GO Notice of Effectiveness); Ex. 2 (GO

Prospectus) at cover.

GO's RS and Prospectus begin by explaining that "[GO] is newly incorporated for the

purpose of effecting a merger . . . or similar business combination with one or more businesses or

entities, which we refer to as our initial business combination."  *See* Compl. ¶ 31; Ex. 1 (GO RS)

at 2; Ex. 2 (GO Prospectus) at cover, 2.[3]  GO continues to explain that "we intend to focus our

efforts on travel-related and travel-adjacent businesses with either all or a substantial portion of

their activities in North America or Europe."  *Id.*  GO's Certificate of Incorporation ("COI")

confirms that GO's purpose is to "effect[] a merger, capital stock exchange, asset acquisition, stock

purchase, reorganization or similar business combination, involving the Corporation and one or

more businesses."  Ex. 4 (GO COI) at Art. II.

### B.    GO's Capital Structure

GO's IPO raised $575 million on August 7 and 21, 2021 through the sale of 57.5 million

---

4601847, at *10 (S.D.N.Y. Sept. 22, 2019) ("A complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference. . . .  A court may also consider any matters that are subject to judicial notice, including publicly filed documents." (internal citations omitted)).

[2]  References to "Ex. __" are to the exhibits appended to the Declaration of Matthew S. Dontzin, filed herewith.

[3]  The SEC describes a SPAC as "a company *with no operations* that offers securities for cash and places substantially all the offering proceeds into a trust or escrow account *for future use in the acquisition of one or more private operating companies.*" Division of Corporation Finance, SEC CF Disclosure Guidance: Topic No. 11 (Dec. 22, 2020): Special Purpose Acquisition Companies (emphasis added).

Units (each a Class A share and 1/3 of a warrant) at a price of $10 each.  Compl. ¶¶ 32, 35.

GO is sponsored by Defendant GO Acquisition Founder LLC ("Sponsor").  Defendants Noam Gottesman and Gregory O'Hara, the Co-CEOs and Directors of GO (referred to in the Complaint as the "Founder Defendants") manage the Sponsor and "directly or indirectly own its equity."  *Id.*  ¶¶ 22–23, 27, 41.  Pursuant to the June 22, 2020 Class B Share Subscription Agreement, Sponsor invested $13,525,000, receiving 14,375,000 Class B shares (which convert 1:1 to Class A shares only if GO completes a business combination) and 9,000,000 warrants.  *Id.* ¶¶ 9, 36, 42, 66; Ex. 2 (GO Prospectus) at 9, 13, 76.

In July 2020, GO Sponsor transferred 25,000 Class B shares to each of GO's other directors, Jeremy Isaacs, Gilbert Ahye, and Norma Corio (identified in the Complaint as the "Independent Director Defendants").  Compl. ¶¶ 24–26, 28, 42–43; Ex. 2 (GO Prospectus) at 76.

### C.   GO's Trust Account Holdings

GO's $575 million IPO proceeds were "deposited into a segregated trust account" (the "Trust Account") "located in the United States at J.P. Morgan Chase Bank, N.A., with Continental Stock Transfer & Trust Company, acting as trustee," in accordance with NYSE Listing Rules, its Investment Management Trust Agreement ("Trust Agreement"), and its IPO disclosures.  Compl. ¶ 37; Ex. 2 (GO Prospectus) at cover, 17–18; NYSE Listed Company Manual; Ex. 5 (Trust Agreement).[4]  Neither GO nor its stockholders have access to the proceeds held in the Trust Account, nor do they receive any proceeds or returns from the Trust Account, while GO pursues a business combination.  *Id.*

---

[4]  Under the Trust Agreement, the trustee may only "invest and reinvest the Property solely in [U.S.] government securities within the meaning of Section 2(a)(16) of the Investment Company Act of 1940 . . . having a maturity of 185 days or less, or in money market funds meeting the conditions of paragraphs (d)(1), (d)(2), (d)(3) and (d)(4) of Rule 2a-7 promulgated under the Investment Company Act of 1940, as amended (or any successor rule), which invest only in direct U.S. government treasury obligations, as determined by the Company[.]"  Ex. 1 (GO RS) at ex. 10.1.

Importantly, all Class A shares will be redeemed for the cash in the Trust Account if GO does not complete a business combination in the next 10 months, and when GO does complete a business combination, investors also have the option to redeem their shares at the IPO price of $10 per share from the Trust Account at the time of the combination.  *See* Ex. 2 (GO Prospectus) at cover, 14, 20–22.  Accordingly, as GO disclosed, the Trust Account is "a holding place for funds pending" a business combination or redemption, and "not intended for persons who are seeking a return on investments in government securities or investment securities."  *Id.* at cover, 41.  Funds deposited into the Trust Account in August 2020 have been held in 185-day Treasuries and cash; the value of the Trust Account has increased only 0.06%.  *See* Ex. 6 (GO Form 10-KA) at F-6; Ex. 7 (GO Form 10-Q) at 1.

### D.     GO's Pursuit Of A Business Combination

After its IPO, GO "beg[a]n the process of pursuing and reviewing potential opportunities" for a business combination transaction.  Ex. 2 (GO Prospectus) at 4; *see also* Ex. 8 (Form 10-Q) at 5.  Per NYSE Listing Rules, GO must acquire one or more target businesses that constitute an "aggregate fair market value of at least 80% of the net assets held in the trust account."  Ex. 2 (GO Prospectus) at 5; NYSE Manual, 102.06.  If GO enters into a business combination, shareholders may vote for or against the transaction, and will also have a right to "redeem all or a portion of their Class A common stock," or none.  Ex. 2 (GO Prospectus) at 20–22; NYSE Manual, 102.06.  Only if GO consummates a business combination will the Sponsor's Class B shares convert to Class A shares.  *See* Ex. 2 (GO Prospectus) at cover, 15, 21–22, 100, 121; Ex. 4 (GO COI) at § 9.2(f).

GO has 10 months from today remaining to announce an initial business combination.  If it does not, GO must, pursuant to its COI, liquidate and "redeem 100% of the public shares" from the Trust Account.  Ex. 2 (GO Prospectus) at 100, cover.  In the event of liquidation, public

shareholders will receive the full value of their shares, while GO Sponsor will lose its entire investment of $13,500,000. *See id.* at 51; Compl. ¶ 36.

