**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GEORGE ASSAD, directly on behalf of himself and all others similarly situated, and derivatively on behalf of GO ACQUISITION CORP., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| GO ACQUISITION CORP., | ) ) |
| Nominal Defendant, | ) **CASE NO. 1:21-cv-07076 (JPC)(JLC)** ) **JURY TRIAL DEMANDED** ) |
| v. | ) ) |
| GO ACQUISITION FOUNDER LLC., NOAM GOTTESMAN, M. GREGORY O'HARA, JEREMY ISAACS, GILBERT AHYE, AND NORMA CORIO, | ) ) ) ) |
| Defendants. | ) ) ) |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

# **TABLE OF CONTENTS**

Preliminary Statement.................................................................................................1

Statutory and Factual Background..............................................................................3

Argument ....................................................................................................................5

I.      THE COMPLAINT PLAUSIBLY PLEADS VIOLATIONS OF THE ICA. ...................5

        A.      The *Tonopah Mining Company* Standard Demonstrates that GO Is
                Primarily Engaged in the Business of Investing in Securities. ..............6

                1.      Defendants Cannot Avoid the ICA by Hiding Behind Future
                        Plans. ...............................................................................................6

                2.      The *Tonopah* Factors Show that GO Is an Investment Company.
                        ...........................................................................................................9

        B.      GO "Invests" in Securities. .................................................................12

        C.      GO Has Exceeded Any Grace Period Under the ICA. ..........................13

        D.      The Illegal Contracts Continue to Violate the ICA and Will Do So in
                the Future. ............................................................................................15

II.     PLAINTIFF'S CLAIMS ARE TIMELY............................................................18

        A.      Plaintiff's Section 47(b) Claim Did Not Accrue Until August 2021....................18

        B.      The Applicable Statute of Limitations is Two Years.............................20

        C.      Plaintiff's Section 36(b) Claim is Timely.............................................21

III.    PLAINTIFF HAS DERIVATIVE STANDING. ....................................................23

        A.      Plaintiff   Satisfies   Rule   23.1's   Contemporaneous   Ownership
                Requirement. .........................................................................................23

        B.      Plaintiff Adequately Pleaded Demand Futility. ....................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Avianca, Inc. v. Corriea*,
   1993 WL 797455 (D.D.C. May 13, 1993)................................................................22

*Basic, Inc. v. Levinson*,
   485 U.S. 224 (1988)..................................................................................................8

*Blatt v. Merrill Lynch, Pierce, Fenner & Smith*
   916 F. Supp. 1343 (D.N.J. 1993) ......................................................................13, 20

*Conrad v. Blank*,
   940 A.2d 28 (Del. Ch. 2007).....................................................................................25

*CSX Corp.* v. *Children's Inv. Fund Mgmt.*,
   562 F. Supp. 2d 511 (S.D.N.Y. 2008).........................................................................2

*Daily Income Fund v. Fox*,
   464 U.S. 523 (1984).................................................................................................23

*Dan River, Inc. v. Icahn*,
   701 F.2d 278 (4th Cir. 1983) .....................................................................................6

*de Rothschild v. Serlin*,
   2021 WL 860227 (S.D.N.Y. Mar. 8, 2021) ..............................................................21

*Eaton Vance Senior Income Tr. v. Saba Capital Master Fund, Ltd.*,
   2021 WL 2222812 (Sup. Ct. Mass. Mar. 31, 2021)..................................................23

*Forsythe v. Sun Life Financial, Inc.*,
   475 F. Supp. 2d 122 (D. Mass. 2007) ......................................................................23

*Frank v. Elgamal*,
   2012 WL 1096090 (Del. Ch. 2012) ..........................................................................24

*Franklin v. Gwinnett Cty. Pub. Sch.*,
   503 U.S. 60 (1992)...................................................................................................22

*Gabelli v. SEC*,
   568 U.S. 442 (2013).................................................................................................19

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
   694 F.2d 923 (2d Cir. 1982).....................................................................................18

*Gladstone v. Bennett*,
  153 A.2d 577 (Del. 1959) ......................................................................................18

*Hunt v. Invesco Funds Group, Inc.*,
  2006 WL 1751900  (S.D. Tex. June 22, 2006) .....................................................23

*In re Activision Blizzard, Inc. S'holder Litig.*,
  124 A.3d 1025 (Del. Ch. 2015)............................................................................23

*In re Franklin Mut. Funds Fee Litigation*,
  478 F. Supp. 2d 677 (D.N.J. 2007) ......................................................................22

*In re Gartenberg*,
  636 F.2d 16 (2d Cir. 1980)...................................................................................22

*In re Initial Public Offering Antitrust Litigation*,
  287 F. Supp. 2d 497 (S.D.N.Y. 2003)....................................................................2

*In re Penn Cent. Transp. Co.*,
  341 F. Supp. 845 (E.D. Pa. 1972) ........................................................................24

*Ingenhutt v. State Farm Inv. Mgmt. Corp.*,
  2017 WL 1398646 (C.D. Ill. Apr. 18, 2017) ........................................................22

*Jones v. Harris Assocs. L.P.*,
  559 U.S. 335 (2010)..............................................................................................22

*Kahn v. Kohlberg, Kravis, Roberts & Co.*,
  970 F.2d 1030 (2d Cir. 1992)..........................................................................21, 22

*London v. Tyrrell*,
  2008 WL 2505435 (Del. Ch. June 24, 2008).......................................................25

*Miller v. Butler*,
  2014 WL 1716184 (D.N.J. Apr. 30, 2014) ...........................................................22

*Morada Music, LLC v. Hays*,
  2010 WL 11596237 (C.D. Cal. Jan. 27, 2010) .....................................................22

*Moses v. Black*
   1981 WL 1599 (S.D.N.Y. 1981).........................................................................10

*Norman v. Salomon Smith Barney*,
  350 F. Supp. 2d 382 (S.D.N.Y. 2004)...................................................................21

*Oxford Univ. Bank v. Lansuppe Feeder*,
  933 F.3d 99 (2d Cir. 2019)...................................................................................17

*Phoenix Four, Inc. v. Strategic Res. Corp.*,
   2006 WL 399396 (S.D.N.Y. Feb. 21, 2006).........................................................................21

*Rales v. Blasband*,
   634 A.2d 927 (Del. 1993) ................................................................................................24

*Roth v. The Goldman Sachs Grp.*,
   No. 12-2509, Dkt. No. 94 (2d Cir. Mar. 21, 2013) ............................................................2

*Rubenstein v. Adamy*,
   2021 WL 1269080 (S.D.N.Y. Apr. 6, 2021)......................................................................24

*SEC v. Am. Bd. of Trade, Inc.*,
   751 F.2d 529 (2d Cir. 1984).............................................................................................11

*SEC v. Fifth Ave. Coach Lines*,
   289 F. Supp. 3 (S.D.N.Y. 1968)...........................................................................6, 11, 14

*SEC v. Nat'l Presto Indus.*,
   486 F.3d 305 (7th Cir. 2007) ..................................................................................*passim*

*SEC v. S & P Nat'l Corp.*,
   360 F.2d 741 (2d Cir. 1966)..............................................................................................16

*Curd ex rel. SEI Int'l Equity Fund v. SEI Inv. Mgmt. Corp.*,
   2015 WL 4243495 (E.D. Pa. July 14, 2015).....................................................................22

*Siimes v. Giordano*,
   1992 WL 301622 (D.N.J. Oct. 8, 1992)........................................................................6, 11

*STAAR Surgical Co. v. Waggoner*,
   588 A.2d 1130 (Del. 1991) ...............................................................................................23

*Strigliabotti v. Franklin Res., Inc.*,
   398 F. Supp. 2d 1094 (N.D. Cal. 2005) ............................................................................22

*Tarlov v. Paine Webber Cashfund, Inc.*,
   559 F. Supp. 429 (D. Conn. 1983).....................................................................................23

*Thomas v. Metropolitan Life Ins. Co.*,
   2008 WL 4619822 (W.D. Okla. Oct. 16, 2008) ................................................................21

*Tonopah Mining Co. of Nev.*,
   26 S.E.C. 426 (1947)...............................................................................................*passim*