### E. Plaintiff's Claims

Plaintiff purports to be an investor in GO (Compl. ¶ 19) and like all GO investors, purchased GO shares with constructive knowledge of all the relevant facts regarding the "Illegal Contracts," GO's Class B share structure, and GO's planned use of the Trust Account. Ex. 2 (GO Prospectus) at 16, 104; Compl. ¶¶ 31 n.4, 42. Plaintiff asserts three claims:

- Count I: Seeks a declaration that GO is an "investment company" within the meaning of the ICA. *Id.* ¶¶ 70–75; 115–117; *see also id.* 10.

- Count II: Premised on GO being subject to the ICA, a derivative claim against GO's directors for breach of fiduciary duty in violation of ICA § 80a-36(b) due to "excessive compensation" in the form of the Class B shares. Compl. ¶¶ 118–125.

- Count III: Premised on GO being subject to the ICA, derivative, and direct claims for rescission of the June 22, 2020 Class B Share Subscription Agreement and the COI) as "Illegal Contracts" voidable under ICA § 80a-46(b) *Id.* ¶¶ 77, 126–131.

## ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "plausible" factual allegations, taken as true, which "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court need not accept "'legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## I.   ALL OF PLAINTIFF'S CLAIMS MUST BE DISMISSED AS UNTIMELY

This action was indisputably filed on August 20, 2021, more than one year *after* (1) the Class B shares, which Plaintiff alleges constitutes excessive compensation actionable under Section 36(b), were received; (2) GO's June 22 and August 4, 2020 entry into the purportedly

Illegal Contracts Plaintiff now seeks to rescind pursuant to Section 47(b); and (3) GO's full disclosure all of the facts underpinning his claims in its August 4, 2020 IPO Prospectus. *See* Compl. ¶¶ 31, 42, 87–88, 120; Ex. 2 (GO Prospectus) at 13–15. Plaintiff's claims are untimely.

**Section 36(b)**: "Section 36(b) has a built-in one year statute of limitations." *In re Gartenberg*, 636 F.2d 16, 18 (2d Cir. 1980). "Congress [did not] intend[] to create a broad remedy under Section 36(b) but rather a mechanism whereby the *current level of management fees* would be policed, tested and, if necessary, rectified." *Krinsk v. Fund Asset Mgmt., Inc.*, 1986 WL 205, at *4 (S.D.N.Y. May 9, 1986), *aff'd*, 875 F.2d 404, 413 (2d Cir. 1989)). It provides that "[n]o award of damages shall be recoverable for any period prior to one year before the action was instituted" and that damages are limited to "compensation or payments received" within this one year period. 15 U.S.C. § 80a-35(b)(3). Section 36(b) claims are subject to dismissal where, as here, the compensation at issue was received more than one year prior to the lawsuit. *See, e.g., In re AllianceBernstein Mut. Fund Excess. Fee Litig.*, 2006 WL 74439, at *2 (S.D.N.Y. Jan. 11, 2006) (action untimely where plaintiff failed to identify excessive advisory fees received in the year prior to filing of lawsuit). The Complaint alleges that the "the issuance of the Class B shares constitutes a breach of fiduciary duty with respect to the receipt of compensation." Compl. ¶ 120. The Class B shares were issued on June 22, 2020, and the Sponsor Defendant transferred 25,000 Class B shares to the Independent Directors in July 2020, more than one year prior to the filing of this action. Compl. ¶¶ 42, 43, 87–88.

**Section 47(b)**: Section 47(b) claims are likewise subject to a one-year statute of limitations, borrowed from the limitations period applicable to non-fraud based claims under the Securities Act of 1933—*i.e.*, the lesser of one year from the date of discovery or three years from the date of the violation—because the ICA does not provide an express limitations period. *See,*

*e.g., Phoenix Four, Inc. v. Strategic Res. Corp.*, 2006 WL 399396, at *5–6 (S.D.N.Y. Feb. 21, 2006) (collecting cases).  Courts apply the reasoning set forth in the Second Circuit's decision in *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1033 (2d Cir. 1992), which involved a similar rescission provision under the Investment Advisers Act of 1940 ("IAA").  The Second Circuit looked to the Securities Act because: (i) the limitations period should be uniform; (ii) the Securities Act regulates interstate commerce; and (iii) the Securities Act limitations period provides a better "fit" for the IAA than state law claims because both federal statutes regulate the integrity of securities markets.  *Id*. at 1036–37.  *Kahn* further recognized that these considerations apply equally in the context of the ICA, noting that the one year period in Section 36(b) of the ICA supports application of a one year limitations period under the IAA because Section "36(b) focuses on the analogous relationship, involves the same policy concerns, and provides for a similar restitutionary remedy."  *Id.* at 1038.

A claim for rescission accrues when the allegedly unlawful contract is entered into and the plaintiff "knew or should have known the basis for the claims."  *Id.* at 1040; *Phoenix Four*, 2006 WL 399396, at *6 ("an action for rescission accrues when the contract is executed").  Here, the Subscription Agreement was entered into on June 22, 2020, Compl. ¶ 42, and the COI is dated August 4, 2020, *id.* ¶ 31 n.4 (citing Form 8-K which attaches COI dated August 4, 2020).  *See* Ex. 9 (GO Subscription Agreement).  Moreover, Plaintiff was "placed on inquiry notice of [his] claims by the very SEC-mandated disclosure documents [he] rel[ies] upon in [his] complaint[]."  *See Menowitz v. Brown*, 991 F.2d 36, 42 (2d Cir. 1993).  He knew, or should have known, of all of the predicate violations of the ICA when GO filed the Prospectus on August 4, 2020.  For example, the limitations period applicable to Plaintiff's alleged violation of ICA § 7(a)(1) for failure to register as an investment company clearly began to run on the date that GO offered securities for

sale—August 4, 2020—because such failure is plain on the face of the Prospectus.  *See Kahn*, 970 F.2d at 1038; *Blatt v. Merrill Lynch, Pierce, Fenner & Smith*, 916 F. Supp. 1343, 1354 n.8 (D.N.J. 1993) (prospectus put investor on notice of ICA claims relating to failure to register).  Similarly, Plaintiff's other alleged violations of ICA §§ 16(a) (director election by all voting shares), 18(i) (equal voting rights), and 22(g) and 23 (limitations on issuance of securities as compensation) are all predicated on facts disclosed in the Prospectus, namely that the holders of Class B shares alone had the power to elect members of the board prior to any business combination and the terms of the purportedly Illegal Contracts.  Ex. 2 (GO Prospectus) at 16, 104.