*UFCW Loc. 1500 Pension Fund v. Mayer*
   2016 WL 6122458 (N.D. Cal. Oct. 19, 2016)....................................................................20

iv

*United Food & Commercial Workers Union v. Zuckerberg*,
    2021 WL 4344361 (Del. Sept. 23, 2021)..........................................................................24, 25

*Weiss v. Swanson*,
    948 A.2d 433 (Del. Ch. 2008)..........................................................................................25

**Statutes**

15 U.S.C. § 78c ...............................................................................................................21

15 U.S.C. § 80a ....................................................................................................... *passim*

28 U.S.C. § 1658 .............................................................................................................21

**Rules**

Fed. R. Civ. P. 23.1 ...................................................................................................23, 24

**Regulations**

17 C.F.R. § 230.419 ........................................................................................................15

17 C.F.R. § 270.3a-2(a) ..................................................................................................14

17 C.F.R. § 270.3a-8 .......................................................................................................10

**Treatises**

Restatement (Third) of Restitution and Unjust Enrichment (2011).................................16

**Other Authorities**

Andrew Ross Sorkin, *The Poor Man's Private Equity: Gambling on Unknown IPOs*,
    N.Y. Times (Feb. 12, 2008) .............................................................................................1

*Arizona Property Investors, Ltd.*, SEC No-Action Ltr.,
    1979 WL 14220 (Aug. 9, 1979).............................................................................6, 11, 12

*Baker, Watts & Co.*, SEC No-Action Ltr.,
    1982 WL 29238 (May 6, 1982) .......................................................................................11

*Byrndun Corp.*,
    11 S.E.C. 861 (1942).................................................................................................10, 12

*Credit Suisse First Boston Corp.*, SEC No-Action Ltr.,
    1998 WL 799305 (Sept. 9, 1998).............................................................................11, 13

*Financial Funding Group, Inc.*, SEC No-Action Ltr.,
    1982 WL 28965 (Mar. 3, 1982).............................................................................10, 11

*Florida First Equities Corp.*, SEC No-Action Ltr.,
    1980 WL 14869 (Sept. 11, 1980)...........................................................................14

*George W. Helme Co.*, Rel. No. IC-109,
    9 S.E.C. 16 (1941)..............................................................................................10, 12

*ICOS Corp.*, 1940 Act Release No. 19334,
    58 Fed. Reg. 15,392 (Mar. 22, 1993)...............................................................9, 10

*The Investment Company Act of 1940*,
    50 YALE L.J. 440 (1940).......................................................................................4

*J.D. Gillespie, Tr. for Cleo George*, Rel. No. IC-513,
    13 S.E.C. 470 (1943)........................................................................................10, 13

*Medidentic Mortgage Investors*, SEC No-Action Ltr.,
    1984 WL 45320 (May 23, 1984) .......................................................................14

Michael Klausner, et al., A Sober Look at SPACs,
    (forthcoming YALE J. REG. 2022) .....................................................................8

Sam Goldfarb, *Some Investors Find Stability in SPACs*,
    WALL ST. J. (Oct. 12, 2021).................................................................................1

Transient Investment Companies,
    46 Fed. Reg. 6882 (Jan. 22, 1981) ....................................................................14

*Upstart Holdings Inc.*,
    Rel. No. IC-34088 (Nov. 9, 2020) ....................................................................10

*Willkie Farr & Gallagher*, SEC No-Action Ltr.,
    2000 WL 1585635 (Oct. 23, 2000)....................................................................11

## PRELIMINARY STATEMENT

GO Acquisition Corp. ("GO" or the "Company") is an illegal investment company under the Investment Company Act of 1940, 15 U.S.C. §§ 80a-1 *et seq.* ("ICA"). Although GO describes itself as a special purpose acquisition company, or "SPAC," it is precisely the kind of business the ICA was designed to regulate. Like a money market fund, GO offers redemption rights and direct access to the returns on a pool of securities.[1] Like a private equity fund, it searches for "one or more businesses" to invest in, potentially through "stock purchases."[2] Motion to Dismiss ("Mot."), Ex. 4 ("COI"), Art. II. And like every type of investment fund, GO has no employees of its own, relying entirely on a group of private equity and hedge fund managers who dominate it from the outside. Defendants believe they have found a loophole in the ICA through which they can extract more than a hundred million dollars of compensation from retail investors. But in fact, Defendants have created precisely the kind of business that triggers the ICA's longstanding investor protections.

Defendants speculate that the SEC believes SPACs are not investment companies because SPAC registration statements have been declared effective under the Securities Act of 1933. But Defendants offer no legally cognizable reason why this bears on the ICA questions raised here. And there is no need to guess about what the SEC believes. If this Court wishes to know the SEC's views, Plaintiff urges the Court to issue an order asking the SEC to express those views directly to the Court.[3] Notably, GO has the right to request the SEC's views or even an exemption from the

---

[1] *See, e.g.*, Sam Goldfarb, *Some Investors Find Stability in SPACs*, WALL ST. J. (Oct. 12, 2021), https://www.wsj.com/articles/some-investors-find-stability-in-spacs-11634007742.

[2] Andrew Ross Sorkin, *The Poor Man's Private Equity: Gambling on Unknown IPOs*, N.Y. TIMES (Feb. 12, 2008), https://www.nytimes.com/2008/02/12/business/worldbusiness/12iht-deal.1.9962658.html.

[3] Courts of this Circuit have long sought the Commission's views on important questions of securities law. *See, e.g.*, *CSX Corp. v. Children's Inv. Fund Mgmt.*, 562 F. Supp. 2d 511, 518-519 (S.D.N.Y. 2008); *In re Initial Public Offering Antitrust Litigation*, 287 F. Supp. 2d 497 (S.D.N.Y. 2003); *Roth v. The Goldman Sachs Grp.*, No. 12-2509, Dkt. No. 94 (2d Cir. Mar. 21, 2013).

ICA itself.[4] But fearing that the SEC would say it is an investment company, neither GO nor any other SPAC has done so.

Defendants' main argument is that GO is not an investment company because it is a SPAC. The ICA defines an investment company as a business that invests primarily in securities, and all agree that, from the time of its IPO fifteen months ago, this is all that GO has done and nearly all of its assets and income are derived from securities. Nevertheless, GO argues that while it invests all of its assets in securities now, it will eventually acquire an operating business later. The courts and the SEC have seen this argument before, however—often in the failed defenses of other acquisition companies—and have developed doctrines to limit it. Although the law recognizes a brief grace period before a company must comply with the ICA, the law also specifically limits how long this period can go on. For GO, the period ended after the Company had invested all of its assets in securities for more than a year.

Defendants also argue that GO is not an investment company because investors do not perceive it as one. This argument has three problems. **First**, the inquiry into investor perceptions is comparative, not absolute. It asks whether a company looks more like an investment company **or** more like an operating company. Although Defendants offer a string of weak arguments as to why GO might differ from some investment companies, they cannot point to a single similarity between GO and an operating company. GO has no present revenues, assets, or business that offer any hint of operations. GO does not even have a single full-time employee.

**Second**, GO grants its investors the right—typical of investment companies but extraordinary for an operating business—to take the returns on the company's securities independent of the company's potential future operations. Just before GO's business combination,

---

[4] GO could seek a no-action letter or apply for exemptive relief under 15 U.S.C. §§ 80a-3(b)(2), 6(c).

investors can hand over their shares and receive the return on the company's portfolio of securities, thereby giving up any exposure to GO's post-acquisition operations. In most SPACs, the great majority of investors choose to redeem in this way, making it likely that the only return most of GO's investors will ever receive is the investment income on the company's portfolio of securities.

**Third**, GO spectacularly fails the five-factor test that the SEC and the courts have developed to assess what investors are likely to perceive. Under the *Tonopah Mining Co.* standard, the "most important" factors are the "nature of the company's **present** assets" and "the sources of its **present** income." GO triggers these factors in the most egregious manner possible, by deriving 100% of its present assets and income from securities. GO's aspirations to a future business do not help it here, because the test expressly focuses only on assets and income in the "present."