If Plaintiff argues, as he did in his pre-motion letter, that the two-year limitations period set forth in 28 U.S.C. § 1658(b) applies, he would be wrong.  That limitations period is applicable to "a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws." 28 U.S.C. § 1658(b).  *See Phoenix Four*, 2006 WL 399396, at *6 (rejecting argument that 28 U.S.C. § 1658(b) applies to non-fraud claims under the ICA); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 442 (S.D.N.Y. 2003) ("In the context of the securities laws, 'deceit,' 'manipulation' and 'contrivance' refer to securities fraud."), *vacated on other grounds*, 496 F.3d 245 (2d. Cir. 2007).  Here, there are no allegations of fraud. The continuing wrong doctrine similarly does not help Plaintiff because the harm caused by an allegedly unlawful contract occurs when that contract is entered into—and that harm occurred here more than one year ago.  *Kahn*, 970 F.2d at 1041.

**Declaratory Judgment**:  A declaratory judgment claim is subject to dismissal as untimely along with the underlying substantive claims upon which it is premised.  *See, e.g.*, *118 E. 60th Owners v. Bonner Props.*, 677 F.2d 200, 202 (2d Cir. 1982) (when "claims for affirmative relief are time-barred [plaintiff] likewise can secure no declaration of entitlement to such relief");

9

*Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 268 (S.D.N.Y. 2008) (collecting cases).  Here, where Plaintiff's substantive claims are untimely, his declaratory judgment claim is also untimely.

## II.   ALL OF PLAINTIFF'S CLAIMS MUST BE DISMISSED BECAUSE THE COMPLAINT DOES NOT PLAUSIBLY PLEAD THAT GO IS AN INVESTMENT COMPANY UNDER SECTION 3(A)(1)(A)

Each of Plaintiff's claims is predicated on this Court declaring that GO is an investment company subject to the ICA.[5]  To avoid dismissal, Plaintiff must plausibly allege an entitlement to relief on an underlying substantive claim.  *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012) (requiring a "valid legal predicate").  Plaintiff has not done so here.  Plaintiff's chief allegation is that GO became an investment company by temporarily parking its assets in government securities while pursuing an acquisition target—as GO promised to do for the sole purpose of protecting investors' capital during that limited window.  *See* Ex. 2 (GO Prospectus) at 41.  This comes nowhere close to plausibly pleading that GO qualifies as an investment company.

### A.   GO Is Not An Investment Company Under The Plain Language Of Section 3(a)(1)(A)

By its plain language, Section 3(a)(1)(A), commonly referred to as the "orthodox" investment company test, applies to an issuer who "is or holds itself out as being primarily engaged . . . in the business of investing, reinvesting, or trading in securities."  Plaintiff concedes that GO does not "hold itself out" as an investment company.  Instead, Plaintiff argues that GO "is" in fact an investment company because, through its trust account holdings, "investing in

---

[5]  Plaintiff's pursuit of private litigation to declare that GO is an investment company and then deploy the ICA's statutory machinery to dismantle the sponsor economics central to its SPAC model is an unprecedented expansion of the narrow private rights of action that have been permitted by the Courts under ICA Sections 36(b) and 47(b).  The flaws in Plaintiff's Complaint are almost too numerous to catalogue.  Given Plaintiff's clear pleading failures, and in light of Second Circuit case law sanctioning certain private actions under these provisions, Defendants expressly preserve, but do not further address, arguments related to why private litigation by vigilante investors seeking to reform SPACs is fundamentally inconsistent with Congress's intent and should not be countenanced by the courts.  *See, e.g., Northstar Fin. Advs. v. Schwab Invs.*, 904 F.3d 821 (9th Cir. 2018); *Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co.*, 677 F.3d 178 (3d Cir. 2012).

securities is all [GO] has ever done." Compl. ¶¶ 7, 10, 71. This simplistic interpretation ignores key statutory language and the overall statutory scheme.

*First*, in focusing on GO's Trust Account holdings, Plaintiff ignores that Section (3)(a)(1)(A) applies only to an issuer that is "engaged ***primarily*** . . . in the business of investing, reinvesting, or trading in securities." As this court has long recognized, "[t]he key word" in Section 3(a)(1)(A) is "***primarily***." *SEC v. Fifth Ave. Coach Lines, Inc.*, 289 F. Supp. 3, 268 (S.D.N.Y. 1968), *aff'd*, 435 F.2d 510 (2d Cir. 1970) (emphasis added); *see also* Willkie Farr & Gallagher, SEC No-Action Letter, 2000 WL 1585635 (Oct. 23, 2000) ("[A]n issuer's 'primary engagement' remains a benchmark for determining whether the issuer is an investment company for purposes of section 3(a)(1)(A)."). Plaintiff ignores GO's COI and GO's disclosures stating in unambiguous terms that GO has the primary "purpose of effecting a merger . . . or similar business combination," Ex. 2 (GO Prospectus) at cover, 2, 73, 79, and instead focuses exclusively on an unquestionably collateral facet of its structure, the NYSE-required Trust Account. But GO's temporary holding of Government securities (which, as discussed below, still does not render an issuer an investment company under Section 3(a)(1)(A)), is incidental to GO's primary purpose of consummating a business combination transaction. GO did not solicit investors based on representations that it would invest their money in short-term government securities to earn a (minimal) return. To the contrary, the Prospectus explicitly states that GO utilizes the Trust Account only "as a holding place for funds pending" a business combination or redemption, and that it is "not intended for persons who are seeking a return on investments in government securities or investment securities." *Id.* at cover, 41.