**Finally**, Defendants advance a host of procedural arguments about timeliness and standing, alleging that the Plaintiff brought his claims too late. These arguments fail for the simple reason that they assume that GO became an investment company at the moment of its IPO, when in fact it did not become an investment company until about one year later.

The bottom line is that in order to win this case, Defendants will have to make new law. Defendants cannot cite any authority in which the SEC or the courts have knowingly authorized any issuer to offer redemption rights in a pool of securities comprising 100% of its assets with no operating business for two full years without becoming an investment company.

## STATUTORY AND FACTUAL BACKGROUND

In 1940, Congress passed the ICA to protect investors from Depression-era "abuses [that] stemmed from the control of investment companies by banking, brokerage, or dealer interests." Note, *The Investment Company Act of 1940*, 50 YALE L.J. 440, 441-42 (1940) (citing *Hearings Before Subcomm. of Sen. Comm. on Banking and Currency*, S.3580, 76th Cong., 3d Sess. (1940)). Because investment companies had no employees or resources of their own, they were especially

vulnerable to exploitation by outside financial advisers, who sometimes called themselves "sponsors" and who controlled the investment companies that they established and managed. Congress expressed concern that "control [of investment companies would be] . . . exercised to benefit the sponsor[s]" rather than investors. *Id.* at 442.

In response, Congress passed the ICA, which imposes a comprehensive regulatory regime to address abuses that arise when outsiders dominate an investment company. The law regulates the capital structure of an investment company, as well as the rights and powers of investors, and the kind and amount of compensation that investment advisers, directors, and officers can be paid. The ICA applies to any company that satisfies the statute's definition of an "investment company," which includes any entity that is "engaged primarily" "in the business of investing, reinvesting, or trading in securities." 15 U.S.C. § 80a-3(a)(1)(A).

GO is such a company. As Defendants concede, since GO's IPO in August 2021, it has held all of its $575 million in assets in securities. Mot. 3-4; *see also* Compl. ¶¶ 37-39. It has no other present operations or business. *Id.* Though it purports to be trying to combine with another business—potentially by acquiring the stock of one or more companies—it has yet to announce a deal target and has done nothing but invest in securities since its IPO. Compl. ¶¶ 37-39. GO has given itself two full years to complete its combination. Compl. ¶ 31; COI § 9.1(b).

GO has issued two classes of common stock. The first, the Class A, was sold at the time of the IPO in units costing $10 each. Compl. ¶ 35. Each IPO unit included one share of Class A stock and 1/3 of a warrant that entitles its holder to purchase additional shares of Class A stock after the business combination. Just before the business combination, a holder of Class A stock can redeem her shares by handing them over to GO and receiving in exchange the cash value of the portion of

GO's portfolio of securities that corresponds to the shares. Compl. ¶¶ 33, 67; COI § 9.2. In its IPO, GO sold 57.5 million of the IPO units at $10 each, raising $575 million dollars. Compl. ¶ 35.

The second class of securities is the Class B common stock, which was issued to the Defendants as compensation. The Class B shares grant the Defendants the exclusive right to elect and remove the Company's directors prior to the initial business combination and entitle the Defendants to at least 20% of the Company's outstanding stock when they exercise their right to convert their Class B to Class A stock upon or before the business combination. Compl. ¶¶ 64-69. Defendants—GO's Sponsor, founders, and directors—received the Class B shares for just $25,000. *Id.* As a claim on 20% of a $575 million pot of money, however, the Class B shares may be worth up to $115 million. *Id.*

Plaintiff seeks a declaratory judgment that GO is an investment company, rescission of parts of GO's Certificate of Incorporation and the Class B Share Subscription Agreement (the "Illegal Contracts") whose performance violates the ICA, and other equitable relief and damages.

## <u>ARGUMENT</u>

## I.   THE COMPLAINT PLAUSIBLY PLEADS VIOLATIONS OF THE ICA.

Under section 3(a)(1)(A) of the ICA, an investment company is a business that is "engaged primarily . . . in the business of investing . . . in securities." 15 U.S.C. § 80a-3(a)(1)(A). Defendants argue that GO is not an investment company because GO will eventually try to combine with an operating business, and therefore investors cannot reasonably perceive it to be "engaged primarily . . . in the business . . . of investing in securities." The courts and the SEC have seen this theory many times before, consistently in the failed arguments of acquisition companies like GO that have faced similar problems.

In actions such as *SEC v. Fifth Ave. Coach Lines*, 289 F. Supp. 3 (S.D.N.Y. 1968), *Siimes v. Giordano*, 1992 WL 301622 (D.N.J. Oct. 8, 1992), *Tonopah Mining Co. of Nev.*, 26 S.E.C. 426

(1947), and *Arizona Property Investors, Ltd.*, SEC No-Action Ltr., 1979 WL 14220 (Aug. 9, 1979), the SEC and the courts have repeatedly found that a company that has no present operations and invests the bulk of its assets in securities for more than a year as it searches to buy an operating business is an investment company. So many acquisition companies have been found to be "primarily engaged" in investing in securities that a leading case described an acquisition company as the very "model" of an inadvertent investment company. *SEC v. Nat'l Presto Indus.*, 486 F.3d 305, 312 (7th Cir. 2007).

> **A. The *Tonopah Mining Company* Standard Demonstrates that GO Is Primarily Engaged in the Business of Investing in Securities.**

The main standard for balancing a company's present investments in securities against its future operating ambitions has long been the SEC's order in *Tonopah*, which has received extensive deference from the courts and the SEC.[5] In *Tonopah*, the Tonopah Mining Company operated a business much like GO. It invested heavily in securities while claiming to avoid the ICA because it was trying to acquire an operating business. The SEC assessed the company's primary business with a five-factor test: "1) the company's historical development; 2) its public representations of policy; 3) the activities of its officers and directors; and, most important, 4) the nature of its present assets; and 5) the sources of its present income." 26 S.E.C. at 427.

> **1. Defendants Cannot Avoid the ICA by Hiding Behind Future Plans.**

Defendants' main strategy for dealing with the *Tonopah* factors is to try to escape them. Relying on the Seventh Circuit's opinion in *National Presto*, Defendants argue that "what principally matters is the beliefs the company is likely to induce in investors." Mot. 13. According

---

[5] *Nat'l Presto Indus.*, 486 F.3d at 312; *Dan River, Inc. v. Icahn*, 701 F.2d 278, 291 n.14 (4th Cir. 1983). Although *Tonopah* was an order issued under ICA section 3(b)(2), it has also guided interpretation of section 3(a)(1)(A) because sections 3(b)(2) and 3(a)(1)(A) each assess a company's "primary" business.

to Defendants, the activities of GO will not "lead investors to treat [it] as an investment company . . . ." *Id.* at 13-14.

What Defendants misunderstand is that the inquiry is comparative, not absolute: it asks whether investors would be more likely to treat a firm "as an investment vehicle *or* as an operating enterprise." *Nat'l Presto*, 486 F.3d at 315 (emphasis added). Although Defendants speculate about why an investor might not treat GO as an investment vehicle, they do not offer a single reason why any investor could possibly think of GO as an operating enterprise. GO has no present employees, revenues, or assets that offer any hint of operations. Defendants' tactic for sidestepping this problem is to drop the phrase "or as an operating enterprise" from their quotation of *National Presto,* inserting ellipses where the benchmark for comparison should be. Mot. 13-14.

Defendants argue that GO will be an operating enterprise *in the future*, but the Seventh Circuit plainly used the term "operating enterprise" to refer to a company's business in *the present*. Throughout *National Presto*, Judge Easterbrook emphasized the company's present operations as a "designer and marketer" of "military supplies," "diapers and puppy pads." *Nat'l Presto*, 486 F.3d at 307, 313. The key distinction between National Presto and an acquisition company was National Presto's "substantial *ongoing* presence in product markets." *Id.* at 312.