*Second*, Plaintiff's argument that GO's Trust Account holdings transform GO into an investment company under Section 3(a)(1)(A) ignores a key distinction between Section

11

3(a)(1)(A)'s orthodox investment company test and the so-called "inadvertent investment company" test under Section 3(a)(1)(C). Section 3(a)(1)(C) applies to an issuer that "engage[s] in the business of investing, reinvesting, **owning, holding**, or trading in securities." 15 U.S.C. § 80a-3(a)(1)(C) (emphasis added).[6]   By contrast, Section 3(a)(1)(A) omits the words "owning" and "holding," and applies only to an issuer "primarily engaged . . . in the business of **investing, reinvesting, or trading** in securities." 15 U.S.C. § 80a-3(a)(1)(A) (emphasis added). Plaintiff asks the Court to import "owning" and "holding" from Section 3(a)(1)(C) into Section 3(a)(1)(A) to find an issuer that has deliberately adopted a trust structure solely as a protective holding mechanism while it pursues another opportunity to be an investment company.

Plaintiff's claim that GO is an investment company is therefore contrary to fundamental principles of statutory interpretation, including that statutes must be read as a whole and that "where Congress includes particular language in one section of a statute but omits it in another . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States.*, 508 U.S. 200, 208 (1993); *see also Bailey v. United States*, 516 U.S. 137, 146 (1995). The Court must presume that, by including "owning" and "holding," Congress intended Section 3(a)(1)(C) to reach a broader set of activities than Section

---

[6] This would be the obvious test to apply to an entity that does not promote itself as an investment company but merely holds securities in trust while pursuing a business combination. It looks at whether an issuer (i) has made investments and (ii) then applies an objective, quantitative test comparing the issuer's "investment securities" to the issuer's total assets. If more than 40% of an issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis are "investment securities," the issuer is deemed an investment company. Plaintiff concedes that GO is not an investment company under the Section 3(a)(1)(C). This is because the Section 3(a)(1)(C) threshold expressly excludes "government securities" from the definition of "investment securities." *See* Section 3(a)(2) ("As used in this section, "investment securities" includes all securities except (A) Government securities . . ."). This means that *none* of GO's assets in trust are held in "investment securities" within the meaning of Section 3(a)(2) because they are all in cash or short-term U.S. Government securities. While Plaintiff correctly points out that short-term government securities are included within the definition of "securities" under Section 3(a)(1)(A), the ICA's exclusion of such safe, liquid investments from the definition of "investment securities" remains relevant to the Court's consideration of whether holding government securities in a segregated trust account is "investing" for the purposes of Section 3(a)(1)(A). *See, e.g.*, *Moses v. Black*, 1981 WL 1599, at *5 (S.D.N.Y. 1981).

3(a)(1)(A).  *See United States v. Zukerman*, 897 F.3d 423, 431 (2d Cir. 2018) ("the presumption

of consistent usage and meaningful variation, and the textual [canon] of *expressio unius est*

*exclusio alterius*[,] suggest that the presence of a phrase applicable to one factor makes clear that

the phrase's omission elsewhere was deliberate").   Plaintiff cannot proffer an "alternative

interpretation [of Section 3(a)(1)(A) that] distorts the plain sense of words, ignores the context,

and flies in the face of common understanding for forty years." *Moses*, 1981 WL 1599, at *5

(S.D.N.Y. 1981).[7]

  **B.**  **Application Of The SEC's *Tonopah Mining* Factors Further Demonstrates That GO Is Not "Primarily" Engaged In The Business Of "Investing, Reinvesting, Or Trading Securities"**

  Though Section 3(a)(1)(A) does not define the term "primarily," the SEC in 1947 set out a

five-factor test to determine whether an issuer is primarily engaged in the business of "investing,

reinvesting, or trading securities."   *See In re Tonopah Mining Co. of Nev.*, Investment Co. Act

Release No. 1084, 26 SEC Docket 426, 427 (July 22, 1947).  These factors are: (1) the company's

history; (2) the way the company represents itself to the investing public today; (3) the activities

of its officers and directors; (4) the nature of its assets; and (5) the sources of its income. *Id.*; *see,*

*e.g.*, *SEC v. Nat'l Presto Indus., Inc.*, 486 F.3d 305 (7th Cir. 2007); *SEC v. Fiore*, 416 F. Supp. 3d

306, 328 (S.D.N.Y. 2019).  Importantly, "what principally matters is the ***beliefs the company is***

***likely to induce in investors***.  Will its portfolio and activities lead investors to treat a firm as an

---

[7] In 1940, Congress enacted the ICA in response to concern with market abuse stemming from investment companies' ability to misappropriate and divert highly liquid and negotiable assets.  *See* Sen. Rep. No. 1775, 76th Cong., 3d Sess. 6 (1940) ("The assets of [investment] companies invariably consist of cash and securities, assets which are completely liquid, mobile, and readily negotiable.  Because of these characteristics, control of such funds offers manifold opportunities for exploitation by the unscrupulous managements of some companies.  These assets can and have been easily misappropriated and diverted by such types of managements, and have been employed to foster their personal interests rather than the interests of public security holders.").  GO, like most SPACs, is structured in a manner that does not raise the same concerns.  For example, GO's segregated Trust Account, which pursuant to the terms of the Trust Agreement, the trustee is not permitted to invest in other securities or assets, serves solely to preserve the value of investors' capital.  Further, SPACs do not realize gains for investors by engaging in speculative trading of securities, nor by assembling large pools of securities to generate passive income.

investment vehicle . . . ?" *Nat'l Presto*, 486 F.3d at 315 (emphasis added); *see also Tonopah*, 26 S.E.C. at 430 ("More important . . . [is] the nature of the assets and income of the company, disclosed in the annual reports . . . such as ***to lead investors to believe that the principal activity of the company was trading and investing in securities***.") (emphasis added).  Plaintiff has not plausibly alleged that a reasonable investor would view GO as primarily engaged in the business of investing in government securities.  Plaintiff has not even pleaded that *he* invested in GO with this belief.  The *Tonopah* factors clearly show that GO is not an investment company.