The reasons an investor would think of GO as an investment vehicle are many. First, there is the extraordinary fact that an investor in GO can elect to take the return on GO's portfolio of securities independent of GO's success or failure in any future business combination. Compl. ¶¶ 33, 67; COI § 9.2. An investor who redeems receives only the value of the securities in the investment portfolio and gives up any right to participate in the future business combination. This right to redeem is thus equivalent to the redemption right that defines the open-end mutual funds that now dominate the investment company industry. 15 U.S.C. § 80a-5(a)(1) (defining an open-

end investment company by its redeemable securities). Studies show that the great majority of SPAC investors elect to redeem, meaning that for most of GO's investors, the securities portfolio is likely to be the only source of returns they will ever receive.[6] In this regard, GO is very different from the company in *National Presto*, in which the court observed that returns on operations and securities investments were inseparable. *Nat'l Presto*, 486 F.3d at 313. Instead, GO mimics the open-end mutual funds that comprise the great bulk of the investment company industry.

Second, GO's stock price is a powerful indicator that GO's investors treat the company "as an investment vehicle" rather than "an operating enterprise." It is a basic axiom of financial economics and securities law that a company's stock price aggregates investors' beliefs and expectations about a company's future earnings. *Basic, Inc. v. Levinson*, 485 U.S. 224, 241-247 (1988). For months, GO's Class A common stock has traded just below the redemption value, which will be equal to about $10 plus investment interest. Compl. ¶ 92. The tight linkage between the stock price and the redemption value makes clear that investors believe GO's only value is as a pool of securities that will generate about $10 in redemption.

Third, GO is structured like an investment company. GO is dominated by an outside sponsor and its affiliates. Compl. ¶¶ 46-62. It has no operational resources and no employees— only executives who are on loan from and are compensated by the private equity and hedge fund management businesses that GO's founders operate alongside GO. Compl. ¶¶ 46-53. This pattern raises precisely the kinds of conflicts the ICA was designed to regulate. Compl. ¶¶ 8-9, 46-62.

---

[6] *See, e.g.*, Michael Klausner, et al., A Sober Look at SPACs, 10 tbl. 1 (forthcoming YALE J. REG. 2022) (showing that in the median SPAC 73% of investors redeem), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3720919.

## 2.    The *Tonopah* Factors Show that GO Is an Investment Company.

Defendants are wrong that investors view GO as an operating company. But that is not even the correct inquiry. Rather, the Court should apply the well-established factors from the *Tonopah* test—which GO fails. *Nat'l Presto*, 486 F.3d at 313-315 (applying the *Tonopah* factors).

**Present assets and present income.** Of the five factors in the test, the *Tonopah* order declared that the "most important" are the "nature of the company's present assets" and "the sources of its present income." 26 S.E.C. at 428-430. The SEC has emphasized that these factors are the most important.[7] Defendants avoid drawing attention to these factors' importance by choosing to paraphrase rather than quote the test, omitting the words "most important." Mot. 13.

Another word the Defendants omit from their paraphrasing of controlling law is "present." *Id. Tonopah* focuses on the nature of a company's "*present* assets" and "*present* income." *Tonopah*, 26 S.E.C. at 427. Because, like GO, the Tonopah Mining Company tried to emphasize only its future acquisition, the SEC worded the *Tonopah* test to make clear that what mattered was the character of the company's assets and income in the present, not its hopes for the future.

Under these "most important" factors, GO's status is beyond dispute. If 100% of income and assets is not enough to satisfy the test, then nothing is. GO argues that the amount of income it derives from its securities is "de minimis." Mot. 19. But GO has no other source of income. Compl. ¶ 73. And if a low level of income were enough to escape the ICA, then an investment company could avoid scrutiny by merely making investments that turned out to be unprofitable.

GO's levels of assets and income from securities greatly exceed the levels permitted to other companies in the past. The SEC has declared that under *Tonopah*, "an issuer generally is

---

[7] *See also* ICOS Corp., 1940 Act Release No. 19334, 58 Fed. Reg. 15,392, (Mar. 22, 1993) ("The Commission accorded the fourth and fifth factors the most weight."); Robert H. Rosenblum, Investment Company Determination Under the 1940 Act § 6.3 n. 17 (2003).

deemed to be engaged primarily in the business of investing in securities if *most* of its assets are securities and *most* of its income is derived from securities." *ICOS Corp.*, 1940 Act Release No. 19334, 58 Fed. Reg. 15,392, 15,393 (Mar. 22, 1993); *Financial Funding Group, Inc.*, SEC No-Action Ltr., 1982 WL 28965, at *1 (Mar. 3, 1982). GO's levels of securities also exceed the levels in each of the cases Defendants cite in which a company was found not to be an investment company. In these cases, including *National Presto*, the companies all had significant revenues, expenses, and assets from operations—not in the future, but in the present.[8]

In the face of this obvious problem, Defendants try a string of other long-shot defenses:

- Defendants argue that government securities do not fall within the ICA's definition of "investment securities." Mot. 12 n.6, 19. But section 3(a)(1)(A) does not use the term "investment securities." It uses the broader term "securities." The Defendants do not dispute that GO's investments are "securities."[9] And the courts and the SEC have many times stated that "[A]n issuer could invest exclusively in government securities, thereby owning no investment securities, and yet be an investment company under section 3(a)(1)[A] of the Act."[10]

---

[8] In *National Presto*, the issuer invested only 60% of its assets in securities and derived only 50% of its net income and a mere 10% of its gross revenues from securities. 486 F.3d at 313-314. In *Moses v. Black*, the issuer derived only 49% of its assets from securities and less than 10% of its income. 1981 WL 1599, at *7 (S.D.N.Y. 1981); *see also Byrndun Corp.*, 11 S.E.C. 861 (1942); *George W. Helme Co.*, Rel. No. IC-109, 9 S.E.C. 16 (1941). In ICOS Corp. and the administrative rule that later followed it, ICA Rule 3a-8, the SEC allowed a company to derive more than a majority of its assets and income from securities, but only if it had significant research and development operations in the present. *ICOS Corp.*, 58 Fed. Reg. 15,392; 17 C.F.R. § 270.3a-8. In granting orders to Snowflake, Lyft, and Upstart, the SEC took note of the extensive operations these companies had in the present and the fact that they derived nearly all of their revenues from operations in the present. *Snowflake, Inc.*, Rel. No. IC-34049 (Oct. 9, 2020); Rel. No. IC-34085 (Nov. 4, 2020); *Lyft, Inc.*, Rel. No. IC-33399 (Mar. 14, 2019); Rel. No. IC-33442 (Apr. 8, 2019); *Upstart Holdings Inc.*, Rel. No. IC-34088 (Nov. 9, 2020); Rel. No. IC-34124 (Dec. 1, 2020). In assessing the SEC's administrative actions, it is important to distinguish between *interpretive relief* in no-action letters and orders issued under section 3(b)(2), and *exemptive relief* under section 6(c). Unlike the interpretive relief, exemptive relief under section 6(c) allows the SEC to waive noncompliance for a company that is clearly breaking the law. 15 U.S.C. § 80a-6(c). By applying for an exemption under section 6(c), as Upstart did, a company acknowledges that it is primarily engaged in investing in securities and that its only remedy is to seek an order waiving its illegal noncompliance. Under section 6(c), the power to waive noncompliance belongs exclusively to the SEC. It cannot be exercised by a court.

[9] *J.D. Gillespie, Tr. for Cleo George*, Rel. No. IC-513, 13 S.E.C. 470, 475 n.4 (1943) ("The broader term 'securities' used in section 3(a)(1)[A] obviously includes Government obligations."). Section 3(a)(1)(A) was previously codified as section 3(a)(1).

[10] *Baker, Watts & Co.*, SEC No-Action Ltr., 1982 WL 29238, at *1 (May 6, 1982); *see also Credit Suisse First Boston Corp.*, SEC No-Action Ltr., 1998 WL 799305, at *3 (Sept. 9, 1998) ("If a trust is engaged primarily in the business of investing in securities, it is an investment company even if it holds only government securities."); *Willkie Farr & Gallagher*, SEC No-Action Ltr., 2000 WL 1585635, at *6 (Oct. 23, 2000) (warning that although market fund securities are not "investment securities" under section 3(a)(1)(C), they are "securities" under section 3(a)(1)(A))

- Defendants argue that GO's primary asset is its expectation of future gains from a business combination. The Defendants' citations here are irrelevant, addressing, *inter alia*, *presently* operating businesses and unconsolidated financial reporting. Mot. 18. GO's stock trades below the liquidation value of GO's securities portfolio, implying no value in the company beyond its securities. Compl. ¶ 92.