**GO's Historical Development**: The first *Tonopah* factor focuses on the extent to which a company's current activities reflect the company's historical practices.  The SEC has found that former operating companies that have divested themselves of "all or almost all" assets and reduce "operations to a skeleton staff," while "purport[ing] to be looking for acquisitions but never seem[ing] to find them[,]" to be investment companies.  *Nat'l Presto*, 486 F.3d at 313.  For example, where a mining company divested all operations other than one unprofitable mine and otherwise traded in the securities of other mining companies, the SEC found it to be an investment company.  *Tonopah*, 26 SEC Docket at 427.  Similarly, where a former bus company no longer owned any busses and instead traded in bank stocks, and also pursued a strategy whereby it "[employed] a company's cash to acquire control of other companies, thereby gaining access to their cash which, in turn, c[ould] be used to acquire still more companies[,]" the SEC found it was primarily engaged in the business of investing, reinvesting, or trading securities. *Fifth Ave. Coach Lines*, 289 F. Supp. at 30.  By contrast, GO was formed a little more than a year ago with the express intent of pursuing a business combination with an operating company within two years.  Its trust account holdings are designed to preserve GO's investor's capital while the SPAC pursues its announced business plan to identify targets, and then effectuate a merger.  *See* Ex. 2 (GO

Prospectus) at 41.  Capital preservation is especially important because GO's Class A shareholders will have the opportunity to redeem their shares for cash in connection with a proposed business combination, and all Class A shares will be redeemed automatically if there is no transaction in the next 10 months.  *See id.* at cover, 14–15, 21–22.  Finally, the target business, post-combination, will not itself be an investment company.  Rather, it will be a majority-owned subsidiary of the issuer, engaged in a "travel-related and travel-adjacent business."  Ex. 1 (GO RS) at 2; Ex. 2 (GO Prospectus) at cover, 2.

***GO's Public Perception As A SPAC***:  The public perception *Tonopah* factor looks to how the company presents itself to the public through "its web site, its annual reports, and its publicity[.]"  *Nat'l Presto*, 486 F.3d at 313.  Although Plaintiff implies that GO is a secret investment fund for treasuries, this position is refuted by GO's COI, its public disclosures and common sense.  GO consistently has marketed itself to the public as "a blank check company newly incorporated for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses or entities."  Ex. 2 (GO Prospectus) at cover, 3; Ex. 1 (GO RS) at 2; Ex. 10 (GO Press Release); Ex. 11 (GO Press Release).  The Prospectus details GO's process to acquire an acquisition target and to deposit the proceeds of its IPO into a trust account invested solely in government securities with the intention of either executing a business combination or liquidating.  *See* Ex. 2 (GO Prospectus) at 5, 25, 30, 41.  The Prospectus specifically warns investors that "[t]his offering is not intended for persons who are seeking a return on investments."  *Id.* at 41.

The SEC has explained that "[i]n determining whether an entity . . . [is primarily] engaged in the business of investing in securities," it considers "*the area of business in which the entity anticipates realization of the greatest gains and exposure to the largest risks of loss*" to be critically

important.  *Peavey Commodity Futures Fund I, II, III*, Fed. Sec. L. Rep. ¶ 77,511, 1983 WL 28438 (June 2, 1983) (emphasis added).  "[W]ith respect to such a company, a company's intentions are of great importance in determining its primary business."  *Id*.  Here, axiomatically, the greatest potential gains and greatest risk of losses are all contingent on GO effectuating an initial business combination—a fact that is clearly communicated by GO's representations to its investors.  *See* Ex. 2 (GO Prospectus) at 29 ("Until we complete our initial business combination, we will have no operations and will generate no operating revenues.").  Plaintiff cannot plausibly allege that the investor funds in GO's Trust Account—which are temporarily parked in short-term government securities that have realized a 0.06% gain since August 2020—represent the area of business in which GO anticipates its greatest gains or risk of loss.  *See Mgmt. Assistance Inc. v. Edelman*, 584 F. Supp. 1021, 1035 (S.D.N.Y. 1984) ("the difference in [an entity's] risk/return characteristics . . . is probably the primary concern of the reasonable investor").

   ***GO's Team Is Not Trading***:  "Activities of [the] officers and directors," the third *Tonopah* factor, looks to the day-to-day conduct of the directors and officers.  *Nat'l Presto*, 486 F.3d at 313. In cases where the SEC has deemed a company to be an investment company under Section 3(a)(1)(A), the directors and officers spent most of their time managing their company's investment portfolio and not on its core business operations.  *See Fiore*, 416 F. Supp. 3d at 328 ("[The company] and its officers [] engaged in significant securities trading activity."); *Fifth Ave. Coach Lines*, 289 F. Supp. at 29 ("[The company] was particularly active in buying bank stocks."); *Tonopah*, 26 SEC Docket at 427 (record did not show "that any members of the corporate management spen[t] any considerable part of their time in connection with the company's mining operations"); *Nat'l Presto*, 486 F.3d at 313 ("[The Company] estimates that 95% of its managers' time is devoted to running its consumer-products and military-ordnance businesses.").  Such is not

the case here, and Plaintiff neither makes nor could make any plausible allegations that GO's team is devoting their time to "managing [GO's] investment portfolio[]." *Nat'l Presto*, 486 F.3d at 313; *see also* Ex. 6 (GO Form 10-KA) at F-7 ("all" of GO's activities since its IPO have related to "the search for a potential target business"); Ex. 7 (GO Form 10-Q) at 5 (same). Instead, Plaintiff simply asks the Court to infer from the fact that GO has not yet announced an initial business combination that GO is not actively pursuing one. This request for a baseless inference is patently insufficient under *Twombly*. *See, e.g.*, *Zamora v. FIT Int'l Grp. Corp.*, 834 F. App'x 622, 625 (2d Cir. 2020) (under *Twombly*, rejecting plaintiffs' requested inference where it was based only on "naked assertion[s]" devoid of "factual enhancement").