- Defendants argue that GO is required to deposit its assets with a trustee under stock exchange rules. Mot. 4-5. Defendants fail to explain why this matters and neglect to mention that the rules do not require the trustee to invest in securities. *See* NYSE Listed Company Manual 102.06.

- Defendants argue that GO's investments are very conservative. But many companies have been deemed to be investment companies despite holding conservative portfolios of government securities and high-grade corporate debt, including the huge industry of money market mutual funds that are the backbone of the regulated investment company industry.[11]

**Public representations of policy.** Defendants argue that GO can avoid the ICA because it has publicly said it is not an investment company. But if all a company had to do to avoid becoming an investment company was to say that it was not one, then the ICA would be a dead letter. The courts and the SEC weigh a company's own statements lightly. Almost every company that has ever lost a fight under section 3(a)(1)(A) has gone down claiming to the court and the public that it was not an investment company. *See, e.g.*, *Fifth Ave. Coach Lines*, 289 F. Supp. at 27-28, 30; *Siimes*, 1992 WL 301622, at *1.[12]

**Historical Development.** Defendants try to distinguish GO's historical development from other acquisition companies deemed to be investment companies by pointing out that, unlike those companies, GO has no historic operations. Mot. 14. This argument hurts GO more than it helps. A company is in the strongest position under the history factor if it can demonstrate a history of

---

[11] *See, e.g.*, *SEC v. Am. Bd. of Trade, Inc.*, 751 F.2d 529, 536 (2d Cir. 1984) (holding an issuer that invested solely in government securities to be an investment company under § 3(a)(1)(A)); *Credit Suisse First Boston*, 1998 WL 799305, at *3; *Financial Funding Group*, 1982 WL 28965, at *1 ("The fact that these securities may also be United States Government securities is irrelevant for purposes of section 3(a)(1)[A]."); *Arizona Property Investors*, 1979 WL 14220.
[12] Defendants also argue that section 3(a)(1)(A) is intended for "deliberate[]" investment companies while 3(a)(1)(C) is left to catch "inadvertent" investment companies. Mot. at 10-13. *Fifth Avenue Coach Lines* squarely rejected this argument. *Fifth Ave. Coach Lines*, 289 F. Supp. at 27-28.

substantial operations and a set of circumstances that forced the company to abandon those operations involuntarily. *See, e.g.*, *Byrndun Corp.*, 11 S.E.C. 861 (1942); *George W. Helme Co.*, Rel. No. IC-109, 9 S.E.C. 16 (1941). GO, however, began its life as a pool of securities, with no history of operations, knowing that it might never run a real business at all.

*Activities of Officers and Directors.* GO next argues that it is not an investment company because its officers and directors have spent the bulk of their time seeking to complete a business combination. Mot. 16. But this is only because GO has delegated the job of managing the portfolio of securities to an outside trustee, which acts as an agent of GO and whose contract with the company was entered at the direction of GO's directors. Compl. ¶¶ 37. In this regard, GO is no different from a mutual fund, which likewise outsources the management of its investment portfolio to a professional investment management firm. Compl. ¶¶ 54-62. Moreover, the SEC and its staff have said that when a company invests as heavily in securities as GO does, it may be an investment company even if its officers and directors spend the bulk of their time looking for acquisitions. *See, e.g.*, *Arizona Property*, 1979 WL 14220, at *1.

**B.  GO "Invests" in Securities.**

Failing under the *Tonopah* factors, Defendants shift topics and argue that although GO may "hold" securities within the meaning of section 3(a)(1)(C) of the ICA, it does not "invest" in them within the meaning of section 3(a)(1)(A). Mot. 11-13. Defendants offer no definition of the word "hold," no authority distinguishing between "holding" and "investing" under section 3(a)(1)(A) of the ICA, and no account of why GO "holds" but does not "invest."

GO's activities clearly fall within the plain meaning of the word "invest," *as evidenced by GO's own usage*. The agreement between GO and the trustee that manages its investments is titled "*Investment* Management Trust Agreement." Mot., Exh. 5 ("Trust Agreement"). Paragraph 1(c) instructs the trustee to "invest and reinvest" GO's assets in securities. *Id.* § 1(c). GO's prospectus

repeatedly refers to the assets in the trust as "investments" saying that "The proceeds held in the trust account, if *invested*, will be *invested* only in U.S. government treasury obligations . . . ." Mot., Ex. 2 ("GO Prospectus") at 18.

The SEC staff has also rejected many times the idea that active trading is necessary to qualify as an investment company under section 3(a)(1)(A).[13] And even if active trading were required, GO would qualify, since its government securities are limited in duration to 185 days, requiring GO to continually replenish its portfolio with new purchases. Compl. ¶ 37.

**C. GO Has Exceeded Any Grace Period Under the ICA.**

Although GO invests all of its assets in securities, Defendants argue that it warranted a grace period before investing in securities became its "primary" business. Plaintiff agrees. Where Plaintiff and Defendants disagree is on when the grace period ends. Defendants say nothing about the length of the grace period. But in considering other acquisition companies, the courts and the SEC have consistently fixed the period at around one year. GO is now well past this line.

In *Fifth Avenue Coach Lines,* the court considered a company whose assets had been seized in a condemnation proceeding. Like GO, the company invested the proceeds of the condemnation award in securities as it sought to acquire another operating business. The court held that although the company invested heavily in securities, these investments did not become the company's "primary" business immediately. However, the grace period was not unlimited. "The time must eventually come," the court held, "when a corporation initially possessed of cash and no real business, by spending its cash becomes engaged in a business of some sort"—i.e., the business of

---

[13] *J.D. Gillespie*, 13 S.E.C. 470; *Credit Suisse First Boston*, 1998 WL 799305, at *3 ("[E]ven a completely passive trust may be considered to be engaged primarily in the business of investing in securities within the meaning of [Section 3(a)(1)(A)] . . . ."); *Centex Corp.*, SEC No-Action Letter, 1986 WL 67311, at *1 (Oct. 10, 1986); *Merrill, Lynch*, 1982 WL 30517, at *2.

investing in securities. *Id.* at 29. The grace period the court allowed the company to complete an acquisition was nine months, at which point the company became an investment company. *Id.*

Since *Fifth Ave. Coach Lines*, the grace period has been extended to one year. This was the period the SEC staff granted in several no-action letters to acquisition companies that proposed to invest the bulk of their assets in securities before making acquisitions. *Medidentic Mortgage Investors*, SEC No-Action Ltr., 1984 WL 45320 at *2 (May 23, 1984) ("We would generally consider a period of up to one year to be temporary"); *Florida First Equities Corp.*, SEC No-Action Ltr., 1980 WL 14869 (Sept. 11, 1980); *Arizona Property Investors, Ltd.*, 1979 WL 14220.

On the basis of "previous no-action assurances in this area" like these, the SEC eventually extended the one-year grace period to all companies under ICA Rule 3a-2. 17 C.F.R. § 270.3a-2(a) (2020); Transient Investment Companies, 46 Fed. Reg. 6882, 6882 (Jan. 22, 1981). In the release that adopted this rule, the SEC clarified that a company would not be allowed to exceed the one-year limit except in extraordinary circumstances. 46 Fed. Reg. at 6883. ("[T]he Commission stresses that a company's inability to become engaged primarily in a non-investment company business within the rule's one-year period would raise serious questions concerning the applicability of the Act to that company.").

The facts and circumstances of this case do not allow extending the period beyond one year. GO has given itself two full years to complete a deal—not merely exceeding the one-year grace period, but *doubling* it. Compl. ¶ 31; COI § 9.1(b). And GO chose to drag its search for an acquisition on for an extended time, even though many other SPACs have completed or planned to complete their acquisitions within one year.[14] *See, e.g.*, CF Acquisition Corp. VII, Am. No. 4 to

---

[14] Nor does the SEC's Rule 419, 17 C.F.R. § 230.419, extend this period for GO. Rule 419 does not apply to GO because GO is not a "penny stock," *id.* § 230.419(a)(2)(ii), and in all events the rule limits the applicable acquisition period to 18 months, *id.* § 230.419(e)(2)(iv). GO gave itself up to 24 months, COI § 9.1(b), and is now almost certain to exceed 18 months in actuality.