*GO's Assets Are Held For A Business Combination*: The fourth factor looks to the nature of GO's assets. *First*, GO's government securities holdings serve the purpose of preserving capital while GO pursues a business combination. The current asset composition provides significant protection for shareholders as they can be assured that until the merger is effectuated, the proceeds of the IPO are securely held in a trust account invested in short-term, government-backed securities. This makes sense, because shareholders' right to get their money back is the key protection (a) for those investors who oppose any transaction GO may pursue, and (b) for *all* investors if there is no business combination. *See* Ex. 2 (GO Prospectus) at cover, 21–22. Significantly, neither the courts nor the SEC have considered an issuer that temporarily holds securities in a segregated trust account to preserve value pending investment in a non-investment company business to be "primarily engaged in the business" of investing in securities. *See, e.g.*, *Fifth Ave. Coach Lines*, 289 F. Supp. at 9; *Medidentic Mtge. Investors*, SEC No-Action Letter, Fed. Sec. L. Rep. P 77,665, 1984 WL 45320 (May 23, 1984) (noting that generally the SEC "would not recommend . . . enforcement action . . . for not registering under the [ICA] when the company,

17

following receipt of the proceeds (i) of a securities offering which are to be invested in a business other than that of investing in securities ("non-investment business") . . . temporarily invests such proceeds, in order to preserve their value pending their investment in a non-investment or excepted business . . . in government securities"); *Fla. First Equities Corp.*, SEC No-Action Letter, Fed. Sec. L. Rep. P 76,703, 1980 WL 14869 (Sept. 11, 1980) (same).  Moreover, the SEC has issued numerous exemptive orders recognizing the distinction between a company holding securities for capital preservation purposes and an investment company.[8]  The same reasoning applies here.

   ***Second***, GO's most important asset is not its securities holdings but instead the experience and expertise of its directors and officers in identifying appropriate targets and negotiating favorable terms for its *raison d'être* business combination.  In *National Presto*, Judge Easterbrook observed that courts must go beyond "looking primarily at accounting assets" to include non-balance sheet assets such as intangible assets, the business structure, and corporate purpose.  *Nat'l Presto*, 486 F.3d at 314; *see also Fiore*, 416 F. Supp. 3d at 328 (considering "assets on an unconsolidated basis" as well as the operational history of the company); *Int'l Mining Corp.*, 1959 WL 59434 (considering total assets as well as character of assets).  Though nearly all of GO's assets are currently held in government securities, from the perspective of GO's IPO investors, the most valuable asset is the experience of its directors and officers in sourcing, negotiating, and

---

[8]  *See, e.g.*, *In re Snowflake, Inc.*, Release No. IC – 34049 (October 9, 2020) (request for exemption from ICA registration by company that operates cloud-based data platform; application stated that company sought to "preserve its capital and maintain liquidity . . . by investing in cash items, government securities, as well as in short-term investment grade and liquid fixed income and money market instruments that earn competitive market returns and provide a low level of credit risk"); Release No. IC – 34085 (November 4, 2020) (granting no-action relief in response to *Snowflake* application, determining that company was not primarily engaged in investing, reinvesting, owning, holding, or trading in securities); *see also In re Lyft, Inc.*, Release No. IC – 33442, 2019 WL 1529627, (April 8, 2019); *Upstart Holdings Inc.*, Release No. IC – 34124, 2020 WL 7054861 (Dec. 1, 2020).  In each, a company was granted an exemptive order determining that it was not primarily engaged in investing securities based on representing to the SEC that (i) it sought to preserve capital and maintain liquidity, pending the use of such capital to support its business operations, by investing in cash items, government securities and other short-term, liquid assets and (ii) it did not invest in securities for short-term speculative purposes.

executing a business combination transaction.[9]   Plaintiff's allegations acknowledge this reality. The premise of his excessive compensation claim is that GO is likely to achieve a business combination—the only way that Class B shares would "turn out to be worth a tremendous amount of money."  Compl. ¶ 68; *see* ¶¶ 63–67.

   ***Finally***, as explained *supra*, GO is not invested in "investment securities" as defined by Section 3(a)(2) of the ICA.  Rather, its investment holdings are short-term government securities. As such, though GO's balance sheet reflects holdings in securities, the types of securities in GO's Trust Account are not indicative of an "investment company" and instead are entirely consistent with the Company's lifecycle and pursuit of a business combination.

   ***GO's De Minimis Trust Income***:   Although GO earns interest from its holdings of government securities, this source of income is negligible and serves only to preserve the investor capital in GO's segregated Trust Account.  In *Tonopah*, the SEC found that the company was an investment company because its "only source of net income consists of interest, dividends and profits on the sale of securities" and because there was "nothing to indicate that this situation will be changed substantially in the foreseeable future."   *Tonopah*, at 429.  For GO, it is not only foreseeable but *guaranteed* that the situation will change—either it will effectuate a business combination and begin generating operating income or it will return the proceeds of the IPO to shareholders.  In either case, the company will no longer temporarily hold funds in government securities.  *See Int'l Mining Corp.*, SEC Investment Co. Act Release No. 2872, May 1, 1959; *In re Daxor Corp.*, Investment Co. Act Release No. 29417, 2010 WL 3615547 (Sept. 17, 2010).

---

[9]  The Prospectus explains that their expertise includes "a specialty of sourcing unique joint venture, spin-out and partnership opportunities at attractive valuations" and that "[GO's] selection process will leverage Mr. Gottesman's and Mr. O'Hara's broad and deep relationship network, unique industry experiences and deal-sourcing capabilities to access a broad spectrum of differentiated opportunities."  Ex. 2 (GO Prospectus) at 3, 4.

### III.    PLAINTIFF'S SECTION 47(B) CLAIM MUST BE DISMISSED FOR LACK OF STANDING AND FAILURE TO PLEAD PREDICATE ICA VIOLATIONS

Plaintiff's Section 47(b) claim seeks rescission of the Subscription Agreement and the "elements of the [COI] that establish the rights of the Class B shares."  Compl. Prayer (B), (E).

### A.    Plaintiff Cannot Pursue His Claims For Rescission Directly

Plaintiff seeks rescission—an unwinding of the transfer of Class B shares to restore any value lost by the transfer—because the payment received "represents a massive dilution of what the fair market value of 20% of the Company should be," (Compl. ¶ 94), and contends that the transfer of the Class B shares resulted in grossly excessive compensation for the Directors and the Sponsor.  *Id.* ¶¶ 63–65, 93.  Such a dilution, or overpayment, claim is quintessentially derivative, as was recently reaffirmed by the Delaware Supreme Court in *Brookfield Asset Mgmt. v. Rosson*, 2021 WL 4260639, at \*11 (Del. Sep. 20, 2021) (claim that "allege[s] an overpayment (or over-issuance) of shares to the controlling stockholder constituting harm to the corporation for which it has a claim to compel the restoration of the value of the overpayment" is solely derivative).[10]

### B.    Plaintiff Does Not Have Derivative Standing

Because any claims for rescission under Section 47(b) are derivative, they are subject to the requirements of Federal Rule of Civil Procedure 23.1.