Form S-1, at i (Mar. 10, 2021) (promising redemption if business combination is not completed within 12 months); Montes Archimedes Acquisition Corp., Form 8-K (Sept. 30, 2021) (business combination completed within one year of October 7, 2020 IPO).

**D. The Illegal Contracts Continue to Violate the ICA and Will Do So in the Future.**

Section 47(b) of the ICA provides for rescission of "[a] contract that is made, or whose performance involves, a violation of this subchapter . . . ." 15 U.S.C. § 80a-46(b)(1). The Illegal Contracts must be rescinded because they have violated, are now violating, and will continue to violate the ICA. Plaintiff is not seeking to rescind all of GO's contracts on the bare theory that GO is an investment company. Instead, Plaintiff requests rescission of specific portions of the Illegal Contracts on the theory that those particular contracts violate core provisions of the ICA.

**Section 7(a).** The Illegal Contracts violate section 7(a)(1) of the ICA because they require the issuance of securities in violation of the ICA's demand that GO register as an investment company. 15 U.S.C. § 80a-7(a)(1). GO issued the Class B shares in the past without registering as an investment company. And it will issue more Class A shares in the future when the Class B stockholders exercise their right to convert their shares into Class A shares prior to or upon the initial business combination. Compl. ¶ 66; COI § 4.3(b). The Illegal Contracts also violate and will continue to violate section 7(a)(4) of the ICA, which prohibits an unregistered investment company from "engag[ing] in any business in interstate commerce." 15 U.S.C. § 80a-7(a)(4).

It is irrelevant that the issuance of the Class B shares occurred prior to GO's becoming an investment company. The Class B shares require GO to issue new shares of Class A stock upon the conversion of the Class B shares in the future.[15] Compl. ¶ 66; COI § 4.3(b). Section 47(b)

---

[15] GO must continue to comply with the ICA even after it completes a business combination. Once a company has registered as an investment company, the only way for it to deregister is to obtain an order from the SEC finding that the company has ceased to be an investment company. 15 U.S.C. § 80a-8(f); *SEC v. S & P Nat'l Corp.*, 360 F.2d 741, 746 (2d Cir. 1966). This is true even if a company that failed to register initially. *S&P*, 360 F.2d at 746.

allows rescission for a contract whose "performance" is illegal, as well as one whose execution is illegal. Allowing the Class B shares to remain outstanding would involve continued "performance" of the contracts that establish the Class B shares.

**Sections 16(a) and 18(i).** Directors have received their Class B shares by virtue of positions they hold illegally because the Illegal Contracts grant the holders of the Class B shares the exclusive right to elect and remove the directors in violation of sections 18(i) and 16(a) of the ICA. Compl. ¶¶ 44, 80-82; COI § 9.8. With respect to section 16(a), which requires directors to be elected by the holders of all outstanding voting shares, Defendants say only that the directors were elected prior to the time the Class A shares were issued. Mot. 24. But the directors should have faced election again since then. Because GO has divided its board into three classes, section 16(a) requires at least one class of directors to be elected by the shareholders annually. 15 U.S.C. § 80a-16(a); COI § 5.2. The time for that election has now passed, making both the failure to hold the election and the exclusive voting rights of the Class B shares illegal.

With respect to section 18(i), which prohibits unequal voting rights, Defendants have no defense except to say that the remedy Plaintiff seeks is reformation than rescission. But what Plaintiff requests is for this Court to require GO and Defendants to restore to each other the benefits they received under the Illegal Contracts. Defendants must return the Class B shares to GO and GO must return the $25,000 purchase price to Defendants. That is not reformation; it is rescission. Restatement (Third) of Restitution and Unjust Enrichment (2011) § 54 cmt. *a*. Section 47(b) expressly permits partial recission of only those portions of a contract that are illegal. *See* 15 U.S.C. 80a-46(b)(3). Plaintiff also asks this Court to declare the Illegal Contracts unenforceable, which is a private remedy plainly contemplated by section 47(b)(1). 15 U.S.C. § 80a-46(b)(1); *Oxford Univ. Bank v. Lansuppe Feeder*, 933 F.3d 99, 105 (2d Cir. 2019). It does not matter that the exclusive

voting rights in the Class B shares were created before GO became an investment company. GO still refuses to hold an annual director election even now, after GO has crossed the one-year line.

**Sections 22(g) and 23(a).** The Class B shares were issued in violation of sections 22(g) and 23(a) of the ICA, which prohibit the issuance of shares in exchange for "services." Though Defendants paid $25,000 for the shares, the Complaint makes clear that this cash consideration is not the only consideration exchanged, since the shares may well be worth $115 million. Compl. ¶¶ 9, 69, 83, 93-94. As the Complaint plainly alleges, the difference was and is to be provided in services. Compl. ¶ 83. The provision of these services by the Defendants is ongoing, meaning that even though the Class B shares were issued before GO became an investment company, the continued "performance" of the services still triggers section 47(b). 15 U.S.C. § 80a-46(b).

**Section 36(b).** Section 36(b) imposes fiduciary duties on officers, directors, and affiliates of an investment company with respect to compensation. Defendants seek to evade liability by arguing GO issued the Class B shares before Defendants formally took on fiduciary duties by becoming directors and officers of GO. This argument fails for two reasons. First, section 36(b) imposes liability on anyone "act[ing]" as an officer or director at the time of receiving the compensation. 15 U.S.C. § 80a-35(a); *id.* 35(b) (liability for those listed in § 35(a)). The Founder Defendants were so acting at the time the Class B shares were issued because they were the corporation's promoters. They created the corporation and controlled it until it until its directors were elected. Compl. ¶¶ 40-44. As such, they were "acting" as the corporation's officers and directors and they owed the corporation fiduciary duties both before and after its incorporation. *See Gladstone v. Bennett*, 153 A.2d 577, 582 (Del. 1959). The Independent Director Defendants similarly "acted" as directors at the time the Class B shares were issued because the issuance took place only weeks, at most, before they took office, and was granted, as the Complaint alleges, in

exchange for their service on the Board. Compl. ¶¶ 36, 42-43. Second, GO remains obligated to make still more compensation and payments to Defendants now and in the future, at a time when Defendants clearly are or will be acting as fiduciaries. Among other things, GO will issue new shares of Class A stock to Defendants upon the conversion of their Class B shares, which Plaintiff seeks to enjoin.

Defendants also argue that Plaintiff has failed to allege that the compensation "bore no reasonable relationship to the services rendered," but Plaintiff did just that in paragraph 91 of the Complaint.  Defendants paid just $25,000 for shares that could be worth $115 million. The facts alleged in the complaint easily satisfy the six factors the Second Circuit has set out for assessing section 36(b) claims, particularly at the pleadings stage. *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 929-30 (2d Cir. 1982). The relevant facts include the more than $100 million in profits to be realized by the Defendants in excess of their expenses, Compl. ¶ 68, the massive economies of scale in GO (which is much larger than most SPACs), Compl. ¶ 35, the lack of independence among the Director Defendants, Compl. ¶¶ 43-50, and the poor quality of services evident in the long delay GO has faced in completing a deal, Compl. ¶¶ 91-92. It does not matter whether other SPAC sponsors take similar compensation because under section 36(b), prevailing levels of compensation are not dispositive. *Gartenberg*, 694 F.2d at 929.

## II.   PLAINTIFF'S CLAIMS ARE TIMELY.

### A.  Plaintiff's Section 47(b) Claim Did Not Accrue Until August 2021.

Plaintiff's claim is timely because it accrued in August 2021, when GO exceeded its grace period and became an investment company. Since then, the Illegal Contracts have violated the ICA in many ways and will continue to do so in the future.