### 1.    Plaintiff Fails To Plead Contemporaneous Ownership

Rule 23.1 requires an allegation that the plaintiff held securities of the company "at the time of the transaction of which the plaintiff complains."  *In re Bank of N.Y. Deriv. Litig.*, 320 F.3d 291, 297 (2d Cir. 2003).  "The main purpose of this so-called 'contemporaneous ownership' rule is to prevent[] . . . courts from being used to litigate purchased grievances."  *Id.* at 297 (internal

---

[10]  Delaware law determines whether a claim against GO under Section 47(b) is direct or derivative.  *See Burks v. Lasker*, 441 U.S. 471, 486 (1979) (federal courts should look to state corporate law to fill gaps in the statute when applying the ICA); *AHW Inv. P'ship v. Citigroup, Inc.*, 806 F.3d 695, 699 (2d Cir. 2015) ("we look to the law of the state of incorporation when adjudicating whether a claim is direct or derivative").

citations omitted).   It is difficult to view Plaintiff's claim as anything other than disfavored vigilante investing, because although he alleges that he "held shares . . . at all times relevant hereto" (Compl. ¶ 19, conspicuously omitting his purchase date), Plaintiff necessarily purchased his shares *after*—and following full disclosure of—the transactions he seeks to unwind: (1) the adoption of the provision of the COI granting Class B shareholders the right to convert into Class A shares on a one-to-one basis, and (2) the transfer of Class B shares to the Sponsor on June 22, 2020, and to the Independent Directors in July 2020 (Complaint ¶¶ 42-43).   Plaintiff inherently lacks contemporaneous ownership because the Class A shares that Plaintiff purchased were not issued until GO's IPO closed on August 7, 2020, well after the "time of the transaction of which the plaintiff complains" and with full disclosure of the transaction in the Prospectus.  *Bank of N.Y. Deriv. Litig.*, 320 F.3d at 297; *see, e.g.*, *Ucar Int'l v. Union Carbide Corp.*, 2004 WL 137073, at *8 (S.D.N.Y. Jan. 26, 2004) (shareholders lacked standing to challenge corporate transactions disclosed in the prospectus made prior to IPO).

### 2.      Plaintiff Fails To Specifically Plead Demand Futility

Rule 23.1's "demand requirement" requires particularized pleading before a plaintiff can proceed derivatively without a demand to the board.   The Delaware Supreme Court recently adopted a three-part test to assess whether demand should be excused as futile:

(i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

(ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and

(iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct . . . or who would face a substantial likelihood of liability on any of the claims.

*United Food & Commer. Workers Union v. Zuckerberg*, 2021 WL 4344361, at *17 (Sep. 23,

2021).[11]  Plaintiff must demonstrate that the answer to one or more of these questions is "yes" for a majority of directors.  *Id.* at *17.  Plaintiff makes no attempt to meet this test as he must "on a director-by-director" basis.  *Id.* at *16.  Instead, he lumps the directors into two groups he calls the "Founder Defendants" and "Independent Director Defendants" and alleges that a demand would have been futile because (1) the Founders and Independent Directors are the beneficiaries of the Class B shares and (2) the Independent Directors are controlled by the Sponsor by virtue of its power to elect them.  Compl. ¶¶ 102–105.  These allegations are insufficient.

**First**, "Delaware law is clear that absent particularized factual allegations indicating such a disabling conflict, 'ordinary director compensation alone is not enough to show demand futility.'"  *Ryan v. Gursahaney*, 2015 WL 1915911, at *8 (Ch. Apr. 28, 2015) (*quoting A.R. Demarco Enters. v. Ocean Spray Cranberries*, 2002 WL 31820970, at *5 (Ch. Nov. 26, 2002)); *see also In re GoPro, Inc. S'holder Deriv. Litig.*, 2020 WL 2036602, at *11 n.143 (Ch. Apr. 28, 2020) (allegation that directors were "heavily compensated" insufficient to plead demand futility).  Plaintiff does not even attempt to state particularized facts plausibly alleging that the Director Defendants received extraordinary compensation or that compensation "was of a sufficiently material importance, in the context of the director's economic circumstances."  *In re GM Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999).  He merely speculates that the Class B shares will be more valuable in the future.  Compl. ¶¶ 63–66, 68.  As is plain on the face of the Complaint, at the time of issuance of the Class B shares to the Sponsor, and their subsequent transfer in part to the Independent Directors, the Company had *no assets* and the Class B shares had no value other than their *pro rata* share of the purchase price paid for them by the Sponsor.  *Id.* ¶¶ 42–43, 35–36, 68.  Plaintiffs' allegation that the Directors' will "lose the value of their Class B shares," *id.*

_____

[11]  When applying the ICA, federal courts look to the law of the state of incorporation when assessing whether demand would have been futile.  *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 92 (1991).

¶¶ 103–104, fail as a matter of law.  *See Tilden v. Cunningham*, 2018 WL 5307706, at *12 (Del. Ch. Oct. 26, 2018) (allegations that "director's holdings *might* be devalued as a result of derivative litigation" insufficient).

**Second**, Plaintiff also fails to plead that any director faces a substantial likelihood of liability on any of the pleaded claims.  The Independent Directors face no personal liability for the rescission claims and their liability for the breach of fiduciary duty claims is limited by statute to "the amount of compensation or payments received," a nominal amount.  15 U.S.C. § 80a–35(b)(3).

**Third**, Plaintiff's conclusory allegation that the Founder Defendants control the Independent Directors because they can replace them and are responsible for their compensation, Compl. ¶ 105, is insufficient to establish demand futility.  The mere fact that a director might be replaced by a controlling shareholder "does not excuse presuit demand on the board." *Beam v. Stewart*, 845 A.2d 1040, 1054 n.37 (Del. 2004).