As described above, the Illegal Contracts are violating the ICA right now. The exclusive voting rights the Illegal Contracts grant to the Class B shares are presently violating sections 16(a)

and 18(i) because GO is in breach of its obligation under section 16(a) to hold an annual election in which the Class B shares would exercise these illegal rights. The Directors' continued receipt of compensation for their work is likewise illegal because the Directors have not been duly reelected to their positions. Further, all of the Defendants continue to provide services to GO in performance of their obligations under the Illegal Contracts, which is illegal under sections 22(g) and 23(a) of the ICA. The continued performance of the Illegal Contracts also involves transactions in interstate commerce in violation of section 7(a)(4).

GO will also violate the ICA in the future. Defendants may exercise their right to convert their Class B shares into Class A shares at any time and will do so automatically upon the business combination. When the conversion happens, GO will have to issue new shares of Class A stock in violation of section 7(a)(1), as well as sections 7(a)(4), 22(a),(g), 23(a), (b), and 36(b) of the ICA.

Defendants assert that Plaintiff was put "on notice" of his claims by GO's August 4, 2020 Prospectus. Mot. 8-9. But at that time, there was still a chance that GO could have avoided becoming an investment company by combining with an operating company in less than a year. *See, e.g.*, *Gabelli v. SEC*, 568 U.S. 442, 448 (2013) ("[T]he standard rule is that a claim accrues when the plaintiff has a complete and present cause of action.").

Moreover, section 47(b) covers not merely "[a] contract that is made" in violation of the ICA, but also one "**whose performance involves**" a violation of the ICA. 15 U.S.C. § 80a-46(b) (emphasis added). As the court in *UFCW Loc. 1500 Pension Fund v. Mayer* explained when rejecting a statute of limitations defense, "[a]n ICA violation . . . does not occur when an investment company fails to register under the ICA. . . . An ICA violation occurs when an unregistered investment company transacts interstate commerce" or otherwise performs a contract that violates the ICA. 2016 WL 6122458, at *10 (N.D. Cal. Oct. 19, 2016). The only case GO

19

relies on, *Blatt v. Merrill Lynch, Pierce, Fenner & Smith*, is inapposite, because the plaintiff there argued only that the company had failed to register under the ICA, not that it had taken specific actions for which registration was required or which were prohibited for companies that had registered. *See* 916 F. Supp. 1343, 1351-52 (D.N.J. 1993).

GO's position that the statute of limitations began to run before it ever became an investment company would make it impossible for anyone to ever bring a timely claim under the ICA. A plaintiff who challenged the Illegal Contracts before the one-year grace period had run would be too early and a plaintiff who challenged the Illegal Contracts after then would be too late. Defendants' position also means that any company may render the ICA moot by just entering its illegal contracts moments before becoming an investment company. That threat is acute because the ICA excludes a company from the definition of an investment company before it goes public. 15 U.S.C. § 80a-3(c)(1). Defendants would allow a mutual fund to evade the ICA by entering illegal contracts on the eve of its public offering, thereby destroying the ICA.

### B. The Applicable Statute of Limitations is Two Years.

Even if the Court concludes that Plaintiff's claims accrued before GO crossed the one-year line, the claims are timely. Sarbanes-Oxley ("SOX") section 804 changed the one-year statute of limitations/three-year statute of repose applicable to most securities claims to a two-year/five-year regime for certain statutory claims, including those brought under the ICA and IAA. Defendants argue the SOX change affects only a claim of fraud; that is incorrect. Section 804 applies to "a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws." 28 U.S.C. § 1658.[16] Courts have already applied the SOX statute of limitations to non-fraud claims under the IAA, which Defendants concede is analogous, Mot.

---

[16] The statute cross-references 15 U.S.C. § 78c(a)(47), which makes clear that it covers the ICA and IAA.

8.[17] *See, e.g.*, *de Rothschild v. Serlin*, 2021 WL 860227, at *7 (S.D.N.Y. Mar. 8, 2021) (applying SOX to IAA claim for violation of requirements regarding maintenance of books and records); *Norman v. Salomon Smith Barney*, 350 F. Supp. 2d 382, 390, n.2 (S.D.N.Y. 2004) (applying SOX to IAA claims that did not sound in fraud); *Thomas v. Metropolitan Life Ins. Co.*, 2008 WL 4619822, at *3-4 (W.D. Okla. Oct. 16, 2008) (similar and collecting cases).

Crucially, the SOX provision applies not just to a claim of fraud, but also to any claim involving a "manipulation" or "contrivance in contravention of a regulatory requirement" of the ICA. To equate fraud with the other causes of action in the statute would render every word that follows "fraud" superfluous. Plaintiff alleges that Defendants have employed a contrivance in contravention of the ICA by crafting a structurally complex securities offering and repeatedly telling investors that it had avoided the ICA by doing so.

### C.  Plaintiff's Section 36(b) Claim is Timely.

Plaintiff's section 36(b) claim is timely because the one-year period cited in section 36(b) does not apply to any of the equitable remedies Plaintiff is pursuing. Section 36(b)(3) states that: "[N]o damages **or other relief** shall be granted against any person other than the recipient of such compensation or payments. No award **of damages** shall be recoverable for any period prior to one year before the action was instituted." 15 U.S.C. § 80a-35(b)(3) (emphasis added). Both damages **and other relief** are available, but only damages are limited by the one-year look back.

That 36(b)(3) provides for equitable remedies other than damages is well-settled. *See In re Gartenberg*, 636 F.2d 16, 17 (2d Cir. 1980). Plaintiffs under section 36(b) routinely seek rescission

---

[17] The single case Defendants cite rejecting SOX's application to the ICA did not conduct any analysis of why the Plaintiff's ICA claim was not covered by SOX and, in any event, applied "the longer limitations period of three years from the wrong." *Phoenix Four, Inc. v. Strategic Res. Corp.*, 2006 WL 399396, at *6 (S.D.N.Y. Feb. 21, 2006). Moreover, Defendants' thesis that a statute of limitations for securities fraud should not apply to non-fraud claims was rejected by the Second Circuit. The *Kahn* Court **rejected** the argument that the statute of limitations applicable to securities fraud claims should not apply to the IAA—again, which Defendants concede is analogous to Section 47(b) of the ICA. *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1038 (2d Cir. 1992).

21

or injunctive relief as remedies without regard to any one-year limitation.[18] The availability of other remedies is consistent with the Supreme Court's mandate that, "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 7-71 (1992). In a statute prohibiting a breach of fiduciary duty, both injunctions and rescission can be appropriate remedies.[19] Section 36(b) can thus provide a remedy for rescission, independent of the right to rescission available under section 47(b).

The equitable remedies available under section 36(b) are not subject to the one-year limitation. *Kahn*, 970 F.2d at 1037-38 ("There is no express time limit on bringing an action under § 36(b), but the plaintiff may collect only those damages that have accrued in the prior year."); *see also In re Franklin Mut. Funds Fee Litigation*, 478 F. Supp. 2d 677, 685 (D.N.J. 2007). In no case has a court prohibited a section 36(b) plaintiff from rescinding or enjoining a contract more than one year after the contract was signed.