### C.      Plaintiff Fails To Adequately Plead Predicate Violations of the ICA

Plaintiff's everything-but-the-kitchen-sink approach to identifying a predicate violation of the ICA that would support Section 47(b) rescission fails because he has not pleaded facts sufficient to show such a predicate violation.  *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 109 (2d Cir. 2019) (plaintiff must allege contract violated a provision of the ICA).

**Section 7(a)(1)**: Section 47(b) does not allow an investor to seek rescission of any contract entered into by an unregistered investment company simply because the entity failed to register. In *Oxford*, noteholders sought to rescind provisions of the issuer's indenture because the issuer allegedly failed to register as an investment company and should have done so as the result of sales to "non-Qualified Purchasers."  933 F.3d at 109.  The Second Circuit affirmed dismissal of the claim, holding the noteholders could not seek rescission of provisions of the indenture because it

was not the "contract[] of sale under which non-Qualified Purchasers acquired unregistered notes." *Id.* Here, even if Plaintiff could allege a violation of Section 7(a)(1), rescission of the Subscription Agreement and the COI would not be warranted because those are not the contracts pursuant to which the Plaintiff and other Class A shareholders acquired their shares.

*Section 16(a)* requires that the members of the board of directors be elected "by the holders of the outstanding voting securities of such company," 15 U.S.C. § 80a-16(a). The Complaint alleges that the holders of the Class B shares elected the members of the board, and those shares were the only shares in existence in June 2020 when the Board was elected. Compl. ¶¶ 29–30, 81. The board was thus elected by the holders of all "outstanding voting securities."

*Section 18(i)* requires that voting shares have "equal voting rights." 15 U.S.C. § 80a-18(i). Plaintiff has no viable remedy for a violation of this provision because Section 47(b) allows only for rescission. Even if a COI was a contract within the meaning of Section 47(b), Plaintiff is not seeking to rescind it. He is seeking reformation to provide for equal voting rights and the statute does not contemplate reformation as a remedy. 15 U.S.C. § 80a-46(b)(2) (providing that "rescission" is the remedy for an unlawful contract, not reformation).

*Section 22(g) and Section 23(a)* prohibit issuance of securities in exchange for services or "for property other than cash or securities . . . ." 15 USC §§ 80a-22(g), 80a-23(a). By their terms, these provisions are not violated if shares are issued in exchange for "cash." The Complaint alleges that the Class B shares were issued in exchange for payment of $25,000, rendering Section 22(g) and Section 23(a) inapplicable. Compl. ¶¶ 9, 69, 91, 95.

*Section 23(b)* prohibits the sale of common stock for less than its net asset value. 15 U.S.C. § 80a-23(b).[12] Plaintiff's claim fails because prior to June 22, 2020, the Company had no assets.

---

[12] Plaintiff also cites Section 22(a) in the Complaint but that provision only addresses rules that can be adopted by a "securities association registered under section 78*o*-3." 15 U.S.C. § 80a-22(a).

*See* Ex. 2 (GO Prospectus) at 13 ("Prior to the initial investment in the company of $25,000 by our sponsor [on June 22, 2020], the company had no assets").  By definition, the transfer of the Class B shares could not have been for less than its net asset value.  GO's audited financial statements as of June 22, 2020, attached to the Prospectus as Exhibit F-1 show that the Company's net asset value as of that date was $24,111.  *Id.* at F-3, F-5.  The Sponsor paid $25,000, more than the Company's net asset value, in exchange for the Class B shares.

## IV.   PLAINTIFF'S SECTION 36(B) CLAIM MUST BE DISMISSED FOR FAILURE TO PLEAD DISPROPORTIONATE FEES

Section 36(b) provides that an investment advisor "shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services" and provides for a private right of action for "breach of fiduciary duty in respect of such compensation" against specified parties.  15 U.S.C. § 80a-35(b).  A director may be sued under this provision only if that director "has a fiduciary duty concerning such compensation." *Id.*  Plaintiff cannot state a claim under this provision because the Founder and Independent Directors did not have any fiduciary duty with respect to the alleged compensation because they were indisputably not directors when the alleged breach of duty "concerning such compensation" occurred.  15 U.S.C. § 80a-35(b); *see* Compl. ¶ 120 (alleging the breach occurred when Class B shares were issued); *id.* ¶¶ 42–44 (directors appointed by Class B holders after issuance of Class B shares).  In addition, the Section 36(b) claims fail because the Complaint does not allege that the compensation was "so disproportionately large that [it] bore no relationship to the services rendered." *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007).  As discussed above, the Sponsor paid more than the Company's net asset value in exchange for the Class B shares.

### CONCLUSION

For all these reasons, the Complaint should be dismissed with prejudice.

Dated:  October 4, 2021
       New York, New York


/s/ *Matthew S. Dontzin*                                                       /s/ *Paul R. DeFillipo*
Matthew S. Dontzin                                                           Paul R. DeFillipo
Tibor L. Nagy                                                              David H. Wollmuth
David A. Fleissig                                                   Steven S. Fitzgerald
Jason A. Kolbe                                                    Joshua M. Slocum
DONTZIN NAGY& FLEISSIG LLP                  Grant J. Bercari
980 Madison Avenue                                       WOLLMUTH MAHER & DEUTSCH LLP
New York, NY 10075                                     500 Fifth Avenue
Telephone: (212) 717-2900                       New York, NY 10110
mdontzin@dnfllp.com                                    Telephone: (212) 382-3300
tibor@dnfllp.com                                         pdefilippo@wmd-law.com
dafleissig@dnfllp.com                                  dwollmuth@wmd-law.com
jkolbe@dnfllp.com                                      sfitzgerald@wmd-law.com
                                                              jslocum@wmd-law.com
/s/ *Jonathan K. Youngwood*                      gbercari@wmd-law.com
Jonathan K. Youngwood
Stephen P. Blake
Rachel S. Sparks Bradley                               *Attorneys for GO Acquisition Founder LLC*
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502
jyoungwood@stblaw.com
sblake@stblaw.com
rachel.sparksbradley@stblaw.com


*Attorneys for Defendants GO Acquisition Corp.,*
*Noam Gottesman, M. Gregory O'Hara, Jeremy*
*Isaacs, Gilbert Ahye, and Norma Corio*