Additionally, as described above, the relief Plaintiff seeks under section 36(b) is forward-looking and does not implicate the one-year lookback. Plaintiff asks the Court for rescission, an injunction, and a declaratory judgment to prevent Defendants from continuing to perform the Illegal Contracts ***now and in the future***. Compl. pg. 31. The one-year limitation does not prohibit

---

[18] *See, e.g.*, *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 341 (2010); *Curd ex rel. SEI Int'l Equity Fund v. SEI Inv. Mgmt. Corp.*, 2015 WL 4243495, at *1 (E.D. Pa. July 14, 2015); *Ingenhutt v. State Farm Inv. Mgmt. Corp.*, 2017 WL 1398646, at *9 (C.D. Ill. Apr. 18, 2017); *Strigliabotti v. Franklin Res., Inc.*, 398 F. Supp. 2d 1094, 1096 (N.D. Cal. 2005).
[19] *See, e.g.*, *Miller v. Butler*, 2014 WL 1716184, at *5 (D.N.J. Apr. 30, 2014) ("[R]escission is . . . an appropriate remedy in breach of fiduciary duty or fraud claim[.]"); *Morada Music, LLC v. Hays*, 2010 WL 11596237, at *4 (C.D. Cal. Jan. 27, 2010) ("Where a breach of fiduciary duty occurs, equitable remedies are available, including imposition of a constructive trust, rescission, restitution, and incidental damages."); *Avianca, Inc. v. Corriea*, 1993 WL 797455, at *4 (D.D.C. May 13, 1993) (similar).

forward-looking relief for payments made and actions taken after the commencement of a suit.[20]

## III.    PLAINTIFF HAS DERIVATIVE STANDING.

### A.  Plaintiff Satisfies Rule 23.1's Contemporaneous Ownership Requirement.

Rule 23.1 requires that a derivative complaint "allege that the plaintiff was a shareholder or member at the time of the transaction complained of." Fed. R. Civ. P. 23.1(b)(1). Here, Plaintiff may proceed directly on his section 36(b) claim, *see Daily Income Fund v. Fox*, 464 U.S. 523, 527-42 (1984). As a party to the contract created by the Company's Certificate of Incorporation, Plaintiff may also sue directly to rescind it. *See, e.g.*, *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991); *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1049-50 (Del. Ch. 2015); *Eaton Vance Senior Income Tr. v. Saba Capital Master Fund, Ltd.*, 2021 WL 2222812, at *5-6 (Sup. Ct. Mass. Mar. 31, 2021).

Rule 23.1 therefore applies only to Plaintiff's section 47(b) claim premised on the Class B Share Subscription Agreement. Because Plaintiff purchased his shares before GO held its government securities for more than one year, Plaintiff had and will have contemporaneous ownership during the relevant transactions.[21] Plaintiff also satisfies the contemporaneous ownership requirement because he seeks forward-looking relief under section 47(b) for independently actionable violations of the ICA pursuant to the Illegal Contracts. Courts have held that shareholders have standing to challenge unlawful corporate actions taken pursuant to a contract where the shareholders did not hold stock at the time the contract was executed, but did hold at the time the unlawful acts were committed. *See, e.g.*, *In re Penn Cent. Transp. Co.*, 341 F.

---

[20] *See, e.g.*, *Forsythe v. Sun Life Financial, Inc.*, 475 F. Supp. 2d 122, 124 (D. Mass. 2007); *Hunt v. Invesco Funds Group, Inc.*, 2006 WL 1751900, at *1 (S.D. Tex. June 22, 2006); *Tarlov v. Paine Webber Cashfund, Inc.*, 559 F. Supp. 429, 433 (D. Conn. 1983)

[21] Plaintiff purchased his shares on May 26, 2021.

Supp. 845, 846 (E.D. Pa. 1972) (plaintiff had standing to challenge 1873 lease, despite acquiring stock later, because plaintiff alleged ongoing injuries from lease).

Defendants thus fail to understand which "transactions" are at issue under Rule 23.1. The key transactions are not GO's IPO disclosures, but its transformation into an investment company after one year and its continued subsequent violations of the ICA through the performance of the Illegal Contracts. *See Rubenstein v. Adamy*, 2021 WL 1269080, at *6-7 (S.D.N.Y. Apr. 6, 2021).

## B.  Plaintiff Adequately Pleaded Demand Futility.

Plaintiff has adequately pleaded demand futility for the claims for which it is required, and the question is not close. In Delaware demand is excused when a majority of directors receive a material personal benefit from the alleged misconduct that is the subject of the litigation. *United Food & Commercial Workers Union v. Zuckerberg*, 2021 WL 4344361, at *17 (Del. Sept. 23, 2021). Every member of the GO Board now holds securities that are illegal and will be rescinded if Plaintiff prevails. No member of this Board can "properly exercise[]" "independent and disinterested business judgment," *id.* at *7 (quoting *Rales* v. *Blasband*, 634 A.2d 927, 934 (Del. 1993)), in a suit that directly challenges the legality of their own compensation.

Each member of the Board received at least 25,000 Class B shares pursuant to transactions that, the Complaint alleges, violated the ICA and must be rescinded. Compl. ¶¶ 43, 77. There can thus be no doubt that each of these directors "received a material personal benefit from the alleged misconduct that is the subject of the litigation," *Zuckerberg*, 2021 WL 43443561, at *17, and demand is therefore clearly excused.[22]

---

[22] As the complaint alleged, two of the directors, Gottesman and O'Hara, own the Sponsor, and thus directly or indirectly own 14.3 million Class B shares that, upon an Initial Business Combination, will be worth more than $50 million. Compl. ¶¶ 21-23. As the complaint also explained, the remaining three directors each own 25,000 Class B shares worth hundreds of thousands of dollars upon an Initial Business Combination. Compl. ¶ 43. These amounts are material, certainly at the pleading stage. *See, e.g.*, *Frank v. Elgamal*, 2012 WL 1096090, at *11 & n.83 (Del. Ch. 2012).

It is true that in a case in which the challenged transaction does not involve the directors' compensation, "demand is not excused simply because directors receive compensation from the company." *London v. Tyrrell*, 2008 WL 2505435, at *5 (Del. Ch. June 24, 2008). In this case, however, things are different because the directors' compensation is the very transaction being challenged.[23] A decade ago, Delaware's Chancery called this distinction "well settled law," because directors "who have received [pay] plaintiffs seek to challenge 'have a strong financial incentive to maintain the status quo by not authorizing any corrective action that would . . . cause them to disgorge improperly obtained profits.'" *Id.* (quoting *Conrad v. Blank*, 940 A.2d 28, 38 (Del. Ch. 2007)). Delaware courts have thus often held that demand is excused when plaintiffs challenge the validity of directors' stock options, because that situation "creates an unacceptable conflict that restricts [directors] from evaluating the litigation independently." *Conrad*, 940 A.2d at 38.[24]

Demand is also excused here because the Founder Defendants own the Sponsor Defendant, which stands to receive significant benefits from the transactions challenged, and the Sponsor Defendant granted each of Directors Isaacs, Ahye, and Corio 25,000 Class B shares, such that all five Directors "lack[] independence from [the Sponsor Defendant], who received a material personal benefit from the alleged misconduct that [is] the subject of the litigation." Compl. ¶ 43; *Zuckerberg*, 2021 WL 4344361, at *17.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the motion be denied.

---

[23] Responding to defendants who "cite . . . cases for the general rule that demand is not excused simply because directors receive compensation from the company," Delaware courts have long explained that "those cases do not address the slightly different question presented here—whether demand is excused where the challenged decision" bears on the legal validity of the directors' own pay. *Weiss v. Swanson*, 948 A.2d 433, 448 (Del. Ch. 2008).

[24] *See also Tyrrell*, 2008 WL 2505435, at *5 (collecting a series of Delaware cases distinguishing between plaintiffs seeking to excuse demand simply because directors receive compensation and those for whom demand is excused because their claims bear upon the legal validity of the directors' compensation).

Dated: New York, New York
    October 25, 2021

SUSMAN GODFREY L.L.P.
Shawn J. Rabin
Stephen Shackelford
Cory Buland
Beatrice Franklin
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
E-mail: SRabin@susmangodfrey.com

BUZIN LAW, P.C.
Robert J. Jackson, Jr. (admitted pro hac vice)
John Morley (admitted pro hac vice)
111 Broadway, Suite 1204
New York, NY 10006
Telephone: (914) 819-7527
E-mail: john.morley@yale.edu

RM LAW, P.C.
Richard A. Maniskas
1055 Westlakes Dr., Ste. 300
Berwyn, PA 19312
Telephone: (484) 258-1585
Facsimile: (484) 631-1305
E-mail: rm@rmclasslaw.com

BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP

/s/ Mark Lebovitch
Mark Lebovitch
Daniel E. Meyer
Joseph W. Caputo (Bar Admission Pending)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1519
Facsimile: (212) 554-1444
E-mail: MarkL@blbglaw.com

Gregory V. Varallo
500 Delaware Avenue
Suite 901
Wilmington, DE 19801
Telephone: (302) 364-3601
E-mail: Greg.Varallo@blbglaw.com