### Dontzin Nagy & Fleissig LLP

980 Madison Avenue
New York, N.Y. 10075
Telephone (212) 717-2900
Fax (212) 717- 8088

Hon. Michael J. Dontzin (1993-2012)
Matthew S. Dontzin
Tibor L. Nagy, Jr
David A. Fleissig.
Tracy O. Appleton
Jason A. Kolbe

Ruben G. Perlmutter
Amina M. Hafez
Gregory N. Wolfe
Susan S. Hu
Asher T. Lowenstein
Heidi R. Schumann
William H. LaGrange
Diego Martinez-Krippner
Richard J. Sarcone

March 31, 2021

**<u>VIA ECF AND EMAIL</u>**

The Honorable John P. Cronan
United States District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007-1312

Re: *Assad v. Go Acquisition Corp. et al.*, No. 21 Civ. 7076

Dear Judge Cronan:

We represent Defendants in the above-referenced action.  We are writing to respectfully request that the Court consider as supplemental authority in support of Defendants' motion to dismiss the enclosed proposed rules and amendments regarding special purpose acquisition companies ("SPACs") (the "Proposed Rules").  The Proposed Rules were announced yesterday following an open meeting of the U.S. Securities and Exchange Commission (the "SEC").  The Proposed Rules include a series of sweeping new disclosure requirements for SPACs to address issues such as conflicts and forward-looking statements.  They also directly address the status of SPAC's under the Investment Company Act (the "ICA"), which is the focus of this novel lawsuit.

In promulgating the Proposed Rules, the SEC acknowledges that there are some ambiguities as to application of the ICA to SPACs.  However, certain things are clear.  The SEC does not—as Plaintiff has argued—consider SPACs like Defendant GO Acquisition Corp. ("GO") to be clandestine investment companies *de facto* subject to regulation under the ICA.  Unlike the activist Plaintiff in this case, the SEC is not pursuing enforcement actions against GO and other SPACs to mandate registration under the ICA.  Instead, the SEC is proposing a new safe-harbor in the form of Proposed Rule 3a-10 under the ICA to clarify the  circumstances where a "SPAC's operations would be limited and differ sufficiently from those of investment companies so as to generally not raise the types of investor protection concerns that the [ICA] is intended to address." (Proposed Rules at p. 136-37).  Defendant GO unquestionably fell within this proposed safe-harbor on August 20, 2021 when Plaintiff's Complaint was filed.  (Dkt. No. 1).

DONTZIN NAGY & FLEISSIG LLP

The Hon. John P. Cronan
March 31, 2022
Page 2 of 4

Under Proposed Rule 3a-10, a SPAC is not an investment company where, among other things, it meets several conditions:

**_Nature and Management of SPAC Assets_**: "[A] SPAC's assets must consist solely of Government securities, Government money market funds and cash items prior to the completion of the de-SPAC transaction." (Proposed Rules at p. 142.) Plaintiff has focused at length in this case on the fact that government securities such as the 185-day held to maturity Treasuries in GO's Trust Account are "securities" under ICA § 3(a)(1)(A). In its Proposed Rules, the SEC adopts Defendants' position—a SPAC holding government securities is "consistent with cash management practices rather than primarily investment purposes."[1]

**_Objective of De-SPAC Transaction_**: "[T]he SPAC must have a business purpose aimed at providing its shareholders with the opportunity to own interests in a public entity that, in contrast to an investment company, will either be an operating company, or will, through a primarily controlled company, operate such operating company." As discussed at length in Defendants' briefs, GO unquestionably has disclosed its primary "purpose of effecting a merger . . . or similar business combination." (MTD at 3.)[2]

**_Primary Engagement Toward Objective_**: A SPAC must be "primarily engaged in the business of seeking to complete a de-SPAC transaction in the manner and within the time frame set forth in the rule." (Proposed Rules at p. 147.) The SEC explains that this criteria can be satisfied "by the activities of its officers, directors and employees, its public representations of policies, and its historical development." (Proposed Rules at pp. 147-48.) As Defendants explained in their motions to dismiss, it is not a plausible inference that SPAC managers are primarily engaged in investment management activities rather than pursuing a business combination in which Trust Assets are held in government securities and simply rolled from maturity-to-maturity for meager cash-management returns. GO's public representations of its primary purpose and development as a SPAC (rather than an inadvertent investment company transitioning from an operating company to an investment company) all support its primary engagement is as a SPAC and not a secret investment company.[3]

---

[1] The SEC further explained that placing assets in trusts or escrow as SPACs like GO typically do in compliance with exchange listing rules helped to reinforce important regulatory purposes. The SEC analogized to the "status of escrow or trust accounts established by blank check companies that comply with Rule 419" where "in light of the purposes served by the regulatory requirement to establish such an account, the limited nature of the investments, and the limited duration of the account, such an account will neither be required to register as an investment company nor regulated as an investment company . . . ." (Proposed Rules at p. 137.)

[2] The Proposed Rule also requires that the "surviving company would have at least one class of securities listed for trading on a national securities exchange," GO would unquestionably satisfy this requirement. (Proposed Rules at p. 145.)

[3] The Proposed Rule requires that "the SPAC's board of directors would also need to adopt an appropriate resolution evidencing that the company is primarily engaged in the business of seeking to complete a single de-SPAC transaction as described by the rule . . . ." (Proposed Rules at p. 148.) Given that the Proposed

Dontzin Nagy & Fleissig LLP
The Hon. John P. Cronan
March 31, 2022
Page 3 of 4

*Durational Limitations*:  A SPAC must "announc[e] that it has entered into an agreement with the target company (or companies) to engage in a de-SPAC transaction no later than 18 months after the effective date of the SPAC's registration statement for its initial public offering" and "must then complete the de-SPAC transaction no later than 24 months after the effective date of its registration statement for its initial public offering."[4] (Proposed Rules at p. 152.)  Plaintiff's Complaint was filed slightly over twelve months after GO's initial public offering, falling squarely within the SEC's proposed safe harbor.  Plaintiff has argued at length in this litigation that GO should be treated as an investment company because more than a year had passed since its IPO.  The SEC disagrees, explaining that it is "proposing a longer time frame under Rule 3a-10 because we understand that the search for a de-SPAC target frequently takes more than one year and an issuer relying on Rule 3a-10 would be more restricted in its business purpose and activities throughout the period of reliance than an issuer relying on Rule 3a-2.  This proposed timeframe reflects a consideration of the *Tonopah* factors, including the factor that focuses on an issuer's historical development as well as our position with respect to Rule 419." (Proposed Rules at p. 155.)

*       *       *

Furthermore, despite the creation of Proposed Rule 3a-10, the SEC explicitly states that a SPAC "would not be required to rely on the safe harbor," but that the SEC "designed the proposed conditions of the safe harbor to align with the structures and practices that [they] preliminarily believe would distinguish a SPAC that is likely to raise serious questions from one that would not." (Proposed Rules at p. 138.)  Therefore, even if GO does not qualify for the Proposed safe harbor, it does not follow that GO is therefore subject to the ICA.

In multiple ways, the SEC's Proposed Rules reinforce what Defendants have said from the outset of this litigation: GO is a SPAC, not a secret investment company.  Plaintiff has not plausibly pleaded otherwise simply because GO holds its investor assets in a Trust Account invested exclusively in held to maturity government securities, which the SEC recognizes should not itself trigger investment company status.

---

Rule was not in effect at the time, GO's board did not adopt such a resolution, but would have unquestionably done so given its public representations of the SPAC's purpose.

[4] A SPAC is also "required to distribute its assets in cash to investors as soon as reasonably practicable if it does not meet either the 18-month deadline or the 24-month deadline." (Proposed Rules at p. 153.)

Dontzin Nagy & Fleissig LLP
The Hon. John P. Cronan
March 31, 2022
Page 4 of 4

We look forward to discussing these matters with the Court at a hearing.

Respectfully submitted,

Matthew S. Dontzin

cc:    All counsel of record (via ECF)

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Parts 210, 229, 230, 232, 239, 240, 249, and 270**

**[Release Nos. 33-11048; 34-94546; IC-34549; File No. S7-13-22]**

**RIN 3235-AM90**

**Special Purpose Acquisition Companies, Shell Companies, and Projections**

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Proposed rules.

**SUMMARY:** The Securities and Exchange Commission ("Commission") is proposing rules intended to enhance investor protections in initial public offerings by special purpose acquisition companies ("SPACs") and in subsequent business combination transactions between SPACs and private operating companies. Specifically, we are proposing specialized disclosure requirements with respect to, among other things, compensation paid to sponsors, conflicts of interest, dilution, and the fairness of these business combination transactions. The proposed new rules and amendments to certain rules and forms under the Securities Act of 1933 and the Securities Exchange Act of 1934 would address the application of disclosure, underwriter liability, and other provisions in the context of, and specifically address concerns associated with, business combination transactions involving SPACs as well as the scope of the Private Securities Litigation Reform Act of 1995. Further, we are proposing a rule that would deem any business combination transaction involving a reporting shell company, including a SPAC, to involve a sale of securities to the reporting shell company's shareholders and are proposing to amend a number of financial statement requirements applicable to transactions involving shell companies. In addition, we are proposing to update our guidance regarding the use of projections in Commission filings as well as to require additional disclosure regarding projections when used in

connection with business combination transactions involving SPACs.  Finally, we are proposing a new safe harbor under the Investment Company Act of 1940 that would provide that a SPAC that satisfies the conditions of the proposed rule would not be an investment company and therefore would not be subject to regulation under that Act.

**DATES:** Comments should be received on or before [INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER OR MAY 31, 2022 (WHICH IS 60 DAYS AFTER ISSUANCE), WHICHEVER IS LATER].

**ADDRESSES:** Comments may be submitted by any of the following methods:

Electronic comments:

- Use the Commission's internet comment form (https://www.sec.gov/rules/submitcomments.htm); or

- Send an email to rule-comments@sec.gov.  Please include File Number S7-13-22 on the subject line; or.

Paper comments:

- Send paper comments to Vanessa A. Countryman, Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549-1090.

All submissions should refer to File Number S7-13-22.  This file number should be included on the subject line if email is used.  To help the Commission process and review your comments more efficiently, please use only one method.  The Commission will post all comments on the Commission's website (http://www.sec.gov/rules/proposed.shtml).  Comments are also available for website viewing and printing in the Commission's Public Reference Room, 100 F Street NE, Washington, DC 20549 on official business days between the hours of 10 a.m. and 3 p.m.  Operating conditions may limit access to the Commission's Public Reference Room.

All comments received will be posted without change.  Persons submitting comments are cautioned that we do not redact or edit personal identifying information from comment submissions.  You should submit only information that you wish to make available publicly.

Studies, memoranda, or other substantive items may be added by the Commission or staff to the comment file during this rulemaking.  A notification of the inclusion in the comment file of any such materials will be made available on our website.  To ensure direct electronic receipt of such notifications, sign up through the "Stay Connected" option at www.sec.gov to receive notifications by email.

**FOR FURTHER INFORMATION CONTACT:** Charles Kwon, Office of Rulemaking, Division of Corporation Finance, at (202) 551-3430; or with respect to proposed Rules 140a and 145a under the Securities Act, Adam Turk, Office of Chief Counsel, Division of Corporation Finance, at (202) 551-3500; with respect to proposed Rule 15-01 of Regulation S-X, Ryan Milne, Office of Chief Accountant, Division of Corporation Finance, at (202) 551-3400; with respect to the proposed amendments relating to projections disclosure and tender offer rules, Daniel Duchovny, Office of Mergers & Acquisitions, Division of Corporation Finance, at (202) 551-3440; and with respect to proposed Rule 3a-10 under the Investment Company Act, Rochelle Kauffman Plesset, Seth Davis, or Taylor Evenson, Senior Counsels; Lisa Reid Ragen, Branch Chief; or Thoreau Bartmann, Assistant Director, Chief Counsel's Office, Division of Investment Management, at (202) 551-6825; U.S. Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549.

**SUPPLEMENTARY INFORMATION:** The Commission is proposing for public comment new 17 CFR 210.15-01 (Rule 15-01 of Regulation S-X), new 17 CFR 229.1601 through 229.1610 (Subpart 1600 of Regulation S-K), new 17 CFR 230.140a (Securities Act Rule 140a),

new 17 CFR 230.145a (Securities Act Rule 145a), and new 17 CFR 270.3a-10 (Investment

Company Act Rule 3a-10).  We are also proposing for public comment amendments to:

| Commission Reference | | CFR Citation (17 CFR) |
|---|---|---|
| Securities Act of 1933 ("Securities Act")[1] | Rule 137 | § 230.137 |
| | Rule 138 | § 230.138 |
| | Rule 139 | § 230.139 |
| | Rule 163A | § 230.163A |
| | Rule 164 | § 230.164 |
| | Rule 174 | § 230.174 |
| | Rule 405 | § 230.405 |
| | Rule 419 | § 230.419 |
| | Rule 430B | § 230.430B |
| | Rule 437a | § 230.437a |
| | Form S-1 | § 239.11 |
| | Form F-1 | § 239.31 |
| | Form S-4 | § 239.25 |
| | Form F-4 | § 239.34 |
| Securities Exchange Act of 1934 ("Exchange Act")[2] | Rule 12b-2 | § 240.12b-2 |
| | Rule 14a-6 | § 240.14a-6 |
| | Rule 14c-2 | § 240.14c-2 |
| | Schedule 14A | § 240.14a-101 |
| | Schedule TO | § 240.14d-100 |
| | Form 20-F | § 249.220f |
| | Form 8-K | § 249.308 |
| Regulation S-K (17 CFR 229.10 through 229.1406) | Item 10 | § 229.10 |
| | Item 601 | § 229.601 |
| Regulation S-T (17 CFR 232.10 through 232.903) | Rule 405 | § 232.405 |

---

[1]  15 U.S.C. 77a *et seq.*

[2]  15 U.S.C. 78a *et seq.*

| Commission Reference | | CFR Citation (17 CFR) |
|---|---|---|
| Regulation S-X (17 CFR 210.1-01 through 210.13-02) | Rule 1-02 | § 210.1-02 |
| | Rule 3-01 | § 210.3-01 |
| | Rule 3-02 | § 210.3-02 |
| | Rule 3-05 | § 210.3-05 |
| | Rule 3-14 | § 210.3-14 |
| | Rule 8-02 | § 210.8-02 |
| | Rule 10-01 | § 210.10-01 |
| | Rule 11-01 | § 210.11-01 |

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................ 8
II.  PROPOSED NEW SUBPART 1600 OF REGULATION S-K ............................ 22
     A. Definitions ................................................................................................ 24
     B. Sponsors ................................................................................................... 28
     C. Conflicts of Interest ................................................................................. 32
     D. Dilution .................................................................................................... 36
     E. Prospectus Cover Page and Prospectus Summary Disclosure .......................... 41
     1.   Prospectus Cover Page ......................................................................... 42
     2.   Prospectus Summary ............................................................................ 42
     F. Disclosure and Procedural Requirements in De-SPAC Transactions ............. 46
     1.   Background of and Reasons for the De-SPAC Transaction; Terms and Effects .......... 46
     2.   Fairness of the De-SPAC Transaction .................................................. 52
     3.   Reports, Opinions, and Appraisals ...................................................... 55
     4.   Proposed Item 1608 of Regulation S-K ............................................... 58
     G. Structured Data Requirement ................................................................. 61
III. ALIGNING DE-SPAC TRANSACTIONS WITH INITIAL PUBLIC OFFERINGS ......... 64
     A. Aligning Non-Financial Disclosures in De-SPAC Disclosure Documents ......... 67
     B. Minimum Dissemination Period .............................................................. 70
     C. Private Operating Company as Co-Registrant to Form S-4 and Form F-4 ........ 74
     D. Re-Determination of Smaller Reporting Company Status ......................... 78
     E. PSLRA Safe Harbor ................................................................................ 82
     F. Underwriter Status and Liability in Securities Transactions ..................... 87
     1.   Participants in a Distribution as "Underwriters" .................................. 92
     2.   The De-SPAC Transaction as a "Distribution" of the Combined Company's Securities ............................................................................... 94
     3.   Proposed Rule: SPAC IPO Underwriters are Underwriters in Registered De-SPAC Transactions ....................................................... 96

IV.  BUSINESS COMBINATIONS INVOLVING SHELL COMPANIES ............................. 101
   A. Shell Company Business Combinations and the Securities Act of 1933 ...................... 101
   1.  Shell Company Business Combinations .............................................................. 101
   2.  Proposed Rule 145a ........................................................................................... 104
   3.  Excluded Transactions ....................................................................................... 108
   B. Financial Statement Requirements in Business Combination Transactions Involving Shell
   Companies ................................................................................................................ 112
   1.  Number of Years of Financial Statements .......................................................... 113
   2.  Audit Requirements of Predecessor .................................................................... 116
   3.  Age of Financial Statements of the Predecessor ................................................. 117
   4.  Acquisitions of Businesses by a Shell Company Registrant or Its Predecessor That Are
      Not or Will Not Be the Predecessor .................................................................... 118
   5.  Financial Statements of a Shell Company Registrant After the Combination with
      Predecessor ......................................................................................................... 122
   6.  Other Amendments ............................................................................................ 124
V.   ENHANCED PROJECTIONS DISCLOSURE ...................................................... 127
   A. Background ............................................................................................................... 127
   B. Rule Proposals .......................................................................................................... 129
   1.  Item 10(b) of Regulation S-K ............................................................................ 130
   2.  Item 1609 of Regulation S-K ............................................................................. 132
VI.  PROPOSED SAFE HARBOR UNDER THE INVESTMENT COMPANY ACT ........... 135
   A. Background ............................................................................................................... 135
   1.  Potential Status as an Investment Company ........................................................ 136
   2.  Rationale for the Safe Harbor ............................................................................. 137
   3.  Boundaries of the Safe Harbor ........................................................................... 138
   B. Conditions ................................................................................................................ 141
   1.  Nature and Management of SPAC Assets ........................................................... 142
   2.  SPAC Activities ................................................................................................. 144
   3.  Duration Limitations .......................................................................................... 152
VII. ADDITIONAL REQUESTS FOR COMMENT .................................................... 160
VIII.      GENERAL REQUEST FOR COMMENTS ..................................................... 164
IX.  ECONOMIC ANALYSIS ................................................................................ 165
   A. Broad Economic Considerations ................................................................................ 168
   B. Baseline and Affected Parties .................................................................................... 177
   1.  SPAC Initial Public Offerings ............................................................................ 177
   2.  De-SPAC Transactions ....................................................................................... 186
   3.  Blank Check Companies ..................................................................................... 198
   4.  Shell-Company Business Combinations .............................................................. 199
   5.  Projections Under Item 10(b) of Regulation S-K ................................................ 202
   6.  Investment Company Act Safe Harbor ................................................................ 202
   C.   Benefits and Costs of the Proposed Rules ................................................................ 209
   1.  Disclosure-Related Proposals ............................................................................. 209
   2.  Liability-Related Proposals ................................................................................. 243
   3.  Shell-Company Related Proposals ...................................................................... 252
   4.  Enhanced Projections Disclosure (Amendments to Item 10(b) of Regulation S-K) .... 262
   5.  Investment Company Act Safe Harbor ................................................................ 264

D. Effects on Efficiency, Competition, and Capital Formation........................................... 274
   1. Efficiency ..................................................................................................... 274
   2. Competition .................................................................................................. 275
   3. Capital Formation......................................................................................... 276
E. Reasonable Alternatives................................................................................................. 277
   1. Disclosure-Related Proposals....................................................................... 277
   2. Liability-Related Proposals .......................................................................... 281
   3. Expanding Disclosure in Reporting Shell Company Business Combinations ............ 282
   4. Enhanced Projections Disclosures ............................................................... 284
   5. Investment Company Act Safe Harbor ........................................................ 284
F. Requests for Comment.................................................................................................... 286
X.   PAPERWORK REDUCTION ACT ................................................................................... 291
A. Summary of the Collections of Information .................................................................. 291
B. Estimates of the Effects of the Proposed New Rules and Amendments on the Collections of Information............................................................................................................... 293
C. Incremental and Aggregate Burden and Cost Estimates................................................ 299
D. Request for Comment .................................................................................................... 304
XI.   SMALL BUSINESS REGULATORY ENFORCEMENT FAIRNESS ACT ................... 305
XII.  INITIAL REGULATORY FLEXIBILITY ANALYSIS AND CERTIFICATION .......... 306
A. Reasons for, and Objectives of, the Proposed Action.................................................... 307
B. Legal Basis ..................................................................................................................... 308
C. Regulatory Flexibility Act Certification ........................................................................ 308
D. Small Entities Subject to the Proposed Rules and Amendments.................................... 309
E. Reporting, Recordkeeping, and Other Compliance Requirements................................. 311
F. Duplicative, Overlapping or Conflicting Federal Rules ................................................ 312
G. Significant Alternatives ................................................................................................. 312
STATUTORY AUTHORITY AND TEXT OF PROPOSED RULE AND FORM
AMENDMENTS ................................................................................................................ 315

## I.    INTRODUCTION

Special purpose acquisition companies first began to emerge in the 1990s as an alternative to blank check companies regulated pursuant to Rule 419 under the Securities Act.[3] In response to widespread fraud and abuse in blank check offerings, Congress passed the Securities Enforcement Remedies and Penny Stock Reform Act of 1990,[4] which required the Commission to adopt rules governing registration statements filed by blank check companies offering penny stock.[5]  In response, the Commission adopted comprehensive disclosure and other requirements for blank check offerings in Rule 419.[6]  Following the adoption of Rule 419, securities offerings by SPACs, which are not subject to the rule's requirements but have many similar features, began to appear, with the number of these offerings fluctuating over the years.[7] In the past two years, however, the U.S. securities markets have experienced an unprecedented surge in the number of initial public offerings by SPACs, with SPACs raising more than $83 billion in such offerings in 2020 and more than $160 billion in such offerings in 2021.[8]  In 2020 and 2021, more than half of all initial public offerings were conducted by SPACs.

---

[3]  The term "blank check company" is defined in 17 CFR 230.419(a)(2) as a development stage company that has no specific business plan or purpose or that has indicated that its business plan is to engage in a merger or acquisition with an unidentified company or companies, and that is issuing "penny stock," as defined in 17 CFR 240.3a51-1 (Exchange Act Rule 3a51-1).

[4]  Pub. L. 101-429, 104 Stat. 931 (Oct. 15, 1990).

[5]  *Id.* at sec. 508; Section 7(b) of the Securities Act.

[6]  *Blank Check Offerings*, Release No. 33-6932 (Apr. 13, 1992) [57 FR 18037 (Apr. 28, 1992)].  Rule 419 requires a blank check company to meet certain disclosure and investor protection requirements in registered offerings of securities.

[7]  Between 2011 and 2021, the average number of initial public offerings by SPACs registered under the Securities Act per year was 98, with the highest number of such offerings (613) in 2021 and the lowest number of such offerings (9) in 2012.  In 2008, both the New York Stock Exchange and Nasdaq adopted rules to permit the listing of SPACs on these exchanges for the first time.  *See, e.g.*, Release No. 34-57785 (May 6, 2008) [73 FR 27597 (May 13, 2008)] and Release No. 34-58228 (July 25, 2008) [73 FR 44794 (July 31, 2008)].

[8]  By comparison, SPACs raised a total of $13.6 billion in initial public offerings in 2019 and a total of $10.8 billion in initial public offerings in 2018.  As used in this release, "initial public offering" refers to a securities offering

A SPAC is typically a shell company[9] that is organized for the purpose of merging with or acquiring one or more unidentified private operating companies (a "de-SPAC transaction") within a certain time frame (often two years) and that conducts a firm commitment underwritten initial public offering of $5 million or more in units consisting of redeemable shares and warrants.[10]   A SPAC is organized and managed by its sponsor, which is usually compensated through an amount equal to a percentage (often 25 percent) of the SPAC's initial public offering proceeds (in the form of discounted shares and warrants) to be received upon the completion of a de-SPAC transaction.[11]   Although SPACs are not subject to the requirements of Rule 419,[12] they

---

registered under the Securities Act by an issuer that was not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act immediately prior to the registration.

[9]  The term "shell company" is defined in Securities Act Rule 405 and Exchange Act Rule 12b-2 as a registrant, other than an asset-backed issuer, that has: (1) no or nominal operations; and (2) either: (i) no or nominal assets; (ii) assets consisting solely of cash and cash equivalents; or (iii) assets consisting of any amount of cash and cash equivalents and nominal other assets.

[10]  The descriptions included in this release of common features currently seen in SPACs and SPAC transaction structures are based, in part, on reviews by the Commission staff of SPAC filings with the Commission.  The terms "private operating company" and "target company" are used interchangeably in this release, unless otherwise indicated.  We are proposing to define the term "target company" for purposes of the requirements applicable to SPACs.  *See infra* Section II.A.

[11]  This sponsor compensation is often referred to as the sponsor's "promote" or "founder shares," which usually amounts to around 20% of the total shares of a SPAC after its initial public offering.  The underwriting fees in a SPAC's initial public offering are typically between 5% and 5.5% of the offering proceeds, of which 3.5% is also usually conditioned on the completion of the de-SPAC transaction.

[12]  Issuers that raise more than $5 million in a firm commitment underwritten initial public offering are excluded from the definition of "blank check company" in Rule 419, and thus are not subject to the requirements of the rule, because they are not selling "penny stock," as defined in Exchange Act Rule 3a51-1.  The definition of "penny stock" in Exchange Act Section 3(a)(51) and Rule 3a51-1 encompasses any equity security except those excluded under the rule, such as an NMS stock, as defined in 17 CFR 242.600(b)(55), that meets certain criteria; securities issued by a registered investment company; and securities of an issuer that has net tangible assets in excess of $2 million, or $5 million if the issuer has been in continuous operation for less than three years, or average revenue of at least $6 million for the last three years.  In 1993, the Commission issued guidance stating that issuers may aggregate the proceeds of a firm commitment underwritten initial public offering in order to exceed the $5 million net tangible assets test in Rule 3a51-1(g)(1).  *See Penny Stock Definition for Purposes of Blank Check Rule*, Release No. 33-7024 (Oct. 25, 1993) [58 FR 58099 (Oct. 29, 1993)].  SPACs often have provisions in their governing instruments that prohibit them from being "penny stock" issuers.  As used in this release, the term "SPAC" excludes those issuers that are subject to Rule 419.  In Dec. 2020, the Commission received a rulemaking petition ("Rulemaking Petition") requesting that the Commission adopt rule amendments to permit SPACs to conduct initial public offerings on a best-efforts basis without being subject to Rule 419.  *See* Rulemaking Petition from Loeb & Loeb LLP, File No. 4-768 (Dec. 21, 2020), *available at:* https://www.sec.gov/rules/petitions/2020/petn4-768.pdf. As of the date of this release, we have not received any comment letters in response to the Rulemaking Petition.

are typically structured to operate under similar, though usually less stringent, conditions in order to attract investors and to comply with exchange listing requirements.[13]

Following its initial public offering, a SPAC generally places all or substantially all of the offering proceeds into a trust or escrow account,[14] and the SPAC's shares and warrants are typically registered under Section 12(b) of the Exchange Act and then begin trading on a national securities exchange.[15]  If a SPAC does not complete a de-SPAC transaction within the time frame specified in its governing instruments, the SPAC may seek an extension of the time frame from its shareholders or may dissolve and liquidate, with the sponsor not earning the "promote" and the assets held in the trust or escrow account returned on a pro rata basis to its shareholders.[16]

If, on the other hand, a SPAC identifies a candidate for a business combination transaction, the shareholders of the SPAC have the opportunity to either: (1) redeem their shares prior to the business combination and receive a pro rata amount of the initial public offering

---

[13]  These conditions are generally market driven, and are typically set forth in their governing instruments and/or contractual arrangements, or are pursuant to the laws of the state or country of organization or the listing standards of national securities exchanges.  *See, e.g.*, NYSE Listed Company Manual Section 102.06 and Nasdaq Listing Rule IM-5101-2.  For example, Section 102.06 of the NYSE Listed Company Manual requires, among other things, that at least 90% of the initial public offering proceeds, together with the proceeds of any other concurrent sales of equity securities, be held in a trust account controlled by an independent custodian until the consummation of a business combination with a fair market value equal to at least 80% of the net assets held in the trust, with the time period to consummate the de-SPAC transaction not to exceed three years.  In contrast, under Rule 419, a blank check company must, among other things, complete a merger or acquisition within 18 months after the effective date of its registration statement and must place the offering proceeds and the securities sold in the offering in an escrow or trust account until the completion of the merger or acquisition, which precludes trading in the blank check company's securities until after the merger or acquisition is completed.

[14]  The assets in the trust or escrow account are typically invested in U.S. government securities and money market funds that invest in U.S. government securities.  *See infra* Section VI.

[15]  The shares and warrants usually begin trading as a unit, with a unit frequently consisting of a common share and a fraction of a warrant, and are traded separately after a certain period.  The warrants often become exercisable one year after the SPAC's initial public offering or upon the completion of a de-SPAC transaction.

[16]  Exchange rules require a listed SPAC to complete a de-SPAC transaction within a specified timeframe not to exceed 36 months after its initial public offering.  *See, e.g.,* NYSE Listed Company Manual Section 102.06.and Nasdaq Listing Rule IM-5101-2.

proceeds held in the trust or escrow account, or (2) remain a shareholder of the company after the business combination.[17]  To offset shareholder redemptions and to fund larger de-SPAC transactions, SPACs often conduct additional private capital-raising transactions, typically in the form of private investment in public equity (PIPE) transactions.[18]  De-SPAC transactions often result in the former SPAC's shareholders owning a minority interest in the post-business combination company, with the former private operating company's shareholders and PIPE investors owning a majority interest in the post-business combination company following these transactions.[19]

Shareholder approval is often required in de-SPAC transactions, and, in such cases, a SPAC provides its shareholders with a proxy statement on Schedule 14A, or an information statement on Schedule 14C if it is not soliciting proxies from its shareholders.[20]  If a SPAC or the target company is registering an offering of its securities (or the securities of a new holding company) to be issued in the de-SPAC transaction, then a registration statement on Form S-4 or

---

[17]  According to a study of SPAC initial public offerings between 2010 and 2018, an average of 54.4% and a median of 57.1% of shares issued in an initial public offering by a SPAC during this period were redeemed prior to the completion of a de-SPAC transaction.  Usha R. Rodrigues and Michael Stegemoller, *SPACs: Insider IPOs* (SSRN Working Paper, 2021).  Another analysis found that, between July 1, 2021 and Dec. 1, 2021, mean and median SPAC redemption rates were 55% and 66%, respectively.  Michael Klausner, Michael Ohlrogge, and Emily Ruan, *A Sober Look at SPACs*, 39 YALE J. ON REGUL. 228 (2022).  *See infra* Section IX.C.1.a.4. for a discussion of shareholder redemptions based on analysis by the Division of Economic and Risk Analysis (DERA) of available data.

[18]  The parties to a de-SPAC transaction often negotiate a minimum cash condition pursuant to which a SPAC must have a specified minimum amount of cash at the closing of the de-SPAC transaction, which could include funds in the trust or escrow account, the proceeds from PIPE transactions, and other sources.  When a SPAC conducts a PIPE transaction in connection with a de-SPAC transaction, the post-business combination company generally files a Securities Act registration statement following the de-SPAC transaction to register the resale of the securities purchased in the PIPE transaction.

[19]  According to one study, of the 47 SPAC mergers that occurred between Jan. 2019 and June 2020, SPAC shareholders, including the sponsor, held a median of 35% of the merged company after a de-SPAC transaction (of which the sponsor held a median of 12% of the merged company), with the remaining 65% of the merged company held by other parties including the target company's shareholders and PIPE investors.  Klausner, Ohlrogge, and Ruan, *supra* note 17.

[20]  17 CFR 240.14a-2 (Exchange Act Rule 14a-2) and 17 CFR 240.14c-2 (Exchange Act Rule 14c-2).

F-4 would be filed for the securities offering.  If no registration statement or proxy or information statement is required, then the SPAC disseminates a tender offer statement (Schedule TO) for the redemption offer to its security holders with information about the target company.[21]  Regardless of how the de-SPAC transaction is structured, the operations of the private company are conducted by the post-business combination company following the consummation of a de-SPAC transaction, with the shareholders of the private company now owning shares in a publicly listed company.

De-SPAC transactions can be viewed as a way for private operating companies to become public reporting companies under the Exchange Act and obtain a listing on a national securities exchange while avoiding certain of the safeguards for investors and conventions of the typical initial public offering process.[22]  From the perspective of the shareholders and management of a private operating company, some of the purported advantages of combining with a SPAC compared to conducting an underwritten initial public offering could include: greater pricing certainty in merger negotiations; a relatively shorter time frame in becoming a

---

[21]  The Commission has promulgated rules under the Exchange Act setting forth filing, disclosure, and dissemination requirements in connection with tender offers.  *See, e.g.*, Regulations 14D and 14E and Exchange Act Rule 13e-4.  When an issuer conducts a tender offer, the issuer may be required to file and disseminate a Schedule TO pursuant to Rule 13e-4.  The redemption rights in a SPAC context generally have indicia of being a tender offer, such as a limited period of time for the SPAC security holders to request redemption of their securities.  The Commission staff, however, has not insisted that SPACs comply with the tender offer rules when a SPAC files a Schedule 14A or 14C in connection with the approval of a de-SPAC transaction or an extension of the timeframe to complete a de-SPAC transaction and conducts the solicitation in accordance with Regulation 14A or 14C, as the federal proxy rules mandate substantially similar disclosures and applicable procedural protections as required by the tender offer rules.  However, this staff position does not apply when a SPAC does not file a Schedule 14A or 14C in connection with the de-SPAC transaction or an extension.  SPACs that do not file a Schedule 14A or 14C, such as SPACs that are foreign private issuers, have generally filed and disseminated Schedules TO for the redemptions of their securities and complied with the procedural requirements of the tender offer rules.  In these circumstances, the staff has taken the position that the Schedule TO should include the same financial and other information as is required in Schedule 14A or 14C for a de-SPAC transaction.  *See infra* Section II.F.4 for a discussion of proposed Item 1608 of Regulation S-K and Section IV.A. for a discussion of proposed Rule 145a under the Securities Act, which would affect when a SPAC may be required to file a Form S-4 or F-4 in connection with a de-SPAC transaction.

[22]  *See infra* note 119.

public company; and the perceived freedom to use projections in connection with de-SPAC transactions, with reduced liability exposure.[23]  De-SPAC transactions also offer private operating companies an infusion of capital from the SPAC,[24] as well as potentially greater share liquidity for the post-business combination company based on the existing trading market for the SPAC's securities.[25]

Although the basic structure of SPACs has existed since the 1990s, the recent surge in SPAC offerings and the increasing use of de-SPAC transactions as a mechanism for private operating companies to access the U.S. public securities markets have caused some market observers to express concerns about various aspects of the SPAC structure.[26]  For example, some commentators have raised concerns regarding the amount of sponsor compensation and other costs and their dilutive effects on a SPAC's shareholders.[27]  A number of commentators have also pointed to the nature of the sponsor compensation (*i.e.*, dependent on the completion of a de-SPAC transaction) as a potential conflict of interest in the SPAC structure that could lead sponsors to enter into de-SPAC transactions that are unfavorable to unaffiliated shareholders of

---

[23] *See, e.g.*, Klausner, Ohlrogge, and Ruan, *supra* note 17; Rodrigues and Stegemoller, *supra* note 17; Minmo Gahng, Jay R. Ritter, and Donghang Zhang, *SPACs* (SSRN Working Paper, 2021).

[24] Typically, much of this cash comes from PIPE investors around the time of the de-SPAC transaction and not from investors in the SPAC's initial public offering.  *See, e.g.*, Klausner, Ohlrogge, and Ruan, *supra* note 17.

[25] However, one study found evidence of illiquidity in SPAC shares, with relatively thin trading volume particularly during the period before the announcement of a proposed de-SPAC transaction.  Rodrigues and Stegemoller, *supra* note 17.

[26] For example, in May 2021, the Subcommittee on Investor Protection, Entrepreneurship, and Capital Markets of the House Financial Services Committee held a hearing on "Going Public: SPACs, Direct Listings, Public Offerings, and the Need for Investor Protections," which included testimony on, among other things, misaligned incentives in the SPAC structure, disclosure issues with respect to SPACs, and the use of projections in de-SPAC transactions.  A webcast of the hearing is available at: https://financialservices.house.gov/events/eventsingle.aspx?EventID=407753.

[27] *See* Testimony of Stephen Deane, CFA Institute, before the Investor Protection, Entrepreneurship, and Capital Markets Subcommittee of the U.S. House Committee on Financial Services, May 24, 2021 ("Deane Testimony"), https://financialservices.house.gov/uploadedfiles/hhrg-117-ba16-wstate-deanes-20210524.pdf. *See also* Amrith Ramkumar, *SPAC Insiders Can Make Millions Even When the Company They Take Public Struggles*, The Wall Street Journal, Apr. 25, 2021.

the SPACs without performing robust due diligence in connection with these transactions, when the alternative is to liquidate the SPACs and return the initial public offering proceeds to the shareholders.[28]  Other commentators have criticized stock exchange listing rules under which SPAC shareholders have voted in favor of proposed de-SPAC transactions while still redeeming their shares prior to the closing of the transactions.[29]  A number of studies have found that returns are relatively poor for investors in companies following a de-SPAC transaction.[30]

In addition, some commentators have expressed concerns regarding the adequacy of the disclosures provided to investors in these transactions in terms of explaining the potential benefits, risks and effects for investors, as well as the potential benefits for the sponsor and other affiliates of the SPAC.[31]  One of these commentators also expressed the view that the disclosure

---

[28]  *See, e.g.*, Klausner, Ohlrogge, and Ruan, *supra* note 17; Rodrigues and Stegemoller, *supra* note 17; Gahng, Ritter, and Zhang, *supra* note 23; letter dated Feb. 16, 2021 from Americans for Financial Reform and Consumer Federation of America to the House Financial Services Committee ("AFR Letter"); Deane Testimony; Testimony of Andrew Park, Americans for Financial Reform, before the Investor Protection, Entrepreneurship, and Capital Markets Subcommittee of the U.S. House Committee on Financial Services, May 24, 2021 ("Park Testimony"), https://financialservices.house.gov/uploadedfiles/hhrg-117-ba16-wstate-parka-20210524.pdf.

[29]  *See* Mira Ganor, *The Case for Non-Binary, Contingent, Shareholder Action*, 23 U. PA. J. BUS. L. 390 (2021); Rodrigues and Stegemoller, *supra* note 17.  We note that exchange listing rules only explicitly require that, when a shareholder vote on a business combination is held, the public shareholders voting against a business combination have a right to redeem shares.  *See, e.g.*, Nasdaq Listing Rule IM-5101-2 (stating, in part, that "public Shareholders voting against a business combination must have the right to convert their shares of common stock into a pro rata share of the aggregate amount then in the deposit account (net of taxes payable and amounts distributed to management for working capital purposes) if the business combination is approved and consummated").

[30]  *See, e.g.*, Lora Dimitrova, *Perverse Incentives of Special Purpose Acquisition Companies, the "Poor Man's Private Equity Funds,"* JOURNAL OF ACCOUNTING AND ECONOMICS (2017); Johannes Kolb and Tereza Tykvová, *Going Public via Special Purpose Acquisition Companies: Frogs Do Not Turn Into Princes*, JOURNAL OF CORPORATE FINANCE (2016); Klausner, Ohlrogge, and Ruan, *supra* note 17; Gahng, Ritter, and Zhang, *supra* note 23; Chen Lin, Fangzhou Lu, Roni Michaely, and Shihua Qin, *SPAC IPOs and Sponsor Network Centrality* (SSRN Working Paper, 2021).  *See also* Testimony of Scott Kupor, Andreessen Horowitz, before the Investor Protection, Entrepreneurship, and Capital Markets Subcommittee of the U.S. House Committee on Financial Services, May 24, 2021, https://financialservices.house.gov/uploadedfiles/hhrg-117-ba16-wstate-kupors-20210524.pdf; Alexander Osipovich and Dave Michaels, *Investors Flock to SPACs, Where Risks Lurk and Track Records Are Poor*, The Wall Street Journal, Nov. 13, 2020.

[31]  *See, e.g.*, AFR Letter; Testimony of Professor Usha R. Rodrigues, University of Georgia School of Law, before the Investor Protection, Entrepreneurship, and Capital Markets Subcommittee of the U.S. House Committee on Financial Services, May 24, 2021 ("Rodrigues Testimony"), https://financialservices.house.gov/uploadedfiles/hhrg-117-ba16-wstate-rodriguesu-20210524.pdf.  A number of recent SEC actions have highlighted disclosures about the private operating company that are allegedly incomplete, inaccurate, and materially misleading.  *See, e.g.*, *In the*

about the private operating company provided through the de-SPAC transaction process may be less complete and less reliable than that provided by an issuer in a traditional initial public offering.[32]  Other commentators have criticized the use of projections in de-SPAC transactions that, in their view, have appeared to be unreasonable, unfounded or potentially misleading, particularly where the target company is an early stage company with no or limited sales, products, and/or operations,[33] as well as the lack of a named underwriter in these transactions that would typically perform traditional gatekeeping functions, such as due diligence, and would be subject to liability under Section 11 of the Securities Act for untrue statements of material facts or omissions of material facts.[34]  In response to a number of these and other issues, the Commission staff has provided guidance relating to SPACs on five occasions since December 2020.[35]

---

*Matter of Momentus, Inc., Stable Road Acquisition Corp., SRC-NI Holdings, LLC, and Brian Kabot*, Release No. 33-10955, 34-92391 (July 13, 2021); *In the Matter of Nikola Corp.*, Release No. 33-11018, 34-93838 (Dec. 21, 2021); *SEC v. Akazoo S.A.*, Case No. 1:20-cv-08101 (S.D.N.Y. filed Sept. 30, 2020); *SEC v. Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D.N.Y. filed June 18, 2019).

[32] *See* AFR Letter.

[33] *See, e.g.*, Michael Dambra, Omri Even-Tov, and Kimberlyn George, *Should SPAC Forecasts be Sacked?* (SSRN Working Paper, 2022); AFR Letter; Park Testimony; Rodrigues and Stegemoller, *supra* note 17.  *See also* Heather Somerville and Eliot Brown, *SPAC Startups Made Lofty Promises.  They Aren't Working Out.*, The Wall Street Journal, Feb. 25, 2022.

[34] *See* AFR Letter; Deane Testimony; Rodrigues Testimony.  *See also* John C. Coffee Jr., *Gatekeeper Failure and Reform: The Challenge of Fashioning Relevant Reforms*, 84 B. U. L. REV. 301 (2004) and John C. Coffee, Jr., *Gatekeepers: The Professions and Corporate Governance* (2006).

[35] *See CF Disclosure Guidance: Topic No. 11 – Special Purpose Acquisition Companies* (Division of Corporation Finance, Dec. 22, 2020); *Staff Statement on Select Issues Pertaining to Special Purpose Acquisition Companies* (Division of Corporation Finance, Mar. 31, 2021); *Public Statement on Financial Reporting and Auditing Considerations of Companies Merging with SPACs* (Office of Chief Accountant, Mar. 31, 2021); *Public Statement on SPACs, IPOs and Liability Risk under the Securities Laws* (Division of Corporation Finance, Apr. 8, 2021); and *Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ("SPACs")* (Division of Corporation Finance and Office of Chief Accountant, Apr. 12, 2021).  This guidance and other staff statements (including those cited herein) represent the views of Commission staff and are not a rule, regulation, or statement of the Commission.  The Commission has neither approved nor disapproved the content of these documents and, like all staff statements, they have no legal force or effect, do not alter or amend applicable law, and create no new or additional obligations for any person.

In September 2021, the Commission's Investor Advisory Committee[36] issued preliminary recommendations regarding SPACs and expressed concerns about whether sponsors and target companies have engaged in regulatory arbitrage by using de-SPAC transactions as a path to the public markets.  In addition, the Investor Advisory Committee expressed concerns about potential conflicts of interest between sponsors and retail investors, and the effectiveness of the disclosures provided in these transactions.[37]  Among other things, the Investor Advisory Committee recommended that the Commission "regulate SPACs more intensely" through an enhanced focus on and stricter enforcement of existing disclosure rules in areas such the sponsor's role in a SPAC, the process and risks in identifying and assessing target companies, PIPE financing terms, and de-SPAC transaction due diligence, as well as application of the Plain English disclosure rules.[38]  The Investor Advisory Committee also recommended that the Commission prepare and publish a report analyzing the parties involved in SPAC transactions at various stages and the compensation and incentives of these parties.

---

[36]  The Investor Advisory Committee was established by Section 911 of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), Pub. L. 111-203, 124 Stat. 1376 (2010), to advise and consult with the Commission on regulatory priorities, issues, and initiatives.

[37]  *See* Recommendations of the Investor Advisory Committee Regarding Special Purpose Acquisition Companies (Sept. 9, 2021) ("IAC Recommendations"), *available at:* https://www.sec.gov/spotlight/investor-advisory-committee-2012/20210909-spac-recommendation.pdf.  The Dodd-Frank Act authorizes the Investor Advisory Committee to submit findings and recommendations for review and consideration by the Commission.  The Commission then issues a public statement assessing the finding or recommendation and disclosing the Commission's intended action, if any, in regard to the finding or recommendation.  *See* Section 911(g) of the Dodd-Frank Act.

[38]  17 CFR 230.421(d) (Securities Act Rule 421(d)) requires registrants to write the prospectus cover page, prospectus summary, and risk factors sections of prospectuses using plain English principles, including the use of short sentences; definite, concrete, everyday language; active voice; tabular presentation of complex information whenever possible; no legal or business jargon; and no multiple negatives.  *Plain English Disclosure*, Release No. 33-7497 (Jan. 28, 1998) [63 FR 6370 (Feb. 6, 1998)].

Also in September 2021, the Commission's Small Business Capital Formation Advisory Committee[39] held a panel discussion on initial public offerings, direct listings, and SPACs.[40] The panelists expressed their views on a range of topics related to SPACs, including the factors behind the significant growth of the SPAC market over the past two years, the potential benefits of SPACs to the public markets, the potential benefits of enhanced disclosure requirements applicable to SPACs, and perceived issues surrounding the use of projections in de-SPAC transactions. The panel discussion also addressed the costs embedded in the SPAC structure and the dilutive effects of these costs on non-redeeming shareholders, as well as the poor market-adjusted returns of companies, on average, following de-SPAC transactions.[41]

Having considered these and other perspectives on the SPAC market, we are of the view that greater transparency and more robust investor protections could assist investors in evaluating and making investment, voting, and redemption decisions with respect to these transactions. Accordingly, we are proposing new rules and rule amendments to enhance existing disclosure requirements and investor protections in initial public offerings by SPACs and in de-SPAC transactions. A number of the rules and amendments we are proposing are intended to improve the usefulness and clarity of the information provided to investors so that they can make better informed decisions as to whether to purchase securities in SPAC initial public offerings, to purchase or sell SPAC securities in secondary trading markets, and in voting, investment and redemption decisions in connection with de-SPAC transactions.

---

[39] The Small Business Capital Formation Advisory Committee was established by Section 2 of the SEC Small Business Advocate Act of 2016, Pub. L. 114-284, 130 Stat. 1447 (2016), to provide advice to the Commission on the Commission's rules, regulations, and policies relating to (1) capital raising by emerging, privately held small businesses and public companies with less than $250 million in public market capitalization; (2) trading in their securities; and (3) public reporting and corporate governance requirements applicable to these companies.

[40] The panelists were Isabelle Freidheim, Michael Klausner, David Ni, and Phyllis Newhouse.

[41] *See* Transcript of SEC Small Business Capital Formation Advisory Committee (Sept. 27, 2021), *available at:* https://www.sec.gov/info/smallbus/acsec/sbcfac-transcript-092721.pdf.

The proposed rules and amendments, if adopted, could help the SPAC market function more efficiently by improving the relevance, completeness, clarity, and comparability of the disclosures provided by SPACs at the initial public offering and de-SPAC transaction stages, and by providing important investor protections to strengthen investor confidence in this market.  In developing these proposals, we have considered the recommendations and views discussed above, as well as the Commission staff's experience in reviewing disclosures in SPAC initial public offerings and de-SPAC transactions.

Specifically, we are proposing to add new Subpart 1600 of Regulation S-K that would set forth specialized disclosure requirements in connection with initial public offerings by SPACs and in connection with de-SPAC transactions.  In new Subpart 1600, we are proposing to, among other things:

- Require additional disclosures about the sponsor of the SPAC, potential conflicts of interest, and dilution;

- Require additional disclosures on de-SPAC transactions, including a requirement that the SPAC state (1) whether it reasonably believes that the de-SPAC transaction and any related financing transaction are fair or unfair to investors, and (2) whether it has received any outside report, opinion, or appraisal relating to the fairness of the transaction; and

- Require certain disclosures on the prospectus cover page and in the prospectus summary of registration statements filed in connection with SPAC initial public offerings and de-SPAC transactions.

In addition, in view of the increasing number of private companies using de-SPAC transactions to become publicly-traded reporting companies, we are proposing amendments to

provide procedural protections and to align the disclosures provided, as well as the legal obligations of companies, in de-SPAC transactions more closely with those in traditional initial public offerings. Specifically, we are proposing to:

- Amend the registration statement forms and schedules filed in connection with de-SPAC transactions to require additional disclosures about the private operating company;

- Require that disclosure documents in de-SPAC transactions be disseminated to investors at least 20 calendar days in advance of a shareholder meeting or the earliest date of action by consent, or the maximum period for disseminating such disclosure documents permitted under the laws of the jurisdiction of incorporation or organization if such period is less than 20 calendar days;

- Deem a private operating company in a de-SPAC transaction to be a co-registrant of a registration statement on Form S-4 or Form F-4 when a SPAC files such a registration statement for a de-SPAC transaction, such that the private operating company and its signing persons would be subject to liability under Section 11 of the Securities Act as signatories to the registration statement;

- Amend the definition of smaller reporting company to require a re-determination of smaller reporting company status following the consummation of a de-SPAC transaction; and

- Propose a definition for "blank check company" that would encompass SPACs and certain other blank check companies for purposes of the Private Securities Litigation Reform Act of 1995 (PSLRA)[42] such that the safe harbor for forward-looking

---

[42] Pub. L. No. 104-67, 109 Stat. 737 (1995).

statements under the PSLRA would not be available to SPACs, including with respect to projections of target companies seeking to access the public markets through a de-SPAC transaction.

Underwriters play a critical role in the securities offering process as gatekeepers to the public markets.  In light of this important role, we are proposing a new rule, Securities Act Rule 140a, that would deem anyone who has acted as an underwriter of the securities of a SPAC and takes steps to facilitate a de-SPAC transaction, or any related financing transaction or otherwise participates (directly or indirectly) in the de-SPAC transaction to be engaged in a distribution and to be an underwriter in the de-SPAC transaction.  By affirming the underwriter status of SPAC IPO underwriters in connection with de-SPAC transactions, the proposed rule should better motivate SPAC underwriters to exercise the care necessary to ensure the accuracy of the disclosure in these transactions by affirming that they are subject to Section 11 liability for that information.

In addition, private companies have historically used shell companies with Exchange Act reporting obligations in various forms of transactions, including SPACs, to become a public company without undergoing a traditional initial public offering.  In many cases, such shell company shareholders may not receive a Securities Act registration statement containing disclosures about the private company that is entering the public market for the first time.  Due to the significant increase in the use of reporting shell company business combination transactions as a means to enter the U.S. capital markets, and in an effort to provide reporting shell company shareholders with more consistent Securities Act protections regardless of transaction structure, we are proposing to add new Rule 145a that would deem any business combination of a

reporting shell company, involving another entity that is not a shell company, to involve a sale of securities to the reporting shell company's shareholders.[43]

Further, we are proposing new Article 15 of Regulation S-X, as well as related amendments, to more closely align the financial statement reporting requirements in business combinations involving a shell company and a private operating company with those in traditional initial public offerings.  This is consistent with our view that the manner in which a company goes public should not generally result in substantially different financial statement disclosures being provided to investors.

We are also proposing amendments intended to enhance the reliability of projections disclosure in Commission filings, as well as additional requirements when projections are disclosed in connection with de-SPAC transactions.  The proposed amendments to Item 10(b) of Regulation S-K would address broader concerns regarding the use of projections generally, while proposed Item 1609 of Regulation S-K would address concerns specific to de-SPAC transactions.

Finally, as the SPAC market has grown dramatically in recent years, some SPACs have sought to operate in novel ways that suggest a need for SPACs and their sponsors to increase

---

[43]  Throughout this release, we use "shell company" in lieu of the phrase "shell company, other than a business combination related shell company."  The term "business combination related shell company" is defined in Securities Act Rule 405 and Exchange Act Rule 12b-2 as a shell company that is: "(1) Formed by an entity that is not a shell company solely for the purpose of changing the corporate domicile of that entity solely within the United States; or (2) Formed by an entity that is not a shell company solely for the purpose of completing a business combination transaction (as defined in 17 CFR 230.165(f)) among one or more entities other than the shell company, none of which is a shell company."  For purposes of proposed Rule 145a (*see infra* Section IV.A.), the term "reporting shell company" is defined as a company, other than an asset-backed issuer as defined in Item 1101(b) of Regulation AB, that has: (1) no or nominal operations; (2) either: (i) no or nominal assets; (ii) assets consisting solely of cash and cash equivalents; or (iii) assets consisting of any amount of cash and cash equivalents and nominal other assets; and (3) an obligation to file reports under Section 13 or Section 15(d) of the Exchange Act. We similarly use "reporting shell company" in lieu of the phrase "reporting shell company, other than a business combination related shell company" throughout this release.

their focus on evaluating when a SPAC could be an investment company and thus subject to the requirements under the Investment Company Act of 1940 ("Investment Company Act").[44]  We are concerned that SPACs may fail to recognize when their activities raise the investor protection concerns addressed by the Investment Company Act.  To assist SPACS in focusing on, and appreciating, when they may be subject to investment company regulation, we are proposing a new safe harbor under the Investment Company Act.  The proposed rule would provide a safe harbor from the definition of "investment company" under Section 3(a)(1)(A) of the Investment Company Act for SPACs that satisfy certain conditions that limit a SPAC's duration, asset composition, business purpose and activities.[45]

We welcome feedback and encourage interested parties to submit comments on any or all aspects of the proposed new rules and amendments.  When commenting, it would be most helpful if you include the reasoning behind your position or recommendation.

## II.    PROPOSED NEW SUBPART 1600 OF REGULATION S-K

We are proposing to add new Subpart 1600 to Regulation S-K to set forth specialized disclosure requirements applicable to SPACs regarding the sponsor, potential conflicts of interest, and dilution, and to require certain disclosures on the prospectus cover page and in the prospectus summary.[46]  Proposed Subpart 1600 would also require enhanced disclosure for de-SPAC transactions, including a fairness determination requirement.  We are proposing to amend a number of forms and schedules used by SPACs for initial public offerings and de-SPAC

---

[44]  15 U.S.C. 80a-1 *et seq.*

[45]  *See infra* Section VI for a discussion of proposed Rule 3a-10.

[46]  The proposed requirements in new Subpart 1600 would, to an extent, codify and standardize some of the disclosures already commonly provided by SPACs.

transactions to require the information set forth in proposed Subpart 1600.[47]  To the extent that the disclosure requirements in proposed Subpart 1600 address the same subject matter as the existing disclosure requirements of the forms or schedules, the requirements of proposed Subpart 1600 would be controlling.[48]  The following table summarizes the proposed items in Subpart 1600, as described more fully below:[49]

| Item | Summary Description | Principal Objective(s) | Applicable forms and schedules |
|------|---------------------|------------------------|-------------------------------|
| **Item 1601, *Definitions*** | Definitions for the terms "special purpose acquisition company," "de-SPAC transaction," "target company," and "SPAC sponsor." | Establish the scope of the issuers and transactions subject to the requirements of Subpart 1600. | Forms S-1, F-1, S-4, and F-4; Schedules 14A, 14C, and TO |
| **Item 1602, *Registered offerings by special purpose acquisition companies*** | Require certain information on the prospectus cover page and in the prospectus summary of registration statements for offerings by SPACs other than de-SPAC transactions. Require enhanced dilution disclosure in these registration statements. | Enhance the clarity and readability of prospectuses in SPAC initial public offerings and the disclosures relating to dilution in these prospectuses. | Forms S-1 and F-1 |
| **Item 1603, *SPAC sponsor; conflicts of interest*** | Require certain disclosure regarding the sponsor and its affiliates and any promoters of SPACs and disclosure regarding conflicts of interest between the sponsor or its affiliates or promoters and unaffiliated security holders. | Provide investors with a more complete understanding of the role of sponsors and their conflicts of interest. | Forms S-1, F-1, S-4, and F-4; Schedules 14A, 14C and TO |
| **Item 1604, *De-SPAC transactions*** | Require certain information on the prospectus cover page and in the prospectus summary of registration statements for de-SPAC transactions.  Require enhanced dilution disclosure in these registration statements. | Enhance the clarity and readability of prospectuses in de-SPAC transactions and disclosures relating to dilution in these prospectuses. | Forms S-4 and F-4; Schedules 14A, 14C, and TO |

---

[47]  *See* the proposed amendments to Forms S-1, F-1, S-4, and F-4, and Schedules 14A and TO.  While we are not proposing amendments to Schedule 14C, the disclosure contemplated by proposed Subpart 1600 would be required in Schedule 14C pursuant to Item 1 of Schedule 14C, which states that a Schedule 14C must include the information called for by all of the items of Schedule 14A, with limited exceptions, to the extent each item would be applicable to any matter to be acted upon at a shareholder meeting if proxies were to be solicited in connection with the meeting.  If the securities to be issued in a de-SPAC transaction are registered on a form other than Form S-4 or F-4, such as Form S-1 or F-1, but would be authorized to be registered on Form S-4 or F-4, the proposed requirements of Form S-4 or F-4, as applicable, in regard to de-SPAC transactions would apply in that context.

[48]  Proposed General Instruction L.1. to Form S-4; Proposed General Instruction I.1. to Form F-4; Proposed Item 14(f)(1) to Schedule 14A; Proposed General Instruction K to Schedule TO.  We are also proposing to re-designate existing General Instruction K to Schedule TO as General Instruction L to the schedule.

[49]  The information in this table is not comprehensive and is intended only to summarize the proposed items of Subpart 1600.  This table should be read together with the complete text of this release.

| Item | Summary Description | Principal Objective(s) | Applicable forms and schedules |
|---|---|---|---|
| **Item 1605, Background of and reasons for the de-SPAC transaction; terms of the de-SPAC transaction; effects** | Require disclosure on the background, material terms and effects of a proposed de-SPAC transaction. | Provide investors with a more complete understanding of the background of and motivations behind a proposed de-SPAC transaction. | Forms S-4 and F-4; Schedules 14A, 14C, and TO |
| **Item 1606, Fairness of the de-SPAC transaction and any related financing transaction** | Require disclosure on whether a SPAC reasonably believes that a de-SPAC transaction and any related financing transactions are fair or unfair to investors, as well as a discussion of the bases for this reasonable belief. | Provide investors with additional information regarding a proposed de-SPAC transaction and address concerns regarding potential conflicts of interest and misaligned incentives. | Forms S-4 and F-4; Schedules 14A, 14C, and TO |
| **Item 1607, Reports, opinions, appraisals and negotiations** | Require disclosure on whether a SPAC or its sponsor has received a report, opinion or appraisal from an outside party regarding the fairness of a de-SPAC transaction or any related financing transaction. | Provide investors with additional information underlying a fairness determination by a SPAC. | Forms S-4 and F-4; Schedules 14A, 14C, and TO |
| **Item 1608, Tender offer filing obligations in de-SPAC transactions***  | Require additional disclosures in a Schedule TO filed in connection with a de-SPAC transaction. | Align the information provided in such a Schedule TO with the information provided in other filings in connection with a de-SPAC transaction. | Schedule TO |
| **Item 1609, Financial projections in de-SPAC transactions**** | Require additional disclosures regarding financial projections disclosed in a disclosure document for a de-SPAC transaction. | Provide investors with additional information regarding the use of projections in connection with a de-SPAC transaction. | Forms S-4 and F-4; Schedules 14A, 14C, and TO |
| **Item 1610, Structured data requirement***** | Require information disclosed pursuant to Subpart 1600 to be tagged in a structured, machine-readable data language. | Provide investors and other market participants with information that is more readily available and more easily accessible for aggregation, comparison, filtering, and other analysis | Forms S-1, F-1, S-4, and F-4; Schedules 14A, 14C, and TO |

Notes:
* Proposed Item 1608 is discussed in Section II.F.4.
** Proposed Item 1609 is discussed in Section V.B.2.
*** Proposed Item 1610 is discussed in Section II.G.

## A.  Definitions

For purposes of proposed new Subpart 1600, we are proposing Item 1601 to define the term "special purpose acquisition company" to mean a company that has indicated that its business plan is to (1) register a primary offering of securities that is not subject to the

requirements of Rule 419;[50] (2) complete a de-SPAC transaction within a specified time frame; and (3) return all remaining proceeds from the registered offering and any concurrent offerings to its shareholders if the company does not complete a de-SPAC transaction within the specified time frame.[51]  While the proposed definition does not include certain features common to SPACs, such as the listing of the SPAC's securities on a national securities exchange[52] or the issuance of redeemable securities, the proposed definition incorporates the key defining features of the issuers that in our view should be subject to the disclosure and procedural requirements of Subpart 1600, while remaining sufficiently broad to take into account potential variations in the SPAC structure and the possibility that SPACs may continue to evolve.  In particular, the proposed definition would encompass issuers that would otherwise be subject to Rule 419's investor protection requirements but for the fact that the issuer is not issuing "penny stock."[53]  At the same time, the proposed definition does not include criteria such as listing on a national securities exchange, certain requirements that are applicable to exchange-traded SPACs,[54] or the issuance of redeemable securities, as these criteria would result in an overly narrow definition by including transactional terms that have not applied to every SPAC offering in the past or that could change as the SPAC market continues to evolve.

The term "de-SPAC transaction" would be defined as a business combination such as a merger, consolidation, exchange of securities, acquisition of assets, or similar transaction

---

[50]  Blank check companies subject to Rule 419 must comply with a comprehensive set of disclosure and investor protection requirements under the rule and would not be subject to the requirements applicable to SPACs under the proposed rules.  *See supra* notes 6 and 13.

[51]  Proposed Item 1601(b).

[52]  In this regard, we note that the securities of SPACs were not listed on national securities exchanges until the 2000s.

[53]  *See supra* note 12.

[54]  *See infra* note 57.

involving a SPAC and one or more target companies (contemporaneously, in the case of more

than one target company).[55]  The term "target company" would be defined as an operating

company, business, or assets.[56]  As proposed, these definitions are intentionally broad and, taken

together, would encompass more typical transactions such as the acquisition of one or more

private operating companies by a SPAC, as well as less common transactions that may or may

not be permitted under exchange listing rules but for which the proposed enhanced disclosure

and procedural requirements described below may be appropriate because they raise the same

investor protection concerns.[57]

 The term "SPAC sponsor" would be defined as the entity and/or person(s) primarily

responsible for organizing, directing or managing the business and affairs of a SPAC, other than

in their capacities as directors or officers of the SPAC as applicable.[58]  Although a sponsor of a

SPAC may perform a variety of functions within the SPAC's structure, the proposed definition

encompasses activities that, based on the staff's experience reviewing SPAC filings and public

---

[55]  Proposed Item 1601(a).

[56]  Proposed Item 1601(d).

[57]  The proposed definitions would apply to both exchange-traded SPACs and SPACs traded in the over-the-counter market.  Some transactions encompassed by the proposed definitions may not be permitted under exchange listing rules for SPACs, and nothing in this release is intended to indicate that such transactions are or should be permitted under the exchanges' SPACs listing rules or that exchange listing requirements should not, at a minimum, apply to SPACs seeking an exchange listing.  The Commission has consistently recognized the importance of national securities exchange listing standards.  Among other things, such listing standards help ensure that exchange-listed companies will have sufficient public float, investor base, and trading interest to provide the depth and liquidity necessary to promote fair and orderly markets.  Furthermore, Section 6(b)(5) of the Exchange Act requires exchange listing rules be designed to prevent fraudulent and manipulative acts and practices, promote just and equitable principles of trade, and protect investors and the public interest.  The Commission has also stated that listing standards are of significant importance to investors that may rely on the status an exchange listing ascribes to a security.  *See, e.g.*, Release No. 34-57785 (May 6, 2008) [73 FR 27597, 27599 (May 13, 2008)] (SR-NYSE-2008-17) (order approving initial and continued listing standards for NYSE exchange-listed SPACs).

[58]  Proposed Item 1601(c).  In regard to natural persons, we are proposing to exclude from the scope of the definition of "SPAC sponsor" the activities performed by natural persons in their capacities as directors and/or officers of the SPAC to avoid overlap with existing disclosure requirements relating to directors and officers.  *See infra* Section II.B. for a discussion of the activities of a sponsor.

commentary, are commonly associated with sponsors of SPACs. We are proposing to define this term broadly so that the appropriate entities or persons are subject to the proposed enhanced disclosure requirements applicable to the sponsors of a SPAC.[59]

**Request for Comment**

1.      Should we define the term "special purpose acquisition company" as proposed? Does the proposed definition provide a workable approach to determining which issuers would be subject to the requirements of proposed Subpart 1600? Should we define this term differently? If so, how? For example, are there certain other common characteristics of SPACs that should be included in the definition, such as redemption rights, exchange listing, the placing of initial public offering proceeds in a trust or escrow account, and/or that the de-SPAC transaction must meet a minimum fair market value (*e.g.*, at least 80%) of the value of the proceeds in the trust or escrow account? Should we include a reference to "shell company" in the definition?

2.      Should we define "de-SPAC transaction" as proposed? Should the scope of the proposed definition instead be tied to de-SPAC transactions that are permitted under exchange listing standards?[60]

3.      Should we define the term "SPAC sponsor" as proposed? Does the proposed definition reflect those activities commonly associated with a SPAC's sponsor? Would the proposed definition encompass persons or entities that are not commonly considered to be sponsors of a SPAC? If so, how should we revise the definition to avoid scoping in such persons or entities? In regard to natural persons, should we exclude from the scope

---

[59] Proposed Item 1603.

[60] *See supra* notes 13 and 16.

of the definition the activities performed by natural persons in their capacities as directors and/or officers of the SPAC, as proposed?

4.  Should we define the term "target company" as proposed?  Is this definition sufficiently clear?  Would this definition, in combination with the other proposed definitions, be overly broad and encompass transactions that should not be treated as de-SPAC transactions?

5.  Are there other terms that we should define in proposed Subpart 1600?  If so, which terms and how should we define them?

6.  With respect to the proposed definition of "special purpose acquisition company," is it clear what "has indicated that its business plan" is intended to convey?  Should we require registrants to affirmatively state in filings whether they are a special purpose acquisition company?  For example, should we amend Form S-1, Form F-1, Form S-4, and/or Form F-4 to add to the registration statement cover page of these forms a check box for issuers to indicate whether they are special purpose acquisition companies?  Should we also amend Schedule 14A, Schedule 14C and Schedule TO to include this check box on the cover pages of these schedules?

### B.    Sponsors

The sponsor's role is critical to the success of a SPAC.  At the earliest stage, the sponsor typically organizes and manages the SPAC, including appointing the initial directors and officers of the SPAC, and provides the initial capital for the SPAC's operations prior to its initial public offering.[61]  In subsequent stages, among other things, the sponsor may work with one or more

---

[61] *See* proposed Item 1601(c) for the proposed definition for "SPAC sponsor."  There is often an identity of interest between the sponsor and the SPAC's officers and directors, in that the same persons may work for both the sponsor and the SPAC in different capacities.  In many instances, SPACs will not hold a public election for directors until

investment banks in preparing for the SPAC's initial public offering and may place the proceeds

from the offering into a trust or escrow account.  Following the initial public offering, the

sponsor typically identifies potential candidates for a business combination transaction,

negotiates the transaction to acquire the target private operating company and promotes the

transaction to the SPAC's shareholders.  As discussed above, the value of the sponsor's

compensation is usually contingent on the completion of a de-SPAC transaction.[62]

In view of the central role of the sponsor in a SPAC's activities, we are proposing

Item 1603(a) to require additional disclosure about the sponsor, its affiliates and any promoters[63]

of the SPAC in registration statements and schedules filed in connection with SPAC registered

offerings and de-SPAC transactions, including disclosure on the following:

- The experience, material roles, and responsibilities of these parties, as well as any

  agreement, arrangement or understanding (1) between the sponsor and the SPAC, its

  executive officers, directors or affiliates, in determining whether to proceed with a de-

  SPAC transaction and (2) regarding the redemption of outstanding securities;

- The controlling persons of the sponsor and any persons who have direct and indirect

  material interests in the sponsor, as well as an organizational chart that shows the

  relationship between the SPAC, the sponsor, and the sponsor's affiliates;

- Tabular disclosure of the material terms of any lock-up agreements with the sponsor and

  its affiliates; and

---

the de-SPAC transaction or thereafter.  Some SPACs provide that only the founder shares may vote in director elections until the de-SPAC transaction.

[62]  *See* text accompanying *supra* notes 14-16.

[63]  The term "promoter" is defined in Securities Act Rule 405 and Exchange Act Rule 12b-2.

- The nature and amounts of all compensation that has or will be awarded to, earned by, or paid to the sponsor, its affiliates and any promoters for all services rendered in all capacities to the SPAC and its affiliates, as well as the nature and amounts of any reimbursements to be paid to the sponsor, its affiliates and any promoters upon the completion of a de-SPAC transaction.[64]

Proposed Item 1603(a)'s disclosure requirements are intended to provide a SPAC's prospective investors and existing shareholders with detailed information relating to the sponsor that could be important in understanding and analyzing a SPAC, including how the rights and interests of the sponsor, its affiliates, and any promoters may differ from, and may conflict with, those of public shareholders.[65]  Given that a SPAC does not conduct an operating business, information about the background and experience of the sponsor is often important in assessing a SPAC's prospects for success and may be a relevant factor in the market value of a SPAC's securities.[66]  To the extent that a sponsor's activities and arrangements with a SPAC are carried out through, or in conjunction with, the sponsor's affiliates and any promoters of the SPAC, we are proposing to require corresponding disclosure with respect to these affiliates and promoters. In addition, enhanced disclosure on the sponsor's compensation and the sponsor's agreements, arrangements, or understandings may be helpful to a SPAC's prospective investors and existing shareholders in considering whether to acquire or redeem the SPAC's securities, and in

---

[64] This would include, for example, fees and reimbursements in connection with lease, consulting, support services, and management agreements with entities affiliated with the sponsor, as well as reimbursements for out-of-pocket expenses incurred in performing due diligence or in identifying potential business combination candidates.

[65] Proposed Item 1603(a) would operate in addition to existing disclosure requirements that may be applicable to a SPAC's arrangements with its sponsor such as Item 701 of Regulation S-K, which requires disclosure about, among other things, the terms of any private securities transactions between a SPAC and its sponsor within the past three years, and Item 404 of Regulation S-K, which requires disclosure about certain related party transactions.

[66] *See, e.g.*, Lin, Lu, Michaely, and Qin, *supra* note 30; Andrea Pawliczek, A. Nicole Skinner, and Sarah L.C. Zechman, *Signing Blank Checks: The Roles of Reputation and Disclosure in the Face of Limited Information* (SSRN Working Paper, 2021).

evaluating the potential risks and merits of a proposed de-SPAC transaction because it could highlight additional motivations for completing a de-SPAC transaction.

While proposed Item 1603 calls for detailed disclosure about the sponsor, its experience and its rights and interests, we note that some of this information is already being provided, to an extent, by SPACs. Codifying and amplifying these existing disclosure practices would help ensure that issuers provide consistent and comprehensive information across transactions, so that investors can make more informed investment, voting and redemption decisions.

**Request for Comment**

7.    Should we require additional information regarding sponsors of SPACs pursuant to Item 1603(a), as proposed? If so, should we also require disclosure regarding the sponsor's affiliates and any promoters of the SPAC, as proposed?

8.    Should we require disclosure about the experience and material roles and responsibilities of the sponsor, its affiliates and any promoters of the SPAC in directing and managing the SPAC's activities, as proposed? How would investors use this information?

9.    Should we require more or less information about the sponsor's compensation and reimbursements? Should we require this disclosure only when the amounts exceed a *de minimis* threshold? If so, what should the *de minimis* threshold be?

10.    Should we require additional disclosure about the sponsor's agreements, arrangements, or understandings in determining whether to proceed with a de-SPAC transaction and regarding the redemption of outstanding securities of the SPAC, as proposed?

11.    Should we require disclosure about the controlling persons of the sponsor and any persons who have direct and indirect material interests in the sponsor, as proposed? Should we take a different approach than requiring disclosure on persons with "material

interests" in the sponsor?  Should we consider requiring additional disclosure on the controlling persons of entities that own or control the sponsor?  Should we require an organizational chart that shows the relationship among the SPAC, the sponsor, and the sponsor's affiliates, as proposed?  Would both narrative disclosure and an organizational chart be helpful to investors?

12.   Should we require disclosure of the material terms of any lock-up agreements with the sponsor and its affiliates as proposed?  Would the proposed requirement to provide this disclosure in a tabular format be helpful to investors?  Should we instead require this disclosure in a non-tabular format?

13.   Is there additional information regarding sponsors that should be disclosed?  Should we require more or less information about the sponsor depending on the size or other characteristics of a SPAC?

14.   Should additional disclosure be required regarding affiliated entities involved in the SPAC's operations?

### C.   Conflicts of Interest

Within a SPAC's structure, there may be a number of potential or actual conflicts of interest between the sponsor and public investors that could influence the actions of the SPAC. A notable example is the potential conflict of interest stemming from the contingent nature of the sponsor's compensation, whereby the sponsor and its affiliates have significant financial incentives to pursue a business combination transaction even though the transaction could result in lower returns for public shareholders than liquidation of the SPAC or an alternative

transaction.[67]  Other conflicts of interest may arise when a sponsor is a sponsor of multiple

SPACs and manages several different SPACs at the same time; when a sponsor and/or its

affiliates hold financial interests in, or have contractual obligations to, other entities; or when a

SPAC enters into a business combination with a private operating company affiliated with the

sponsor, the SPAC, or the SPAC's founders, officers, or directors.  Further, a SPAC's officers

often do not work full-time at the SPAC, may work for both the sponsor and the SPAC, and/or

may have responsibilities at other companies, which may impact such officers' ability to devote

adequate time and attention to the activities of the SPAC and may influence their decision to

proceed with a particular de-SPAC transaction.  These potential conflicts of interest could be

particularly relevant for investors to the extent that they arise when a SPAC and its sponsor are

evaluating and deciding whether to recommend a business combination transaction to

shareholders, especially as the SPAC nears the end of the period to complete such a transaction

under, *e.g.*, its governing instruments or the proposed safe harbor under the Investment Company

Act,[68] if adopted, and the sponsor may be under pressure to find a target and complete the de-

SPAC transaction on less favorable terms or face losing the value of its securities in the SPAC.

We are proposing Item 1603(b) to require disclosure of any actual or potential material

conflict of interest between (1) the sponsor or its affiliates or the SPAC's officers, directors, or

promoters, and (2) unaffiliated security holders.  This would include any conflict of interest in

determining whether to proceed with a de-SPAC transaction and any conflict of interest arising

from the manner in which a SPAC compensates the sponsor or the SPAC's executive officers

and directors, or the manner in which the sponsor compensates its own executive officers and

---

[67]  *See, e.g.*, Usha Rodrigues and Mike Stegemoller, *Exit, Voice, and Reputation: The Evolution of SPACs*, 37 DEL. J. CORP. L. 849 (2013).

[68]  *See infra* Section VI.

directors.  In addition, we are proposing Item 1603(c) to require disclosure regarding the fiduciary duties each officer and director of a SPAC owes to other companies.  Such disclosure could allow investors to assess whether and to what extent officers or directors may have to navigate a conflict of interest consistent with their obligations under the laws of the jurisdiction of incorporation or organization, may be compelled to act in the interest of another company or companies that compete with the SPAC for business combination opportunities, or may have their attention divided such that it may affect their decision-making with respect to the SPAC.

The proposed disclosure requirements would provide a SPAC's shareholders and prospective investors with a more complete understanding of any actual or potential material conflicts of interest associated with the SPAC and the benefits that may be realized by the sponsor and its affiliates and any promoters arising from these conflicts of interest.  Such disclosure could allow investors to more accurately assess the potential risk associated with the conflicts of interest in a SPAC.  Further, disclosure about the fiduciary duties a SPAC's officers and directors owe to other companies could allow the SPAC's shareholders and prospective investors to better assess the actions of these officers and directors in managing the SPAC's activities and in determining to proceed with a proposed de-SPAC transaction.

**Request for Comment**

15.     Should we require disclosure with respect to material conflicts of interest that may arise in connection with de-SPAC transactions, as proposed?  Should we include a materiality threshold, as proposed?  Is it clear what would constitute an actual or potential material conflict of interest, or is further guidance or specification needed?  For example, are there other specific conflicts of interest that we should identify in the rule?

16.     Would the proposed disclosure requirements adequately inform investors as to potential material conflicts of interest?  Are there approaches that could minimize potential boilerplate or duplicative disclosure?  Should we require that this disclosure be presented in a tabular format?

17.     Is there any additional information that we should require regarding conflicts of interest?  For example, should we also require a description of any policies and procedures used or to be used to minimize potential or actual conflicts of interest?  Should we require disclosure of how the board of directors assesses and manages such conflicts, in particular where directors themselves have conflicts of interest?

18.     Should SPACs be required to provide additional disclosure regarding material conflicts of interest in Exchange Act reports following their initial public offerings?  For example, should periodic reports require that any changes in previously disclosed conflicts of interest be reported?  Should we require disclosure about material conflicts of interest relating to both the SPAC and the identified target company in the Form 8-K that is required to be filed in connection with the announcement of a de-SPAC transaction?

19.     Should we require disclosure about any fiduciary duties each officer and director of a SPAC owes to other companies, as proposed?  How would investors use this information?  Should we require additional or different disclosure regarding these fiduciary duties?  Would this requirement potentially result in the disclosure of information that is not relevant to SPAC investors?  Should this disclosure requirement be focused instead on material conflicts of interests arising from these fiduciary duties to other companies?  Should we require that this disclosure be provided in a tabular format?  Should we consider other approaches to this disclosure?

### D.    Dilution

We are proposing Items 1602(a)(4), 1602(c) and 1604(c) to require additional disclosure about the potential for dilution in (1) registration statements filed by SPACs, including those for initial public offerings, and (2) de-SPAC transactions.  Proposed Item 1602(c) would be applicable to all registered offerings by a SPAC other than a de-SPAC transaction, while proposed Item 1604(c) would be applicable to all de-SPAC transactions.  We are also proposing Item 1602(a)(4) to require simplified tabular dilution disclosure on the prospectus cover page in registered offerings by a SPAC on Form S-1 or F-1 other than for de-SPAC transactions.

There are a number of potential sources of dilution in a SPAC's structure, including dilution resulting from shareholder redemptions, sponsor compensation, underwriting fees, outstanding warrants and convertible securities, and PIPE financings.  This dilution may be particularly pronounced for the shareholders of a SPAC who do not redeem their shares prior to the consummation of the de-SPAC transaction and who may not realize or appreciate that these costs are disproportionately borne by the non-redeeming shareholders.[69]  According to one study, the median dilutive impact of sponsor compensation, underwriting fees, warrants, and rights equaled 50.4% of the cash raised in a SPAC initial public offering.[70]  Further, several commentators have asserted that the complexity of the disclosures in these transactions makes it difficult for investors to understand the dilutive impact of sponsor compensation on the SPAC's non-redeeming shareholders.[71]

---

[69]  For example, the dilutive impact of underwriting fees deferred until the completion of a de-SPAC transaction and the number of shares received by the sponsor is not required to be disclosed in a manner that takes into account the additional dilution caused by redemptions.

[70]  Klausner, Ohlrogge, and Ruan, *supra* note 17.

[71]  *See, e.g.*, AFR Letter; Klausner, Ohlrogge, and Ruan, *supra* note 17; Michael Klausner, Michael Ohlrogge, and Harald Halbhuber, *SPAC Disclosure of Net Cash Per Share* (SSRN Working Paper, 2022).

In light of the potential for significant dilution embedded within the typical SPAC structure, enhanced disclosure regarding dilution could enable investors in a SPAC initial public offering and subsequent purchasers of SPAC shares to better understand the potential impact upon them of the various dilutive events that may occur over the lifespan of the SPAC.[72]  We are therefore proposing to require dilution disclosure in registration statements filed by SPACs other than for de-SPAC transactions that would require a description of material potential sources of future dilution following a SPAC's initial public offering, as well as tabular disclosure of the amount of potential future dilution from the public offering price that will be absorbed by non-redeeming SPAC shareholders, to the extent quantifiable.[73]  This proposed disclosure would be in addition to the disclosure already required under Item 506 of Regulation S-K.[74]

In addition, we are proposing to require simplified tabular dilution disclosure incorporating a range of potential redemption levels on the prospectus cover page of SPAC registration statements on Forms S-1 and F-1.[75]  In providing disclosure pursuant to Item 506, SPACs currently provide prospective investors with estimates of dilution as a function of the

---

[72]  In this regard, we note that the initial purchasers in SPAC initial public offerings often resell or redeem their shares prior to the completion of the de-SPAC transaction.  *See, e.g.*, Benjamin Mullin and Amrith Ramkumar, *BuzzFeed Suffers Wave of SPAC Investor Withdrawals Before Going Public*, The Wall Street Journal, Dec. 2, 2021. *See also supra* note 17.

[73]  Proposed Item 1602(c).

[74]  Under Item 506, a company is required to provide disclosure regarding dilution when (1) the company is not subject to the reporting requirements of the Exchange Act and is registering an offering of common equity securities where there is substantial disparity between the public offering price and the effective cash cost to officers, directors, promoters, and affiliated persons of common equity acquired by them in transactions during the past five years, or which they have the right to acquire; or (2) the company is registering an offering of common equity securities and the company has had losses in each of its last three fiscal years and there is a material dilution of the purchasers' equity interest.  In the first instance, a company must provide a comparison of the public contribution under the proposed public offering and the effective cash contribution of such persons.  In both instances, Item 506 requires disclosure of the net tangible book value per share before and after the distribution; the amount of the increase in such net tangible book value per share attributable to the cash payments made by purchasers of the shares being offered; and the amount of the immediate dilution from the public offering price which will be absorbed by such purchasers.

[75]  Proposed Item 1602(a)(4).

difference between the initial public offering price and the pro forma net tangible book value per share after the offering.  These estimates often include an assumption that the maximum allowable number of shares eligible will be redeemed prior to the de-SPAC transaction.[76]  While this information can be useful, investors may benefit from a more detailed and prominent tabular presentation of this dilution disclosure that shows various potential levels of redemption, not just the upper bound on dilution attributable to redemptions.  We are therefore proposing to require that registration statements on Form S-1 or Form F-1 filed by SPACs, including for an initial public offering, include on the prospectus cover page a simplified dilution table, in the following format, which would present the reader with an estimate of the remaining pro forma net tangible book value per share at quartile intervals up to the maximum redemption threshold:

| Remaining Pro Forma Net Tangible Book Value per Share | | | | |
|---|---|---|---|---|
| Offering Price of _____ | 25% of Maximum Redemption | 50% of Maximum Redemption | 75% of Maximum Redemption | Maximum Redemption |
| | | | | |

The proposed Item 1602(a)(4) dilution disclosure would be calculated in a manner consistent with the methodologies and assumptions more fully articulated in the disclosures provided pursuant to Item 506 elsewhere in the prospectus.  If the initial public offering includes an overallotment option, the table would need to include separate rows showing remaining pro forma net tangible book value per share with the exercise and without the exercise of the over-allotment option.  We are also proposing to require that SPACs provide a cross-reference to the more detailed dilution disclosure later in the prospectus when providing this tabular disclosure on the prospectus cover page.

---

[76]  In practice, redemption rates rarely reach this level.

In regard to de-SPAC transactions, investors could benefit from clearer dilution disclosure that takes into account the unique characteristics of the SPAC structure, including any terms negotiated with the target private operating company, as well as the potential for additional financing from PIPE investors.  At the time of a de-SPAC transaction, investors are making a decision as to whether to remain a shareholder of the post-business combination company going forward.  Apart from the operating success of the post-business combination company, dilution is likely to have a significant impact on the value of a shareholder's continued investment in the company.  We are therefore proposing Item 1604(c) to require disclosure of each material potential source of additional dilution that non-redeeming shareholders may experience at different phases of the SPAC lifecycle by electing not to redeem their shares in connection with the de-SPAC transaction.[77]

For example, to the extent material, this disclosure would need to explain that, when a SPAC's shareholders retain their warrants after redeeming their shares prior to the de-SPAC transaction, the non-redeeming shareholders and the post-business combination company may face potential additional dilution.  Proposed Item 1604(c)(1) would also require a sensitivity analysis in a tabular format that shows the amount of potential dilution under a range of reasonably likely redemption levels and quantifies the increasing impact of dilution on non-redeeming shareholders as redemptions increase.  We are also proposing to require disclosure of a description of the model, methods, assumptions, estimates, and parameters necessary to understand the sensitivity analysis disclosure.

**Request for Comment**

---

[77] Depending on the circumstances, material potential sources of additional disclosure may include dilution from sponsor compensation, underwriting fees, outstanding warrants and convertible securities, and financing transactions (including PIPE transactions).

20.     Should we require disclosure of material potential sources of future dilution in registration statements filed by SPACs for initial public offerings and in disclosure documents for de-SPAC transactions, as proposed?  How would investors benefit from this additional disclosure?  Should we require other information either in addition to, or in lieu of, the proposed dilution disclosure, such as disclosure of the cumulative amount of dilution that non-redeeming shareholders may experience or the amount of net cash underlying each share at the time of a de-SPAC transaction?  If so, should we require that this disclosure be presented in a tabular format?  Should we provide additional explanation on how to calculate the amount of dilution for purposes of these disclosure requirements?  Should we provide further guidance about disclosures that SPACs should consider making to help non-affiliated shareholders understand the potential for dilution and the consequences of dilution for non-affiliated shareholders?

21.     Should we also consider requiring enhanced dilution disclosure in other Commission filings?  If so, what additional information should we require in this context?  How would investors use this additional dilution disclosure?

22.     Should we require simplified tabular disclosure regarding dilution on the prospectus cover page of a Form S-1 or Form F-1, as proposed?  Should we require additional or less information, or alternative information, in the tabular disclosure?  For example, would a tabular presentation of cash remaining per non-redeemed share in lieu of a tabular presentation of remaining pro forma net tangible book value per share be useful to investors?  Should we consider adding a similar requirement to provide simplified tabular disclosure (1) in the prospectus summary of a Form S-1 or F-1 or (2) on the prospectus cover page and/or in the prospectus summary of a Form S-4 or Form F-4 for a de-SPAC

transaction?  If so, what information should be included in such tabular disclosure?  Are there other ways to present the potential for dilution to investors in a more accessible format?

23.    Should we require, in disclosure documents for de-SPAC transactions, a sensitivity analysis in a tabular format, as proposed?  Should we consider additional or alternative approaches to this disclosure requirement?

24.    Are there any significant challenges in providing the proposed enhanced dilution disclosure at the initial public offering stage or at the de-SPAC transaction stage?

25.    Should we consider additional amendments that would highlight or simplify dilution disclosure so that it is more clear and accessible for investors?

### E.    Prospectus Cover Page and Prospectus Summary Disclosure

In response to concerns raised about the complexity of disclosures in Securities Act registration statements filed by SPACs for initial public offerings and for de-SPAC transactions,[78] we are proposing Item 1602 to require that certain information be included on the prospectus cover page and in the prospectus summary using plain English principles.[79]  Given the unique nature of SPAC offerings and the potential risks they present to investors, investors could benefit from requiring the issuer to highlight certain disclosures on the cover page and in the prospectus summary, in a form that can be more easily read and understood.

---

[78]  *See, e.g.*, IAC Recommendations, *supra* note 37 (expressing concerns "relating to the effectiveness of disclosure about the risks, economics and mechanics of SPACs as a result of the complexity of these transactions and the staggered nature of the disclosure process"); Rodrigues Testimony; Klausner, Ohlrogge, and Ruan, *supra* note 17.

[79]  *See* Securities Act Rule 421(d).  *See supra* note 38.

### 1.   Prospectus Cover Page

Item 501(b) of Regulation S-K sets forth disclosure requirements for the outside front cover page of prospectuses, such as the name of the registrant, title and amount of securities being offered, and the offering price of the securities.  In regard to registered offerings (including initial public offerings) by SPACs other than de-SPAC transactions, we are proposing Item 1602(a) to require information on the prospectus cover page in plain English about, among other things, the time frame for the SPAC to consummate a de-SPAC transaction, redemptions, sponsor compensation, dilution (including simplified tabular disclosure), and conflicts of interest.  In regard to de-SPAC transactions, we are proposing Item 1604(a) to require that SPACs include information on the prospectus cover page in plain English about, among other things, the fairness of the de-SPAC transaction, material financing transactions, sponsor compensation and dilution, and conflicts of interest.

Investors should benefit from having these significant aspects of SPAC offerings and de-SPAC transactions disclosed prominently on the prospectus cover page in plain English,[80] in addition to the information otherwise required under Item 501 of Regulation S-K.  Although most SPACs already provide much of the proposed information on prospectus cover pages, the proposed rules would standardize this information across all registration statements filed by SPACs for initial public offerings and for de-SPAC transactions.

### 2.   Prospectus Summary

Item 503 of Regulation S-K requires a brief summary of the information in the prospectus where the length or complexity of the prospectus makes a summary useful.  While the information that should be included in a prospectus summary will depend on the particular

---

[80]  *Id.*

offering and issuer, a prospectus summary should provide disclosure in clear language of the most significant aspects of the transaction being registered.[81]  In light of the often complex disclosure in registration statements filed by SPACs, a requirement that SPACs present certain information in the prospectus summary in plain English should help investors more easily to identify and assess those aspects of the transaction that are likely to be important in their investment, voting, and redemption decisions.[82]

In regard to registered offerings other than de-SPAC transactions, we are proposing Item 1602(b) to require that SPACs include the following information in the prospectus summary in plain English:

- The process by which a potential business combination candidate will be identified and evaluated;

- Whether shareholder approval is required for the de-SPAC transaction;

- The material terms of the trust or escrow account, including the amount of gross offering proceeds that will be placed in the trust;

- The material terms of the securities being offered, including redemption rights;

- Whether the securities being offered are the same class as those held by the sponsor and its affiliates;

- The length of the time period during which the SPAC intends to consummate a de-SPAC transaction, and its plans if it does not do so, including, whether and how the time period may be extended, the consequences to the sponsor of not completing an extension of this

---

[81] *See* Instruction to Item 503(a) and 17 CFR 230.421(b) (Securities Act Rule 421(b)).

[82] In the context of asset-backed offerings, the Commission previously specified that certain information be included on the prospectus cover page and in the prospectus summary.  *See* Items 1102 and 1103 of Regulation S-K. *Asset-Backed Securities*, Release No. 33-8518 (Dec. 22, 2004) [70 FR 1506 (Jan. 7, 2005)].  *See also* Item 3 of Form S-4 and Item 3 of Form F-4 (specifying that certain information be included in the prospectus summary).

time period, and whether shareholders will have voting or redemption rights with respect to an extension of time to consummate a de-SPAC transaction;

- Any plans to seek additional financing and how such additional financing might impact shareholders;

- Tabular disclosure of sponsor compensation and the extent to which material dilution may result from such compensation; and

- Material conflicts of interest.

Based on the Commission staff's experience in reviewing registration statements filed by SPACs, we believe these topics are among those that investors are likely to find most important when considering an investment in the SPAC prior to the identification of a potential business combination candidate.

In regard to registered de-SPAC transactions, we are proposing Item 1604(b) to require that registrants include the following information in the prospectus summary in plain English:

- The background and material terms of the de-SPAC transaction;

- The fairness of the de-SPAC transaction;

- Material conflicts of interest;

- Tabular disclosure on sponsor compensation and dilution;

- Financing transactions in connection with de-SPAC transactions; and

- Redemption rights.

Based on the Commission staff's experience in reviewing registration statements for de-SPAC transactions, we believe investors would find this information, in particular those topics that illuminate potential conflicts of interest and the overall fairness of the proposed transaction, important when making an investment decision at the de-SPAC transaction stage.

**Request for Comment**

26.     Would requiring certain information in regard to SPAC offerings on the prospectus cover
        page and in the prospectus summary make it easier for investors to review and understand
        the disclosures in these registration statements?  Are there other ways we could make
        these registration statements easier for investors to understand?

27.     Should we require the proposed cover page disclosures for SPAC initial public offerings
        and de-SPAC transactions?  Is there other information that we should require to be
        included on the cover page, either in addition to, or in lieu of, the information proposed to
        be required?  Conversely, are there any proposed additional cover page disclosures that
        we should not adopt?

28.     Should we require the inclusion of the proposed specified information in the prospectus
        summary?  Is there other information that we should require to be included in the
        prospectus summary?

29.     Is the subset of the disclosure under proposed Item 1605 that we are proposing to require
        to be more prominently presented on the prospectus cover page and in the prospectus
        summary via proposed Items 1604(a) and (b) the most informative or otherwise important
        information for purposes of the prospectus cover page and the prospectus summary?
        Should any additional disclosure provided pursuant to proposed Item 1605 be added to or
        replace an existing element of the information proposed to be required on the prospectus
        cover page or in the prospectus summary?

30.     Are there other changes we should consider in regard to the prospectus cover page and
        prospectus summary?  For example, should we impose any additional formatting
        requirements, such as the use of tables or bullet points, for certain information in the

prospectus summary?  Would such formatting requirements improve the clarity of this disclosure?

## F.     Disclosure and Procedural Requirements in De-SPAC Transactions

We are proposing specialized disclosure and procedural requirements in de-SPAC transactions so that investors can better understand and evaluate the merits of a prospective de-SPAC transaction.[83]  The proposed rules would require: (1) additional disclosures on the background of and reasons for the transaction; (2) a statement from the SPAC as to whether it reasonably believes that the de-SPAC transaction and any related financing transaction are fair or unfair to unaffiliated security holders; (3) disclosure on any outside report, opinion, or appraisal relating to the fairness of the transaction; and (4) additional information in a Schedule TO filed in connection with a de-SPAC transaction, as well as clarify the need to comply with the procedural requirements of the tender offer rules when filing such a Schedule TO.[84]

### 1.     Background of and Reasons for the De-SPAC Transaction; Terms and Effects

In order to provide investors with a more complete understanding of the de-SPAC transaction, we are proposing Item 1605 of Regulation S-K which would require disclosure of the background, material terms, and effects of the de-SPAC transaction, including:

---

[83]  As discussed above, a SPAC is required to provide its shareholders with a proxy statement on Schedule 14A if shareholder approval is required in a de-SPAC transaction.  If a SPAC is registering an offering of its shares to be issued in the de-SPAC transaction, the SPAC generally files a registration statement on Form S-4 or F-4.  Alternatively, if shareholder approval is required but the SPAC is not soliciting proxies from its shareholders, the SPAC is required to provide an information statement on Schedule 14C.  Otherwise, if no registration statement, proxy statement or information statement is required, the SPAC must disseminate a Schedule TO (tender offer statement) to its shareholders.  *See* Section IV.A. for a discussion of proposed Rule 145a, which would affect when a SPAC may be required to file a Form S-4 or F-4 in connection with a de-SPAC transaction.

[84]  In addition, we are proposing new rules applicable to business combinations involving shell companies more generally, which would include de-SPAC transactions.  *See infra* Section IV.

- A summary of the background of the de-SPAC transaction, including, but not limited to, a description of any contacts, negotiations, or transactions that have occurred concerning the de-SPAC transaction;[85]

- A brief description of any related financing transaction, including any payments from the sponsor to investors in connection with the financing transaction;

- The reasons for engaging in the particular de-SPAC transaction and for the structure and timing of the de-SPAC transaction and any related financing transaction;

- An explanation of any material differences in the rights of security holders of the post-business combination company as a result of the de-SPAC transaction;[86] and

- Disclosure regarding the accounting treatment and the federal income tax consequences of the de-SPAC transaction, if material.[87]

These disclosure requirements are modeled, in part, on Item 1004(a)(2) and Item 1013(b) of Regulation M-A[88] and are intended to provide investors with, among other things, an

---

[85]  For example, this disclosure could encompass whether any portion of the underwriting fees in connection with a SPAC's initial public offering is contingent upon the SPAC's completion of a de-SPAC transaction and whether the underwriter in the SPAC's initial public offering has provided additional services to the SPAC following the initial public offering, such as locating potential target companies, providing financial advisory services, acting as a placement agent for PIPE transactions, and/or arranging debt financing.  For a discussion of the role of the underwriter in connection with a de-SPAC transaction, *see infra* Section III.F.

[86]  This proposed disclosure requirement is intended to address situations where the shares of a SPAC are being exchanged for shares of a new holding company or the target company in a de-SPAC transaction.

[87]  Proposed Items 1605(a) and (b).  This disclosure would be required in any Form S-4 or F-4 or Schedule 14A, 14C, or TO filed in connection with a de-SPAC transaction.  We note that registrants are already subject to similar disclosure requirements in Schedules 14A and 14C and in Forms S-4 and F-4.  These proposed disclosure requirements are intended to complement these existing requirements by setting forth specialized disclosure requirements that are specific to de-SPAC transactions.

[88]  17 CFR 229.1000 through 229.1016.  Regulation M-A is a subpart (the 1000 series) of Regulation S-K. Item 1004(a)(2) sets forth disclosure requirements regarding the material terms of mergers or similar transactions, and Item 1013(b) requires disclosure of alternative means considered by the subject company or affiliate in the context of a going-private transaction.  In our view, these rules are appropriate models for the proposed specialized disclosure requirements for de-SPAC transactions, in that Item 1004(a)(2) sets forth disclosure requirements for mergers generally and the same potential for self-interested transactions exists in de-SPAC transactions as in going-private transactions.

enhanced basis upon which to evaluate a SPAC's reasons for proposing a de-SPAC transaction and for choosing a particular structure and financing for the transaction, through a specialized disclosure rule tailored to SPACs that would address disclosure issues more specific to de-SPAC transactions.  These proposed requirements would also help promote consistent disclosure, which would allow for greater comparability of these disclosures across de-SPAC transactions.  As proposed, Item 1605(b) would require a reasonably detailed discussion of the reasons for, and the structure and timing of, a proposed de-SPAC transaction, which could include a discussion of the key events and activities in identifying the target private operating company and in negotiating the terms of the merger or acquisition, as well as the material factors considered by a SPAC's board of directors in approving the terms of the proposed de-SPAC transaction and in recommending shareholder approval of the transaction.

In addition, we are proposing Item 1605(c) to require disclosure of the effects of the de-SPAC transaction and any related financing transaction on the SPAC and its affiliates, the sponsor and its affiliates, the private operating company and its affiliates, and unaffiliated security holders of the SPAC.  Such disclosure could allow investors to better assess whether the transactions have been structured in a manner that would benefit one of these parties in particular or that would be to the detriment of other parties.  As proposed, the disclosure must provide a reasonably detailed discussion of both the benefits and detriments to non-redeeming shareholders of the de-SPAC transaction and any related financing transaction, with such benefits and detriments quantified to the extent practicable.[89]  For example, if the sponsor's interests and returns may differ from those of public investors in regard to a prospective de-SPAC transaction, the disclosure should describe and quantify, to the extent practicable, dollar amounts or

---

[89]  Proposed Item 1605(c).

prospective returns the sponsor and its affiliates stand to gain or lose that are dependent on the completion of the transaction.

We are also proposing Item 1605(d) to require disclosure of the SPAC's sponsors', officers' and directors' material interests in the de-SPAC transaction or any related financing transaction, including any fiduciary or contractual obligations to other entities and any interest in, or affiliation with, the private operating company that is the target of the de-SPAC transaction.  This proposed disclosure requirement is intended to address, among other things, the concern that a sponsor may be proposing a de-SPAC transaction that will produce benefits or detriments that are not fully disclosed to investors.[90]

Under Item 403 of Regulation S-K, SPACs currently provide tabular disclosure regarding the beneficial ownership of its equity or voting securities, as applicable, by management and beneficial owners of more than 5% of a class of voting securities.[91]  The proposed disclosure requirement in Item 1605(d) would be broader than Item 403, and would require disclosure of any material interests that the sponsor and the SPAC's officers and directors have in a de-SPAC transaction or any related financing transaction, including fiduciary or contractual obligations to other entities as well as any interest in, or affiliation with, the target company.  The proposed disclosure requirement would also encompass material interests that are non-pecuniary in nature that may nevertheless affect the decision to proceed with a prospective de-SPAC transaction or related financing transaction.  In the context of a de-SPAC transaction, this disclosure could help investors, when making an investment, voting or redemption decision with respect to the de-

---

[90] *See, e.g.*, IAC Recommendations, *supra* note 37 (stating that "there may be financial arrangements that constitute conflicts of interest that are not fully disclosed or understood by investors"); Rodrigues and Stegemoller, *supra* note 17; Klausner, Ohlrogge, and Ruan, *supra* note 17; Deane Testimony.

[91] Under Item 403, beneficial ownership is determined in accordance with 17 CFR 240.13d-3(d)(1) (Exchange Act Rule 13d-3(d)(1)), pursuant to which a person is generally deemed to be the beneficial owner of securities that the person has the right to acquire within 60 days.

SPAC transaction, to assess whether, on balance, the benefits of the de-SPAC transaction justify the detriments, and particularly whether the sponsor is motivated to complete a de-SPAC transaction by interests not held by all investors.

Proposed Item 1605(e) would require disclosure of whether or not security holders are entitled to any redemption or appraisal rights, and if so, a summary of the redemption or appraisal rights.[92]  Under the proposed rules, SPACs would be required to disclose, among other things, whether shareholders may redeem their shares regardless of whether they vote in favor of or against a proposed de-SPAC transaction, or abstain from voting, and whether shareholders have the right to redeem their securities at the time of any extension of the time period to complete a de-SPAC transaction.  If there are no redemption or appraisal rights available for security holders who object to the de-SPAC transaction, the proposed rules would require disclosure of any other rights that may be available to security holders under the law of the jurisdiction of organization.  These disclosures would help investors better assess the impact of any redemption or appraisal rights on a proposed de-SPAC transaction, including whether the existence of such rights might lead some investors to redeem their securities after voting in favor of a de-SPAC transaction.[93]

---

[92]  This proposed disclosure requirement would build upon, and be in addition to, the existing disclosure requirement in Item 202 of Regulation S-K (Description of registrant's securities).  Under Item 202, SPACs are currently required to disclose the redemption provisions of their capital stock being registered, such as whether redemptions would be required under certain circumstances at the SPAC's option, *e.g.*, whether a SPAC may require the redemption of warrants held by public shareholders for nominal consideration if the underlying shares trade above a certain threshold price.

[93]  One commentator has observed that SPAC shareholders may vote in favor of a proposed de-SPAC transaction while redeeming their shares prior to the closing of the transaction, such that the vote is decoupled from any economic interest in the post-business combination company.  Rodrigues and Stegemoller, *supra* note 17.  *See also supra* note 29.

**Request for Comment**

31.   Would the proposed disclosure requirements provide investors with important information regarding the background of and reasons for a de-SPAC transaction?  Is there any additional information about the background of and reasons for the de-SPAC transaction that we should require to be disclosed?  Are there any additional or alternative requirements that we should consider to further improve the disclosures about de-SPAC transactions?

32.   Should we adopt the proposed disclosure requirements with respect to the effects of the de-SPAC transaction and any related financing transaction, as proposed?  Should we require additional or alternative disclosure regarding the effects of the de-SPAC transaction and any related financing transaction?

33.   Should we require disclosure with respect to material interests in a prospective de-SPAC transaction or any related financing transaction held by the sponsor and the SPAC's officers and directors, as proposed?  Should we require additional or alternative disclosure regarding the interests of these parties in the de-SPAC transaction?

34.   Should we require disclosure regarding whether or not security holders are entitled to any redemption or appraisal rights and a summary of any such rights, as proposed?  Is there additional or alternative disclosure about redemption or appraisal rights that we should require?

35.   Would the disclosure requirements in proposed Item 1605 result in duplicative disclosures?  If so, are there alternative approaches that we should consider to avoid this result?

2.      *Fairness of the De-SPAC Transaction*

To address concerns regarding potential conflicts of interest and misaligned incentives in connection with the decision to proceed with a de-SPAC transaction and to assist investors in assessing the fairness of a particular de-SPAC transaction to unaffiliated investors,[94] we are proposing Item 1606(a) to require a statement from a SPAC as to whether it reasonably believes that the de-SPAC transaction and any related financing transaction are fair or unfair to the SPAC's unaffiliated security holders, as well as a discussion of the bases for this statement.[95] We are proposing to require that this statement encompass both the de-SPAC transaction and any related financing transaction so that the fairness determination would require consideration of the combined effects of both transactions, which are often dependent on each other, on unaffiliated security holders.  As proposed, a SPAC would be required to include this statement in any Forms S-4 and F-4 or Schedules 14A, 14C, and TO filed in connection with a de-SPAC transaction.[96] Proposed Item 1606(a) would also require disclosure on whether any director voted against, or abstained from voting on, approval of the de-SPAC transaction or any related financing

---

[94]  *See supra* note 28.  *See also* Michael Klausner and Michael Ohlrogge, *SPAC Governance: In Need of Judicial Review* (SSRN Working Paper, 2021).

[95]  In this regard, we are proposing an instruction to Item 1606 that a "statement that the special purpose acquisition company has no reasonable belief as to the fairness or unfairness of the de-SPAC transaction or any related financing transaction to unaffiliated security holders will not be considered sufficient disclosure in response to [Item 1606(a)]."  As proposed, a SPAC would not be required to disclose that a de-SPAC transaction and any related financing transaction are fair but rather would be required to state its reasonable belief as to the fairness or unfairness of the transaction as well as the bases for this statement.

[96]  We have modeled certain of the proposed requirements in Item 1606 and Item 1607 (*see infra* Section II.F.3.), on the disclosures required in going-private transactions subject to 17 CFR 240.13e-3 (Exchange Act Rule 13e-3).  *See* Items 1014 and 1015 of Regulation M-A.  In our view, the disclosure requirements in Rule 13e-3 provide an appropriate model for the proposed requirements with respect to de-SPAC transactions, in that the conflicts of interests and misaligned incentives inherent in going-private transactions are similar to those often present in de-SPAC transactions.

transaction, and if so, identification of the director and, if known after making a reasonable

inquiry, the reasons for the vote against the transaction or abstention.

Under proposed Item 1606(b), a SPAC would be required to discuss in reasonable detail

the material factors upon which a reasonable belief regarding the fairness of a de-SPAC

transaction and any related financing transaction is based and, to the extent practicable, the

weight assigned to each factor.  These factors would include but not be limited to: the valuation

of the private operating company; the consideration of any financial projections; any report,

opinion, or appraisal obtained from a third party; and the dilutive effects of the de-SPAC

transaction and any related financing transaction on non-redeeming shareholders.  Together,

these proposed disclosures are intended to help investors assess the reasonableness of the

SPAC's stated belief about the fairness of the transaction.

To provide additional context for understanding the process by which a SPAC

determined to proceed with a de-SPAC transaction, we are proposing Items 1606(c), (d), and (e),

which would require disclosure on whether:

- The de-SPAC transaction or any related financing transaction is structured so that

  approval of at least a majority of unaffiliated security holders is required;

- A majority of directors who are not employees of the SPAC has retained an unaffiliated

  representative to act solely on behalf of unaffiliated security holders for purposes of

  negotiating the terms of the de-SPAC transaction or any related financing transaction

  and/or preparing a report concerning the fairness of the de-SPAC transaction or any

  related financing transaction; and

- The de-SPAC transaction or any related financing transaction was approved by a majority

  of the directors of the SPAC who are not employees of the SPAC.

**Request for Comment**

36.     Should we adopt Item 1606 as proposed?

37.     Should we require a statement from the SPAC as to whether it reasonably believes that

the de-SPAC transaction and any related financing transaction are fair or unfair to

unaffiliated security holders, as proposed?  Should the scope of the fairness determination

include both the de-SPAC transaction and any related financing transaction, as proposed?

Should the fairness determination be as to the SPAC's security holders as a whole, rather

than to the SPAC's unaffiliated security holders?  The factors enumerated in proposed

Item 1606(b) in determining fairness include, but are not limited to, the valuation of the

target company, the consideration of any financial projections, any report, opinion, or

appraisal described in Item 1607 of Regulation S-K, and the dilutive effects described in

Item 1604(c) of Regulation S-K.  Is there any additional or alternative information that

should be disclosed in connection with the SPAC's fairness determination?

38.     Should we include an instruction to Item 1606 that a statement that the SPAC has no

reasonable belief as to the fairness or unfairness of the de-SPAC transaction or any

related financing transaction to unaffiliated security holders will not be considered

sufficient disclosure in response to Item 1606(a), as proposed?

39.     What are the potential benefits and costs of the statement that would be required by

proposed Item 1606(a)?  Would the costs of complying with this disclosure requirement

discourage SPAC initial public offerings or discourage private operating companies from

pursuing business combinations with SPACs?

40.     Should we require registrants to disclose whether any director voted against, or abstained

from voting on, the approval of a de-SPAC transaction or any related financing

transaction, as well as the reasons for such vote or abstention, as proposed?  Are there

additional or alternative disclosures that we should require in this regard?

41.   Should we require registrants to discuss in reasonable detail the material factors and, to

the extent practicable, the weight assigned to each factor underlying the fairness

determination, as proposed?  Are there additional or alternative factors that should be

specified in the proposed rule to enhance an investor's understanding of the fairness

determination?

42.   How would investors use disclosure about whether the approval of at least a majority of

unaffiliated security holders is required and whether the de-SPAC transaction or any

related financing transaction was approved by a majority of non-employee directors of

the SPAC?  How would investors use disclosure about whether a representative has been

retained to represent the investors in the negotiations of the de-SPAC transaction?

### 3.   *Reports, Opinions, and Appraisals*

In addition, we are proposing Item 1607 to require disclosure about certain reports,

opinions, or appraisals from outside parties.[97]  Proposed Item 1607(a) would require disclosure

about whether or not the SPAC or its sponsor has received any report, opinion, or appraisal

obtained from an outside party relating to the consideration or the fairness of the consideration to

be offered to security holders or the fairness of the de-SPAC transaction or any related financing

transaction to the SPAC, the sponsor or security holders who are not affiliates.[98]  This

requirement would provide additional transparency about whether a SPAC's board of directors

---

[97]  As noted above, we have modeled the proposed requirements in Item 1607 on the disclosures required in going-
private transactions subject to Exchange Act Rule 13e-3.  See Item 1015 of Regulation M-A.

[98]  Though currently not a routine practice in de-SPAC transactions, SPACs often obtain fairness opinions in
connection with de-SPAC transactions involving an affiliated private operating company.

and/or its sponsor have access to information underlying a fairness determination that shareholders could find useful in making voting, investment, and redemption decisions in connection with the de-SPAC transaction.[99]

To assist investors in considering the usefulness and reliability of any outside party report, opinion or appraisal described in response to proposed Item 1607(a), as well as any negotiation or report by an unaffiliated representative acting solely on behalf of unaffiliated security holders described in response to proposed Item 1606(d), proposed Item 1607(b) would require disclosure of:

- The identity, qualifications, and method of selection of the outside party and/or unaffiliated representative;

- Any material relationship between (1) the outside party, its affiliates, and/or unaffiliated representative, and (2) the SPAC, its sponsor and/or their affiliates, that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship;[100]

- Whether the SPAC or the sponsor determined the amount of consideration to be paid to the private operating company or its security holders, or the valuation of the private operating company, or whether the outside party recommended the amount of consideration to be paid or the valuation of the private operating company; and

---

[99]  For example, the proposed rule would require a SPAC to disclose whether or not the SPAC or its sponsor has received a fairness opinion or valuation report from a financial advisor.

[100]  For example, this disclosure could include whether the compensation for a financial advisor's fairness opinion is conditioned on the completion of the de-SPAC transaction or whether the amount of compensation due the financial advisor may include a bonus or may be increased depending on the ultimate financial terms of the de-SPAC transaction.

- A summary concerning the negotiation, report, opinion or appraisal, which would be required to include a description of the procedures followed; the findings and recommendations; the bases for and methods of arriving at such findings and recommendations; instructions received from the SPAC or its sponsor; and any limitation imposed by the SPAC or its sponsor on the scope of the investigation.

Finally, proposed Item 1607(c) would require all such reports, opinions or appraisals to be filed as exhibits to the Form S-4, Form F-4, and Schedule TO for the de-SPAC transaction or included in the Schedule 14A or 14C for the transaction, as applicable.

**Request for Comment**

43.    Should we require disclosure regarding reports, opinions, or appraisals from an outside party, as proposed?  Is there any additional or alternative information that we should require with respect to these reports, opinions, or appraisals?  Is there any proposed information that should not be required?

44.    Should we require that the reports, opinions or appraisals be filed as exhibits to the Form S-4, Form F-4, or Schedule TO for the de-SPAC transaction or included in the Schedule 14A or Schedule 14C for the transaction, as proposed?  Should we require instead that such reports, opinions, or appraisals be made available for inspection and copying upon written request?  Should we require the filing of board books and other written materials presented to the board in connection with the reports, opinions, or appraisals, as is the case with going-private transactions?  Are there other means by which investors should be able to access such report, opinion, or appraisal, such as posting on a website?

45.     As proposed, filers would be required to include a summary of the report, opinion, or

        appraisal and file such report, opinion, or appraisal as an exhibit to the filing.  Would

        investors benefit from having both the summary and the actual report, opinion, or

        appraisal disclosed, or would one or the other item of disclosure be sufficient?

### 4.     Proposed Item 1608 of Regulation S-K

We are proposing Item 1608 of Regulation S-K to codify a staff position that a

Schedule TO filed in connection with a de-SPAC transaction should contain substantially the

same information about a target private operating company that is required under the proxy rules

and that a SPAC must comply with the procedural requirements of the tender offer rules when

conducting the transaction for which the Schedule TO is filed, such as a redemption of the SPAC

securities.  Redemption rights offered by a SPAC to its security holders in connection with the

de-SPAC transaction or an extension of the timeframe to complete a de-SPAC transaction

generally have indicia of being a tender offer, but the Commission staff has not objected if a

SPAC does not comply with the tender offer rules when the SPAC files a Schedule 14A or 14C

in connection with a de-SPAC transaction or an extension and complies with Regulation 14A or

14C, because the federal proxy rules would generally mandate substantially similar disclosures

and applicable procedural protections as required by the tender offer rules.[101]  Proposed Item

1608, if adopted, would not affect the availability of this staff position for those SPACs that file

Schedule 14A or 14C for their de-SPAC transactions or extensions.  SPACs that are unable to

avail themselves of this position and file a Schedule TO (such as foreign private issuers[102]),

---

[101]  *See supra* note 21.

[102]  "Foreign private issuer" is defined in Securities Act Rule 405 and Exchange Act Rule 3b-4(c).  A foreign private issuer is any foreign issuer other than a foreign government, except for an issuer that (1) has more than 50% of its outstanding voting securities held of record by U.S. residents and (2) any of the following: (i) a majority of its officers and directors are citizens or residents of the United States, (ii) more than 50 percent of its assets are located in the United States, or (iii) its business is principally administered in the United States.

however, would be subject to the requirements of proposed Item 1608 of Regulation S-K, which would codify the staff's view regarding the information required to be included in a Schedule TO filed for a SPAC redemption and clarify the need to comply with the procedural requirements of the tender offer rules.[103]

Proposed Item 1608 would require a SPAC that files a Schedule TO pursuant to Exchange Act Rule 13e-4(c)(2) for any redemption of securities offered in connection with a de-SPAC transaction to include disclosures required by specified provisions of Forms S-4 and F-4, and Schedule 14A, as applicable.  Proposed Item 1608 would specify and standardize the information required in a Schedule TO that is filed in connection with a de-SPAC transaction so that it is consistent with the information required by the proposed amendments to Forms S-4 and F-4 and Schedule 14A.  As a result, SPAC shareholders who are not solicited for their votes to approve a de-SPAC transaction (in a solicitation subject to Regulation 14A) would nevertheless receive the same information about the target private operating company that could be material to their redemption decisions.[104]  Proposed Item 1608 would clarify that SPACs that file a Schedule TO for a redemption also must comply with the procedural requirements of Rule 13e-4 and Regulation 14E (such as the requirement to keep the redemption period open for at least 20 business days).  This proposed codification would eliminate any potential ambiguity as to the

---

[103]  The staff has historically expressed the view that the same information about the target company that would be required in a Schedule 14A should be included in such a Schedule TO, in view of the requirements of Item 11 of Schedule TO and Item 1011(c) of Regulation M-A and the importance of this information in making a redemption decision.  Item 11 of Schedule TO states "Furnish the information required by Item 1011(a) and (c) of Regulation M-A."  Item 1011(c) of Regulation M-A states "Furnish such additional material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading."

[104]  Proposed Item 1608 would also be consistent with exchange listing rules regarding the use of Schedule TO in de-SPAC transactions.  *See, e.g.,* Nasdaq Listing Rule IM-5101-2(e) and NYSE Listed Company Manual Section 102.06(c).

SPAC's obligation to provide the tender offer rules' procedural protections to the SPAC security holders who are considering whether to redeem their securities.

**Request for Comment**

46.   Should we adopt Item 1608 as proposed?

47.   Is there any additional or alternative information that we should require in proposed Item 1608 when a Schedule TO is filed in connection with a de-SPAC transaction?

48.   Are there any requirements of Rule 13e-4 and Regulation 14E that should not apply to SPACs that file a Schedule TO for the redemption of the SPAC securities?

49.   Are there any other provisions of Rule 13e-4 or Regulation 14E that should be amended to ensure that SPAC security holders are provided with the information material to their decision on whether to redeem their SPAC securities or to address other issues arising from the SPAC redemption process?  For example, should we amend Exchange Act Rule 14e-5, which generally prohibits a bidder or its affiliates from making purchases outside of a tender offer, to permit a sponsor's purchases of SPAC securities outside of the redemption offer as long as certain conditions are satisfied (such as requiring disclosures of the sponsor's purchases and limiting the purchase price to no more than the price offered through the redemption offer), *e.g.*, in a manner consistent with the Division of Corporation Finance's Tender Offers and Schedules Compliance and Disclosure Interpretation 166.01 (Mar. 22, 2022)?[105]

50.   As noted above, the staff has taken the position that a SPAC filing a Schedule 14A or 14C in connection with a de-SPAC transaction or an extension of the time frame to complete a de-SPAC transaction would not need to file a Schedule TO or otherwise

---

[105]  This staff interpretation is available at: https://www.sec.gov/divisions/corpfin/guidance/cdi-tender-offers-and-schedules.htm.

comply with the tender offer rules, including the procedural requirements of the tender offer rules, such as the all-holders requirement.  Should we codify this position?  Should we reconsider this position?

### G.    Structured Data Requirement

We are proposing to require SPACs to tag all information disclosed pursuant to Subpart 1600 of Regulation S-K in a structured, machine-readable data language.  Specifically, we are proposing to require SPACs to tag the disclosures required under Subpart 1600 in Inline XBRL in accordance with Rule 405 of Regulation S-T and the EDGAR Filer Manual.[106]  The proposed requirements would include detail tagging of the quantitative disclosures and block text tagging of the narrative disclosures that would be required under Subpart 1600.

In 2009, the Commission adopted rules requiring operating companies to submit the information from the financial statements (including footnotes and schedules thereto) included in certain registration statements and periodic and current reports in a structured, machine-readable data language using eXtensible Business Reporting Language ("XBRL").[107]  In 2018, the Commission adopted modifications to these requirements by requiring issuers to use Inline XBRL, which is both machine-readable and human-readable, to reduce the time and effort

---

[106]  This tagging requirement would be implemented by including a cross-reference to Rule 405 of Regulation S-T in Subpart 1600 of Regulation S-K, and by revising 17 CFR 232.405(b) of Regulation S-T to include the proposed SPAC-related disclosures.  A corresponding Note and Instruction would also be added to Schedules 14A and TO, respectively.  Pursuant to Rule 301 of Regulation S-T, the EDGAR Filer Manual is incorporated by reference into the Commission's rules.  In conjunction with the EDGAR Filer Manual, Regulation S-T governs the electronic submission of documents filed with the Commission.  Rule 405 of Regulation S-T specifically governs the scope and manner of disclosure tagging requirements for operating companies and investment companies, including the requirement in 17 CFR 232.405(a)(3) to use Inline XBRL as the specific structured data language to use for tagging the disclosures.

[107]  *Interactive Data to Improve Financial Reporting*, Release No. 33-9002 (Jan. 30, 2009) [74 FR 6776 (Feb. 10, 2009)] ("2009 Financial Statement Information Adopting Release") (requiring submission of an Interactive Data File to the Commission in exhibits to such reports).  *See also Interactive Data to Improve Financial Reporting*, Release No. 33-9002A (Apr. 1, 2009) [74 FR 15666 (Apr. 7, 2009)].

associated with preparing XBRL filings and improve the quality and usability of XBRL data for investors.[108]

Requiring Inline XBRL tagging of the Subpart 1600 disclosures would benefit investors by making SPAC disclosures more readily available and easily accessible to investors and other market participants for aggregation, comparison, filtering, and other analysis, as compared to requiring a non-machine readable data language such as ASCII or HTML. This would enable automated extraction and analysis of granular SPAC disclosures, allowing investors and other market participants to more efficiently perform large-scale analysis and comparison of SPAC disclosures across SPAC transactions and time periods, including information on sponsor compensation and material conflicts of interest. At the same time, we do not expect the incremental compliance burden associated with tagging the additional information to be unduly burdensome, because SPACs subject to the proposed tagging requirements would be subject to similar Inline XBRL requirements in other Commission filings.[109] However, because issuers (including SPACs) are not required to tag any filings until after they have filed a periodic report on Form 10-Q, 20-F, or 40-F, the proposed tagging requirement for disclosures in SPAC IPO registration statements would accelerate the tagging obligations (and related compliance burdens) of SPACs compared to those of other filers.[110] Enhancing the usability of the SPAC initial public offering disclosures through a tagging requirement is of particular importance given the unique nature of SPAC offerings and the potential risks they present to investors.

---

[108] *Inline XBRL Filing of Tagged Data*, Release No. 33-10514 (June 28, 2018) [83 FR 40846, 40847 (Aug. 16, 2018)]. Inline XBRL allows filers to embed XBRL data directly into an HTML document, eliminating the need to tag a copy of the information in a separate XBRL exhibit. *Id.* at 40851.

[109] *Id*.

[110] *See* 17 CFR 229.601(b)(101)(i)(A).

**Request for Comment**

51.   Should we require SPACs to tag the disclosures required by Subpart 1600 of Regulation S-K, as proposed?  Are there any changes we should make to ensure accurate and consistent tagging?  If so, what changes should we make?

52.   Should we modify the scope of the Subpart 1600 disclosures required to be tagged?  For example, should we require tagging of quantitative disclosures only?  Should we limit the tagging requirement to only those disclosures required in de-SPAC transactions?

53.   Where an item in Subpart 1600 requests that a registrant provide a tabular presentation without specifying a particular format for the table, or data points to include in the table, such as the proposed disclosure related to SPAC sponsor compensation, dilution of unaffiliated shareholders, and the related sensitivity analysis, should we instead require specific elements in the tabular presentation?  If we do not propose a specific tabular presentation or required elements, would detail tagging provide useful data for investors and other market participants?

54.   Should we require SPACs to use a different structured data language to tag the Subpart 1600 disclosures?  If so, what structured data language should we require, and why?

55.   We have not proposed exemptions or different requirements from the proposed structured data requirement for foreign private issuers, smaller reporting companies,[111] or emerging growth companies.[112]  Should we exempt or provide different requirements from some or all of the proposed structured data requirements for these or other classes of registrants?

---

[111]   *See infra* Section III.D.

[112]   Section 101(a) of the JOBS Act amended Section 2(a) of the Securities Act [15 U.S.C. 77b(a)] and Section 3(a) of the Exchange Act [15 U.S.C. 78c(a)] to define an "emerging growth company" as an issuer with less than $1 billion in total annual gross revenues during its most recently completed fiscal year, as such amount is indexed for inflation every five years by the Commission.  If an issuer qualifies as an EGC on the first day of its fiscal year, it

## III.    ALIGNING DE-SPAC TRANSACTIONS WITH INITIAL PUBLIC OFFERINGS

As discussed above, private operating companies have increasingly turned to de-SPAC transactions as a means of accessing public securities markets and becoming public reporting companies.  As the SPACs that were part of the unprecedented growth in the SPAC market in 2020 and 2021 continue to identify target private operating companies and consummate de-SPAC transactions, it is likely that a significant proportion of companies in the coming years that enter the U.S. public securities markets will do so through de-SPAC transactions.

A private operating company's path to the public markets through a de-SPAC transaction usually commences when a SPAC begins considering it as a potential business combination candidate.  After agreeing to the terms of the business combination, the SPAC typically files a Form 8-K announcing the transaction that includes limited information on the material terms of the business combination agreement.[113]  This announcement is usually followed by a disclosure document (a Securities Act registration statement, proxy statement, or information statement) filed by the SPAC that includes more extensive information about the private operating company.[114]  SPACs use a variety of legal structures to effect de-SPAC transactions, and the particular transaction structure and the consideration used can affect (1) the Commission filings

---

maintains that status until the earliest of (1) the last day of the fiscal year of the issuer during which it has total annual gross revenues of $1.07 billion or more; (2) the last day of its fiscal year following the fifth anniversary of the first sale of its common equity securities pursuant to an effective registration statement; (3) the date on which the issuer has, during the previous three-year period, issued more than $1 billion in nonconvertible debt; or (4) the date on which the issuer is deemed to be a "large accelerated filer" (as defined in Exchange Act Rule 12b-2).  *See* Section 2(a)(19) of the Securities Act [15 U.S.C. 77b(a)(19)]; Section 3(a)(80) of the Exchange Act [15 U.S.C. 78c(a)(80)]; and *Inflation Adjustments and Other Technical Amendments under Titles I and II of the JOBS Act*, Release No. 33-10332 (Mar. 31, 2017) [82 FR 17545 (Apr. 12, 2017)].

[113]  A SPAC is required to file a Form 8-K that provides certain disclosures regarding the business combination agreement if the agreement is a material definitive agreement not made in the ordinary course of business.  See Item 1.01 of Form 8-K.

[114]  The disclosure document may be a Form S-4 or F-4, Schedule 14A or Schedule TO, depending on, among other things, whether shareholder approval is required and whether the SPAC is registering an offering of shares to be issued in the transaction.

required for the transaction,[115] (2) which entity will have a continuing Exchange Act reporting obligation following the transaction,[116] and (3) the disclosures provided in connection with the transaction.[117]

After the completion of the de-SPAC transaction, the post-business combination company is required to file a Form 8-K within four business days that includes even more information about the private operating company that is equivalent to the information that a new reporting company would be required to provide when filing a Form 10 under the Exchange Act.[118] The result is that investors may receive disclosures about the future public company that

---

[115] SPACs may use cash, securities, or a combination of both to acquire a target company in a de-SPAC transaction, and the form of consideration is a factor in determining whether a registration statement, proxy or information statement, or tender offer statement is required to be filed in connection with a de-SPAC transaction. Additionally, the SPAC, the target company or a new holding company may issue securities in a de-SPAC transaction, which may necessitate the filing of a registration statement on Form S-4 or F-4 for the transaction.

[116] For example, when a holding company is formed to acquire both the private operating company and the SPAC, and the holding company files a registration statement for the de-SPAC transaction, generally the holding company would continue as the registrant with the Exchange Act reporting obligation following the transaction. In these situations, the private operating company would be the holding company's predecessor, as the term is used in Regulation S-X, with respect to the financial statements and possibly the accounting acquirer under generally accepted accounting principles as used in the United States ("U.S. GAAP"), with the equity ownership percentage in the combined company held by the former owners of the private operating company and the degree to which former management of the private operating company continues with the combined company among the factors that could impact the accounting acquirer determination under U.S. GAAP. Under the proposed amendments to Regulation S-X, the SPAC would be an acquired business. *See infra* Section IV.B.

[117] The disclosures required in connection with a de-SPAC transaction are determined by the applicable disclosure form (Form S-4 or F-4, Schedule 14A or 14C, or Schedule TO) and which entity is filing the form. Under the proposed amendments, companies would not be subject to the same disclosure requirements in every de-SPAC transaction structure. For example, if the SPAC is a domestic registrant and a new holding company is a foreign issuer, and the private operating company meets the criteria to be a foreign private issuer, the holding company (the company filing the de-SPAC transaction filing) would also qualify as a foreign private issuer. Foreign private issuer status would permit the foreign holding company to file a Form F-4 for the de-SPAC transaction and apply the foreign private issuer disclosure regime. In contrast, if a de-SPAC transaction is structured so that (1) a domestic SPAC is the company issuing securities as the acquiring entity of the foreign private operating company, (2) there is no foreign holding company, and (3) the SPAC makes the de-SPAC transaction filing, the registrant would continue to be a domestic issuer and follow domestic reporting rules until the next determination date for foreign private issuer status.

[118] Form 10 is the long-form registration statement to register a class of securities under Section 12(b) or 12(g) of the Exchange Act. *See* Items 2.01(f), 5.01(a)(8), and 9.01(c) of Form 8-K. By the time the Form 8-K with Form 10 information is filed, the securities of the post-business combination company have often already begun trading on a national securities exchange with a new ticker symbol, in that the securities of the SPAC generally trade on an exchange until the consummation of the de-SPAC transaction, after which the securities of the post-business combination company generally commence trading on the following business day.

differ from, or are not provided in the same manner as, the information disclosed in a Form S-1 or F-1 filed in connection with a traditional initial public offering.  Additionally, some of the investor protections afforded in a traditional initial public offering are not available or are more attenuated when a private operating company becomes a public company through a de-SPAC transaction.[119]

In light of the increasingly common reliance on de-SPAC transactions as a vehicle for private operating companies to access the U.S. public securities markets, we are proposing a number of new rules and amendments to existing rules to align more closely the treatment of private operating companies entering the public markets through de-SPAC transactions with that of companies conducting traditional initial public offerings.  In our view, a private operating company's method of becoming a public company should not negatively impact investor protection.  Accordingly, the proposed new rules and amendments are intended to provide investors with disclosures and liability protections comparable to those that would be present if the private operating company were to conduct a traditional firm commitment initial public offering.

These proposed new rules and amendments would (1) more closely align the non-financial statement disclosure requirements with respect to the private operating company in disclosure documents for a de-SPAC transaction with the disclosure required in a Form S-1 or F-

---

[119]  For example, a private company engaged in a traditional initial public offering is generally more limited in its ability to make communications about its offering prior to the filing of a Securities Act registrations statement on Form S-1 than companies engaged in a business combination transaction that will be registered on Form S-4 or F-4. De-SPAC transactions also often lack named underwriters that perform due diligence and other traditional gatekeeping functions, and it may be more difficult for investors to trace their purchases to the registered de-SPAC transaction for purposes of establishing a Section 11 claim for material misstatements or omissions in de-SPAC disclosure documents.

1 for an initial public offering;[120] (2) require a minimum dissemination period for disclosure documents in de-SPAC transactions; (3) treat the private operating company as a co-registrant of the Form S-4 or Form F-4 for a de-SPAC transaction when a SPAC is filing the registration statement; (4) require a re-determination of smaller reporting company status following the consummation of a de-SPAC transaction; (5) amend the definition of "blank check company" for PSLRA purposes such that the safe harbor for forward-looking information would not apply to projections in filings by SPACs and certain other blank check companies that are not penny stock issuers; and (6) provide, in a Commission rule, that underwriters in a SPAC initial public offering are deemed to be underwriters in a subsequent de-SPAC transaction under certain circumstances.

A.    **Aligning Non-Financial Disclosures in De-SPAC Disclosure Documents**

In regard to non-financial statement disclosures, we are proposing that, if the target company in a de-SPAC transaction is not subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act, disclosure with respect to such company pursuant to the following items in Regulation S-K would be required in the registration statement or schedule filed in connection with the de-SPAC transaction: (1) Item 101 (description of business); (2) Item 102 (description of property); (3) Item 103 (legal proceedings); (4) Item 304 (changes in and disagreements with accountants on accounting and financial disclosure); (5) Item 403 (security ownership of certain beneficial owners and management, assuming the completion of the de-

---

[120]  We are also proposing to more closely align the financial statement disclosure requirements with respect to the private operating company in any business combination involving a shell company with the disclosure required in a Form S-1 for an initial public offering, which would encompass de-SPAC transactions.  *See infra* Section IV.B.

SPAC transaction and any related financing transaction);[121] and (6) Item 701 (recent sales of unregistered securities).[122]  If the private operating company is a foreign private issuer,[123] the proposed rules would include the option of providing disclosure relating to the private operating company in accordance with Items 3.C, 4, 6.E, 7.A, 8.A.7, and 9.E of Form 20-F, consistent with disclosure that could be provided by these entities in an initial public offering.[124]

The proposed additional information is already required to be included in a Form 8-K due within four business days of the completion of the de-SPAC transaction, such that registrants currently should already be preparing this information in anticipation of this Form 8-K filing in connection with a de-SPAC transaction.[125]  Aligning the disclosure requirements in de-SPAC transactions in this manner with those in initial public offerings would mandate that this additional information about the private operating company be provided to shareholders before they make voting, investment, or redemption decisions in connection with the proposed

---

[121]  We note that Item 18(a)(5) of Form S-4 currently requires disclosure pursuant to Item 403 regarding the target company and a SPAC's principal shareholders, through Item 6 of Schedule 14A, in a Form S-4 that includes a proxy seeking shareholder approval of the de-SPAC transaction.

[122]  Proposed General Instruction L.2. to Form S-4; Proposed General Instruction I.2. to Form F-4; Proposed Item 14(f) of Schedule 14A; Proposed General Instruction K to Schedule TO.  We note that disclosure pursuant to Item 303 (management's discussion and analysis of financial condition and results of operations) of Regulation S-K is already required with respect to a non-reporting target company in Forms S-4 and F-4 and in Schedules 14A and 14C for a de-SPAC transaction.  As proposed, disclosure pursuant to Item 701 of Regulation S-K would be required in Part I (information required in the prospectus) of Form S-4 and Form F-4, whereas in Form S-1, the Item 701 disclosure requirement appears under Part II (information not required in prospectus) of the form.

[123]  *See supra* note 102.

[124]  Disclosure requirements for foreign private issuers differ from domestic registrants, including the absence of quarterly reporting requirements, the use of different forms with different disclosure provisions, and an ability to present financial statements in accordance with IFRS instead of U.S. GAAP.  In addition, foreign private issuers are not required to file current reports on Form 8-K using the Form 8-K disclosure criteria; rather, they can furnish current reports on Form 6-K applying the disclosure requirements of that Form.  *See Foreign Issuer Reporting Enhancements*, Release 33-8959 (Sep. 23, 2008) [73 FR 58300 (Oct. 6, 2008)].

[125]  This Form 8-K is required to include the same information that would be required for a newly reporting company when filing a Form 10 under the Exchange Act.  *See* Items 2.01(f), 5.01(a)(8), and 9.01(c) of Form 8-K. In this regard, we note that these items of Form 8-K each provide that if any disclosure required by these items has been previously reported, the registrant may identify the filing in which that disclosure is included instead of including that disclosure in the Form 8-K.

transactions.[126]  As proposed, this information would also be available to investors prior to the inception of trading of the post-business combination company's securities on a national securities exchange, rather than being required in a Form 8-K due within four business days of the completion of the de-SPAC transaction.  Further, if this disclosure is included in a Form S-4 or Form F-4, any material misstatements or omissions contained therein would subject the issuers and other parties to liability under Sections 11 and 12 of the Securities Act, which would align with the protections afforded to investors under the Securities Act for disclosures provided in a Form S-1 or F-1 for an initial public offering.

**Request for Comment**

56.   Should we require additional information regarding the private operating company in disclosure documents filed in connection with a de-SPAC transaction, as proposed?  Would these additional disclosures provide investors with a better understanding of the private operating company's operations and related risks?  Should we require more or less disclosure regarding the private operating company in the registration statements or schedules filed in connection with de-SPAC transactions?

57.   What are the benefits of providing this information earlier to investors when they are making voting, investment, and redemption decisions in connection with a de-SPAC transaction or at or before the commencement of trading in the post-business combination company's securities on a securities exchange?  Would it be unduly burdensome to provide this additional information regarding the private operating company at this earlier point in time?

---

[126]  In this regard, we note that many, but not all, Forms S-4 and F-4 and Schedules 14A and 14C that are filed in connection with de-SPAC transactions contain information about the target company as proposed.  The proposed amendments, if adopted, would require that this information be provided in all de-SPAC transactions subject to the specialized disclosure requirements in Subpart 1600.

58.     Should a private operating company that would qualify as a foreign private issuer have

        the option of providing disclosure in accordance with certain items of Form 20-F, as

        proposed?

59.     Should we require additional or less information in proposed Item 1608 and Schedule TO

        when a SPAC files a Schedule TO in connection with a de-SPAC transaction?  For

        example, should we require disclosure regarding management's discussion and analysis

        of financial condition and results of operations (Item 303 of Regulation S-K) pursuant to

        Item 1608 or Schedule TO?

60.     Should the proposed disclosure requirements with respect to the private operating

        company be scaled to take into account the size, nature, or certain characteristics of the

        company?

### B.     Minimum Dissemination Period

In addition to the need for enhanced disclosure in de-SPAC transactions, we recognize

the importance of ensuring that SPAC shareholders have adequate time to analyze the

information presented in these transactions.  There is currently no federally mandated period in

business combination transactions to provide security holders with a minimum amount of time to

consider proxy statement or other disclosures.[127]  In view of the unique circumstances

surrounding de-SPAC transactions, we are proposing to amend Exchange Act Rules 14a-6 and

14c-2, as well as to add instructions to Forms S-4 and F-4,[128] to require that prospectuses and

proxy and information statements filed in connection with de-SPAC transactions be distributed

---

[127]  In Form S-4 and Form F-4, however, there is a minimum 20-business day period requirement in sending a
prospectus to security holders prior to a security holder meeting that is applicable when a registrant incorporates by
reference information about the registrant or the company being acquired into the form.  General Instruction A.2 of
Form S-4 and General Instruction A.2 of Form F-4.

[128]  Proposed General Instruction L.3. to Form S-4; Proposed General Instruction I.3. to Form F-4.

to shareholders at least 20 calendar days in advance of a shareholder meeting or the earliest date

of action by consent, or the maximum period for disseminating such disclosure documents

permitted under the applicable laws of the SPAC's jurisdiction of incorporation or organization

if such period is less than 20 calendar days.[129]  As stated above, SPACs are organized for the

purpose of completing a de-SPAC transaction within a certain time frame, and as a SPAC

approaches the end of this period, there is less time available for a SPAC to find a candidate for a

business combination transaction, prepare and file the appropriate de-SPAC disclosure

documents with the Commission, disseminate such documents to its shareholders, receive the

requisite shareholder approval when applicable, and consummate the de-SPAC transaction.

Although the laws of a SPAC's jurisdiction of incorporation or organization may require the

SPAC to send a notice to its shareholders at least a specified number of days before the

shareholder meeting to approve a proposed business combination transaction, such notices are

generally limited to information regarding the time, place, and purpose of the meeting, along

with a copy or summary of the business combination agreement.[130]  They do not generally

require a minimum period of time for dissemination of any other information about the

transaction (including any proxy statements or other materials required by the federal securities

laws) to shareholders.[131]  Similarly, such requirements do not exist in exchange listing

---

[129]  The proposed amendments would be applicable to Forms S-4 and F-4 and Schedules 14A and 14C.  We are not proposing to amend the 20 business day period when a Schedule TO is filed in connection with a de-SPAC transaction.  *See supra* Section II.F.4.

[130]  *See, e.g.*, DEL. CODE ANN. tit. 8, sec. 251(c) (2022) (stating, in part, that "[d]ue notice of the time, place and purpose of the meeting shall be given to each holder of stock, whether voting or nonvoting, of the corporation at the stockholder's address as it appears on the records of the corporation, at least 20 days prior to the date of the meeting [to vote on an agreement of merger or consolidation]").

[131]  *See* R. Franklin Balotti, *et al.*, Delaware Law of Corporations and Business Organizations, § 9.16 (4th ed. 2022 & Supp. 2022) ("[t]he only statutory requirements for the notice of the meeting are that it state the time, place and purpose of the meeting and that the notice contain a copy of the merger agreement or a summary of the

standards.[132]  Without a minimum period for dissemination of prospectuses, proxy statements,

and other materials before a shareholder meeting (or action by consent), a SPAC and its sponsor

may have incentives to provide prospectuses or proxy or information statements for a de-SPAC

transaction to the SPAC's security holders within an abbreviated time frame, leaving the security

holders with relatively little time to review what are often complex disclosure documents for

these transactions.

We are proposing a minimum 20-calendar day dissemination period for prospectuses and

proxy and information statements that, in our view, would provide an important investor

protection.[133]  We recognize that SPACs are often required under their governing instruments

and applicable exchange listing rules to complete de-SPAC transactions within a certain time

frame and that relying on the safe harbor we are proposing under the Investment Company Act

would also limit the time frame in which to announce and complete a de-SPAC transaction.[134]

Nevertheless, given the complexity of the SPAC structure, the conflicts of interest that are often

present in this structure and the effects of dilution on non-redeeming shareholders, the proposed

20-calendar day period would establish a minimum time period for shareholders to review

---

agreement…[i]n practice, of course, many such meetings will be governed by the federal proxy rules, which require that a full proxy statement be submitted to the stockholders.").

[132]  Although both the NYSE and Nasdaq generally require that listed companies solicit proxies and provide proxy statements for all shareholder meetings, neither requires a minimum number of days between when proxy materials are provided to shareholders and when the meeting is held.  Instead, for example, NYSE Listed Company Manual Section 402.03 simply "recommends that a minimum of 30 days be allowed between the record and meeting dates so as to give ample time for the solicitation of proxies."

[133]  The proposed 20-calendar day period is the same length of time as the 20-day advance disclosure period in 17 CFR 13e-3(f)(1) (Exchange Act Rule 13e-3(f)(1)).  In adopting a 20-day advance disclosure requirement for dissemination of documents in connection with going private transactions, the Commission stated this requirement was intended to provide reasonable assurance that the information required to be disclosed to security holders would be disseminated sufficiently far in advance of the transactions to permit security holders to make "an unhurried and informed" decision.  *Going Private Transactions by Public Companies or Their Affiliates*, Release No. 33-6100 (Aug. 2, 1979) [44 FR 46736 (Aug. 8, 1979)].

[134]  *See infra* Section VI.B.3.

prospectuses and proxy and information statements in de-SPAC transactions (subject to the carve-out discussed below),[135] so that they have sufficient time to consider the disclosures and to make more informed voting, investment and redemption decisions.[136]  In the event that the laws of a SPAC's jurisdiction of incorporation or organization have a provision applicable to the dissemination of prospectuses and proxy and information statements required under the federal securities laws, we are proposing to include a provision that would require a registrant to satisfy the maximum dissemination period permitted under the applicable law of such jurisdiction when this period is less than 20 calendar days to avoid conflicting with such a requirement.[137]

**Request for Comment**

61.     Should we require a minimum dissemination period for prospectuses and proxy or

         information statements in de-SPAC transactions as proposed?  Is a 20–day period

         necessary or appropriate to enable shareholders to review and consider these disclosure

         documents relating to a de-SPAC transaction?  Should this 20 calendar day period be

---

[135]  When a registrant incorporates by reference information about the registrant or the company being acquired in the Form S-4 or F-4 for a de-SPAC transaction, the 20-business day period in Form S-4 and Form F-4, which we are not proposing to amend, would continue to be applicable.  General Instruction A.2 of Form S-4 and General Instruction A.2 of Form F-4.

[136]  The proposed minimum dissemination period is intended to apply to the dissemination of certain Commission filings in connection with de-SPAC transactions and is not intended to impact any requirements of the jurisdiction of incorporation or organization regarding the notice of an annual or special meeting, such as Section 251(c) of the Delaware General Corporation Law.

[137]  For example, if the jurisdiction has no minimum dissemination period and does not have a maximum dissemination period, the minimum 20-day period, as proposed, would apply.  If the jurisdiction has a minimum dissemination period of less than 20 days (*e.g.*, 10 days) and does not have a maximum dissemination period, the minimum 20-day period, as proposed, would apply.  If the jurisdiction has a minimum dissemination period of less than 20 days (*e.g.*, 10 days) and a maximum dissemination period of less than 20 days (*e.g.*, 15 days), the maximum dissemination period under the jurisdiction would apply.  If the jurisdiction has no minimum dissemination period and a maximum dissemination period of less than 20 days (*e.g.*, 15 days), the maximum dissemination period under the jurisdiction would apply.

longer or shorter?  Should the minimum dissemination period be based on business days

(*e.g.*, 20 business days) instead of calendar days as proposed?

62.    Would there be timing concerns on the part of SPACs in meeting the proposed minimum

20-day dissemination period?  Should we include an exception for the applicable laws of

the SPAC's jurisdiction of incorporation or organization, as proposed?  Should we

include other exceptions to the proposed minimum 20-day dissemination period?

63.    Would additional guidance be helpful in determining how to apply this proposed

requirement?

64.    Are there additional or alternative requirements we should adopt in connection with the

dissemination of disclosure documents in a de-SPAC transaction?

### C.    Private Operating Company as Co-Registrant to Form S-4 and Form F-4

Under Section 6(a) of the Securities Act, each "issuer" must sign a Securities Act

registration statement.[138]  The Securities Act broadly defines the term "issuer" to include every

person who issues or proposes to issue any securities.[139]  Currently, when a SPAC offers and

sells its securities in a registered de-SPAC transaction, only the SPAC, its principal executive

officer or officers, its principal financial officer, its controller or principal accounting officer, and

at least a majority of its board of directors (or persons performing similar functions) are required

to sign the registration statement for the transaction.  In these situations, the private operating

company, for which the de-SPAC transaction effectively serves as its initial public offering, and

---

[138]  In addition, Section 6(a) requires the issuer's principal executive officer or officers, principal financial officer, comptroller or principal accounting officer, and the majority of its board of directors or persons performing similar functions (or, if there is no board of directors or persons performing similar functions, by the majority of the persons or board having the power of management of the issuer) to sign a registration statement.  When the issuer is a foreign entity, the registration statement must also be signed by the issuer's duly authorized representative in the United States.

[139]  Section 2(a)(4) of the Securities Act.

its officers and directors do not sign the registration statement that contains disclosure about the private operating company's business and financial results and thereby may avoid liability as signatories to the registration statement under Section 11 of the Securities Act, unlike if the private operating company had conducted a traditional initial public offering registered on Form S-1 or Form F-1.[140]

We are proposing to amend Form S-4 and Form F-4 to require that the SPAC and the target company be treated as co-registrants when these registration statements are filed by the SPAC in connection with a de-SPAC transaction.[141]  In view of the protections that the Securities Act provides to investors in a traditional initial public offering, it is appropriate in our view to interpret Section 6(a) to encompass the target company, in addition to the SPAC, as an issuer for purposes of Section 6(a) and the signature requirements of Form S-4 or Form F-4.

A de-SPAC transaction marks the introduction of the private operating company to the U.S. public securities markets, and investors look to the business and prospects of the private operating company in evaluating an investment in the combined company.[142]  Accordingly, it is the private operating company that, in substance, issues or proposes to issue its securities, as

---

[140]  Even when not liable under Section 11, the private operating company and its affiliates, however, may be subject to enforcement actions by the Commission, including those under Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5, as well as potential liability under 17 CFR 240.10b-5 (Exchange Act Rule 10b-5) in private rights of action.  *See, e.g.*, *In the Matter of Momentus, Inc., et al.*, Release No. 34-92391 (July 13, 2021) (settled proceeding charging privately held company with violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 for, among other things, allegedly materially false statements and omissions in the registration statement/proxy statement filed in connection with a business combination with a publicly traded SPAC).

[141]  Proposed General Instruction L.4. to Form S-4; Proposed General Instruction I.4. to Form F-4.  Section 6(a) of the Securities Act uses the term "issuer," but Securities Act registration statement forms use the term "registrant." The term "registrant" is defined in Rule 405 as "the issuer of the securities for which the registration statement is filed."  As a co-registrant of the Form S-4 or Form F-4, the private operating company would have an Exchange Act reporting obligation pursuant to Section 15(d) of the Exchange Act following the effectiveness of the registration statement.

[142]  That is, the operations of the private company constitute the business and the basis for the financial and other disclosures of the newly combined public company following a de-SPAC transaction.

securities of the newly combined public company.[143]  While similar policy considerations can

arise in other business combination contexts, given the substantial increase in the number of

SPAC transactions in recent years, the number of shareholders typically impacted by such

transactions, and concerns that are unique to the SPAC structure, we are concerned that a narrow

approach to registrant status in de-SPAC transactions could undermine the statutory liability

scheme that Congress applied to initial public offerings of securities.

We are proposing to amend the signature instructions to Form S-4 and F-4 to state that, if

a SPAC is offering its securities in a de-SPAC transaction that is registered on the form, the term

"registrant" for purposes of the signature requirements of the form would mean the SPAC and

the target company.[144]  This requirement would make the additional signatories to the form,

including the principal executive officer, principal financial officer, controller/principal

accounting officer, and a majority of the board of directors or persons performing similar

functions of the target company, liable (subject to a due diligence defense for all parties other

than the SPAC and the target company), for any material misstatements or omissions in the

---

[143]  The legislative history of the broad definition of the term "issuer" in the Securities Act suggests that the identification of the "issuer" of a security should be based on the economic reality of a transaction to ensure that, in service of the disclosure purpose of the Act, the person(s) that have access to the information relevant to investors are responsible as an "issuer" for providing such information.  *See, e.g.*, H.R. REP. 73-85, 12 ("Special provisions govern the definition of 'issuer' in connection with security issues of an unusual character…. [For example, in the case of an investment trust], although the actual issuer is the trustee, the depositor is the person responsible for the flotation of the issue.  Consequently, information relative to the depositor and to the basic securities is what chiefly concerns the investor—information respecting the assets and liabilities of the trust rather than of the trustee.").

[144]  The Commission has previously specified who constitutes the "registrant" for purposes of signing a Securities Act registration statement in certain contexts.  For example, an instruction in Forms S-4 and F-4 requires two or more existing corporations to be deemed co-registrants when they will be parties to a consolidation and the securities to be offered are those of a corporation not yet in existence at the time of filing.  See Instruction 3 to the signature page for Form S-4 and Form F-4 ("If the securities to be offered are those of a corporation not yet in existence at the time the registration statement is filed which will be a party to a consolidation involving two or more existing corporations, then each such existing corporation shall be deemed a registrant and shall be so designated on the cover page of this Form, and the registration statement shall be signed by each such existing corporation and by the officers and directors of each such existing corporation as if each such existing corporation were the registrant.").

Form S-4 or Form F-4 and would thereby mitigate the risk that the target company's directors and management would not be held accountable to investors for the accuracy of the disclosures in the registration statement due to the absence of the deterrent threat of liability under Section 11.[145]  Moreover, this proposed requirement could improve the reliability of the disclosure provided to investors in connection with de-SPAC transactions by creating strong incentives for such additional signing persons to review more closely the disclosure about the target company in these registration statements and to conduct more searching due diligence in connection with de-SPAC transactions and related registration statements.

**Request for Comment**

65. Should we amend Form S-4 and Form F-4, as proposed, to require that the SPAC and the private operating company be treated as co-registrants when the registration statement is filed by the SPAC in connection with a de-SPAC transaction?

66. Would amending Form S-4 and Form F-4 in this manner improve the disclosure provided in connection with de-SPAC transactions that are registered on these forms?

67. Should the proposed amendment to Form S-4 and Form F-4 be extended to apply to all business combination transactions where a shell company, other than a business combination related shell company, is the acquirer?

68. Should the sponsor of a SPAC also be required to sign a Form S-4 or Form F-4 filed in connection with a de-SPAC transaction, as well as a Form S-1 or Form F-1 filed for a SPAC's initial public offering, in view of, among other things, the sponsor's control over the SPAC and the sponsor's role in preparing these registration statements?  Would such

---

[145]  In this regard, we note that the target company's directors and executive officers are the parties most similarly situated to the directors and officers of a private company conducting a traditional initial public offering, in terms of their knowledge of, and background in, the company going public through a de-SPAC transaction.

a requirement be consistent with the Commission's approach in requiring a majority of

the board of directors of any corporate general partner to sign a registration statement

when the registrant is a limited partnership?

69.    Should we also adopt corresponding amendments to Form S-1 and Form F-1 in the event

that these forms are used by a SPAC for a de-SPAC transaction?

### D.    Re-Determination of Smaller Reporting Company Status

Smaller reporting companies are a category of registrants that are eligible for scaled

disclosure requirements in Regulation S-K and Regulation S-X and in various forms under the

Securities Act and the Exchange Act.[146]  For example, smaller reporting companies are not

required to provide quantitative and qualitative information about market risk pursuant to

Item 305 of Regulation S-K.[147]  In general, a smaller reporting company is a company that is not

an investment company, an asset-backed issuer or a majority-owned subsidiary of a parent that is

not a smaller reporting company, and had (1) a public float of less than $250 million, or (2) had

annual revenues of less than $100 million during the most recently completed fiscal year for

which audited financial statements are available and either had no public float or a public float of

less than $700 million.[148]  Smaller reporting company status is determined at the time of filing an

initial registration statement under the Securities Act or Exchange Act for shares of common

equity and is re-determined on an annual basis.  Once a company determines that it is not a

---

[146]  *See, e.g.*, 17 CFR 229.10(f) (Item 10(f) of Regulation S-K); Rules 8-01, 8-02, 8-03, 8-07, and 8-08 of Regulation S-X; Item 1A of Form 10 and Form 10-K; Item 3.02 of Form 8-K.  A foreign private issuer is not eligible to use the scaled disclosure requirements for smaller reporting companies unless it uses the forms and rules designated for domestic issuers and provides financial statements prepared in accordance with U.S. GAAP.  Instruction 2 to Item 10(f); Instruction 2 to definition of "smaller reporting company" in Securities Act Rule 405 and Exchange Act Rule 12b-2.

[147]  Item 305(e) of Regulation S-K.

[148]  The definition of "smaller reporting company" is set forth in Securities Act Rule 405, Exchange Act Rule 12b-2 and Item 10(f) of Regulation S-K.

smaller reporting company, it will retain this status unless it determines, when making its annual determination, that its public float was less than $200 million or, alternatively, that its public float and annual revenues fell under certain thresholds.[149]

Currently, most SPACs qualify as smaller reporting companies,[150] and a post-business combination company after a de-SPAC transaction is permitted by rule[151] to retain this status until the next annual determination date when a SPAC is the legal acquirer of the private operating company in a de-SPAC transaction.  The absence of a re-determination of smaller reporting company status upon the completion of these de-SPAC transactions permits certain post-business combination companies to avail themselves of scaled disclosure and other accommodations when they otherwise would not have qualified as a smaller reporting company had they become public companies through a traditional initial public offering.

In view of the informational asymmetries that result when a private operating company chooses to go public through such a de-SPAC transaction and the increasing prevalence of these transactions as a vehicle for private operating companies to become reporting companies under the Exchange Act, we are proposing to require a re-determination of smaller reporting company status following the consummation of a de-SPAC transaction.  As proposed, this re-determination of smaller reporting company status would occur prior to the time the post-business combination company makes its first Commission filing, other than the Form 8-K with Form 10 information,[152] with the public float threshold measured as of a date within four business days after the consummation of the de-SPAC transaction and the revenue threshold

---

[149]   *See* Item 10(f)(2)(iii) of Regulation S-K; Securities Act Rule 405; Exchange Act Rule 12b-2.

[150]   *See infra* Section IX.B.2.f.

[151]   *See* Item 10(f)(2) of Regulation S-K; Securities Act Rule 405; Exchange Act Rule 12b-2.

[152]   A Form 8-K with Form 10 information is filed pursuant to Items 2.01(f), 5.01(a)(8), and/or 9.01(c) of the form.

determined by using the annual revenues of the private operating company as of the most recently completed fiscal year for which audited financial statements are available.[153]   The applicable thresholds in the current definition would remain unchanged.

The proposed four-business day window to calculate the public float threshold following a de-SPAC transaction would end on the due date for the Form 8-K with Form 10 information that a post-business combination company is required to file after the completion of a de-SPAC transaction.  The proposed four-business day period would provide some flexibility for issuers to measure public float, compared to the annual re-determination of smaller reporting company status,[154] and would allow for a more accurate reflection of a post-business combination company's public float, in view of the limited trading history of the common equity securities of the post-business combination company following a de-SPAC transaction.

We are proposing to require a post-business combination company to reflect this re-determination of smaller reporting company status in its first periodic report (Form 10-K or Form 10-Q) following a de-SPAC transaction, which would provide the post-business combination company with time to prepare for any loss of the scaled disclosure and other accommodations available to smaller reporting companies.[155]  As proposed, a post-business

---

[153]  Proposed Item 10(f)(2)(iv) and the proposed amendments to the definition of "smaller reporting company" in Securities Act Rule 405 and Exchange Act Rule 12b-2.  The float determination would be required to precede the first Commission filing after the Form 8-K with Form 10 information.

[154]  In re-determining smaller reporting company status annually, a registrant is required to measure its public float as of the last business day of its most recently completed second fiscal quarter.

[155]  For example, as proposed, a post-business combination company would be required to re-determine whether it qualifies as a smaller reporting company, using the initial qualification thresholds in the definition, prior to the time the company makes its first Commission filing (*e.g.*, a Form 8-K, registration statement or periodic report) after the filing of a Form 8-K with Form 10 information, with its public float measured as of a date within four business days after the completion of the de-SPAC transaction.  The company would not be required to reflect this re-determination of smaller reporting company status in any Commission filing until it files its first periodic report (Form 10-K or Form 10-Q) following the de-SPAC transaction.  Thus, if a SPAC qualified as a smaller reporting company before a de-SPAC transaction and was the legal acquirer in the de-SPAC transaction, the post-business combination company would continue to be able to rely on the scaled disclosure accommodations for smaller

combination company that fails to qualify for smaller reporting company status after a de-SPAC

transaction would remain unqualified until its next annual re-determination of this status.

**Request for Comment**

70.     As proposed, the re-determination of smaller reporting company status must be based on

        public float measured as of a date within four business days after the consummation of

        the de-SPAC transaction and the annual revenues of the private operating company as of

        the most recently completed fiscal year for which audited financial statements are

        available.  Should we require the re-determination of smaller reporting company status

        upon the completion of a de-SPAC transaction, as proposed?  Should public float be

        determined within a different time frame (*e.g.*, 30 days) or through a different method

        (*e.g.*, as the average over a certain period)?  Should the annual revenues of the private

        operating company be used in determining whether the revenue threshold has been met,

        as proposed?

71.     Should we require a post-business combination company following a de-SPAC

        transaction to reflect the re-determination of smaller reporting company status in its next

        periodic report, as proposed?  Alternatively, should we require a post-business

        combination company to reflect the re-determination of smaller reporting company status

        at an earlier or later point in time after the completion of a de-SPAC transaction, such as

        in the first periodic report that covers the period in which the de-SPAC transaction

        occurred (*e.g.*, when a de-SPAC transaction is completed after the end of a fiscal year but

        prior to the due date of the Form 10-K for that fiscal year)?  Should we provide an

---

reporting companies when filing a registration statement between the re-determination date and the post-business
combination company's first periodic report.

accommodation if a de-SPAC transaction is completed close in time to the due date for the registrant's first periodic report?

72.     To the extent that a post-business combination company no longer qualifies for smaller reporting company status as a result of the proposed re-determination of this status following a de-SPAC transaction, would the proposed re-determination make it more difficult for such a company to file a registration statement after the filing of its first periodic report that complies with the disclosure requirements applicable to non-smaller reporting companies?  If so, should we provide any accommodations for this scenario?

73.     Should we make any additional changes with respect to re-determining smaller reporting company status after the completion of a de-SPAC transaction?  For example, should we replace the public float test with a revenue test for this purpose?  Should we provide any guidance with respect to how to apply this proposal?

74.     Should we similarly require a re-determination of emerging growth company status, accelerated filer status, large accelerated filer status and/or foreign private issuer status upon the completion of a de-SPAC transaction?

### E.     PSLRA Safe Harbor

The PSLRA provides a safe harbor for forward-looking statements under the Securities Act and the Exchange Act, under which a company is protected from liability for forward-looking statements in any private right of action under the Securities Act or Exchange Act when, among other things, the forward-looking statement is identified as such and is accompanied by meaningful cautionary statements.[156]  The safe harbor is not available, however, when a forward-

---

[156]  Section 27A of the Securities Act and Section 21E of the Exchange Act.  The PSLRA does not impact the Commission's ability to bring enforcement actions relating to forward-looking statements.

looking statement is made in connection with an offering by a blank check company or an initial public offering.[157]

For purposes of the safe harbor, the term "blank check company" and certain other terms[158] "have the meanings given those terms by rule or regulation of the Commission."[159] The Commission has defined the term "blank check company" for purposes of and in Rule 419 as a development stage company that is issuing "penny stock," as defined in Exchange Act Rule 3a51-1, and that has no specific business plan or purpose, or has indicated that its business plan is to merge with or acquire an unidentified company or companies, or other entity or person.[160] This definition, which has not been amended since it was adopted by the Commission in 1992, predates the enactment of the PSLRA in 1995. SPACs that raise more than $5 million in a firm commitment underwritten initial public offering are excluded from this definition of "blank check company" because they are not selling "penny stock."[161]

Projections of the private operating company's performance are typically prepared and disclosed in connection with a de-SPAC transaction. Some market participants are of the view that the PSLRA safe harbor for forward-looking statements is available in de-SPAC transactions when a SPAC is not a blank check company under Rule 419 and thus may not exercise the same level of care in preparing forward-looking statements, such as projections, as in a traditional

---

[157] Section 27A(b) of the Securities Act and Section 21E(b) of the Exchange Act. In addition, the safe harbor is not available for an offering by a penny stock issuer, a roll-up transaction, a going private transaction, an offering by a partnership or a limited liability company, a tender offer, or an offering by an issuer convicted of specified securities law violations or subject to certain injunctive or cease and desist actions.

[158] These other terms are "rollup transaction," "partnership," "limited liability company," "executive officer of an entity," and "direct participation investment program."

[159] Section 27A(i)(7) of the Securities Act and Section 21E(i)(5) of the Exchange Act.

[160] *See supra* notes 3 and 13. The statutory definition of "blank check company" appears in Section 7(b)(3) of the Securities Act.

[161] *See supra* note 12.

initial public offering.[162]  As noted above, a number of commentators have raised concerns about the use of projections that they believe to be unreasonable in de-SPAC transactions.[163]

To address concerns about the use of forward-looking statements, such as projections, in connection with de-SPAC transactions, and pursuant to the statutory authority under the PSLRA to define "blank check company" by Commission rule or regulation, we are proposing to amend the definition of "blank check company" for purposes of the PSLRA to remove the "penny stock" condition and to define the term as "a company that has no specific business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company or companies, or other entity or person."[164]  As discussed above, private companies are increasingly using de-SPAC transactions as a mechanism to become public companies.  For purposes of the PSLRA, we see no reason to treat forward-looking statements made in connection with de-SPAC transactions differently than forward-looking statements made in traditional initial public offerings, in that both instances involve private issuers entering the public U.S. securities markets for the first time and similar informational asymmetries that exist between these issuers (and their insiders and early investors) and public investors. Moreover, we see no reason to treat blank check companies differently for purposes of the PSLRA safe harbor depending on whether they raise more than $5 million in a firm commitment underwritten initial public offering and thus are not selling penny stock.

---

[162]  *See, e.g.,* Matt Levine, *Money Stuff: Maybe SPACs Are Really IPOs*, Bloomberg, Apr. 12, 2021; Eliot Brown, *Electric-Vehicle Startups Promise Record-Setting Revenue Growth*, The Wall Street Journal, Mar. 15, 2021; *Public Statement on SPACs, IPOs and Liability Risk under the Securities Laws* (Division of Corporation Finance, Apr. 8, 2021).

[163]  *See supra* note 33.

[164]  We are also proposing to amend the definition to remove the reference to "development stage company" because the reference would be unnecessary for purposes of the proposed definition.

Amending the definition of "blank check company" in this manner would clarify that the statutory safe harbor in the PSLRA is not available for forward-looking statements, such as projections, made in connection with de-SPAC transactions involving an offering of securities by a SPAC or other issuer that meets the definition of "blank check company" as amended, such that forward-looking statements by SPACs, such as statements regarding the projections of target private operating companies in these transactions, would not fall under the safe harbor.[165]  The proposed amendment would also eliminate the current overlap in the safe harbor in regard to the exclusion for offerings by blank check companies and the exclusion for penny stock issuers.[166]  To avoid multiple definitions for the term "blank check company," we are proposing to amend Rule 419 in a manner that would otherwise retain the current scope of the rule.  We are also proposing to amend the references to "blank check company" in various Securities Act rules to "blank check company issuing penny stock," as such term would be defined in Securities Act Rule 405, to maintain the current scope of these rules.[167]

**Request for Comment**

75.   Should we define "blank check company" in Rule 405, as proposed?  Should we include a reference in the definition to "development stage company" or the issuance of "penny stock"?  Should we consider other changes to the proposed definition?

---

[165]  Forward-looking statements made by target private operating companies do not fall under the safe harbor, because the safe harbor is not available to companies that are not subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act at the time that the statement is made.  Further, the safe harbor would not be available to the subset of shell companies that meet the amended definition of "blank check company" (*i.e.*, that has no specific business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company or companies, or other entity or person).

[166]  The exclusion in the safe harbor for offerings by "blank check companies" is subsumed by the exclusion for penny stock issuers, in that the term "blank check company," as currently defined in Rule 419, is "a development stage company that … is issuing 'penny stock.'"

[167]  *See* proposed amendments to Rules 137, 138, 139, 163A, 164, 174, 430B, and 437a.  As proposed, the term "blank check company issuing penny stock" would be defined as a company that is subject to Rule 419.  Due to current *Federal Register* formatting requirements, we are also proposing technical changes to Rule 163A and Rule 164 to move the Preliminary Note(s) in these rules to introductory paragraphs of the respective rules.

76.     Would the proposed amendments improve the quality of projections in connection with de-SPAC transactions by clarifying that the safe harbor under the PSLRA is unavailable? Would the proposed amendment discourage some SPACs from disclosing projections in connection with these transactions or affect the ability of SPACs or target companies to comply with their obligations under the laws of their jurisdiction of incorporation or organization to disclose projections used by the board of directors or the companies' fairness opinion advisers?

77.     As an alternative approach, should we issue an interpretation addressing whether a de-SPAC transaction is an "initial public offering" for purposes of the PSLRA?

78.     Would including the proposed Rule 405 definition of "blank check company" in Rule 419 create confusion for registrants and investors?  Should we consider retaining a separate definition of "blank check company" for purposes of Rule 419?  If so, why?

79.     Should we amend the references to "blank check company" in Securities Act Rules 137, 138, 139, 163A, 164, 174, 430B and 437a to refer to "blank check company issuing penny stock," as proposed?

80.     Should we amend Rule 419 so that some or all of its conditions are applicable to SPACs that raise more than $5 million in a firm commitment underwritten initial public offering? If so, which conditions?  What would be the advantages and drawbacks of such an approach?  Should we amend the definition of "penny stock" to bring more SPACs within the scope of Rule 419?

81.     Are there other rule amendments we should consider in connection with the PSLRA?

### F.       Underwriter Status and Liability in Securities Transactions

Underwriters form an essential link in the distribution of securities from an issuer to investors.  The term "underwriter" is broadly defined in Section 2(a)(11) of the Securities Act to mean "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking."[168]  The determination of whether a particular person is an "underwriter" does not depend on the person's business but rather on that person's relationship to a particular securities offering.  Any person whose activities with respect to any given offering fall within one of the prongs of the Section 2(a)(11) definition is deemed to meet the statutory definition of underwriter—commonly known as a "statutory underwriter."[169] Congress enacted a broad definition of "underwriter" in order to "include as underwriters all persons who might operate as conduits for securities being placed into the hands of the investing public."[170]  Correspondingly, the Commission's longstanding view is that, depending on facts and circumstances, any person, including an individual investor who is not a professional in the securities business, can be an "underwriter" within the meaning of the Securities Act if that

---

[168]  15 U.S.C. 77b(a)(11).  Section 2(a)(11) states that the term "issuer" shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.  Therefore, any person who purchased securities from an affiliate of an issuer is an underwriter under Section 2(a)(11) if that person purchased with a view to the distribution of the securities.

[169]  *See* 2 Louis Loss (late), Joel Seligman, and Troy Paredes, Securities Regulation 3.A.3 (6th ed. 2019) ("The term underwriter is defined not with reference to the particular person's general business but on the basis of his or her relationship to the particular offering.…  Any person who performs one of the specified functions in relation to the offering is a statutory underwriter even though he or she is not a broker or dealer.").

[170]  Thomas Lee Hazen, The Law of Securities Regulation, section 4:98.

person acts as a link in a chain of transactions through which securities are distributed from an issuer or its control persons to the public.[171]

As intermediaries between an issuer and the investing public, underwriters play a critical role as "gatekeepers" to the public markets.[172]  Historically, in initial public offerings, where the investing public might be unfamiliar with a particular issuer, financial firms that act as underwriters would lend their well-known name to support that issuer's offering.  Where public investors may not have been inclined to invest with the company seeking to conduct a public offering, they could take comfort in the fact that a large, well-known financial institution, acting as underwriter, was including its name on the first page of the issuer's prospectus.[173]  In exchange, in a firm commitment underwritten offering, the underwriters earn the "gross spread"

---

[171]  17 CFR 230.144, Preliminary Note; *Notice of Adoption of Rule 144 Relating to the Definition of the Terms "Underwriter" in Sections 4(1) and 2(11) and "Brokers Transactions" in Section 4(4) of the Securities Act of 1933, Adoption of Form 144, and Rescission of Rules 154 and 155 Under That Act*, Release No. 33-5223 (Jan. 11, 1972) [37 FR 591 (Jan. 13, 1972)].

[172]  *See, e.g.*, Ronald J. Gilson & Reinier Kraakman, *The Mechanisms of Market Efficiency*, 70 VA. L. REV. 549, 620 (1984); Coffee, *supra* note 34, at 302 n. 1, 308 nn. 13–14; John C. Coffee, Jr., *Brave New World?: The Impact(s) of the Internet on Modern Securities Regulation*, 52 BUS. LAW. 1195, 1210-13, 1232-33 (1999) (each discussing the role of underwriters as "gatekeepers" or "reputational intermediaries").  *See also Securities Act Concepts and Their Effects of Capital Formation*, Release No. 33-7314 (July 25, 1996) [61 FR 40044 (July 31, 1996)] (discussing the role of gatekeepers in maintaining the quality of disclosure); Michael P. Dooley, *The Effects of Civil Liability on Investment Banking and the New Issues Market*, 58 VA. L. REV. 776 (1972) ("The most important function performed during origination is the selection of candidates for public investment.  The decision to underwrite a particular issue is normally made only after careful investigation of the issuer and evaluation of its prospects.  Not all corporations are able to win sponsorship of proposed flotations, and prestigious underwriters reject many more candidates than they accept.  After initially deciding to sponsor a flotation, the managing underwriter must conduct another, more intensive investigation into the issuer's affairs in order to satisfy the duty to conduct a 'reasonable investigation' imposed on underwriters by section 11 of the 1933 Act… [t]he screening and investigative processes employed in origination should weed out those prospective issuers least likely to make productive use of publicly invested funds and should identify elements of risk in those issues which are selected and presented to the public.  The successful performance of these functions is important to the protection of investors and to the optimum allocation of economic resources.").

[173]  *See, e.g.*, Harold S. Bloomenthal & Samuel Wolff, Due diligence defenses—Underwriter's responsibilities and liabilities, 3B Sec. & Fed. Corp. Law § 12:42 (2d ed.) ("The managing or initiating underwriter plays a critical role in determining access to capital markets.  The decision of a particular investment banking firm to put together an underwriting syndicate in order to float an issue of securities or to refrain from doing so for a particular issuer obviously has significance beyond investors since it determines to a degree the shape of our economy.  However, it has specific and immediate significance to members of the investing public in that in large part reliance is being placed on such underwriters to screen the multitude of issuers seeking access to the capital markets.").

between the price stated on the cover of the prospectus (the price at which the underwriters will sell the issuer's shares to the public for the first time) and the price at which the underwriters are able to negotiate with the issuer for the initial purchase of the issuer's shares.[174]

An underwriter's participation in an issuer's offering also exposes the underwriter to potential liability under the Securities Act.  The civil liability provisions of the Securities Act reflect the unique position underwriters occupy in the chain of distribution of securities and provide strong incentives for underwriters to take steps to help ensure the accuracy of disclosure in a registration statement.  Section 11 of the Securities Act imposes on underwriters, among other parties identified in Section 11(a), civil liability for any part of the registration statement, at effectiveness, which contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, to any person acquiring such security.[175]  Similarly, Section 12(a)(2) imposes liability upon anyone, including underwriters, who offers or sells a security, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading, to any person purchasing such security from them.[176]  These provisions provide significant investor protections to those who acquire securities sold pursuant to a registration statement by providing tools to hold companies, underwriters, and other parties accountable for misstatements and omissions in connection with

---

[174]  SPACs initially engage in firm commitment underwritten offerings in order to first sell their securities to the public.  *See supra* Section I.  However, as we further discuss below, the compensation structure for SPAC initial public offerings is generally different than that in traditional firm commitment offerings because a significant portion of the compensation is deferred.

[175]  15 U.S.C. 77k.

[176]  15 U.S.C. 77l(a)(2).

public offerings of securities.[177]  As a result, anyone who might be named as a potential

defendant in these suits has strong incentives to take the necessary steps to avoid such liability.

One defense available to an underwriter in a distribution is the "due diligence" defense,

which shields an underwriter from liability if it can establish that, after reasonable investigation,

the underwriter had reasonable ground to believe and did believe, at the time the registration

statement became effective, that the statements therein were true and that there was no omission

to state a material fact required to be stated therein or necessary to make the statements therein

not misleading.[178]  To establish its "due diligence" defense, an underwriter must establish that it

exercised reasonable care in verifying the statements in the registration statement.  Underwriters

in a traditional initial public offering are therefore motivated to take the investigative steps

necessary to establish the "due diligence" defense.[179]  The statutory provision of a due diligence

defense appears to reflect an intent to improve the standards of conduct to which persons

associated with the distribution of securities are to be held by imposing upon them standards of

"honesty, care, and competence."[180]  It was believed that the imposition of civil liability under

---

[177]  *See* William O. Douglas & George E. Bates, *The Federal Securities Act of 1933*, 43 YALE L.J.171 (1933) ("The civil liabilities imposed by the Act are not only compensatory in nature but also *in terrorem*.  They have been set high to guarantee that the risk of their invocation will be effective in assuring that the 'truth about securities' will be told.").

[178]  *See* Section 11(b)(3) of the Securities Act. [15 U.S.C. 77k(b)(3).].

[179]  Similarly, Section 12(a)(2) of the Securities Act provides a defense for defendants who, in the exercise of "reasonable care," could not have known of the alleged misstatement or omission (15 U.S.C. 77l(a)(2)).  Courts generally have construed these two defenses similarly.  *See, e.g.*, *In re WorldCom Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 663-64 (S.D.N.Y. 2004).

[180]  H.R. No. 85, 73d Cong., 1st Sess. (1933) (From the Introductory Statement to the Report submitted by Mr. Rayburn, Committee on Interstate and Foreign Commerce: "Honesty, care, and competence are the demands of trusteeship.  These demands are made by the bill on the directors of the issues, its experts, and the underwriters who sponsor the issue.  If it be said that the imposition of such responsibilities upon these persons will be to alter corporate organization and corporate practice in this country, such a result is only what your committee expects.").

the Securities Act upon participants in a distribution would cause them to exercise the care

necessary to assure the accuracy of the statements in the registration statement.[181]

Consistent with this intent, the Commission has stated that the due diligence efforts

performed by underwriters are central to the integrity of our disclosure system.[182]  The investing

public relies on underwriters to "screen the multitude of issuers seeking access to the capital

markets" and expects them to verify the accuracy of the information in the registration

statement.[183]  Moreover, although the Securities Act does not expressly require an underwriter to

conduct a due diligence investigation, the Commission has long expressed the view that

underwriters nonetheless have an affirmative obligation to conduct reasonable due diligence.[184]

The Commission has stated that "an underwriter [in a securities offering] impliedly represents

that he has made such an investigation [of the accuracy of the information in the registration

statement] in accordance with professional standards" and "[i]nvestors properly rely on this

---

[181] *Id*. ("The duty of care to discover varies in its demands upon participants in security distribution with the importance of their place in the scheme of distribution and with the degree of protection that the public has a right to expect.").  *See also New High Risk Ventures*, Release No. 33-5275 (July 27, 1972) [37 FR 16011 (Aug. 9, 1972)] (discussing the Commission's views that Section 11 was designed by Congress to incentivize persons associated with the distribution of securities to "exercise the 'honesty, care and competence' necessary to assure the accuracy of the [s]tatements in the registration statement").

[182] *See, e.g.*, *Circumstances Affecting the Determination of What Constitutes Reasonable Investigation & Reasonable Grounds for Belief Under Section 11 of the Sec. Act Treatment of Info. Inc. by Reference into Registration Statements*, Release No. 33-6335 (Aug. 6, 1981) [46 FR 42015 (Aug. 18, 1981)] ("In sum, the Commission strongly affirms the need for due diligence and its attendant vigilance and verification.").

[183] *See* Bloomenthal, *supra* note 173.  *See also* Release No. 33-5275, *supra* note 181.

[184] *See, e.g.*, *In re Charles E. Bailey & Co.*, 35 S.E.C. 33, at 41 (Mar. 25, 1953) ("[An underwriter] owe[s] a duty to the investing public to exercise a degree of care reasonable under the circumstances of th[e] offering to assure the substantial accuracy of representations made in the prospectus and other sales literature."); *In re Brown, Barton & Engel*, 41 SEC 59, at 64 (June 8, 1962) ("[I]n undertaking a distribution . . . [the underwriter] had a responsibility to make a reasonable investigation to assure [itself] that there was a basis for the representations they made and that a fair picture, including adverse as well as favorable factors, was presented to investors."); *In the Matter of the Richmond Corp.*, *infra* note 185 ("It is a well established practice, and a standard of the business, for underwriters to exercise diligence and care in examining into an issuer's business and the accuracy and adequacy of the information contained in the registration statement….  The underwriter who does not make a reasonable investigation is derelict in his responsibilities to deal fairly with the investing public.").

added protection which has a direct bearing on their appraisal of the reliability of the representations in the prospectus."[185]

### 1.    Participants in a Distribution as "Underwriters"

Common interpretations of the underwriter definition in Section 2(a)(11) traditionally have focused on the words "with a view to" in the phrase "purchased from an issuer with a view to ... distribution."  Thus, an investment banking firm that arranges with an issuer for the public sale of its securities is clearly an "underwriter."  However, as noted above, the statutory definition of underwriter is much broader.  Both federal courts and the Commission previously have found that other parties involved in securities offerings can be deemed "statutory underwriters" under the underwriter definition, such as by selling "for an issuer;"[186] and/or

---

[185] *In the Matter of the Richmond Corp.*, Release No. 33-4584 (Feb. 27, 1963).  *See also In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 684 (S.D.N.Y. 2004) ("Underwriters … have special access to information about an issuer at a critical time in the issuer's corporate life, at a time it is seeking to raise capital.  The public relies on the underwriter to obtain and verify relevant information and then make sure that essential facts are disclosed.");  *Sanders v. John Nuveen & Co., Inc.*, 524 F.2d 1064, 1069–70 (7th Cir. 1975) ("An underwriter's relationship with the issuer gives the underwriter access to facts that are not equally available to members of the public who must rely on published information.  And the relationship between the underwriter and its customers implicitly involves a favorable recommendation of the issued security.  Because the public relies on the integrity, independence and expertise of the underwriter, the underwriter's participation significantly enhances the marketability of the security.  And since the underwriter is unquestionably aware of the public's reliance on his participation in the sale of the issue, the mere fact that he has underwritten it is an implied representation that he has met the standards of his profession in his investigation of the issuer.");  *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 370 (2d Cir. 1973) ("No greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter.  He is most heavily relied upon to verify published materials because of his expertise in appraising the securities issue and the issuer, and because of his incentive to do so.  He is familiar with the process of investigating the business condition of a company and possesses extensive resources for doing so….  Prospective investors look to the underwriter … to pass on the soundness of the security and the correctness of the registration statement and prospectus.");  *Escott v. BarChris Const. Corp.*, 283 F. Supp. 643, 697 (S.D.N.Y. 1968) ("The purpose of Section 11 is to protect investors.  To that end the underwriters are made responsible for the truth of the prospectus.").

[186] *See SEC v. Chinese Consolidated Benevolent Association*, 120 F.2d 738 (2d Cir. 1941) (charitable association deemed a statutory underwriter in promoting the sale of war bonds, collecting funds and distributing the securities to its members notwithstanding the charitable association's lack of a relationship with the issuer of the bonds); *SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005).  *See also* Release No. 33-5223, *supra* note 171 (stating that any persons may be underwriters within the meaning of Section 2(a)(11) "if they act as links in a chain of transactions through which securities move from an issuer to the public….  the Commission hereby emphasizes and draws attention to the fact that the statutory language of Section 2[(a)](11) is in the disjunctive.  Thus, it is insufficient to conclude that a person is not an underwriter solely because he did not purchase securities from an issuer with a view to their distribution.  It must also be established that the person is not offering or selling for an issuer in connection with the

---

directly or indirectly "participating" in a distribution by engaging in activities "necessary to the distribution"[187] or in "distribution-related activities."[188]  Such parties can attain underwriter status even if they do not receive compensation for their services,[189] do not sell securities directly to the public,[190] and do not have privity of contract with the issuer.[191]  Similarly, courts have interpreted the underwriter definition broadly to include promoters, officers, and control persons who have arranged for public trading of an unregistered security or have stimulated investor interest in such security through advertisements, research reports, or other promotional efforts.[192]  Moreover, the Commission has stated that "there is nothing in Section 2[(a)](11) which places a

---

distribution of the securities and that the person does not participate or have a participation in any such undertaking, and does not participate or have a participation in the underwriting of any such undertaking.").

[187] *See, e.g.*, *Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392 (7th Cir. 1995) (third party retained as a "qualified independent underwriter" to perform due diligence and recommend a minimum yield for a bond offering deemed a statutory underwriter).  The defendant argued that it was not an underwriter because it had neither purchased nor sold any of the distributed securities.  The court held that the defendant's activities fell within the "participates" and "has a participation" language of Section 2(a)(11), reasoning that Section 2(a)(11) is broad enough to encompass all persons who engage in the steps necessary to the distribution of securities.

[188] *See, e.g.*, *Geiger v. SEC*, 363 F.3d 481, 487 (D.C. Cir. 2004) (defendant "participated" in a distribution as a statutory underwriter through its actions in finding a buyer, negotiating the terms of the transaction, and facilitating the resale of securities).

[189] *See, e.g.*, *Chinese Consolidated Benevolent Association*, *supra* note 186, at 740 ("The solicitation of offers to buy the unregistered bonds, either with or without compensation, brought defendant's activities literally within the prohibition of the statute."); *see also* J. William Hicks, 7A Exempted Trans. Under Securities Act 1933 § 9:39 (citing the Brief for the Securities and Exchange Commission in *Chinese Consolidated Benevolent Association*: "The legislative history of Section 2[(a)](11) makes it apparent that Congress did not intend to require the elements of compensation or a contract with the issuer in order to make a distributor of securities an underwriter.  In an earlier draft of the Securities Act, which was considered by the House Committee on Interstate and Foreign Commerce, the definition of underwriter … would have made the underwriting relationship depend upon the receipt of compensation.  In abandoning that definition and adopting the definition which is included in the bill as enacted, Congress showed a clear intention of extending the term to include all persons who sell for an issuer, whether or not they do so for profit.").

[190] *See, e.g.*, *Raffensperger*, *supra* note 187.

[191] *See, e.g.*, *Chinese Consolidated Benevolent Association*, *supra* note 186, at 740 (Hand, J. explaining, "Whether the Chinese government as issuer authorized the solicitation, or merely availed itself of gratuitous and even unknown acts on the part of the defendant whereby written offers to buy, and the funds collected for payment, were transmitted to the Chinese banks does not affect the meaning of the statutory provisions which are quite explicit.  In either case, the solicitation was equally for the benefit of the Chinese government and broadly speaking was for the issuer in connection with the distribution of the bonds.").

[192] *See, e.g.*, *SEC v. Allison*, No. C-81-19 RPA, 1982 WL 1322 (N.D. Cal. 1982).

time limit on a person's status as an underwriter" because the "public has the same need for

protection afforded by registration whether the securities are distributed shortly after their

purchase or after a considerable length of time."[193]

> 2. *The De-SPAC Transaction as a "Distribution" of the Combined Company's Securities*

Underwriter status depends upon a person's activities occurring "in connection with" a

"distribution" of any security.  The Commission has explained that underwriter status under the

"participation" prong of the underwriter definition depends on the putative underwriter "enjoying

substantial relationships with the issuer or underwriter, or engaging in the performance of any

substantial functions in the organization or management of the distribution."[194]  The Securities

Act does not define the term "distribution;" however, the federal courts and the Commission

have interpreted the term as synonymous with a "public offering" within the meaning of Section

4(a)(2) of the Act.[195]  Moreover, a distribution has been said to comprise "the entire process by

which in the course of a public offer [a] block of securities is dispersed and ultimately comes to

rest in the hands of the investing public."[196]

---

[193]  Release No. 33-5223, *supra* note 171, at 4.  *See also Gilligan, Will & Co. v. SEC*, 267 F.2d 461 (2d Cir. 1959) (holding that a distribution exists if there are sales to those who cannot "fend for themselves" and citing *Ralston Purina Co.*, 346 U.S. 119 (1953)).

[194]  *See Opinion of General Counsel relating to Rule 142*, Release No. 33-1862 (Dec. 14, 1938).

[195]  *See* J. William Hicks, 7A Exempted Trans. Under Securities Act 1933 § 9:18.  Courts have equated the term "distribution" with a public offering of securities.  *See, e.g.*, *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 215 (3d Cir. 2006) ("We agree with the rationale of those courts and similarly hold that the term "distribution" in § 2(a)(11) is synonymous with 'public offering.'"); *see also Gilligan, Will & Co.*, *supra* note 193, at 466 ("a 'distribution' requires a 'public offering'" (citation omitted)).

[196]  J. William Hicks, 7A Exempted Trans. Under Securities Act 1933 § 9:18 (citing *Geiger v. SEC*, 363 F.3d 481, 484, 487 (D.C. Cir. 2004), where the court agreed with the SEC that the petitioners, Charles F. Kirby and Gene Geiger (head trader and salesman, respectively, at a securities brokerage firm), who made resales in broker transactions over a two-week period of 133,333 shares of the roughly 25 million shares then outstanding, were engaged in a distribution within the meaning of Section 2(a)(11) of the Securities Act and that one "did not have to be involved in the final step of [a] distribution to have participated in it").  *See also R.A Holman v. SEC*, 366 F.2d 446, 449 (2d Cir. 1966) (finding that an ongoing distribution and related manipulation had occurred where a broker-dealer sold securities on a "delayed delivery" basis and there was a real possibility at the time of purchase that the purchaser would cancel the order and quoting *Lewisohn Copper Corp.*, 38 S.E.C. 226, 234 (1958)); accord *In the*

The purpose of a SPAC initial public offering is to raise a pool of cash in order to subsequently merge with a private operating company in a de-SPAC transaction that will convert the private operating company into a public company.  Although the timing of a SPAC initial public offering and a de-SPAC transaction is bifurcated because a private operating company is not identified at the SPAC initial public offering stage, the result of a de-SPAC transaction, however structured, is consistent with that of a traditional initial public offering.  The substance of a de-SPAC transaction is, in many ways, analogous to the distribution that occurs in a traditional IPO—*i.e.*, a SPAC's assets consist primarily of highly liquid assets, such as cash and government securities, and the combined company effectively distributes its securities to public holders of SPAC shares in exchange for the contribution of the SPAC's assets to the combined company.  The de-SPAC transaction marks the introduction of the private operating company to the public capital markets[197] and is effectively how the private operating company's securities "come to rest" —in other words, are distributed—to public investors as shareholders of the combined company.[198]  Accordingly, as in a traditional underwritten initial public offering,

---

*Matter of Oklahoma-Texas Tr.*, 2 S.E.C. 764, 769, 1937 WL 32951 (Sept. 23, 1937), aff'd, 100 F.2d 888 (10th Cir. 1939) (finding an ongoing distribution where portions of a registered offering continued to be held by securities dealers).

[197]  Such a transaction may take a variety of forms and involve a multitude of issuers.  However, the rule we are proposing would apply to all de-SPAC transactions involving a registered offer of securities.

[198]  A court has addressed in dicta whether a somewhat analogous situation involving the introduction of private companies to the public markets through an existing shareholder base was a distribution.  *See SEC v. Datronics Engineers, Inc.*, 490 F.2d 250, 254 (4th Cir. 1973), *cert denied*, 416 U.S. 937 (1974) wherein Datronics, a public corporation, acquired a number of privately-held, target companies in merger transactions.  A subsidiary of the defendant would merge with the target company, with the subsidiary surviving the merger.  Both the shareholder-principals of the target and Datronics received stock in the surviving subsidiary.  After the merger, Datronics distributed some of its shares to its shareholders as a dividend.  In this way, formerly privately-held companies became publicly owned without going through a registered public offering.  The court stated *in dicta,* "we think that Datronics was an underwriter within the meaning of the 1933 Act.  Hence its transactions were covered by the prohibitions, and were not within the exemptions, of the Act.  §§ 3(a)(1) and 4(1) of the 1933 Act, 15 U.S.C. §§ 77c, 77d.  By definition, the term underwriter 'means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking….'  § 2(11) of the 1933 Act, 15 U.S.C. § 77b(11). … By this underwriter distribution Datronics violated [Section] 5 of the 1933 Act—sale of unregistered securities."

public investors—who were unfamiliar with the formerly private company—would benefit from the additional care and diligence exercised by SPAC underwriters in connection with the de-SPAC transaction.[199]

>    3.    *Proposed Rule: SPAC IPO Underwriters are Underwriters in Registered De-SPAC Transactions*

Proposed Rule 140a would clarify that a person who has acted as an underwriter in a SPAC initial public offering ("SPAC IPO underwriter") and participates in the distribution by taking steps to facilitate the de-SPAC transaction, or any related financing transaction,[200] or otherwise participates (directly or indirectly) in the de-SPAC transaction will be deemed to be engaged in the distribution of the securities of the surviving public entity in a de-SPAC transaction within the meaning of Section 2(a)(11) of the Securities Act.  Clarifying the underwriter status of SPAC IPO underwriters in connection with de-SPAC transactions should motivate them to exercise the care necessary to help ensure the accuracy of the disclosures in these transactions by affirming that they are subject to Section 11 liability for registered de-SPAC transactions.[201]  In this way, proposed Rule 140a underscores and reinforces that the liability protections in de-SPAC transactions involving registered offerings have the same effect as those in underwritten initial public offerings.

---

[199] *See Gilligan, Will & Co.*, *supra* note 193.

[200] Most SPAC deals contain an available cash condition that represents a minimum amount of proceeds below which the target will not be obligated to consummate the transaction.  The cash condition represents a number the sponsor group believes it can reasonably achieve given their banking syndicate, network, access to capital, and the target company itself.  Since cash in trust is subject to redemption, one mechanism to ensure the cash condition will be satisfied is to secure commitments for a PIPE investment.  *See* SPAC Research Weekly Newsletter (Oct. 19, 2020), available at https://www.spacresearch.com/newsletter?date=2020-10-19.  In addition the staff has observed that for the vast majority of PIPEs associated with de-SPAC transactions, the closing of the PIPE financing is cross-conditioned on the closing of the de-SPAC transaction.

[201] Under Section 11, "any person acquiring such security" has a right of recovery.  The Commission's longstanding view for traditional firm commitment registered offerings is that standing to sue under this provision extends to all purchasers of securities, whether the purchase occurred in the offering or subsequently in the secondary market.  *See* Brief of the SEC in *DeMaria v. Andersen*, 318 F.3d 170 (2d Cir. 2003).

As described above, the purpose of a SPAC's initial public offering is to facilitate a subsequent de-SPAC transaction, and for target companies merging with a SPAC, the de-SPAC transaction is the means chosen, out of the several avenues available under the securities laws, for a private operating company to go public.  It is the method by which the target company's securities, as securities of the combined company, are distributed into the hands of public investors.  Although SPAC IPO underwriters typically are not retained to act as firm commitment underwriters in the de-SPAC transaction, they nevertheless typically participate in activities that are necessary to that distribution.[202]  For instance, it is common for a SPAC IPO underwriter (or its affiliates) to participate in the de-SPAC transaction as a financial advisor to the SPAC, and engage in activities necessary to the completion of the de-SPAC distribution such as assisting in identifying potential target companies, negotiating merger terms, or finding investors for and negotiating PIPE investments.  Furthermore, receipt of compensation in connection with the de-SPAC transaction could constitute direct or indirect participation in the de-SPAC transaction.  While SPAC IPO underwriting fees—those fees the SPAC IPO underwriters earn for their efforts in connection with the initial offering of SPAC shares to the public—generally range between 5% and 5.5% of IPO proceeds, a significant portion (typically 3.5% of IPO proceeds) is deferred until, and conditioned upon, the completion of the de-SPAC transaction.[203]  A SPAC IPO underwriter therefore typically has a strong financial interest in taking steps to ensure the consummation of the de-SPAC transaction.[204]  For these reasons,

---

[202]  *See generally Chinese Consolidated Benevolent Association*, *supra* note 186 and accompanying text.

[203]  *See* Klausner, Ohlrogge, and Ruan, *supra* note 17.  It is not necessary, however, for a SPAC IPO underwriter to derive a pecuniary benefit from the distribution in order for Section 2(a)(11) to apply.  *See* Brief for the SEC at 19, *Chinese Consolidated Benevolent Association*, *supra* note 186 ("The legislative history of Section 2[(a)](11) makes it apparent that Congress did not intend to require the elements of compensation or a contract with the issuer in order to make a distributor of securities an underwriter.")

[204]  *See* Robert J. Haft, Peter M. Fass, Michele Haft Hudson, and Arthur F. Haft, Tax-Advantaged Securities, Overview of SPACs § 6:134.60.

proposed Rule 140a would clarify that the SPAC IPO underwriter is an underwriter with respect to the distribution that occurs in the de-SPAC transaction, when it takes steps to facilitate the de-SPAC transaction, or any related financing transaction, or otherwise participates (directly or indirectly) in the de-SPAC transaction.

We note that proposed Rule 140a addresses the underwriter status of only the SPAC IPO underwriter in the context of a de-SPAC transaction. In addition, we have discussed above some of the activities that are sufficient to establish that the SPAC IPO underwriter is participating in the distribution of target company securities. This discussion, however, is not intended to provide an exhaustive assessment of underwriter status in the SPAC context, and neither is it intended to limit the definition of underwriter for purposes of Section 2(a)(11) of the Securities Act. Federal courts and the Commission may find that other parties involved in securities distributions, including other parties that perform activities necessary to the successful completion of de-SPAC transactions, are "statutory underwriters" within the definition of underwriter in Section 2(a)(11). For example, financial advisors, PIPE investors, or other advisors, depending on the circumstances, may be deemed statutory underwriters in connection with a de-SPAC transaction if they are purchasing from an issuer "with a view to" distribution, are selling "for an issuer," and/or are "participating" in a distribution.

**Request for Comment**

82.   Should we adopt a definition of distribution in Rule 140a, as proposed?

83.   Does the current regulatory regime provide sufficient incentives for participants in a de-SPAC transaction to conduct appropriate due diligence on the target private operating company and the disclosures provided to public investors in connection with the de-SPAC transaction? Would proposed Rule 140a likely result in improved diligence of

private company targets in de-SPAC transactions and related disclosure?  Would the other measures we are proposing in this release mitigate the need for proposed Rule 140a?

84.   Does the SPAC IPO underwriter have the means and access necessary (via contract or otherwise) to perform due diligence at the de-SPAC transaction stage, particularly where the SPAC IPO underwriter is not retained as an advisor in the de-SPAC transaction or the target is the registrant for the de-SPAC transaction?  Could such access be reasonably obtained in the course of the negotiation of the underwriting agreement for the SPAC initial public offering or otherwise?

85.   Will shareholders after the de-SPAC transaction have difficulty recovering against SPAC IPO underwriters liable under Securities Act Section 11 due to potential challenges in tracing the shares they hold to an effective registration statement for the de-SPAC transaction?  Are there steps we should take to address the challenges shareholders might face in tracing their shares to such a registration statement?  For example, should we consider rulemaking to define "any person acquiring such security" under Securities Act Section 11 in the context of de-SPAC transactions and, if so, how should it be defined?

86.   Should we limit the application of proposed Rule 140a to situations in which the SPAC IPO underwriter takes steps to facilitate the de-SPAC transaction, or any related financing transaction, or otherwise participates (directly or indirectly) in the de-SPAC transaction, as proposed?

87.   Would a determination that SPAC IPO underwriters are engaged in a distribution of the private operating company's securities, as proposed, raise additional issues we should address?  For example, does it raise questions about when the SPAC IPO underwriters'

participation in the SPAC initial public offering distribution is completed for purposes of calculating the restricted period under Regulation M?

88. As noted above, there may be additional parties that are involved in a de-SPAC transaction that may fall within the statutory definition of underwriter because they are "participating in the distribution" of the target private operating company's securities to the public. Should proposed Rule 140a be expanded to expressly include such other parties? If so, which parties? Should the rule instead deem any party playing a significant role at the de-SPAC transaction stage to be an underwriter? Should the Commission provide additional guidance as to which additional parties may be underwriters and what activities or other considerations would be relevant to determining whether a party falls within the statutory definition of underwriter in a de-SPAC transaction?

89. Is it clear what parties would be considered a SPAC IPO underwriter for purposes of proposed Rule 140a? Should we limit underwriter status as clarified by Rule 140a to the entities acting as traditional underwriter in a SPAC IPO? Are there other parties that should be specifically excluded from the application of the rule?

90. Are there alternative approaches we should consider that would enhance the incentives of participants in a de-SPAC transaction to assure the accuracy of the disclosures provided to public investors in connection with the de-SPAC transaction and/or align liability protections for investors across the various avenues for private operating companies to go public?

## IV.   BUSINESS COMBINATIONS INVOLVING SHELL COMPANIES

In response to concerns regarding the use of shell companies[205] as a means of accessing the U.S. capital markets, and as discussed more fully below, we are proposing new rules that would apply to business combination transactions involving shell companies, which include de-SPAC transactions.  First, we are proposing new Rule 145a under the Securities Act that would deem such business combination transactions to involve a sale of securities to a reporting shell company's shareholders.  Second, we are proposing new Article 15 of Regulation S-X and related amendments to more closely align the required financial statements of private operating companies in connection with these transactions with those required in registration statements on Form S-1 or F-1 for an initial public offering.[206]  The issues we are addressing with these rule proposals are common to these shell company transactions, regardless of whether the shell company is a SPAC.

### A.   Shell Company Business Combinations and the Securities Act of 1933

#### 1.   *Shell Company Business Combinations*

SPAC initial public offerings and business combinations occurred with increased frequency in 2020 and 2021,[207] but a business combination with a reporting shell company[208] is

---

[205]  As stated above, throughout this release, we use "shell company" and "reporting shell company" in lieu of the phrase "shell company, other than a business combination related shell company" and "reporting shell company, other than a business combination related shell company."  *See supra* note 43 for the definition of "reporting shell company."

[206]  The requirements in Form S-4, Form F-4, and Schedule 14A for an acquisition of a business were developed at a time when acquirers were generally operating companies, and these requirements do not specifically address transactions involving shell companies.  For example, Form S-4 was adopted by the Commission in 1985, which predates the origins of SPACs in the 1990s.  *See Business Combination Transactions-Adoption of Registration Form*, Release No. 33-6578 (Apr. 23, 1985) [50 FR 19001 (May 6, 1985)].

[207]  *See supra* notes 7 and 8 regarding the 2020-2021 increase in popularity of SPACs as a means for private companies to access the public markets.

[208]  *See supra* note 9.

not a new means for a private company to become a U.S. public company with an Exchange Act reporting obligation.[209]  Historically, private companies have utilized shell companies in various forms of transactions,[210] such as spin-offs, reverse mergers, and de-SPAC transactions to become U.S. public companies,[211] in many cases without filing a Securities Act registration statement.[212] Due to abuses involving shell company transactions, over the years the Commission has adopted various rules and limitations intended to address the misuse of shell companies.[213]  For example:

---

[209] *See generally*, Ronald M. Shapiro and Laurence M. Katz, *The "Going Public through the Back Door" Phenomenon—An Assessment*, 29 MD. L. REV. 320 (1969); Leib Orlanski, *Going Public through the Backdoor and the Shell Game*, 58 VA. L. REV. 1451 (1972) (both describing various ways of combining with a public shell company as a method to bring private corporations public).

[210] Shell company business combinations can take many forms.  They can be as simple in structure as a statutory merger, with a private operating company merging with and into a shell company that has previously filed a Form 10 with the Commission, or as complex as a de-SPAC transaction involving multiple merging entities, tax blockers, and/or a new holding company.  Among de-SPAC transactions, the Commission staff has observed a number of variations, only some of which are consistently registered transactions.  For example, in de-SPAC transactions structured as share exchanges, securities can be offered and sold to the public holders of SPAC securities from the target, a new holding company, or they can retain their interests in the reporting SPAC.

[211] These transactions generally can take the form of either a "reverse merger" in which the private business merges into the shell company, with the shell company surviving and the former shareholders of the private business controlling the surviving entity or, in another common type of transaction, a "back door registration," the shell company merges into the formerly private company, with the formerly private company surviving and the shareholders of the shell company becoming shareholders of the surviving entity.  *See Use of Form S-8, Form 8-K, and Form 20-F by Shell Companies*, Release No. 33-8587 (July 15, 2005) [70 FR 42234 (July 21, 2005)] ("Shell Company Adopting Release").  Both alternatives transform a private company into a public company by combining directly or indirectly with a public company (whether through a merger, exchange offer, or otherwise).

[212] For example, unregistered transactions can involve a direct or indirect offer and sale of the public shell's securities to holders of the target entity's securities in consideration for their interests in the target entity.  The public shell is then the entity that survives the business combination.  In the context of SPACs, where there is no registration statement, transactions are typically disclosed to the SPAC's public shareholders in a proxy or information statement if there is a vote or consents being solicited, or otherwise in a Schedule TO.  In shell company mergers where there is no vote, the shell company's shareholders may only learn about the transaction when the shell company files an Item 5.06 Form 8-K to report a change in shell company status.  With respect to de-SPAC transactions, the Commission staff has observed that in 2020 (Sept. 30, 2019 to Oct. 1, 2020), 21 de-SPAC transactions were registered on Form S-4 or F-4 and 16 were disclosed on proxy or information statements soliciting shareholder votes or consents, respectively.  Over the same months in 2021, 212 de-SPAC transactions were registered on Form S-4 or F-4 and 48 were disclosed on proxy or information statements.

[213] We note that these rules and limitations generally do not apply to shell companies that qualify as "business combination related shell companies" as defined in Rule 405.  *See infra* Section IV.A.3.

- Rule 144 is not available for the resale of securities initially issued by either reporting or non-reporting shell companies;[214]

- Shell companies are not permitted to use Form S-8;[215]

- Shell companies are considered ineligible issuers that cannot use free writing prospectuses for communications during a registered offering;[216] and

- Broker-dealers are able to rely on the "piggyback" exception to publish quotations for shell companies for only 18 months following the initial priced quotation on OTC Markets.[217]

Although many of these rules address concerns related to market manipulation and penny stock fraud, the Commission also has previously expressed concerns about the use of a shell company to distribute securities to the public without the protections afforded by the Securities Act including, where required, a registration statement.[218]  The lack of a registration statement could deprive investors of the critical disclosures and protections that come with Securities Act registration.[219]  The use of shell companies to complete business combinations can thus also provide companies with opportunities to avoid the disclosure, liability, and other provisions

---

[214] *See* 17 CFR 230.144(i), 17 CFR 230.145(c) and (d), and *Revisions to Rules 144 and 145,* Release No. 33-8869 (Dec. 6, 2007) [72 FR 71546 (Dec. 17, 2007)].

[215] *See* Form S-8 [17 CFR 239.16b], General Instruction A.1, Rule as to Use of Form S-8; Shell Company Adopting Release, *supra* note 211.

[216] *See* 17 CFR 230.165(e)(2)(ii) and *Securities Offering Reform,* Release No. 33-8591 (July 19, 2005) [70 FR 44722 (Aug. 3, 2005)].

[217] *See* 17 CFR 240.15c2-11(f)(3)(i)(B)(*2*) and *Publication or Submission of Quotations Without Specified Information,* Release No. 33-10842 (Sept. 16, 2020) [85 FR 68124 (Oct. 27, 2020)].

[218] *See generally Spin Offs and Shell Corporations,* Release No. 33-4982 (July 2, 1969) [34 FR 11581 (July 15, 1969)] (stating the Commission's concern over the use of shell companies to effect unregistered distributions of securities in spin-offs and in other contexts).

[219] *Id*. *See also Notice of Adoption of Rules 145 and 153A, Prospective Rescission of Rule 133, Amendment of Form S-14 Under the Securities Act of 1933, and Amendment of Rule 14a-2, 14a-6 and 14c-5 Under the Securities Exchange Act of 1934,* Release No. 33-5316 (Oct. 6, 1972) [37 FR 23631 (Nov. 7, 1972)] ("Rule 145 Adopting Release").

applicable in traditional registered offerings.[220]  These concerns are still present when shell companies are used in business combinations to provide private companies with access to the public markets.

2.    *Proposed Rule 145a*

The substantive reality of a reporting shell company[221] business combination with a company that is not a shell company is that reporting shell company investors have effectively exchanged their security representing an interest in the reporting shell company for a new security representing an interest in the combined operating company.  As noted above, however, unlike investors in transaction structures in which the Securities Act applies and a registration statement would be filed (absent an exemption), investors in reporting shell companies may not always receive the disclosures and other protections afforded by the Securities Act at the time the change in the nature of their investment occurs due to the business combination involving another entity that is not a shell company.

Under the Securities Act, all offers and sales of securities must either be registered or be exempt from registration, and any offer or sale that is not registered or exempt violates Section 5.[222]  Section 2(a)(3) of the Securities Act defines a "sale" as, among other things,

---

[220]  For example, in *SEC v. M & A W., Inc.*, 538 F.3d 1043, 1053 (9th Cir. 2008), the court considered a civil enforcement action against an individual engaged in the business of assisting private corporations to become publicly-traded companies through reverse merger transactions with reporting shell companies, alleging the sale of unregistered securities.  The court noted: "[W]e are informed by the purpose of registration, which is 'to protect investors by promoting full disclosure of information thought necessary to informed investment decisions.'  The express purpose of the reverse mergers at issue in this case was to transform a private corporation into a corporation selling stock shares to the public, without making the extensive public disclosures required in an initial offering.  Thus, the investing public had relatively little information about the former private corporation.  In such transactions, the investor protections provided by registration requirements are especially important.").

[221]  *See supra* note 43 for a definition of this term.

[222]  15 U.S.C. 77e.

"every contract of sale or disposition of a security or interest in a security, for value."[223]   In view of the remedial purpose of the Securities Act, courts and the Commission have broadly interpreted this term, particularly with respect to the creation of a public market in shares of a private company.[224]   Moreover, the Commission has concluded that certain business combination and other transactions involve a sale of securities within the meaning of Section 2(a)(3).[225]

Due to the significant increase in reporting shell company business combination transactions as a means to enter the U.S. capital markets, including through the use of a SPAC, and in an effort to provide reporting shell company shareholders with more consistent Securities Act protections regardless of transaction structure, we are proposing new Rule 145a[226] that would deem any business combination of a reporting shell company[227] involving another entity that is not a shell company to involve a sale of securities to the reporting shell company's

---

[223]  15 U.S.C. 77b(3).

[224]  In this regard, the Supreme Court has stated that securities legislation, enacted for the purpose of avoiding frauds, is to be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes."   *SEC v. Cap. Gains Rsch. Bureau, Inc*., 375 U.S. 180, 195, 84 S. Ct. 275, 284–85 (1963).   *See also SEC v. Harwyn Indus. Corp.*, 326 F. Supp. 943, 954 (S.D.N.Y. 1971) (construing "value" in Section 2(a)(3) to include the creation of a public market in the shares with its resulting benefits to the defendants, the court stated, "…[W]e must look to its overall purpose, which is to provide adequate disclosure to members of the investing public, rather than engage in strangulating literalism."); *SEC v. Datronics Engineers, Inc.*, 490 F.2d 250, 254 (4th Cir. 1973), cert denied, 416 U.S. 937 (1974); *In the Matter of UniversalScience.com, Inc*., Release No. 33-7879 (Aug. 8, 2000) (distribution of securities as purported "free stock" constituted a sale because it was a disposition for value, the "value" arising "by virtue of the creation of a public market for the issuer's securities."); and Thomas Lee Hazen, The Law of Securities Regulation § 12:22 ("Concepts of purchase and sale are to be construed flexibly in order to accomplish the purpose of the securities laws.  The courts will consider the economic reality of the transaction and whether it lends itself to fraud in the making of an investment decision.").

[225]  *See* 17 CFR 230.145(a) and (b) (Securities Act Rules 145(a) and (b)) and Rule 145 Adopting Release, *supra* note 219 (Rule 145 deems the submission to a vote of stockholders of a proposal for certain mergers, consolidations, or reclassifications of securities or transfers of assets to involve a "sale," "offer," "offer to sell," or "offer for sale" of the securities of the new or surviving corporation to the security holders of the disappearing corporation).

[226]  *See* proposed 17 CFR 230.145a.

[227]  *See supra* note 43 for a definition of this term.

shareholders.[228]  It is our preliminary view that such a transaction would be "a disposition of a security or interest in a security… for value,"[229] regardless of the form or structure deployed, and regardless of whether a shareholder vote or consent is solicited.[230]  By deeming such transactions to be a "sale" for the purposes of the Securities Act, the proposed rule is intended to address potential disparities in the disclosure and liability protections available to reporting shell company shareholders depending on the transaction structure deployed in a reporting shell company business combination.

Nothing in proposed Rule 145a would prevent or prohibit the use of a valid exemption, if available, for the deemed sale of securities to the reporting shell company's shareholders in the business combination.[231]  However, our current view is that Section 3(a)(9) of the Securities Act,[232] which exempts any securities exchange by an issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange, generally would not be available for the sales covered by proposed Rule 145a.  In these circumstances, we believe that the deemed exchange by the reporting shell company's existing shareholders for the combined company's securities should be viewed as part

---

[228]  This expresses our views as to the substance of these transactions for the purposes of the Securities Act.  Neither proposed Rule 145a nor the description in this section is intended to express a view with respect to the treatment of these transactions under other laws including, but not limited to, state corporate law and the Internal Revenue Code.

[229]  Although no securities may actually be changing hands, in substance, shareholders in a reporting shell company merger are effectively exchanging their interests in the shell company for interests in a non-shell company; these shareholders can be viewed as having surrendered "value" for the purposes of Section 2(a)(3).

[230]  We note that this rule does not change the conclusion that a merger with a reporting shell company may constitute the offer and sale of securities to other parties for which registration under the Securities Act or an exemption would be required.  For example, where a SPAC survives the de-SPAC transaction, the SPAC will frequently issue its securities to shareholders of the private company in exchange for their interests in the private company.  Such a transaction would still require registration or an exemption from registration.

[231]  We note that even if an exemption applies, if Rule 145a is adopted, investors would have the protections of the anti-fraud provisions in Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 thereunder of the Exchange Act. [15 U.S.C. 77q; 15 U.S.C. 78j; and 17 CFR 240.10b-5, respectively].

[232]  15 U.S.C. 77c(a)(9).

of the same offering as the exchange of the private company's securities for their interests in the combined company.[233]  As a result, because the exchange would not be exclusively with the reporting shell company's existing security holders, Section 3(a)(9) would not be available to exempt the deemed sale to reporting shell company shareholders in proposed Rule 145a, if adopted.  In addition, we note that Section 3(a)(9) would not be available where a commission or other remuneration is paid or given directly or indirectly for soliciting of participation in the deemed exchange.  This would occur, for example, if a proxy solicitor is compensated to solicit the approval of the reporting shell company's shareholders for the business combination.

Given the substance of the transactions that would be covered by new Rule 145a, we are proposing the rule so that shareholders more consistently receive the full protections of the Securities Act disclosure and liability provisions in business combinations involving reporting shell companies, regardless of the transaction structure.  Not only would registration in this context result in enhanced liabilities for signatories to any registration statement and potential underwriter liability as described elsewhere in this release,[234] it would also include liability under Securities Act Section 11(a)(4) for experts, which include every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement or as having prepared or certified any report or valuation which is used in connection with the registration statement.[235]  In addition, if the transaction is registered, Rule 145a would, in some

---

[233]  We note that none of the non-exclusive safe harbors in 17 CFR 230.152(b) would be likely to apply.  In particular, the closing of the business combination with the reporting shell company would be simultaneous with the deemed exchange of reporting shell company securities with its own holders and would therefore not meet the 30-day safe harbor in 17 CFR 230.152(b)(1).

[234]  *See supra* Sections III.C and III.F, respectively.

[235]  *See* 15 U.S.C. 77k(a)(4).  This would include auditors who opine on the financial statements associated with the business combination.  Depending on the transaction and whether services are provided by other parties, this could

cases, provide reporting shell company investors with additional pre-sale disclosure about a transaction that would significantly alter the nature of their investment.[236]  In this way, proposed Rule 145a is consistent with the intent of other rules intended to "inhibit the creation of public markets in securities of issuers about which adequate current information is not available to the public."[237]  The proposed rule should also eliminate potential regulatory arbitrage opportunities to avoid disclosure requirements or liability through the use of alternative transaction structures when combining with a reporting shell company.[238]

### 3.    Excluded Transactions

We wish to emphasize that proposed Rule 145a would have no impact on business combinations between two bona fide non-shell entities.  However, we note that any reporting shell company that is made to appear to have, or has cloaked itself as having, more than "nominal" assets or operations would still be subject to Rule 145a in a business combination transaction.[239]

The Commission has historically recognized the usefulness of shell companies formed solely to change an entity's domicile or to effect a business combination transaction.[240]  As a

---

also include, for example, valuation consultants, outside reviewers of management projections, or anyone who provides a fairness opinion about the transaction.

[236]  Some public shell company business combinations are not disclosed to investors until after the transaction has closed.  *See supra* note 212.

[237]  *See* Rule 145 Adopting Release, *supra* note 219.

[238]  *See infra* Sections III.F for a discussion of the sources of liability in registered de-SPAC transactions.

[239]  We reiterate the Commission's previous position on structuring transactions to avoid shell company status in adopting the 2005 shell company limitations.  *See* Shell Company Adopting Release, *supra* note 211, at n.32.

[240]  *See* the Supplementary Information to the Shell Company Adopting Release, *supra* note 211 ("We recognize that companies and their professional advisors often use shell companies for many legitimate corporate structuring purposes.  Similarly, our definition and use of the term 'shell company' is not intended to imply that shell companies are inherently fraudulent.  Rather, these rules target regulatory problems that we have identified where shell companies have been used as vehicles to commit fraud and abuse our regulatory processes.").

result, the Commission has excluded such so-called business combination related shell companies[241] from many of the shell company requirements and prohibitions that have been put in place to ensure the protection of investors in such companies.[242]  Consistent with this, the proposed rule would not apply to reporting shell companies that are business combination related shell companies as this term is defined in Securities Act Rule 405.[243]

In addition, we are proposing to exclude the business combination of one shell company into another shell company from the scope of Rule 145a.  Such a business combination would not amount to a fundamental change in the nature of the reporting shell company shareholder's investment unlike a business combination with an entity that is not a shell company.[244]

**Request for Comment**

91.    Should we adopt Rule 145a as proposed?

92.    Should we be seeking to align the required disclosures and liabilities associated with shell company business combinations among the various available transaction structures in order to provide reporting shell company investors consistent disclosures and protections across transaction structures?  Are there alternative approaches that would accomplish this goal?

---

[241] *See supra* note 43 for the definition of "business combination related shell company."

[242] *See* Shell Company Adopting Release, *supra* note 211.

[243] Neither a SPAC nor any such entity formed to facilitate a merger with a SPAC meets the definition of a business combination related shell company because neither of these entities is a shell company formed solely for the purpose of changing the corporate domicile solely within the United States or formed solely for the purpose of completing a business combination transaction among one or more entities other than the shell company, none of which is a shell company.

[244] However, such a business combination may continue to fall within Securities Act Rule 145 because there is a shareholder vote and the transaction is one to which Rule 145 would apply (*e.g.,* a statutory merger or consolidation or similar plan or acquisition where the sole purpose of the transaction is not to change an issuer's domicile solely within the United States).

93. How would the proposed rule affect business combinations involving both SPACs and non-SPAC reporting shell companies?  Would these entities be more likely to register such transactions?

94. If the deemed sale to reporting shell company shareholders is required to be registered under the Securities Act pursuant to the proposed amendments, should we provide guidance with respect to the timing of the effectiveness of such registration statement in relation to the business combination?

95. Are there other transactions that have purposes or results similar to reporting shell company business combinations that we should deem to constitute sales?  Conversely, does the proposed rule deem too broad of a set of reporting shell company business combinations to be sales?  For example, should the rule be limited to SPACs?

96. Should proposed Rule 145a be limited to deeming shell company business combinations "sales" with respect to only reporting shell company shareholders?  Are there other parties whose interest in a shell company would be such that a shell company business combination should be deemed a sale?  For example, holders of securities other than common shares?

97. Should reporting shell companies be prohibited from relying on the exemption in Securities Act Section 3(a)(9) in a transaction deemed a sale under proposed Rule 145a? Should we provide additional guidance on the potential availability or lack of availability of other exemptions from registration for the proposed Rule 145a sale?  If so, what exemptions should we address?

98. Should we exclude business combination related shell companies from the scope of proposed Rule 145a, as proposed?

99. Should Rule 145a exclude the business combination of one shell company into another shell company, as proposed? How frequently do such mergers occur in absence of the proposed Rule 145a? In such a situation, would either or both companies' shareholders benefit from registration under the Securities Act?

100. Securities Act Rule 145(a) deems sales within the meaning of Section 2(a)(3) of the Securities Act for certain transactions submitted for the vote or consent of security holders. Securities Act Rules 145(c) and (d) include provisions that have the effect of limiting resales with respect to parties to transactions described in Rule 145(a) and their affiliates that involve shell companies. Although proposed Rule 145a would apply to all reporting shell company business combinations, not all of these business combinations would also fall within Rule 145(a). Should we consider resale limitations for Rule 145a? Should any such resale limitations be similar to those in existing Rule 145?

101. Should we consider guidance or additional rule amendments for transactions where the provisions of existing Rule 145 and Rule 145a could overlap? For example, are there any rules that currently reference Rule 145 that should be amended to apply (or not apply) to transactions covered by proposed Rule 145a (*e.g.*, Rule 500 of Regulation D, which states the availability of the exemptions for Rule 145(a) transactions; Securities Act Rule 135, which allows notice of a registered offering, including for a Rule 145(a) transaction; or Rule 172, which prohibits the use of access equals delivery in Rule 145(a) transactions)? What, if any, issues should the Commission address through guidance?

102. Are there other potential opportunities for regulatory arbitrage in shell company or SPAC transactions that the Commission should consider addressing?

### B.  Financial Statement Requirements in Business Combination Transactions Involving Shell Companies

After a business combination involving a shell company, the financial statements of the private operating company become those of the registrant for financial reporting purposes.  In other words, the private operating company becomes the predecessor.[245]  How the private operating company chooses to become a public company could affect its financial statement disclosures due to differences in the requirements of registration statements on Form S-1/F-1 and the requirements of Form S-4/F-4.  In our view, a company's choice of the manner in which it goes public should not generally result in substantially different financial statement disclosures being provided to investors.

We are proposing amendments to our forms, schedules, and rules to more closely align the financial statement reporting requirements in business combinations involving a shell company and a private operating company with those in traditional initial public offerings.  The financial statements that would be required under the proposed amendments are based, in part, on current staff guidance for transactions involving shell companies.[246]  Codifying this guidance should reduce any asymmetries between financial statement disclosures in business combination transactions involving shell companies and traditional initial public offerings.  Accordingly, we are proposing new Article 15 of Regulation S-X and related amendments to address certain inconsistencies in the reporting of financial information that can arise when applying existing

---

[245]  The term predecessor when used in this section has the same meaning as applied in its use under Regulation S-X and determination of financial statement requirements.

[246]  Commission staff has provided informal guidance to address practical questions related to financial reporting issues for shell company mergers in the Division of Corporation Finance's Financial Reporting Manual ("FRM").  The FRM is not a rule, regulation or statement of the Commission, and the Commission has neither approved nor disapproved its content.

requirements to business combination transactions involving shell companies compared to the financial statement requirements for a Securities Act registration statement.

### 1. Number of Years of Financial Statements

A registration statement on Form S-4 and F-4 and a proxy or information statement require financial statements of the target company for the same number of years of financial statements as would be required by the target in an annual report and any subsequent interim periods.[247]  Three years of statements of comprehensive income, changes in stockholders' equity, and cash flows are required, except in the following scenarios when two years are permitted:

- The target company would qualify as a smaller reporting company;[248]

- The target company would be an emerging growth company ("EGC")[249] if it were conducting an initial public offering of common equity securities and the registrant is an EGC that has not yet filed or been required to file its first annual report, even if the target would not be a smaller reporting company;[250] or

- The transaction is registered on a Form F-4 and either (1) the target company is a first time adopter of International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB"), or (2) the Form F-4 is the initial registration statement of the private company and it provides U.S. GAAP financial statements.[251]

---

[247]  *See* Items 17(b)(7) and 17(b)(8) of Form S-4; Items 17(b)(5) and 17(b)(6) of Form F-4; Item 14 of Schedule 14A; and Instruction 1 of Schedule 14C.

[248]  *See supra* Section III.D.

[249]  *See supra* note 112.

[250]  An EGC is permitted to include two years of statements of comprehensive income in its Securities Act registration statement for an initial public offering of its common equity securities.  EGCs that are not smaller reporting companies are still required to include three years of statements of comprehensive income in their annual reports.  *See* Rule 3-02 of Regulation S-X.

[251]  Item 17(b)(5) of Form F-4; General Instruction G of Form 20-F; and Instruction 3 to Item 8.A.2 of Form 20-F.

Our proposed amendments would expand the circumstances in which target companies may report two years of financial statements under the second bullet above by removing whether or not the shell company has filed its first annual report as a factor in determining the number of years required.  Because the scenarios described in the first and third bullets above are already aligned with the financial statements required in a traditional initial public offering, we have not proposed any changes related to them.  In addition, the proposed amendments would not affect the number of years of statements of comprehensive income that are required for the private operating company when it exceeds both the smaller reporting company and EGC revenue thresholds (that is, three years would continue to be required).[252]  However, to align the reporting with a traditional initial public offering, the proposed amendments would potentially reduce the number of years required when the target company would be an EGC if it were conducting an initial public offering of common equity securities and the registrant is an EGC that has filed or been required to file its first annual report.

In a traditional initial public offering under the Securities Act, the registrant may provide two years of statements of comprehensive income, changes in stockholders' equity, and cash flows when its most recently completed fiscal year revenue is below the smaller reporting company or EGC revenue thresholds (and all the other EGC qualifications are met), or as noted in the third scenario above for a foreign private issuer.  We are proposing to align the number of

---

[252]  *See* Items 17(b)(7) and 17(b)(8) of Form S-4; Items 17(b)(5) and 17(b)(6) of Form F-4; Item 14 of Schedule 14A; and Instruction 1 of Schedule 14C.  In addition to providing three years of financial statements due to the private operating company not qualifying as an EGC, the private operating company would not be able to take advantage of the delayed adoption dates for new or revised accounting standards permitted by EGCs in its financial statements.  In the staff's view, the private operating company's revenue, as predecessor, should be used to determine whether the registrant qualifies as an EGC after the transaction.  *See* FAQ 47 of the Division of Corporation Finance's Jumpstart Our Business Startups Act Frequently Asked Questions, available at https://www.sec.gov/divisions/corpfin/guidance/cfjjobsactfaq-title-i-general.htm (last revised Dec. 21, 2015).  The FAQ does not represent a rule, regulation or statement of the Commission, and the Commission has neither approved nor disapproved its content.

fiscal years required to be included in the financial statements for a private company that will be the predecessor(s) in a shell company combination with the financial statements required to be included in a Securities Act registration statement for an initial public offering of equity securities in proposed Rule 15-01(b) of Regulation S-X.

Proposed Rule 15-01(b) would provide that when the registrant is a shell company, and the financial statements of a business[253] that will be a predecessor to the registrant are required in a registration statement or proxy statement, the registrant must file financial statements of the business that will be a predecessor to the registrant in accordance with § 210.3-01 to 3-12 and § 210.10-01 (Articles 3 and 10 of Regulation S-X) or § 210.8-01 to 8-08 (Article 8), if applicable, as if the filing were a Securities Act registration statement for the initial public offering of that business's equity securities.  As a result, a shell company registrant would be permitted to include in its Form S-4/F-4/proxy or information statement two years of statements of comprehensive income, changes in stockholders' equity, and cash flows for the private operating company for all transactions involving an EGC shell company and a private operating company that would qualify as an EGC, and this determination would not be dependent on whether the shell company has filed or was already required to file its annual report or not.  The proposed amendments would not affect the number of years of statements of comprehensive income that are required for the private operating company when it exceeds both the smaller

---

[253]  We use the term *business* in this context, rather than *private operating company*, in order to be consistent with the provisions in Regulation S-X that define and use *business*, such as Rule 11-01(d) of Regulation S-X.  In a business combination transaction involving a shell company, the private operating company would meet the definition of a business.

reporting company and EGC revenue thresholds (that is, three years would continue to be required).[254]

## 2. *Audit Requirements of Predecessor*

Proposed Rule 15-01(a) would align the level of audit assurance required for the target private operating company in business combination transactions involving a shell company with the audit requirements for an initial public offering.[255]  Specifically, we are proposing that the term audit (or examination), when used in regard to financial statements of a business that is or will be a predecessor to a shell company, means an examination of the financial statements by an independent accountant in accordance with the standards of the PCAOB for the purpose of expressing an opinion thereon.  As a result, a target private operating company would be required to comply with Article 2 of Regulation S-X as if it were filing an initial public offering for its audited financial statements.  Forms S-4 and F-4[256] currently provide that, for an acquisition by a registrant that is not a shell company, (i) the target operating company financial statements may be audited in accordance with U.S. Generally Accepted Auditing Standards,[257] (ii) the financial statements of the most recent fiscal year are required to be audited only to the extent practicable,[258] and (iii) financial statements before the latest fiscal year need not be audited if they were not previously audited.[259]  The staff, however, has advised registrants that it

---

[254] The private operating company would also not be able to take advantage of the delayed adoption dates for new or revised accounting standards as that transition is only available to EGC companies.  As described in FAQ 47 of the Division of Corporation Finance's Jumpstart Our Business Startups Act Frequently Asked Questions, the staff takes the view that the private operating company's revenue, as predecessor, will determine the post-transaction EGC status.  See Securities Act Section 7(a)(2)(B).

[255] *See* proposed Rule 15-01(a) of Regulation S-X and Instruction 1 to Item 17(b) of Form S-4.

[256] *See* Instruction 1 to Item 17(b)(5) of Form F-4 and General Instruction E(c)(2) of Form 20-F.

[257] *See* 17 CFR 210.1-02(d) (Rule 1-02(d) of Regulation S-X).

[258] *See* Instruction 1 to Item 17(b)(7) of Form S-4.

[259] *Id.*

expects the financial statements of the business, *i.e.*, target private operating company, in a transaction involving a shell company to be audited to the same extent as a registrant in an initial public offering, because at consummation the financial statements of the target private operating company become that of the registrant.[260]  The proposed amendments would codify this existing staff guidance.

### 3.    *Age of Financial Statements of the Predecessor*

Proposed Rule 15-01(c) would provide that the age of financial statements for a private operating company that would be the predecessor to a shell company in a registration statement or proxy statement would be based on whether the private operating company would qualify as smaller reporting company if filing its own initial registration statement.  Absent this amendment, our rules require filing financial statements of the private operating company that would be required in an annual report, which do not have the same age requirements as those in the context of an initial registration statement.[261]  Similar to the other proposed amendments to Regulation S-X, this amendment would further align the financial statement requirements for a private operating company involved in a business combination with a shell company with those required in a Securities Act registration statement for an initial public offering.  If the private operating company would qualify to be a smaller reporting company, it would apply Rule 8-08 of Regulation S-X for the age of financial statements.[262]  Otherwise, the private operating

---

[260]  *See* FRM at Section 4110.5 for a chart that outlines the staff's application of certain PCAOB requirements in various filings with the SEC, which includes transactions involving a shell company.

[261]  For example, in an annual report, a domestic company with net losses in its recently completed fiscal year would have up to 90 days after its most recently completed fiscal year-end to update its third quarter financial statements. In contrast, in an initial registration statement, it would have up to only 45 days.  *See* General Instruction A. to Form 10-K and 17 CFR 210.3-12 (Rule 3-12 of Regulation S-X).

[262]  *See* 17 CFR 210.8-08 (Rule 8-08 of Regulation S-X), which states financial statements may be as current as of the end of the third fiscal quarter when the anticipated effective or mailing date falls within 45 days after the end of the fiscal year, OR if the date falls within 90 days of the end of the fiscal year and (1) if a reporting company, all

company would apply the age of financial statement requirements in Rules 3-01(c) and 3-12 of Regulation S-X.  Based on the staff's experience reviewing these transactions, we believe this proposed amendment to be consistent with existing practice.

We are not proposing amendments to the age requirements for the financial statements of the shell company registrant because we continue to believe that the age requirements in Articles 3 and 8 of Regulation S-X that apply to existing registrants are appropriate.  Thus, the existing provisions in Articles 3 and 8 of Regulation S-X for reporting companies required to file under Exchange Act Section 13(a) or 15(d) would continue to apply to shell companies.[263]

> 4.   *Acquisitions of Businesses by a Shell Company Registrant or Its Predecessor That Are Not or Will Not Be the Predecessor*

The financial statements of a target private operating company that is or will be the predecessor to a shell company registrant are required in registration statements or proxy statements related to the business combination.[264]  The financial statements of any other businesses, besides the predecessor, that have been, or are probable to be, acquired may also be required.[265]  For example, "Shell Company A" and "Target Private Operating Company B" are part of a business combination and a Form S-4 registration statement is filed.  Target Private Operating Company B acquired "Company C" before the Form S-4 was filed.  The proposed amendments in this section would address the reporting required for Company C in this non-exclusive example.

---

reports due were filed; (2) in good faith the company expects to report income in the fiscal year just completed; and (3) it reported income in at least one of the two previous fiscal years.

[263]  *See* Rule 3-01(c) of Regulation S-X (Rule 8-08 for smaller reporting companies), which applies to reporting companies required to file under Exchange Act Section 13(a) or 15(d).

[264]  *See* Item 17 of Form S-4 or Form F-4, § 240.14A-3(b), and Items 13 and 14 of Schedule 14A.

[265]  *See* 17 CFR 230.408(a) (Securities Act Rule 408(a)) and 17 CFR 240.12b-20 (Exchange Act Rule 12b-20).

Under existing rules,[266] financial statements of a business acquired or probable of being acquired by the target private operating company (*e.g.*, "Company C" in the above example) are required to be filed in a registration statement or proxy/information statement only when omission of those financial statements would render the target company's financial statements substantially incomplete or misleading.  In order to specify when such financial statements are required, we are proposing new Rule 15-01(d) of Regulation S-X to require application of Rules 3-05 or 8-04 (or Rule 3-14 as it relates to a real estate operation), the Regulation S-X provisions related to financial statements of an acquired business, to acquisitions of businesses by a shell company registrant, or its predecessor, that are not or will not be the predecessor to the registrant.[267]  This proposal would further align the financial reporting for a shell company business combination contained in Forms S-4 or F-4 and a proxy or information statement with what would be required to be included in a Securities Act registration statement for an initial public offering of the target private operating company.  Based on staff's experience reviewing these transactions, we understand this proposed amendment to be consistent with the current market practice of applying Rule 3-05 (or Rule 8-04) to acquisitions by the target private operating company in the context of a business combination involving a shell company.

In connection with this proposed amendment in Rule 15-01(d), we also considered and are proposing amendments related to the significance tests in Rule 1-02(w) of Regulation S-X that determine when acquired business financial statements are required.  The existing tests as applied to acquisitions involving shell companies appear inconsistent with the reasons

---

[266] *Id*.

[267] 17 CFR 210.8-04 (Rule 8-04) applies when the registrant or, depending on the context, its predecessor would qualify to be a smaller reporting company based on its annual revenues as of the most recently completed fiscal year if it were filing a registration statement itself.

underlying the sliding scale approach adopted in Rule 3-05.[268]  Rule 1-02(w) requires the

financial information of the registrant, which may be a shell company, to be used as the

denominator for the significant subsidiary tests and does not address the scenario when there is

both a shell company registrant and target private operating company that is or will be its

predecessor.  Because a shell company has nominal activity, the application of such tests results

in limited to no sliding scale for business acquisitions, including those made by the private

operating company that will be the predecessor to the shell company, because every acquisition

would be significant and thus require financial statements.[269]  Such application may limit the

ability to recognize which acquisitions have a greater impact on the predecessor than others.[270]

      We are proposing to amend Rule 1-02(w) of Regulation S-X to require that significance

of the acquired business be calculated using the private operating company's financial

information as the denominator instead of that of the shell company registrant.  Using the private

operating company's financial statements for the denominator should produce results more

---

[268] *Instructions for the Presentation and Preparation of Pro Forma Financial Information and Requirements for Financial Statements of Businesses Acquired or To Be Acquired*, Release No. 33-6413 (June 24, 1982) [47 FR 29832 (July 9, 1982)] ("Rule 3-05 Adopting Release").  The requirements are based on the significant subsidiary tests using a sliding scale so that the requirements for filing such financial statements, as well as the periods covered by such financial statements, will vary with the percentage impact of the acquisition on the registrant.  In adopting the sliding scale approach, the Commission stated its belief that the selected percentages "meet the objectives of providing adequate financial information to investors, shareholders and other users while at the same time reducing the reporting burdens of registrants involved in acquisitions."

[269] For example, financial statements of a business that the private operating company has acquired and represents less than 5% of its total assets, revenue and net income could be required in the Form S-4 because the acquired business would be compared to the shell company's financial statements.

[270] The 2020 amendments to Rules 1-02(w) and 3-05 did not affect the financial statements related to the acquisition of a business that is the subject of a proxy statement or registration statement on Form S-4 or Form F-4.  *See Amendments to Financial Disclosures about Acquired and Disposed Businesses,* Release 33-10786, (May 21, 2020) [85 FR 54002 (Aug. 31, 2020)], n.20.

consistent with the sliding scale approach in Rule 3-05 and recognizes that certain acquisitions have a greater impact than others.[271]

Related to the application of the significance tests, we considered the impact of the application of 17 CFR 210.11-01(b)(3)(i)(B) ("Rule 11-01(b)(3)(i)(B) of Regulation S-X").  This rule permits, in certain circumstances, the use of pro forma amounts that depict significant business acquisitions and dispositions consummated after the latest fiscal year-end, for which the registrant's financial statements are required to be filed, for the registrant's financial information in the significance tests.[272]  While we are not proposing amendments to this paragraph in Rule 11-01, based on the proposed amendment to 17 CFR 210.11-01(d) ("Rule 11-01(d)") described below, we highlight that application of this rule may change and result in a future acquired business being compared to the pro forma amounts related to the shell company and target private operating company business combination transaction in filings made after the consummation of the business combination transaction.[273]  The impact of such application would be that the SPAC's financial statements, including its cash, would be part of the pro forma financial information and will likely increase the denominator in the significance tests compared to measuring an acquisition solely on the target private operating company.

We are proposing new 17 CFR 210.15-01(d)(2) ("Rule 15-01(d)(2)") to specify when the financial statements of a recently acquired business (or real estate operation) that is not the private operating company that will be the predecessor, which are omitted from a shell company

---

[271]  *Ibid.*

[272]  Such pro forma use is permitted if the registrant has filed audited financial statements for any such acquired business for the periods required by Rule 3-05 or Rule 3-14 and the pro forma information required by Rule 11-01 through 11-02 of Regulation S-X.

[273]  Pursuant to the proposed amendment to Rule 11-01d) that would stipulate that the SPAC is a business, an acquisition of the SPAC is considered to be an acquisition of a business, and the conditions to use pro forma financial statements depicting the acquisition as the denominator in the significance tests may be met.

registration, proxy, or information statement under Regulation S-X, would be required to be filed.  Rule 3-05(b)(4)(ii) of Regulation S-X provides that financial statements of a probable of being acquired or recently acquired business may be omitted from a registration, proxy, or information statement when their significance is measured at 50% or less (or Rule 3-14(b)(3)(ii) as it relates to a real estate operation).  The rule further provides that financial statements of a recently acquired business, when omitted from the registration statement or proxy or information statement, must be filed under cover of Form 8-K within 75 days after consummation of the acquisition.  Because the significance of the acquisition is greater than 20% but less than 50%, the recently acquired business's financial statements, which are omitted from the registration, proxy, or information statement, must be filed.[274]  However, it is unclear how those financial statements are to be filed when the private operating company is not yet subject to Exchange Act reporting requirements and thus may not be able to file a Form 8-K.  Rather than requiring a post-effective amendment, we are proposing in Rule 15-01(d)(2) that the financial statements of the acquired business omitted from the previously-filed registration, proxy, or information statement would be required in an Item 2.01(f) Form 8-K filed with Form 10 information.

>    5.    *Financial Statements of a Shell Company Registrant After the Combination with Predecessor*

In recent years, the staff has received questions on whether the historical financial statements of the shell company are required in filings made after the business combination.  Due to the lack of clarity regarding the application of the financial statement requirements in Articles 3 and 8 of Regulation S-X, we are proposing new Rule 15-01(e), which would allow a registrant to exclude the financial statements of a shell company, including a SPAC, for periods prior to the

---

[274]  Rule 3-05 generally requires financial statements of an acquired business when the conditions in Rule 1-02(w) related to significant subsidiary exceed 20%.

acquisition once the following conditions have been met: (1) the financial statements of the shell company have been filed for all required periods through the acquisition date, and (2) the financial statements of the registrant include the period in which the acquisition was consummated.

In the example of a de-SPAC transaction, the financial statements of the SPAC, as a shell company, would generally no longer be relevant or meaningful to an investor after a de-SPAC transaction once the financial statements of the registrant include the period in which the de-SPAC transaction was consummated for any filing.[275]  The proposed rule would apply regardless of whether the de-SPAC transaction is accounted for as a forward acquisition of the target private operating company by the SPAC or a reverse recapitalization of the target private operating company.  The financial statements of the SPAC would be required in all filings (including registration statements and the Form 8-K with Form 10 information filed following the de-SPAC transaction) prior to the filing of the first periodic report that includes those post-business combination financial statements.  The proposed amendments should not result in a significant change from current practice as it relates to periodic reports because the staff in the last several years has not objected to the registrant excluding the historical financial statements of the SPAC from periodic reports once the financial statements for the registrant include the period in which the acquisition or recapitalization was consummated.

Further, the proposed amendments would not change the requirement that a registrant must provide all material information as may be necessary to make required statements, in light

---

[275]  Once the financial statements of the registrant include the period in which the de-SPAC transaction was consummated, the financial statements required would be those of the predecessor for all historical periods presented.

of the circumstances under which they were made, not misleading,[276] so if there is information included in or about the historical SPAC financial statements that would be material to an investor, a registrant would still be required to provide such information.

6.      *Other Amendments*

In addition, we are proposing a number of other related amendments as follows:

- We are proposing to amend Rule 11-01(d) of Regulation S-X to state that a SPAC is a business for purposes of the rule.  While Rule 11-01(d) states that an entity is presumed to be a business, consideration of the continuity of the SPAC's operations prior to and after the de-SPAC transaction may lead some parties to conclude that the SPAC is not a business under the rule.  Nonetheless, given the significant equity transactions generally undertaken by a SPAC, we believe the financial statements of the SPAC could be material to an investor, particularly when they underpin adjustments to pro forma financial information in a transaction when an operating company is the legal acquirer of a SPAC.  As a result of the proposed rule, an issuer that is not a SPAC may be required to file financial statements of the SPAC in a resale registration statement on Form S-1.

- Item 2.01(f) of Form 8-K currently requires a shell company registrant to file, after an acquisition, the information that would be required if the registrant were filing a general form for the registration of securities on Form 10.  We are proposing to revise this Item to refer to "acquired business," rather than "registrant," in an effort to clarify that the information provided relates to the acquired business and for periods prior to consummation of the acquisition and not the shell company registrant.

---

[276]  *See* Exchange Act Rule 12b-20, Securities Act Rule 408(a).

- Rule 3-02 of Regulation S-X requires that statements of comprehensive income be filed for the registrant and its predecessors.  However, as it relates to balance sheets, certain provisions in Regulation S-X specify that they be filed for the registrant and do not specifically refer to balance sheets of predecessors.  We do not believe the intent of these rules is to provide the predecessor's statements of comprehensive income without the balance sheets as that would not be considered a complete set of financial statements and would be inconsistent with Article 3 of Regulation S-X that requires both.  We are proposing amendments to Rules 3-01, 8-02, and 10-01(a)(1) of Regulation S-X to specifically refer to financial statements of predecessors consistent with the provision regarding income statements.  These amendments codify existing financial reporting practices, and we do not expect them to result in any changes in disclosures.

**Request for Comment**

103.   Should we adopt the amendments and new rules related to aligning financial statement disclosures, including Rule 15-01 of Regulation S-X, as proposed?

104.   Should Rule 15-01 provide that the term audit (or examination), when used in regard to financial statements of a business that is or will be a predecessor to a shell company, means an examination of the financial statements by an independent accountant in accordance with the standards of the PCAOB for the purpose of expressing an opinion thereon, as proposed?

105.   Should Article 15 of Regulation S-X address financial statement requirements for the acquisition by a shell company of a business that will be its predecessor, as proposed, or should we limit the requirements to apply only to a de-SPAC transaction, and if so, why?

106.    Should the significance tests that determine whether the financial statements of
        businesses that are not or will not be the predecessor are required to be filed employ the
        denominator of the private operating company in lieu of that of the shell company
        registrant, as proposed?  Should the pro forma financial information that gives effect to
        the shell company transaction be allowed to be used as the denominator in measuring the
        significance of other acquisitions not involving a predecessor?  Should there be
        restrictions on when such pro forma financial information is used to measure
        significance, such as only for acquisitions that occur subsequent to consummation of the
        transaction and not for acquisitions that are done in tandem with the shell company
        transaction?

107.    Should the financial statements of a shell company not be required in filings once the
        financial statements of the registrant include the period in which the acquisition was
        consummated, as proposed?  Are there situations in which investors would continue to
        rely upon the information in the shell company financial statements after the acquisition
        was consummated and reflected in the financial statements of the registrant, or other
        factors we should consider in determining when the shell company financial statements
        should not be required in filings after the acquisition is complete?  Should the accounting
        for the transaction as a forward acquisition or reverse recapitalization determine whether
        the financial statements are required in filings made after the acquisition was
        consummated?

108.    Should Rule 11-01(d) of Regulation S-X be amended to state that a SPAC is a business
        for purposes of the rule, as proposed?  Would it change the existing application of Rule
        11-01(b)(3)(i)(B) of Regulation S-X as it relates to de-SPAC transactions?  Should

eliciting the financial statements of the SPAC in a resale registration statement of an issuer that is not a SPAC be accomplished through a rule that specifically requires the SPAC financial statements to be filed (subject to the provisions of proposed Rule 15-01(e))?

109.    The Form 8-K filed pursuant to Item 2.01(f) may require a third fiscal year of certain financial statements for an acquired business that is the predecessor to a shell company and an emerging growth company, while Rule 15-01(b), as proposed, would only require two.  Should we amend the Form 8-K requirement to provide an exception to the required Form 10-type information so the financial statements of the acquired business need not be presented for any period prior to the earliest audited period previously presented in connection with a registration, proxy, or information statement of the registrant?

## V.    ENHANCED PROJECTIONS DISCLOSURE

### A.    Background

Disclosure of financial projections is not expressly required by the federal securities laws; however, there are various reasons why registrants produce and disclose such information.  For example, projections may be disclosed to comply with state or foreign corporate law regarding the board's decision to approve a business combination transaction or the basis underlying a fairness opinion issued by a financial advisor.[277]  Companies engaged in business combination transactions may use projections to negotiate the offered consideration, terms, and conditions and to allocate risks in those transactions.  Companies may also disclose projections to avoid claims

---

[277]  *See, e.g.*, *In re Netsmart Techs., Inc.*, 924 A.2d 171 (Del. Ch. 2007), and the disclosure of the substantive work performed by the financial advisor, *see, e.g.*, *In re Pure Res.*, Inc., 808 A.2d 421 (Del. Ch. 2002).

that the omission of such information violates federal anti-fraud provisions or to satisfy certain requirements under Regulation M-A.[278]

Recent events have raised renewed concerns about the use of projections, particularly with respect to de-SPAC transactions in which private operating companies disclose projections that may lack a reasonable basis.[279]  For example, some companies have presented projections of significant increases in revenue or market share even though they do not have any operations at the time such projections were prepared.[280]  Other companies have allegedly used materially misleading assumptions, failed to take into account foreseeable future events in developing

---

[278]  *See* Exchange Act Rules 10b-5, 12b-20, 13e-3(b)(1)(ii), and 17 CFR 240.14a-9 (Exchange Act Rule 14a-9), Securities Act Rule 408(a), and Exchange Act Section 14(e).  *See also* Item 1004(b)(2)(iii) and 1011(c) of Regulation M-A.  Omission of projections used by the board or the fairness opinion advisers, in particular, have been the subject of various lawsuits filed in federal courts alleging violation of Rule 14a-9.  *See, e.g.*, *Smith v. Robbins & Myers, Inc.*, 969 F.Supp.2d 850 (2013), *Azar v. Blount Intern., Inc.*, No. 3:16-cv-483-SI, 2017 WL 1055966, 2017 U.S. Dist. LEXIS 39493 (D. Or. Mar. 20, 2017), and *NECA-IBEW Pension Trust Fund v. Precision Castparts Corp.*, No. 3:16-cv-01756-YY, 2017 WL 4453561, 2017 U.S. Dist. LEXIS 165139 (D. Or. Oct. 3, 2017), adopted by 2018 WL 533912, 2018 U.S. Dist. LEXIS 11463 (D. Or. Jan. 24, 2018) (relating to disclosed projections that management knew were not reflective of management's plans for the registrant).

[279]  The Commission recently has brought enforcement actions alleging the use of baseless or unsupported projections about future revenues and the use of materially misleading underlying financial projections.  These cases involve both SPACs and other reporting companies.  *See* the following matters related to SPACs: *In the Matter of Momentus, Inc., et. al.*, Exch. Act Rel. No. 34-92391 (July 13, 2021); *SEC vs. Hurgin, et al.*, Case No. 1:19-cv-05705 (S.D.N.Y., filed June 18, 2019); *In the Matter of Benjamin H. Gordon*, Exch. Act Rel. No. 34-86164 (June 20, 2019); and, *SEC vs. Milton*, Case No. 1:21-cv-6445 (S.D.N.Y., filed July 29, 2021).  *See* the following non-SPAC cases: *SEC vs. CanaFarma Hemp Products Corp, et al.*, Case No. 1:21-cv-08211 (S.D.N.Y., filed Oct. 5, 2021); *SEC v. Thomas, et al.*, Civil Action No. 19-cv-1132 (D. Nev., filed June 28, 2019); *In the Matter of Ribbon Communications Inc., et. al.*, Exch. Act Rel. No. 34-83791 (Aug. 7, 2018); *SEC v. Enviro Board Corporation, et al.*, [Civil Action No. 2:16-cv-06427 (C.D. Cal., filed Aug. 26, 2016)]; and *SEC v. Roberts, et. al.*, Civil Action No. 8:15-cv-2093-T-17-MAP (M.D. Fla., filed Sept. 9, 2015).  *See also* Dave Michaels, *Regulators Hit Space SPAC Over Disclosures*, The Wall Street Journal, July 26, 2021.

[280]  Some news reports have also suggested that many post-business combination companies, particularly those with less revenue or that are early stage companies, do not meet revenue or earnings targets that they provided to investors at the time of the de-SPAC transaction.  An analysis performed by The Wall Street Journal indicates that, of the 63 companies that became public companies through a de-SPAC transaction in 2021 and had less than $10 million in sales at the time of the transaction, at least 30 did not meet their projections.  The article reported that the companies in the analysis expected to miss their 2021 revenue projections fell short by an average of 53% and that companies falling short of their earnings projections have estimated losses that are approximately 40% greater, on average, than they projected at the time of the de-SPAC transaction.  *See* Heather Somerville, *SPACs Fall Short of Lofty Goals*, The Wall Street Journal, Feb. 26, 2022.

projections, or used projections unsupported by a target's experience.[281]   Similar potentially

misleading projections have been used in non-SPAC filings, including with respect to future

revenues, prospects and profitability.[282]   Although the Commission has previously acknowledged

that projections and other forward-looking information can provide useful information for

investors when making voting and investment decisions,[283] it has also recognized that the use of

such forward-looking information could raise investor protection concerns.[284]   Accordingly, the

Commission adopted Item 10(b) of Regulation S-K to set forth its views on important factors to

be considered in formulating and disclosing such projections in certain Commission filings.[285]

Item 10(b) states that management has the option to present in Commission filings its good faith

assessment of a registrant's future performance, but it also states that management must have a

reasonable basis for such an assessment.   Item 10(b) further expresses the Commission's views

on the need for disclosure of the assumptions underlying the projections, the limitations of such

projections, and the format of the projections.

### B.    Rule Proposals

We are proposing to amend Item 10(b) of Regulation S-K to expand and update the

Commission's views on the use of projections.   Among other things, the proposed amendments

would address the presentation of projections by companies with no history of operations and

---

[281]   *See supra* note 275.

[282]   *Id*.

[283]   *Disclosure of Projections of Future Economic Performance*, Release No. 33-5362 (Feb. 2, 1973) [38 FR 7220 (Mar. 19, 1973)] and *Guides for Disclosure of Projections of Future Economic Performance*, Release No. 33-5992 (Nov. 7, 1978) [43 FR 53246 (Nov. 15, 1978)].

[284]   *See* Release No. 33-5362, *supra* note 283.

[285]   *See Adoption of Integrated Disclosure System*, Release 33-6383 (Mar. 3, 1982) [47 FR 11380 (Mar. 16, 1982)]. In connection with the adoption of the integrated reporting system, the Commission rescinded several staff guides relating to the preparation of registration statements and reports and relocated the substance of some of them into Item 10(b) of Regulation S-K.   *See Rescission of Guides and Redesignation of Industry Guides*, Release No. 33-6384 (Mar. 16, 1982) [47 FR 11476 (Mar. 16, 1982)].

provide that the guidance in the item also applies to projections of future economic performance of persons other than the registrant, such as the target company in a business combination. Further, given the widespread use of projections in de-SPAC transactions and the resulting heightened concerns, we are also proposing new Item 1609 of Regulation S-K that would be applicable to financial projections used in de-SPAC transactions and would set forth additional disclosure requirements relating to financial projections.

The proposed revisions to Item 10(b) of Regulation S-K and proposed Item 1609 of Regulation S-K are intended to help address concerns about the use of projections in de-SPAC transactions and similar circumstances. By providing additional guidance for registrants and mandating specific disclosures in de-SPAC transactions, these proposed rules could enhance the attention and level of care companies bring to the preparation of financial projections, both in de-SPAC transaction filings and in other filings made with the Commission.

1.    *Item 10(b) of Regulation S-K*

We are proposing to amend Item 10(b) to present the Commission's updated views on projected financial information. The proposed amendments to Item 10(b) would continue to state the Commission's view that projected financial information included in filings subject to Item 10(b) must have a reasonable basis. To address specific concerns that some companies may present projections more prominently than actual historical results (or the fact that they have no operations at all) or use non-GAAP financial measures in the projections without a clear explanation or definition of such a measure, we propose to amend Item 10(b) to state that:

- Any projected measures that are not based on historical financial results or operational history should be clearly distinguished from projected measures that are based on historical financial results or operational history;

- It generally would be misleading to present projections that are based on historical financial results or operational history without presenting such historical measure or operational history with equal or greater prominence; and

- The presentation of projections that include a non-GAAP financial measure should include a clear definition or explanation of the measure, a description of the GAAP financial measure to which it is most closely related,[286] and an explanation why the non-GAAP financial measure was used instead of a GAAP measure.[287]

These proposed changes, if adopted, should assist registrants in presenting their projections in an appropriate format and with the appropriate context, which in turn should facilitate investors' evaluation of the projections, assessment of the reasonableness of the bases for these projections (particularly when compared to historical performance and results), and determinations about the appropriate reliance to place on the projections when making an investment or voting decision.

Finally, Item 10(b) currently refers to projections regarding the future performance of a "registrant." In business combination transactions, it is common for projections of the target company to be included in the Securities Act registration statement or proxy statement filed by the acquiring company. In such a case, it may be unclear if the guidance in Item 10(b) applies to the target company's projections because the target company is not the registrant for that filing. In our view, Item 10(b) should apply to such projections because they are nevertheless being presented to investors through the registration statement or proxy statement filed by the

---

[286] The reference to the nearest GAAP measure called for by amended Item 10(b) would not require a reconciliation to that GAAP measure. The need to provide a GAAP reconciliation would continue to be governed by Regulation G and Item 10(e) of Regulation S-K.

[287] The Commission stated a similar view in 2003. *See Conditions for Use of Non-GAAP Financial Measures, Release No. 33-8176 (Jan. 22, 2003), section II.B.2 [68 FR 4820 (Jan. 30, 2003)].*

acquiring company.  Accordingly, we are proposing to amend Item 10(b) to state that the guidance therein applies to any projections of future economic performance of persons other than the registrant, such as the target company in a business combination transaction, that are included in the registrant's Commission filings.

**Request for Comment**

110.    Should we amend Item 10(b) of Regulation S-K, as proposed?  Is there additional or different guidance we should provide?

111.    Instead of applying to all filings covered by Item 10(b), as proposed, should the proposed updated guidance apply solely to filings relating to business combination transactions (including de-SPAC transactions), while retaining the existing Item 10(b) guidance for other filings?

112.    Are the proposed amendments to Item 10(b) necessary in light of proposed Item 1609 of Regulation S-K, which is limited to de-SPAC transactions?

113.    Are there different ways of presenting financial projections that would be beneficial to investors?  For example, should we require registrants to present some or all financial projections in a separately captioned section of a Commission filing?

 2.      *Item 1609 of Regulation S-K*

We are also proposing new Item 1609 of Regulation S-K that would apply only to de-SPAC transactions.[288]  The nature of the SPAC structure and de-SPAC transactions raise heightened concerns about the use of projections in such transactions.  As noted above, a sponsor's compensation may depend to a large extent on the completion of the de-SPAC

---

[288]  The disclosure would be required in the forms or schedules filed for de-SPAC transactions.

transaction, and thus the SPAC and its sponsor may have an incentive to use a private operating company's financial projections in seeking support for the de-SPAC transaction.[289]  In particular, such projections could be used to value the private operating company and may influence how investors evaluate a proposed de-SPAC transaction.[290]  Similarly, as a consequence of the SPAC's expected valuation of the private operating company on the basis of this type of financial projections, controlling shareholders and management of the private operating company may have an incentive to be overly aggressive in their development of projections as a means of justifying a higher price for their company.[291]  Aggressive projections may also be used by the SPAC or the private operating company to justify the target's valuation in order to help meet any exchange listing requirement that the target has a fair market value equal to at least 80% of the balance of funds in the SPAC's trust account.[292]

For these reasons, we are proposing additional disclosures intended to assist investors in assessing the bases of projections used in de-SPAC transactions and determining to what extent they should rely on such projections.  Proposed Item 1609 would require a registrant to provide the following disclosures:

- With respect to any projections disclosed by the registrant, the purpose for which the projections were prepared and the party that prepared the projections;

---

[289]  There is evidence that, in a majority of de-SPAC transactions announced in the twelve months ending in the first quarter of 2021, the private operating companies were pre-revenue, thus making financial projections an important basis for SPACs and private operating companies to find additional investments and to receive support for de-SPAC transactions.  *See* "Why Have SPAC Valuations Skyrocketed?," Stuart Gleichenhaus and Bill Stotzer, FTI Consulting, Aug. 6, 2021.

[290]  In this regard, we note that there also is evidence of the different uses of, and greater reliance on, financial projections by retail investors than by institutional investors.  *See* Dambra, Even-Tov, and George, *supra* note 33.

[291]  *See* Kimball Chapman, Richard M. Frankel, and Xiumin Martin, *SPACs and Forward-Looking Disclosure: Hype or Information?* (SSRN Working Paper, 2021).

[292]  *See, e.g.*, NYSE Listed Company Manual Section 102.06 and Nasdaq Listing Rule IM-5101-2.

- All material bases of the disclosed projections and all material assumptions underlying the projections, and any factors that may materially impact such assumptions (including a discussion of any factors that may cause the assumptions to be no longer reasonable, material growth rates or discount multiples used in preparing the projections, and the reasons for selecting such growth rates or discount multiples); and

- Whether the disclosed projections still reflect view of the board or management of the SPAC or target company, as applicable, as of the date of the filing; if not, then discussion of the purpose of disclosing the projections and the reasons for any continued reliance by the management or board on the projections.

These proposed disclosures would inform investors about why the projections were prepared, and by whom, which could allow them to better understand the motivations underlying such projections.  In addition, the proposed disclosures could help investors assess the continued reliability of the projections both independently and through the views of the board or management.

**Request for Comment**

114.   Should we adopt Item 1609 as proposed?  Are there additional disclosures that we should require in de-SPAC transaction filings related to financial projections?

115.   As proposed, Item 1609 of Regulation S-K would apply only to de-SPAC transactions. Should we expand the scope of the item to apply to all companies that publicly disclose financial projections in Commission filings?

116.   Should we prohibit the disclosure of any specific financial measures or metrics? If so, which measures or metrics?

117.   Will proposed Item 1609 discourage the use of financial projections in de-SPAC

transactions?  What impact would this have on investors?  Would our proposal have any

impact on the ability to comply with state or foreign law obligations regarding

disclosures of projections used in business combination transactions?

118.   Both the proposed amendments relating to the PSLRA safe harbor and proposed Item

1609 may result in market participants using financial projections in de-SPAC

transactions in a different manner than they do currently.  Would adoption of only one of

the proposals strike a better balance in terms of the costs and benefits with respect to the

use of projections?  If so, which proposal?

## VI.   PROPOSED SAFE HARBOR UNDER THE INVESTMENT COMPANY ACT

### A.   Background

While the number of SPACs has grown dramatically in recent years,[293] some SPACs

have sought to operate in novel ways that suggest that SPACs and their sponsors should increase

their focus on evaluating when a SPAC could be an investment company.[294]  We are concerned

that SPACs may fail to recognize when their activities raise the investor protection concerns

addressed by the Investment Company Act.[295]  To assist SPACs in focusing on, and appreciating

---

[293]  *See supra* notes 7-8 and accompanying text.

[294]  The growth of the SPAC industry, among other things, has also sparked debate about the status of SPACs as investment companies.  *See, e.g.*, Kristi Marvin, *49 Law Firms Unite and Push Back on Recent SPAC Litigation*, SPAC Insider (Aug. 27, 2021), *available at* https://spacinsider.com/2021/08/27/49-law-firms-unite-push-back-on-spac-litigation/; Alison Frankel, *Law Profs Defend Theory that SPAC is Illegal under the Investment Company Act*, Reuters (Nov. 1, 2021).

[295]  The Investment Company Act regulates the organization of investment companies that engage primarily in investing, reinvesting, and trading in securities, and whose own securities are offered to the investing public.  The Act is designed to minimize conflicts of interest that arise in these complex operations protecting investors by preventing insiders from managing the companies to their benefit and to the detriment of public investors; preventing the issuance of securities having inequitable or discriminatory provisions; preventing the management of investment companies by irresponsible persons; preventing the use of unsound or misleading methods of computing earnings and asset value; preventing changes in the character of investment companies without the consent of investors; preventing investment companies from engaging in excessive leveraging; and ensuring the disclosure of

when, they may be subject to investment company regulation, we are proposing Rule 3a-10, which would provide a safe harbor from the definition of "investment company" under Section 3(a)(1)(A)[296] of the Investment Company Act for SPACs that meet the conditions discussed below.[297]  We believe that certain SPAC structures and practices may raise serious questions as to their status as investment companies.  While a SPAC would not be required to rely on the safe harbor, we have designed the proposed conditions of the safe harbor to align with the structures and practices that we preliminarily believe would distinguish a SPAC that is likely to raise these questions from one that would not.

### 1.     Potential Status as an Investment Company

Section 3(a)(1)(A) defines an "investment company" as any issuer that is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities.  Depending on the facts and circumstances, SPACs could meet the definition of "investment company" in Section 3(a)(1)(A).  To assess a SPAC's status as an investment company under that definition, we generally look to the SPAC's assets, the sources of its income, its historical development, its public representations of policy, and the activities of its officers and directors (known as the "Tonopah factors").[298]

---

full and accurate information about the companies and their sponsors.  *See* Section 1(b) of the Investment Company Act [15 U.S.C. 80a-1(b)].

[296]  15 U.S.C. 80a-3(a)(1)(A).

[297]  Proposed 17 CFR 270.3a-10.  SPACs that meet the proposed rule's conditions would not need to register under the Investment Company Act.

[298]  *See In the Matter of Tonopah Mining Co.*, 26 S.E.C. 426 (July 21, 1947).  *See generally SEC v. National Presto Industries, Inc.*, 486 F.3d 305 (7th Cir. May 15, 2007), rev'g. *SEC v. National Presto Industries Inc.*, Case No. 02 C 5057 (N.D. Ill, Oct. 31, 2005).  The Tonopah factors were first used by the Commission to determine an issuer's primary engagement under Section 3(b)(2), but have been applied in part or in totality to determine an issuer's primary engagement in other contexts under the Investment Company Act, including Section 3(a)(1)(A) of the Act. *Certain Prima Facie Investment Companies*, Release No. IC-10937 (Nov. 13, 1979) [44 FR 66608 (Nov. 20, 1979)] at n.24 ("Proposing Release to Rule 3a-1") ("Although [Tonopah] was decided under [S]ection 3(b)(2) of the Act, the "primary engagement" standard set forth in that case also appears to be applicable to the identical standard of Section 3(a)(1)[A] and [S]ection 3(b)(1).").  The Commission has also considered the activities of the company's

SPACs are generally formed to identify, acquire and operate a target company through a business combination and not with a stated purpose of being an investment company.[299]  We understand that SPACs typically view their public representations, historical development and efforts of officers and directors as consistent with those of issuers that are not investment companies.  At the same time, most SPACs ordinarily invest substantially all their assets in securities, often for a period of a year or more, meaning that investors hold interests for an extended period in a pool of securities.  Moreover, whatever income a SPAC generates during this period is generally attributable to its securities holdings.  The asset composition and sources of income for most SPACs may therefore raise questions about their status as investment companies under Section 3(a)(1)(A) of the Investment Company Act and, in assessing this status, these factors would need to be weighed together with the other Tonopah factors.

### 2. Rationale for the Safe Harbor

The safe harbor we are proposing focuses on conditions that limit a SPAC's duration, asset composition, business purpose and activities as a means of enhancing investor protection.[300]  The proposed rule is designed so that, if a SPAC satisfies the rule's conditions,

---

employees, in addition to company's officers and directors, in determining a company's primary business.  *See, e.g.*, 17 CFR 270.3a-8 (Rule 3a-8 under the Investment Company Act); *Snowflake Inc.*, Release No. IC-34049 (Oct. 9, 2020) [85 FR 65449 (Oct. 15, 2020)] (notice), Release No. IC-34085 (Nov. 4, 2020) (order); *Lyft Inc.*, Release No. IC-33399 (Mar. 14, 2019) [84 FR 10156 (Mar. 19, 2019)] (notice), Release No. IC-33442 (Apr. 8, 2019) (order).

[299] *See generally supra* Section I.

[300] We understand that SPACs typically place most of their assets in a trust or escrow accounts.  Although the Commission has never addressed the status of SPACs under the Investment Company Act, the Commission has addressed the status of escrow or trust accounts established by blank check companies that comply with Rule 419 under the Securities Act ("Rule 419 Accounts").  The Commission took the position that "although a Rule 419 Account may be an investment company under the Investment Company Act of 1940, in light of the purposes served by the regulatory requirement to establish such an account, the limited nature of the investments, and the limited duration of the account, such an account will neither be required to register as an investment company nor regulated as an investment company as long as it meets the requirements of Rule 419."  *Blank Check Offerings*, *supra* note 6 ("Rule 419 Adopting Release"), at text accompanying n.32.  SPACs have evolved since the Commission adopted Rule 419, and as noted above, SPACs are not subject to the requirements of Rule 419.  *See supra* notes 12 and 13 and accompanying text.

137

together with the disclosure requirements being proposed in this release, such SPAC's operations would be limited and differ sufficiently from those of investment companies so as to generally not raise the types of investor protection concerns that the Investment Company Act is intended to address.  In addition, the proposed rule may also promote investor protection by highlighting for SPACs and their sponsors the Investment Company Act concerns that certain SPAC activities may raise.

The proposed rule may also have the effect of providing more certainty to SPACs regarding their status under the Investment Company Act.  This in turn, could facilitate capital formation because SPACs that operate within the boundaries of the safe harbor would be assured that they would not qualify as investment companies.  The rule may also promote efficiency by providing a clear framework for SPACs to determine their status under the Investment Company Act.[301]

### 3. Boundaries of the Safe Harbor

While a SPAC would not be required to rely on the safe harbor, we have designed the proposed conditions of the safe harbor to align with the structures and practices that we preliminarily believe would distinguish a SPAC that is likely to raise serious questions as to its status as an investment company under the Investment Company Act from one that would not. Activities that would raise these concerns include, solely by way of example and without limitation, if a SPAC were to invest in securities not permitted by the proposed safe harbor, actively manage its portfolio, or hold itself out in a manner that suggests investors should invest to gain exposure to the portfolio it holds prior to the de-SPAC transaction.

---

[301] For these reasons, we believe the safe harbor, subject to the proposed conditions, would be necessary or appropriate in the public interest, and consistent with the protection of investors and the purposes fairly intended by the policy and provisions of the Act.  *See* Section 6(c) of the Investment Company Act [15 U.S.C.80a-6(c)].  *See also* Section 38(a) of the Investment Company Act [15 U.S.C.80a-37(a)].

A SPAC would raise similar concerns if it were to invest its assets in securities, including those permitted by the safe harbor, for a lengthier period of time without identifying a target company.  As discussed below, we are concerned that, the longer the SPAC operates with its assets invested in securities and its income derived from securities, the more likely investors will come to view the SPAC as a fund-like investment and the more likely the SPAC will appear to be deviating from its stated business purpose.[302]  Similarly, if a SPAC did not seek to engage in a business combination but instead sought to acquire a minority interest in a target company with the intention of being a passive investor, it is more likely that it will appear to be an investment company.  Investors in SPACs that engage in the activities discussed above may be at a significantly greater risk of acquiring SPAC shares expecting a fund-like investment.[303]

The safe harbor we are proposing only addresses investment company status under Section 3(a)(1)(A) of the Investment Company Act, commonly known as the "subjective test." Section 3(a)(1)(C) of the Investment Company Act provides an alternate "objective test" that defines an "investment company" as any issuer that is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and that owns or proposes to acquire investment securities,[304] having a value exceeding 40% of the value of the company's total assets (exclusive of Government securities and cash items) on an unconsolidated basis.  If a SPAC owns or proposes to acquire 40% or more of investment securities, it would

---

[302]  *See infra* Section VI.B.2.b.

[303]  In considering the investment company status of SPACs that do not comply with the safe harbor, we would use the traditional framework for evaluating the status of a potential investment company discussed above.

[304]  Section 3(a)(2) of the Investment Company Act generally defines "investment securities" to include all securities except Government securities, securities issued by employees' securities companies, and securities issued by majority-owned subsidiaries of the owner which are not investment companies or certain private investment companies. 15 U.S.C. 80a-3(a)(2).

likely need to register and be regulated as an investment company under the Investment

Company Act.

The safe harbor we are proposing is intended to address the status of a qualifying SPAC

from the time of the SPAC's initial public offering until it completes its de-SPAC transaction.[305]

For purposes of the proposed rule, the definitions of SPAC, de-SPAC transaction, and target

company would be the same as those set forth in proposed Item 1601 of Regulation S-K.[306]

**Request for Comment**

119.   Instead of a safe harbor, should we provide an interpretation concerning when SPACs

would meet the definition of "investment company"?  Alternatively, should we exempt

SPACs that meet the definition of "investment company" from any provisions of the

Investment Company Act, and if so, which provisions?  Are there any changes we should

make to the proposed approach that would better achieve the objectives of the proposed

rule?  Are there conditions we should include in addition to those set forth below?

120.   We request comment on whether the safe harbor should include an exemption from

Section 3(a)(1)(C), in addition to Section 3(a)(1)(A).  If such an expansion is needed,

please explain the circumstances in which a SPAC could meet the definition of

"investment company" in Section 3(a)(1)(C) while still complying with the conditions in

the proposed safe harbor.

121.   Should the proposed rule incorporate the definitions of de-SPAC transaction, special

purpose acquisition company and target company as proposed in Item 1601?  Should any

---

[305]  The remaining company (or companies) after the de-SPAC transaction may also raise separate questions of Investment Company Act status.  If a remaining company meets the definition of "investment company" following the de-SPAC transaction, that company would need to register as an investment company or rely on an appropriate exclusion or exemption under the Investment Company Act.

[306]  *See supra* Section II.A.

of these definitions be different under proposed Rule 3a-10?  If so, please identify the definition, how the definition should be changed, and why.

122.    We understand that SPACs typically place most of their assets in a trust or escrow account as required by the listing standards.  In the event that these accounts may also be "issuers" under the Investment Company Act,[307] does the safe harbor need to address these accounts under that Act?  Alternatively, should the rule text specify that assets and activities of the SPAC (as discussed below) include those of the trust?

123.    As proposed, an existing SPAC that has not completed a de-SPAC transaction prior to the effective date of the rule would not be prohibited from relying on the safe harbor if it satisfies the conditions.  Should we permit an existing SPAC to rely on the safe harbor if it does not have a board resolution but has other contemporary evidence of its intent and otherwise meets the conditions of the safe harbor?  Alternatively, should we limit reliance on the safe harbor to SPACs formed after the effective date of the rule?  If proposed Rule 3a-10 is adopted, should the rule's effective date reflect the possibility that some SPAC's may need to alter their operations or more quickly complete a de-SPAC transaction in order to meet the conditions of the rule?  If so, should we provide an extended or delayed effective date? Should we provide a compliance or transition period, and if so, why?

    **B.    Conditions**

    The conditions to the safe harbor focus on certain defining characteristics of SPACs[308] and are designed to ensure that SPACs wishing to rely on the safe harbor do not operate, or hold themselves out, as investment companies.

---

[307] *See supra* note 300.

[308] The conditions are also consistent with our approach with respect to Rule 419 Accounts.  *Id.*

The conditions are discussed in more detail below.

1.    *Nature and Management of SPAC Assets*

In order to rely on the proposed safe harbor, a SPAC's assets[309] must consist solely of Government securities,[310] Government money market funds[311] and cash items[312] prior to the completion of the de-SPAC transaction.[313] Thus, all proceeds obtained by the SPAC, including those from any SPAC offering, cash infusion from the sponsor, or any interest, dividend, distribution or other such return derived from the SPAC's underlying assets would need to be held in these assets.  We understand that SPACs typically acquire these assets in part because they may be easily liquidated to fund any acquisition or other expenses related to the de-SPAC transaction and investor redemptions and, unlike the investments of registered investment companies, are not primarily made to achieve an investment purpose.[314]  This condition reflects the SPAC's intended business purpose to acquire assets to fund a de-SPAC transaction and also generally limits the SPAC's assets to those that may be consistent with cash management practices rather than primarily investment purposes.[315]

---

[309]  For purposes of the rule, any references to the SPAC's assets refer to both the assets held in the trust or escrow account and any assets held by the SPAC directly.

[310]  The term "Government security" has the same meaning as defined in Section 2(a)(16) of the Investment Company Act.  15 U.S.C. 80a-2(a)(16).

[311]  The term "Government money market fund" has the same meaning as defined in paragraph (a)(14) of Rule 2a-7 under the Investment Company Act.  17 CFR 270.2a-7.

[312]  The Commission has previously included the following as cash items for purposes of Rule 3a-1: cash, coins, paper currency, demand deposits with banks, timely checks of others, cashier checks, certified checks, bank drafts, money orders, travelers' checks, and letters of credit.  *See* Proposing Release to Rule 3a-1, *supra* note 298, at text accompanying n.11.  We take the same view here with respect to the proposed rule.

[313]  Proposed Rule 3a-10(a)(1).

[314]  If a SPAC were to significantly change its asset composition contrary to its original representations, it would raise questions whether the initial representations were false and misleading.

[315]  This limited asset composition would not, on its own, distinguish a SPAC from an investment company.  This provision is designed to operate together with the other conditions to the safe harbor, and nothing in this provision is meant to address the status under Section 3(a)(1)(A) of a company that is not relying on this safe harbor, including those primarily engaged in the business of investing in government securities and/or government money market

142

Under the proposed rule, a SPAC seeking to rely on the safe harbor may not acquire any other type of asset, including interests in an operating company, prior to the completion of a de-SPAC transaction.  Acquiring other types of assets and then transferring such assets to another entity or to SPAC shareholders would suggest that the SPAC's primary business is that of investing in securities.  Nothing in this provision, however, is intended to preclude the SPAC from using SPAC assets to pay expenses related to the operation of the SPAC.

Under the proposed rule, the assets set forth in paragraph (a)(1) may not at any time be acquired or disposed of for the primary purpose of recognizing gains or decreasing losses resulting from market value changes.[316]  Unlike management investment companies, SPACs typically do not actively manage their portfolios, often holding their Government securities to maturity.  The proposed provision is therefore intended to allow SPACs the flexibility to hold their assets consistent with cash management practices yet ensure that SPACs relying on the safe harbor do not engage in activities that would necessitate the investor protections of the Investment Company Act, like portfolio management practices resembling those that management investment companies employ.

**Request for Comment**

124.    Should we allow SPACs seeking to rely on the safe harbor to invest in Government securities?  Alternatively, should we limit these SPACs to only certain types of Government securities, such as U.S. Treasury securities?

---

funds.  For example, an issuer that holds these types of assets, but whose primary business is to achieve investment returns on such assets would still be an investment company under Section 3(a)(1)(A).

[316]  Proposed Rule 3a-10(a)(2).  This provision is similar to that found in paragraph (a)(3)(iii) in 17 CFR 270.3a-7 (Rule 3a-7), and we propose to apply this provision in the same manner in the proposed rule.

125.   Should we allow SPACs to invest in government money market funds, as defined in Rule 2a-7?  Should we instead limit the type of money market funds that a SPAC may invest in to money market funds that only hold U.S. Treasury securities?  Conversely, should the provision be expanded to permit SPACs to invest in all types of money market funds provided that they rely on Rule 2a-7?[317]

126.   In addition to the questions raised above, as a general matter, is paragraph (a)(1) too narrow?  For example, should the safe harbor be expanded to include SPACs that acquire investment securities or other assets (*e.g.*, assets that are not for investment purposes relevant to the operation of the SPAC)?  If yes, please explain which investment securities and/or assets and why such an expansion of the safe harbor would be appropriate.

127.   Does paragraph (a)(2) provide enough flexibility with respect to a SPAC's holdings but yet prevent SPACs from engaging in activities similar to management investment companies?

128.   As noted, we understand that SPACs typically place most of their assets in trust or escrow accounts.  Should the rule text address the manner in which a SPAC holds its assets?  For example, should the rule require SPAC assets to be held in trust or escrow accounts?  If yes, should the safe harbor be conditioned on complying with the terms of the custody rules under the Investment Company Act as if they applied to these accounts?

   *2.   SPAC Activities*

      a.   <u>De-SPAC Transactions</u>

---

[317]  The Commission has taken the position that money market funds relying on Rule 2a-7 may be treated as cash equivalents for purposes of Rule 2a-7 for GAAP purposes.  *See Money Market Fund Reform; Amendments to Form PF*, Release No. IC-31166 (July 23, 2014) [79 FR 47736 (Aug. 14, 2014)].

The proposed rule would provide a safe harbor only to those SPACs that seek to complete a single de-SPAC transaction as a result of which the surviving public entity (the "surviving company"),[318] either directly or through a primarily controlled company,[319] will be primarily engaged in the business of the target company or companies, which is not that of an investment company.  Thus, to rely on the rule, the SPAC must have a business purpose aimed at providing its shareholders with the opportunity to own interests in a public entity that, in contrast to an investment company, will either be an operating company, or will, through a primarily controlled company, operate such operating company.[320]  In addition, the SPAC would need to seek to complete a de-SPAC transaction as a result of which the surviving company would have at least one class of securities listed for trading on a national securities exchange.[321]

A SPAC would be able to engage in only one de-SPAC transaction while relying on the safe harbor, but such transaction may involve the combination of multiple target companies,[322] provided that the SPAC treats them for all purposes as part of a single de-SPAC transaction.

---

[318]  The proposed rule defines the term "surviving company" to mean the public company issuer that survives a de-SPAC transaction and in which the shareholders of the SPAC immediately prior to the de-SPAC transaction will own equity interests immediately following the de-SPAC transaction.  Proposed Rule 3a-10(b)(3).

[319]  The proposed rule defines the term "primarily controlled company" to mean an issuer that (i) is controlled within the meaning of Section 2(a)(9) of the Investment Company Act by the surviving company following a de-SPAC transaction with a degree of control that is greater than that of any other person and (ii) is not an investment company.  Proposed Rule 3a-10(b)(2).

[320]  As drafted, the proposed rule would permit a SPAC relying on the safe harbor to seek to engage in a de-SPAC transaction with any company other than an investment company.  Thus a SPAC may seek to engage in a de-SPAC transaction with a target company that is not considered an investment company just as any company seeking an exchange listing would have to do.  If the surviving company did not qualify for listing, it could not be listed for trading on a national securities exchange and delisting procedures would commence.

[321]  Proposed Rule 3a-10(a)(3)(i).  The post-business combination surviving company would have to qualify for listing on a national securities exchange by meeting initial listing standards just as any company seeking an exchange listing would have to do.  If the surviving company did not qualify for listing, it could not be listed for trading on a national securities exchange and delisting procedures would commence.

[322]  The proposed definitions of "special purpose acquisition company" and "de-SPAC transaction" anticipate that a SPAC may engage in a de-SPAC transaction with more than one target company contemporaneously.  *See supra* Section II.A.

Such intentions would be evidenced by the description in any disclosure or reporting documents, and that the closing with respect to all target companies occurs contemporaneously and within the required time frames.[323]  We are imposing this limitation because we are concerned that a SPAC that makes multiple acquisitions could be engaging in the types of activities that raise the investor protection concerns addressed by the Investment Company Act.  A SPAC that purchases multiple companies as part of a single transaction (and complies with the other conditions of the safe harbor) would not raise these concerns as it would still appear to be seeking to be primarily engaged in the business of an operating company or companies after the de-SPAC transaction, and not to be engaged in investment management activities.

While recognizing that de-SPAC transactions may have various structures and may involve intermediary entities, the proposed safe harbor is intended to ensure that the SPAC must be seeking a business combination in which the surviving entity, directly or through a primarily controlled company,[324] is primarily engaged in the business of the target company or companies and not merely seeking an investment opportunity.  "Primary control" within the definition of "primarily controlled company" means that the surviving company must have "control"[325] of such company and the degree of that control must be greater than that of any other person.[326] The "primarily control" standard, which is similar to that found in other status rules under the Investment Company Act,[327] is designed to distinguish a holding company structure for an

---

[323]  *See infra* Section VI.B.3.

[324]  *See supra* note 319.

[325]  *See* Section 2(a)(9) of the Investment Company Act for the definition of "control"[15 U.S.C. 80a-2(9)].

[326]  *See, e.g.*, paragraph (b)(2) of 17 CFR 270.3a-8 (Rule 3a-8 under the Investment Company Act.

[327]  *See, e.g.*, Rule 3a-8 under the Investment Company Act; 17 CFR 270.3a-1 (Rule 3a-1 under the Investment Company Act).

operating company from an investment in securities of an operating company.[328]  As we previously expressed in a similar context, this level of control is more consistent with an active role in managing the affairs of a company than if the issuer owns a lesser controlling interest in such company.[329]  We believe that a lesser degree of control, or lack of control, would in these circumstances more closely resemble the activities of an investment company[330]

In order to rely on the safe harbor, the surviving company must also have at least one class of securities listed for trading on a national securities exchange.[331]  This condition recognizes that a SPAC's business plan is to engage in a de-SPAC transaction, the result of which is that SPAC shareholders receive the publicly traded shares of the surviving company.[332] Similar to the other parts of this condition, this provision helps to ensure that the SPAC has a business purpose that is different from engaging primarily in the business of investing, reinvesting or trading in securities.

b.    Evidence of Primary Engagement

The proposed rule would require a SPAC wishing to rely on the safe harbor to be primarily engaged in the business of seeking to complete a de-SPAC transaction in the manner and within the time frame set forth in the rule.  Such engagement must be evidenced by the

---

[328]  *See, e.g.*, *Certain Research and Development Companies*, Release No. IC-25835 (Nov. 26, 2002) [67 FR 71915 (Dec. 3, 2002)] ("Proposing Release to Rule 3a-8") at nn.57-58 and accompanying text.

[329]  *See* Proposing Release to Rule 3a-1, *supra* note 287, at n.32.  *See also* Proposing Release to Rule 3a-8, *supra* note 328, at text before n.58 ("The Commission traditionally has viewed the fact that an issuer's degree of control over a company is greater than that of any other person as strong evidence that the issuer is engaged in a business through the other company.").

[330]  *Id.*

[331]  Proposed Rule 3a-10(a)(3)(i)(B).  As noted in *supra* note 321, the surviving company would have to apply for and be approved for listing by meeting the initial listing standards of a national securities exchange.  Otherwise, it could not be listed and traded on an exchange.

[332]  *See supra* Section I.

activities of its officers, directors and employees, its public representations of policies, and its historical development.[333]  For example, the officers, directors and employees of a SPAC wishing to rely on this safe harbor would need to be primarily focused on activities related to seeking a target company to operate and not on activities related to the management of its securities portfolio.  These conditions incorporate three of the Tonopah factors and are intended, together with the other conditions to the safe harbor, to ensure that a SPAC may only rely on the safe harbor if it is primarily engaged in a business other than that of investing, reinvesting or trading in securities.  These factors are also similar to those used to determine the primary engagement of a business in different contexts under the Investment Company Act.[334]

To rely on the safe harbor, the SPAC's board of directors would also need to adopt an appropriate resolution evidencing that the company is primarily engaged in the business of seeking to complete a single de-SPAC transaction as described by the rule, and which is recorded contemporaneously in its minute books or comparable documents.[335]  This condition is similar to other exclusionary rules under the Investment Company Act in which the issuer may only rely on the safe harbor provided by the rule if the issuer's board of directors adopts an appropriate resolution evidencing that the company is primarily engaged in a non-investment business.[336]

---

[333]  Proposed Rule 3a-10(a)(5)(i) through (iii).  Such evidence may also include its articles of incorporation or other formation documents.

[334]  *See, e.g.*, Rule 3a-8 under the Investment Company Act.  As discussed previously, in addition to these factors, the Tonopah factors also focus on the company's assets and sources of income.  *See supra* Section VI.A.1.  While proposed paragraph (a)(1) addresses the asset composition of SPACs wishing to rely on the safe harbor, the proposed safe harbor does not include a separate condition specifically addressing a SPAC's source of income because the sources of income are addressed in the proposed rule's limitations regarding the SPACs' activities and the types of assets it may acquire.

[335]  Proposed Rule 3a-10(a)(5)(iv).

[336]  *See* 17 CFR 270.3a-2 (Rule 3a-2 under the Investment Company Act); Rule 3a-8 under the Investment Company Act.

Such action serves to publicly document the intent of management and helps to establish a shared understanding of shareholders concerning the business purpose of this issuer.

A SPAC relying on the proposed rule also may not hold itself out as being primarily engaged in the business of investing, reinvesting or trading in securities.  Given that SPACs invest in the same types of securities as certain investment companies, such as money market funds, a SPAC relying on the rule may not hold itself out, or otherwise suggest, that the SPAC operates in a manner similar to these types of investment companies.  For example, a SPAC could not market itself as a means for gaining exposure to U.S. Treasury securities.

**Request for Comment**

129.    Do SPACs engage in other activities that should be expressly permitted or prohibited by the safe harbor?  If yes, please explain these business activities and why they should be permitted or prohibited.

130.    As proposed, should the SPAC be required to seek a de-SPAC transaction in which the surviving company is required either to directly or through a primarily controlled company be primarily engaged in the business of the target company?  Are the proposed definitions of "surviving company" and "primarily controlled company" appropriate?  Should the proposed definitions be revised, and if so, how?

131.    Should the safe harbor be limited to SPACs that seek de-SPAC transactions that result in the surviving company having at least a majority interest in the target company?  Conversely, should the safe harbor permit the SPAC to seek a de-SPAC transaction in which the surviving company is only required to control the target company?  Are there other approaches, such as requiring the de-SPAC transaction to result in a consolidation of the SPAC and the target company?

132.   As proposed, should we require that the surviving company be primarily engaged in the business of operating the target company or companies?  Is the use of the term "primarily engaged" consistent with current business practices in this context?  Should we instead require that the surviving company be "solely" in the business of the target company or companies?  If so, how should "solely" be defined?  Alternatively, should we require that the surviving company be engaged in the business of the target company (and in activities related or incidental thereto)?[337]

133.   As proposed, should the SPAC be limited to only one de-SPAC transaction while relying on the safe harbor?  Why or why not?  Similarly, should a SPAC, as proposed, be limited to engaging in a combination with multiple target companies only if the combination occurs as part of a single de-SPAC transaction with a single closing?  Why or why not?  Should there be a limit on how many target companies may be part of a single de-SPAC transaction?  If so, what should that limit be and why?  For example, would limiting the safe harbor to two target companies strike an appropriate balance of the relevant regulatory considerations?

134.   As proposed, should we require a SPAC to be "primarily engaged" in the business of seeking to complete a single de-SPAC transaction?  Should we instead require that the SPAC should be "solely" in the business of seeking to complete a single de-SPAC transaction?  Why or why not?  Alternatively, should we require that the SPAC be engaged in the business of seeking to complete a single de-SPAC transaction (and in activities related or incidental thereto)?[338]

---

[337] *See generally* Rule 3a-7 under the Investment Company Act.

[338] *Id.*

135.   As drafted, the proposed rule would permit a SPAC relying on the safe harbor to seek to engage in a de-SPAC transaction with any company other than an investment company. Should the safe harbor further limit the types of companies in which a SPAC may seek a de-SPAC transaction?  For example, should a SPAC be precluded from seeking to engage in a de-SPAC transaction with issuers relying on Section 3(c)(1) or Section 3(c)(7)? Should a SPAC be precluded from seeking to engage in a de-SPAC transaction with issuers relying on other exclusions under Section 3(c)?  Should a SPAC be precluded from seeking to engage in a de-SPAC transaction with issuers otherwise relying on an exclusion or exemption by order from the definition of "investment company" by Section 3(b) or the rules or regulations under Section 3(a)?  If so please identify which issuers and why?

136.   Should the rule include as evidence of the SPAC's business purpose the SPAC's historical development given the SPAC's short duration?  Should the rule include, as evidence of the SPAC's business purpose, the SPAC's public representation of policies and the activities of its officers, directors and employees?  Similarly, is it appropriate to require the board of directors to adopt a resolution stating that the SPAC is primarily engaged in the business of seeking to complete a de-SPAC transaction as described by the rule?  Should we require that the SPAC's activities also, or instead, be evidenced by its articles of incorporation, other formation documents or by-laws?  If so, which documents should be required?  If a SPAC's business purpose is evidenced in its formation documents or by-laws, should we condition the proposed rule on those provisions being subject to change only with the approval of shareholders?  Should the rule include a separate condition that addresses the SPAC's sources of income?  For

example, should a SPAC's income be limited to that derived from assets in proposed Rule 3a-10(a)(1)?  Are any other conditions necessary to ensure that SPACs do not convey to investors that they have attributes similar to investment companies?  Given the nature of a SPAC's activities and the proposed conditions of the safe harbor, should the proposed rule also include a condition providing that a SPAC must not be a special situation investment company?[339]

137.   Should we include a condition to the safe harbor that SPACs must disclose their intention to rely on the safe harbor?  Would such a condition be redundant to the disclosure requirements under the Securities Act or under the Exchange Act?  Should the safe harbor include a condition that the SPAC's board of directors must adopt a resolution indicating that the SPAC intends to rely on the safe harbor?

   *3.   Duration Limitations*

   To rely on the safe harbor, a SPAC would have a limited time period to announce and complete a de-SPAC transaction.  Specifically, the proposed rule would require a SPAC to file a report on Form 8-K with the Commission announcing that it has entered into an agreement with the target company (or companies) to engage in a de-SPAC transaction no later than 18 months after the effective date of the SPAC's registration statement for its initial public offering.  The SPAC must then complete the de-SPAC transaction no later than 24 months after the effective date of its registration statement for its initial public offering.[340]  Following the completion of the

---

[339]   *See* Proposing Release to Rule 3a-1, *supra* note 298, at n.19 and accompanying text.  *See also In the Matter of United Stores Corp.*, 10 S.E.C. 1145 (Feb. 12, 1942).

[340]   Proposed Rule 3a-10(a)(3)(ii) and (iii).  As we discuss below, the average time between the announcement by a SPAC of its intended de-SPAC transaction and the completion of that transaction is approximately 5 months.  *See infra* Section IX.B.6.

de-SPAC transaction, any assets that are not used in connection with the de-SPAC transaction would need to be distributed in cash to investors as soon as reasonably practicable thereafter.

The SPAC would also be required to distribute its assets in cash to investors as soon as reasonably practicable if it does not meet either the 18-month deadline or the 24-month deadline.[341]  Given that the time needed for such distribution in either case may be dependent on facts and circumstances, we are not defining the term "reasonably practicable."  What is reasonably practicable generally would depend on, among other things, any logistical or legal limitations on an orderly, immediate return of funds to investors.

We are proposing these duration conditions mindful of the framework of the Investment Company Act, the rules thereunder, and past Commission positions.  The Investment Company Act provides that any issuer that meets the definition of "investment company" must register and be regulated under that Act unless the issuer can rely on an exclusion or exemption.  The Investment Company Act requires that an issuer will register and be subject to the Act's regulatory requirements once the issuer meets the definition.[342]  The Commission, however, has in the past provided conditional, temporary relief to certain issuers that meet the definition of "investment company" for only a short period of time.  For example, Rule 3a-2 provides a one-year safe harbor to so-called "transient investment companies," which are issuers that, as a result of an unusual business occurrence, may be considered an investment company under the statutory definitions but intend to be engaged in a non-investment company business.[343]  In

---

[341]  Proposed Rule 3a-10(a)(4).

[342]  *See generally* Sections 7(a) and 8(a) of the Investment Company Act [15 U.S.C. 80a-7(a); 15 U.S.C. 80a-8(a)]

[343]  *See Transient Investment Companies*, Release No. IC-11552 (Jan. 14, 1981) [46 FR 6882 (Jan. 22, 1981)] ("Adopting Release to Rule 3a-2").  *See Transient Investment Companies*, Release No. IC-10943 (Nov. 16, 1979) [44 FR 67152 (Nov. 23, 1979)], at text accompany nn 5-6 ("Proposing Release to Rule 3a-2") ("Examples of unusual business occurrences include: (1) a 'start-up' company's investing its offering proceeds in securities while arranging to purchase operating assets; (2) a company's selling a large operating division and investing the proceeds

addition, as discussed previously, the Commission took the position that Rule 419 Accounts need

not be required to register as an investment company nor regulated as an investment company

under the Investment Company Act in part because the rule limits the duration of such accounts

to 18 months.[344] The Commission has also at times granted short-term, conditional exemptive

relief under Section 6(c) of the Investment Company Act[345] to certain issuers that needed

additional time to restructure their businesses beyond that afforded by Rule 3a-2.[346]

Accordingly, the proposed rule would require a SPAC wishing to rely on the safe harbor

to enter into an agreement with a target company no later than 18 months after its initial public

offering, as evidenced by its filing a report on Form 8-K.[347]  A SPAC may enter into agreements

with additional target companies[348] after the 18-month period provided that the business

combination contemplated by such later agreements are part of the de-SPAC transaction and all

of the transactions close contemporaneously within the 24 month period.  The condition that the

---

in securities pending acquisition of additional operating assets; and (3) a company making a tender offer to stockholders of a non-investment company and failing to obtain a majority of the target company's stock.").

[344]  *See* 17 CFR 230.419(e)(2)(iv) ("If a consummated acquisition(s) meeting the requirements [of Rule 419] has not occurred by a date 18 months after the effective date of the initial registration statement, funds held in the escrow or trust account shall be returned [to investors.]").  .

[345]  Section 6(c) gives the Commission the broad power to exempt conditionally or unconditionally any person, security, or transaction from any provisions of the Act or any rule thereunder, provided that the exemption is "necessary or appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by the policy and provisions of [the Act]."  An applicant requesting such relief must explain in its application that, given its particular facts and circumstances, the requested relief would meet the section's standards. *See generally Amendments to Procedures With Respect to Applications Under the Investment Company Act of 1940*, Release No. IC-33921 (July 6, 2020) [85 FR 57089 (Sept. 15, 2020)].

[346]  *See, e.g.*, *General Electric Company and GE Capital International Holdings Ltd.*, Release No. IC-32477 (Feb. 13, 2017) [82 FR 11079 (Feb. 17, 2017)] (notice), Release No. IC-32532 (Mar. 13, 2017) (order).

[347]  *See infra* Section IX.B.6. (discussing baseline data regarding average duration).  One press report suggests that the average period of time between a SPAC's initial public offering and the signing of its business combination agreement may be decreasing, with the average such period of time being approximately 7.5 months for de-SPAC transactions that closed in 2021.  *See* "De-SPACs Still Popular But Becoming Harder To Close," available at: https://www.law360.com/mergersacquisitions/articles/1464716/de-spacs-still-popular-and-harder-to-close.

[348]  These additional agreements would need to be evidenced by the filing of a Form 8-K.

de-SPAC transaction close within 24 months is designed to allow SPACs to complete their stated business purpose while balancing the risk that investors may come to view a SPAC holding securities for a prolonged period as a fund-like investment, thereby necessitating the regulatory protections of the Investment Company Act.

This timeframe is longer than the one-year timeframe of Rule 3a-2.  We are proposing a longer time frame under Rule 3a-10 because we understand that the search for a de-SPAC target frequently takes more than one year and an issuer relying on Rule 3a-10 would be more restricted in its business purpose and activities throughout the period of reliance than an issuer relying on Rule 3a-2.[349]  This proposed timeframe reflects a consideration of the Tonopah factors, including the factor that focuses on an issuer's historical development as well as our position with respect to Rule 419.  While an issuer relying on Rule 3a-10 may have certain characteristics resembling those of an investment company for a longer period than an issuer relying on Rule 3a-2, its assets, income and purpose, and the activities of its officers and directors, would be further restricted under the other conditions of Rule 3a-10.  Accordingly, the conditions are designed to work together to reduce the likelihood that investors will come to view the SPAC as a fund-like investment.  Nevertheless, we stress that the inability of a SPAC to identify a target and complete a de-SPAC transaction within the proposed timeframe would raise serious questions concerning the applicability of the Investment Company Act to that SPAC.

While we understand most SPACs commit to closing a de-SPAC transaction within 24 months, we also acknowledge that the duration limits we are proposing are shorter than the

---

[349]  We stress that, for an issuer satisfying the safeguards tailored for transient investment companies under Rule 3a-2, a company's inability to become engaged primarily in a noninvestment company business within that rule's one year period would continue to raise serious questions concerning the applicability of the Investment Company Act to that company.  *See* Adopting Release to Rule 3a-2, *supra* note 343, at text following n.5.  *See also infra* note 358 and accompanying text (quoting from Proposing Release to Rule 3a-2, *supra* note 343).

actual timeline of some SPACs that recently completed their de-SPAC transactions.[350]  We

understand that SPACs that choose to rely on the proposed safe harbor may need to seek to

identify and complete de-SPAC transactions on an accelerated timeline.  Nonetheless, we are

concerned that, the longer the SPAC operates with its assets invested in securities and its income

derived from securities, the more likely investors will come to view the SPAC as a fund-like

investment and the more likely the SPAC appears to be deviating from its stated business

purpose.[351]  We have sought to strike a balance between providing flexibility for the SPAC to

pursue its stated purpose and recognizing that, beyond some horizon, the SPAC's historical

development would become difficult to distinguish from that of an investment company.  While

exchange listing rules contemplate potentially longer SPAC lifespans, those rules were adopted

for a different regulatory purpose.

   The proposed rule would also require that any assets that are not used in connection with

the de-SPAC transaction be distributed in cash to SPAC shareholders as soon as reasonably

practicable after the completion of the de-SPAC transaction.[352]  Thus, in the event that the de-

SPAC transaction requires fewer assets than are owned by the SPAC, the SPAC would be unable

to seek another de-SPAC transaction with its remaining assets, or otherwise continue to operate

as a SPAC, even if the de-SPAC transaction met the duration conditions.  As discussed

previously, a SPAC that is relying on the safe harbor would already be precluded from engaging

in more than one de-SPAC transaction pursuant to proposed Rule 3a-10(a)(3)(i).  This separate

---

[350]  *See infra* Section IX.B.6.

[351]  We also note that some SPACs in the past have sought an extension to their lifespan by obtaining approval of their shareholders.  The proposed rule does not provide for any extensions.

[352]  Proposed Rule 3a-10(a)(4)(i).

condition supplements that provision and is designed to ensure that a SPAC may not continue to operate after its single de-SPAC transaction and still qualify for the safe harbor.

A SPAC seeking to rely on the safe harbor would also be required to distribute the SPAC's assets in cash to investors in the event that the SPAC fails to meet either the 18-month or the 24-month deadline.[353]  As proposed, a SPAC would be required to distribute its assets in cash to investors if the SPAC fails to enter into an agreement with a target company within 18 months even if it believes that it would complete a transaction within 24 months.  This condition would result in a SPAC that fails to meet these timing requirements either distributing its assets as soon as reasonably practicable or registering as an investment company.  In any event, such a SPAC would not be permitted to continue to rely on the safe harbor.[354]

A SPAC would not be able to rely on Rule 3a-2 subsequent to its reliance on proposed Rule 3a-10 in the event that it fails to meet either proposed Rule 3a-10's 18-month or 24-month time frame.[355]  A failure to meet either timeframe would not constitute an unusual business occurrence under that rule.[356]  In addition, Rule 3a-2 specifically states that the 12-month safe harbor provided under that rule begins once the issuer acquires specified amounts of securities.[357]  Generally, the commencement date for reliance on Rule 3a-2 (and the 12 month safe harbor provided under that rule) would have passed in the event a SPAC wished later to rely on that rule subsequent to its reliance on proposed Rule 3a-10.  Finally, both Rule 3a-2 and proposed Rule 3a-10 are safe harbors that provide or would provide temporary relief to certain

---

[353]  Proposed Rule 3a-10(a)(4)(ii).

[354]  Once a SPAC has distributed its assets, the SPAC must cease to operate as a SPAC, and it may not rely on the safe harbor again.

[355]  The proposed rule would also preclude a SPAC from relying on proposed Rule 3a-10 after Rule 3a-2, because the time period in the proposed rule begins on the effective date of its initial registration statement.

[356]  *See supra* note 343 and accompanying text.

[357]  Rule 3a-2(b).

issuers that may be investment companies, provided that, among other conditions, they transition to a non-investment company business in a short period of time.  When it was considering Rule 3a-2, the Commission was concerned that issuers could circumvent the Investment Company Act by repeatedly relying on the Rule 3a-2 safe harbor, explaining that  "where an issuer's activities would bring it within the definition of investment company more frequently than would be permitted by the rule, the investor protection concerns of the Act would be relevant, the need for shareholder protections would not be met, and there would be no persuasive public interest from the standpoint of investors in permitting a non-transient investment company to avoid complying with the prohibitions and regulatory provisions of the Act."[358]  This concern would also arise if SPACs were to rely on the Rule 3a-2 safe harbor following reliance on proposed Rule 3a-10.

**Request for Comment**

138.    Should we require, as proposed, that the SPAC reach an agreement with at least one target company within 18 months?  Should we require that the SPAC reach an agreement with at least one target company within 12 months, which would be more consistent with the time period in Rule 3a-2?  Should the time period be even shorter than 12 months (*e.g.*, 6 months)?  Should the time period be longer *(e.g.,* 20 months, 24 months, 36 months)?  If  the time period should be longer, please explain why such a longer period is necessary and how any such longer period would be consistent with the framework of the Investment Company Act, the rules thereunder, and prior Commission positions.

139.    Is there an alternative way to limit the duration of the SPAC?  Should we require that such an agreement be evidenced by the filing of the Form 8-K?  Should a SPAC be

---

[358]  *See* Proposing Release to Rule 3a-2, *supra* note 343.

permitted, as proposed, to enter into agreements with other target companies after the 18 month period provided that all transactions close within 24 months?

140.   Should we include an option for SPACs that have not identified a target within 18 months, or completed the de-SPAC transaction within 24 months to extend these deadlines?  If so, what would that be and what conditions should be included?  For example, should we provide that a SPAC can obtain an extra 2, 4 or 6 months and stay within the safe harbor if it obtains approval from its shareholders?  Please explain how any extensions of these deadlines would be consistent with the framework of the Investment Company Act, the rules thereunder, and prior Commission positions.

141.   Should we require, as proposed, that the SPAC complete the de-SPAC transaction within a 24-month period?  Should the time period be 18 months, as in Rule 419 or 12 months, as in Rule 3a-2?  Should the period be longer (*e.g.*, 30 months)?  If so, how would that longer period be consistent with the framework of the Investment Company Act, the rules thereunder, and past Commission positions?

142.   The rule proposal requires that any assets of the SPAC that are not used in connection with the de-SPAC transaction, or in the event of the SPAC's failure to  meet the timelines required for identification or completion of a de-SPAC transaction, be distributed in cash to investors as soon as reasonably practicable.  Should we allow distributions "in-kind"?  Are there any other distributions made by the SPAC that should be covered by the rule?  Should the rule text define the term "reasonably practicable"?  If yes, how should the term be defined?  If the term "reasonably practicable" is not defined, could that potentially result in unnecessarily extended periods of time before investor assets are returned?  Instead of defining the term "reasonably practicable," should we specifically

require that such assets be distributed within a defined time period such as 30 days?  15 days?  7 days?  Should we require the SPAC to provide notification to the Commission, its investors and/or the SPAC's board of directors if the distribution of cash takes longer than a certain period of time, *e.g.*, 30 days?

143.   The proposed rule would require, following completion of a de-SPAC transaction, or in the event that the SPAC failed to identify or complete a de-SPAC transaction, the SPAC to distribute all remaining assets and cease operating as a SPAC.  The proposed rule, however, does not specifically mandate that the SPAC dissolve.  Should we include this requirement as a condition to the safe harbor?  Why or why not?

144.   In adopting Rule 3a-2, the Commission identified examples of companies that may be able to rely on that safe harbor.  These examples did not specifically include SPACs or blank check companies.  Are SPACs currently relying on Rule 3a-2 and, if so, what is the basis for their reliance?  Should the Commission provide guidance concerning, or amend Rule 3a-2 to address, the ability of SPACs to rely on that safe harbor?

## VII.   ADDITIONAL REQUESTS FOR COMMENT

As discussed above, we believe that the proposed new rules and amendments would enhance the disclosure requirements applicable to SPACs in initial public offerings and in de-SPAC transactions and provide important investor protections in connection with de-SPAC transactions.  In considering the SPAC market as a whole, we are requesting comment on a number of additional matters relating to the disclosures provided by SPACs, investor protection measures, and the treatment of companies following a de-SPAC transaction.

145.   Are there disclosure requirements that we have not proposed that would be helpful for investors in SPACs at the initial public offering stage or at the de-SPAC transaction stage?

146.   Should the disclosure requirements and filer status determinations in a de-SPAC transaction be the same no matter the de-SPAC structure?  Do our proposals accomplish this, or are there other disclosure requirements and filer status determinations impacted by transaction structure that we should address?

147.   What are the reasons, other than possible reporting outcomes, why a de-SPAC transaction is structured so that an entity other than the SPAC is the acquirer and filing the registration statement or proxy or information statement for the de-SPAC transaction? Are there tax or other reasons that we should consider in relation to the proposed amendments in this release and whether the disclosure requirements should be further aligned across all de-SPAC transaction structures?

148.   Should we consider amendments to other registration statement forms under the Securities Act to require enhanced disclosures for offerings by SPACs that are similar to those proposed above with respect to Form S-1 and F-1?  Should we consider similar amendments to Regulation A and Form 1-A?

149.   The periodic reports filed by SPACs under the Exchange Act generally contain limited information due to the absence of an operating business.  Should some of the disclosure requirements we are proposing also be required in the periodic reports filed by a SPAC following its initial public offering?  If so, which disclosures?  Are there other disclosures that we should require in the Exchange Act reports filed by a SPAC?

150.    We note that the announcement of a prospective de-SPAC transaction often results in an immediate and substantial increase in the trading volume of the securities of the SPAC, based on the terms of the transaction that have been disclosed and the limited information publicly available on the private operating company at the time of the announcement, which is far less extensive than that of a newly public company after a traditional initial public offering.[359]  Should we consider requiring additional disclosures, such as more disclosure on the private operating company or risk factor disclosure, in a Form 8-K filed pursuant to Item 1.01 of the form disclosing that the parties have entered into a business combination agreement?  If so, what additional disclosure should we require?  Should we amend Item 1.01 of Form 8-K to require the filing of the business combination agreement as an exhibit to the Form 8-K filing (as opposed to allowing the agreement to be filed as an exhibit to a subsequent periodic report)?  What other amendments should we consider in this regard?

151.    Currently, the post-business combination company is required to file a Form 8-K with Form 10 information within four business days after the completion of a de-SPAC transaction.  Should we require the filing of this Form 8-K within a shorter time frame in order to reduce the gap in timing between the completion of the transaction and the public availability of this information in the Form 8-K?

152.    Are there other rule changes the Commission should consider to enhance investor protections in initial public offerings by SPACs and in de-SPAC transactions?

---

[359]  According to one study, institutional investors typically purchase the vast majority of the securities in a SPAC's initial public offering and are far more likely to redeem their shares instead of reselling the shares, resulting in limited secondary market trading of SPAC shares.  Klausner, Ohlrogge, and Ruan, *supra* note 17.

- We have not proposed requirements for SPAC offerings comparable to those applicable to blank check companies under Rule 419.  Should we consider requiring SPACs to comply with conditions similar to those in Rule 419?  If so, which conditions?

- The shareholders of a SPAC are permitted to vote in favor of a proposed de-SPAC transaction while redeeming their shares prior to the closing of the transaction and retaining their warrants, such that the vote is decoupled from any continuing share ownership in the post-business combination company (unless and until the warrants are exercised).[360]  Should the Commission adopt rule changes or other approaches to address this situation?  For example, should the Commission condition the continued availability of an exclusion from the requirements of Rule 419 on whether shareholders voting to approve a de-SPAC transaction retain an economic interest in the combined company?  Should we address this issue through the Commission's authority under Section 19(c) of the Exchange Act to adopt rules applicable to national securities exchanges?

153.   A post-business combination company following a de-SPAC transaction is subject to different treatment under various rules based on its status as a former shell company.  For example, a post-business combination company following a de-SPAC transaction is an "ineligible issuer," based on its status as a former shell company, which prevents the company from using free writing prospectuses pursuant to Securities Act Rules 164 and 433 for a three-year period.[361]  As a former shell company, the post-business combination

---

[360] *See* Rodrigues and Stegemoller, *supra* note 17.

[361] *See* Securities Act Rule 164(e)(1).

company is also ineligible to file a registration statement on Form S-8 for a 60-day period following the de-SPAC transaction,[362] and the safe harbor in Rule 139 for broker-dealer research reports is not available for research reports on the post-business combination company for a three-year period.[363]  In this regard, we note that the treatment of former shell companies under these rules is based on heightened concerns regarding fraud and other abuses surrounding many shell company transactions.  To better align de-SPAC transactions with initial public offerings, should we consider amending these and other rules relating to former shell companies to treat companies that have become public companies through a de-SPAC transaction in the same or similar manner as those that have completed traditional initial public offerings?  Should we differentiate SPACs from other shell companies in applying these rules?  If so, on what basis?

154.   Are there areas relating to SPACs where additional Commission guidance would be helpful?  For example, would it be useful if the Commission reiterated or expanded upon the Commission staff's guidance in 2020 and 2021 regarding SPACs?[364]

## VIII.   GENERAL REQUEST FOR COMMENTS

We request and encourage any interested person to submit comments on any aspect of our proposals, other matters that might have an impact on the proposed amendments, and any suggestions for additional changes.  With respect to any comments, we note that they are of greatest assistance if accompanied by supporting data and analysis of the issues addressed in those comments and by alternatives to our proposals where appropriate.

---

[362]  *See* General Instruction A.1 to Form S-8.

[363]  *See* Securities Act Rule 139(a)(1)(ii)(B).

[364]  *See supra* note 35.

## IX.   ECONOMIC ANALYSIS

We are mindful of the costs and benefits of these proposed new rules and amendments. The discussion below addresses the potential economic effects of the proposed new rules and amendments, including the likely benefits and costs, as well as the potential effects on efficiency, competition, and capital formation.[365]  We have analyzed the expected economic effects of the proposed new rules and amendments relative to the current baseline, which consists of the existing regulatory framework of disclosure requirements and liability provisions, current market practices, and the distribution of participants by type.

As discussed above, we are proposing new rules and amendments to existing rules that are intended to enhance investor protections in SPAC registered offerings, including initial public offerings, and in de-SPAC transactions.  The proposed new rules and amendments would require disclosures with respect to, among other things, compensation paid to sponsors, conflicts of interest, dilution, and the fairness of de-SPAC transactions.  The proposed new rules and amendments would also revise certain rules and forms under the Securities Act and the Exchange Act to specify their application in the context of de-SPAC transactions, including, among other things, a proposed rule that a SPAC and a target company be treated as co-registrants when a SPAC files a registration statement for a de-SPAC transaction and a proposed rule that addresses the underwriter status of SPAC IPO underwriters in any subsequently registered de-SPAC transaction.

---

[365]  Section 2(b) of the Securities Act [15 U.S.C. 77b(b)] and Section 3(f) of the Exchange Act [17 U.S.C. 78c(f)], and Section 2(c) of the Investment Company Act [15 U.S.C. 80a-2(c)] require the Commission, when engaging in rulemaking where it is required to consider or determine whether an action is necessary or appropriate in (or, with respect to the Investment Company Act, consistent with) the public interest, to consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation.  Further, Section 23(a)(2) of the Exchange Act [17 U.S.C. 78w(a)(2)] requires the Commission, when making rules under the Exchange Act, to consider the impact that the rules would have on competition, and prohibits the Commission from adopting any rule that would impose a burden on competition not necessary or appropriate in furtherance of the Exchange Act.

Additional proposed rules are intended to align de-SPAC transactions more closely with initial public offerings.  One would require certain non-financial disclosures regarding the target private operating company that are typically filed on Form 8-K within 4 days after the completion of a de-SPAC transaction to be included in the disclosures that are filed in connection with an anticipated de-SPAC transaction (Form S-4 or F-4, a proxy or information statement, or a Schedule TO).  The other would require the surviving entity following a de-SPAC transaction to re-determine its eligibility for smaller reporting company status within four business days of the completion of the transaction.

We are also proposing new rules and amendments that would apply to shell companies more broadly.  Proposed Rule 145a would deem any business combination involving a reporting shell company that is not a business combination related shell company, and another entity that is not a shell company, to involve a sale of securities to the reporting shell company's shareholders. In addition, the proposed amendments to Regulation S-X are intended to more closely align the financial statement requirements in business combinations between a shell company (other than a business combination related shell company) and a non-shell company with those required on Forms S-1 or F-1 for an initial public offering.

Furthermore, we are proposing to: (i) amend Item 10(b) of Regulation S-K to expand and update our views with respect to projections used in Commission filings; (ii) require additional disclosures regarding projections when disclosed in connection with de-SPAC transactions;  and (iii) amend the definition of "blank check company" for purposes of the PSLRA safe harbor for forward-looking statements, such that the safe harbor would not be available for projections by blank check companies that are not penny stock issuers, which would include SPACs and target companies in de-SPAC transactions.  Finally, we are proposing to create a safe harbor from the

definition of "investment company" under the Investment Company Act for SPACs that meet certain conditions.

Overall, we expect the proposed new rules and amendments relating to SPAC transactions, in particular, and in some cases to shell company business combinations more broadly, to provide investors[366] with improved and, in some instances, potentially earlier[367] access to more consistent, comprehensive, and readily comparable information and to enhance their ability to make more informed investment decisions, which can lead to more efficient pricing of securities.[368]  Both public reporting companies seeking to make an acquisition (SPACs or other shell or blank check companies, in some cases) and target private operating companies may incur costs related to the production and public disclosure of the proposed required information; however, these costs may be mitigated to the extent that either party may already voluntarily produce or provide such information in response to evolving market demands.[369]  We further anticipate that addressing the liability of various parties in de-SPAC transactions or other shell company business combinations could encourage those parties to exercise greater care in either the selection of an intended target company or the preparation and review of the required disclosures.  This could result in more reliable information for investors regarding a private

---

[366]  Throughout this section, "investor" can refer to any current or a potential shareholder of a company, though it is generally understood costs and benefits may accrue to such investors heterogeneously based on size, sophistication, and affiliation.

[367]  *See infra* Sections IX.C.1.b.7 & IX.C.1.b.8.

[368]  *See, e.g.*, Orie E. Barron & Hong Qu, *Information Asymmetry and the* Ex Ante *Impact of Public Disclosure Quality on Price Efficiency and the Cost of Capital: Evidence from a Laboratory Market*, 89 ACCOUNTING REV. 1269 (2014) (high-quality public disclosure leads to increased price efficiency and decreased cost of capital); Ulf Brüggemann, Aditya Kaul, Christian Leuz, & Ingrid Werner, *The Twilight Zone: OTC Regulatory Regimes and Market Quality*, 31(3) REV. FIN. STUD. 898, 898-942 (2018) (increased disclosure regimes lead to increased liquidity and lower crash risk).

[369]  *See SPAC to the Future III*, IPO Edge (Nov. 10, 2021) (remarks of panelist Chris Weekes, Managing Director and Co-Head of SPACs, Cowen), *available at* https://ipo-edge.com/join-spac-to-the-future-iii-with-nasdaq-cowen-gallagher-ve-icr-morrow-sodali-morganfranklin-featuring-gigcapital-hennessy-and-switchback/.

company target at the time of a transaction, and would further align the protections afforded to investors with those of an initial public offering.

To the extent that the proposed rules would also provide better, more readily accessible information about SPACs, they may result in less adverse selection than might otherwise occur at the de-SPAC transaction. Overall, we expect the proposals may enhance the protection of investors, as well as promote market efficiency. We are mindful that some aspects of this rulemaking may deter some forms of communications or some transactions that might otherwise be efficient or to the economic benefit of issuers and investors. They also may deter some business combinations that otherwise would have created value. We discuss these considerations in more detail below.

In many cases, we are unable to quantify the relative magnitudes of various economic effects because we lack information to quantify such effects with a reasonable degree of accuracy. Where we are unable to quantify the economic effects of the proposed new rules and amendments, we have provided a qualitative assessment of the potential effects and encourage commenters to provide data, studies, reports and other information that would help quantify the benefits, costs, and potential impacts on efficiency, competition, and capital formation.[370]

### A.    Broad Economic Considerations

Although a significant level of information asymmetry exists when a private company "goes public," the traditional initial public offering process (IPO) has developed mechanisms

---

[370]  For our estimates of the paperwork burdens associated with the proposed rules and amendments for purposes of the Paperwork Reduction Act of 1995 ("PRA"), please see Section X below. These PRA burden estimates pertain to "collections of information" as that term is defined in the PRA, and therefore reflect only the hours and costs to prepare required disclosures and maintain records. As a result, these estimates do not reflect the full economic effects or full scope of economic costs of the proposed rules and amendments that are discussed in this analysis.

that can alleviate adverse selection problems.[371]  Those mechanisms include mandated public

disclosures, staff review of registration statements,[372] and the effects of Section 11 liability,

which, among other things, motivates due diligence performed by underwriters, accountants, and

other offering participants.  These mechanisms generally lead to lower levels of information

asymmetry, which can improve the security's pricing and placement efficiency and encourages

investor participation in the IPO market.  The traditional IPO process, however, is associated

with costs, which could be significant for certain firms.  Those costs can be direct, in the form of

fees, or indirect in the form of underpricing, as has long been recognized in the academic

literature.[373]

Alternative ways[374] of going public have emerged that may allow companies to avoid

some of the costs of the traditional initial public offering process, though this also might involve

---

[371]  Adverse selection is sometimes described as the 'lemons' problem:  when buyers have less information than sellers, their bids will be lower to reflect this uncertainty.  In response, the sellers of high quality products may exit the market, causing further decline in buyers' willingness to pay, which could cause a market failure.  *See, e.g.,* George Akerlof, *The Market for "Lemons": Quality Uncertainty and the Market Mechanism*, 84 QTR. J. ECON. 488 (1970).

[372]  This review includes benefits such as, for example, the production of additional valuable information in response to comments issued by the Commission staff during the filing reviews.  *See, e.g.,* Michelle Lowry, Roni Michaely, & Ekaterina Volkova, *Information Revealed Through the Regulatory Process: Interactions Between the SEC and Companies Ahead of Their IPO*, 33 REV. FIN. STUD. 5510 (2020).

[373]  *See* Alexander Ljungqvist, *Chapter 7 - IPO Underpricing*, *in* 1 HANDBOOK OF EMPIRICAL CORPORATE FINANCE 375 (B. Espen Eckbo ed., 2007); Kevin Rock, *Why New Issues are Underpriced*, 15 J. FIN. ECON. 187 (1986); Tim Loughran & Jay Ritter, *Why Has IPO Underpricing Changed Over Time?*, 33 FIN. MGMT. 5 (2004).

[374]  While equity in a private company might also become publicly traded by participation in a roll-up, because such transactions typically involve multiple companies and the surviving entity thus may resemble each of the rolled-up entities less specifically, individually, we do not consider this a comparable way of going public for the purposes of our discussion.  Additionally, a handful of companies have listed their shares directly on a national securities exchange without the use of a traditional underwriter and without raising capital.  As with participation in a roll-up, this method of accessing the public markets is not frequently used.  From 2018 through 2021, only twelve companies went public using this approach.  (This Commission estimate includes 9 direct listings on NYSE and 3 direct listings on Nasdaq that occurred on or before Dec. 31, 2021.)  In December 2020, the Commission issued an order approving a proposed rule change submitted by New York Stock Exchange LLC (NYSE) that would allow private companies to list on the NYSE via a direct listing and raise capital at the same time.  *See* Release No. 34-90768 (Dec. 22, 2020) [85 FR 85807 (Dec. 29, 2020)] (SR-NYSE-2019-67).  In May 2021, the Commission approved a similar proposed rule change submitted by The Nasdaq Stock Market LLC.  *See* Release No. 34-91947 (May 19, 2021) [86 FR 28169 (May 25, 2021)] (SR-NASDAQ-2020-057).  While, it is possible that the number of companies that would seek to offer securities via direct listing will increase following these recent regulatory

forgoing some of the benefits typically considered desirable by market participants (*e.g.*, potentially better pricing due to underwriter help with the placement of securities as well as more robust due diligence and disclosure).[375]  While pursuit of these alternatives suggest private operating companies are interested in accessing the benefits of being publicly traded, it is not clear that these alternatives represent net improvements in the mechanism design of the traditional IPO process.

One way a private company may become a public reporting company is via merger with a shell company that has already obtained exchange listing, quotation, or otherwise registered a class of securities under the Exchange Act.  In recent years, a significant number of private companies have opted to become a public reporting company via a merger with a particular kind of shell company, a SPAC.  SPACs have been in existence since the 1990s, and though their use by private companies as an alternative mechanism for becoming a public reporting company has varied over time, it has increased dramatically in the past three years.  We estimate that in the past year alone, approximately 200 companies have become listed on an exchange via a de-SPAC transaction, which is slightly more than a sevenfold increase since 2019 and a twentyfold increase since 2015.[376]

As with a traditional IPO, becoming a public reporting company through a de-SPAC transaction might also be subject to adverse selection given that this type of transaction is associated with significant information asymmetries between public investors in the SPAC and

---

changes, it is unclear that future use would become comparable in purpose or scope to mergers with shell companies as an alternative means to access the public market.  *See* Release No. 34-94311 (Feb. 24, 2022) [87 FR 11780 (Mar. 2, 2022)] (SR-NASDAQ-2021-045) (order disapproving proposed rule change to modify certain price limitations in a direct listing with a capital raise).

[375]  *See, e.g.*, James Brau & Stanley Fawcett, *Initial Public Offerings: An Analysis of Theory and Practice,* 61 J. FIN. 399 (2006).

[376]  Staff review of Form 8-K filings identified 28 private operating companies acquired in calendar year 2019 and 10 in calendar year 2015 that could be confirmed in the Dealogic M&A module as a de-SPAC transaction.

the private company that the SPAC intends to acquire.  Public SPAC investors could rely on

various mechanisms to overcome the adverse selection problem in the SPAC context:  the

contingent nature of sponsor compensation; the right to vote to approve a de-SPAC transaction

or redeem shares; projections regarding anticipated future performance, to the extent they

improve price formation; potential liability; and any additional unregistered investments by

investors at the de-SPAC transaction stage.[377]  While in some cases, a private company might

prefer these alternative mechanisms to a traditional IPO, their general efficacy in resolving the

problems or costs of information asymmetry might, in practice, be limited.[378]

Some economic theorists have argued that the structure of SPAC sponsor compensation

may efficiently incentivize transactions that benefit investors,[379] but the effects in practice may

be more ambiguous.  On one hand, because almost all of the SPAC sponsor's compensation is

contingent on the completion of a de-SPAC transaction, the sponsors may therefore have an

incentive to select target companies that would maximize their own, as well as investors', returns

at exit.  As noted above, however, there is also a potential conflict of interest for sponsors

precisely because their compensation (*e.g.*, 20% promote) is dependent on the completion of a

de-SPAC transaction.[380]  This could create an incentive to enter into unfavorable, or less

favorable, de-SPAC transactions than would otherwise be optimal for the SPAC's unaffiliated

shareholders because the sponsor's alternative to a de-SPAC transaction is to liquidate the

---

[377] For a detailed description of the SPAC process, see Section I.

[378] In addition to the potentially problematic incentives embedded in the SPAC structure as described in the following sections, we further acknowledge that in some cases management and other insiders in target companies may find that a de-SPAC transaction is a more attractive option for becoming a public reporting company than a traditional initial public offering for reasons that conflict more directly with adequate investor protections.  These reasons may include the lack of a named underwriter or actionable liability.

[379] *See, e.g.,* Sris Chatterjee, N.K. Chidambaran, Gautam Goswami, *Security design for a non-standard IPO: The case of SPACs,* 69 J. INT'L MONEY & FIN. 151 (2016).

[380] *See supra* note 12.

SPAC, and return the initial public offering proceeds, forfeiting their potential promote.  While reputational concerns may be a mitigating source of discipline, sponsors may also be more likely to prioritize private benefits when these concerns are less pressing; for example, in periods when the market is broadly less risk-averse or if the sponsor does not intend to pursue serial SPAC activities.

In addition, voting rights and redemption rights may protect SPAC investors, because SPAC investors have the right to vote against a de-SPAC transaction and may redeem their shares if they believe holding shares in the combined company is not in their best interest.[381] However, these rights can also create potential conflicts of interest between non-redeeming shareholders and shareholders who choose to redeem shares but continue to hold warrants. When SPAC investors redeem the shares but retain and later exercise the warrants of the initial IPO unit, the equity shares of the non-redeeming shareholders are diluted relative to what they would be absent such exercise.  A further conflict may arise because the value of the warrants is enhanced by greater volatility of the underlying security.  Thus, warrant-holders may incur greater financial benefits from high-risk mergers in a manner that may not be aligned with the interests of the non-redeeming SPAC investors.  Additionally, in cases where the SPAC is structured so that the shareholders are able to vote in favor of a merger but also redeem their shares, this could present a moral hazard problem, in economic terms, because these redeeming shareholders would not bear the full cost of a less than optimal choice of target.

The use of projections regarding the future earnings and performance of the target company in the de-SPAC transaction may be another mechanism that helps SPAC investors

---

[381]  For listed SPACs, existing exchange listing standards, if a shareholder vote is held, require public shareholders voting against a de-SPAC transaction to have the right to redeem their shares if the de-SPAC transaction is approved and consummated.  *See infra* Section IX.B.1.a.  SPACs have often extended this redemption right to shareholders voting in favor of the de-SPAC transaction as well.

overcome adverse selection, insofar as they provide information that could improve price formation.  However, there may also be conflicts of interest associated with those projections given some features of the SPAC structure.  The need to secure shareholder approval and meet the respective exchange listing's valuation requirement[382] to complete the de-SPAC transaction may imply that it is in the target company's interest to present the most favorable projections of its future performance.  SPAC sponsors' interests in completing the de-SPAC transaction in order to receive their compensation could also affect the degree to which they would be motivated to scrutinize or question a target company's projections.[383]  Additionally, the basis, source, and support for any projections may not be adequately disclosed to shareholders, thereby limiting their value.  For example, there may be confusion among some practitioners as to whether Item 10(b) of Regulation S-K, which states the Commission's views regarding the reasonableness of projections, applies to projections regarding the target company's future performance that may be included in the SPAC's filings.

Applicable liability provisions may also provide some protections for SPAC investors. For example, SPACs are liable for material misstatements or omissions in their proxy solicitations under Section 14(a) and Rule 14a-9 of the Exchange Act.  However, such liability generally requires proof of negligence.  Similarly, SPAC investors may be protected by the application of Section 11 and Section 12(a)(2) of the Securities Act for material misstatements or omissions made in connection with SPAC transactions involving the filing of a registration

---

[382] *See infra* Section IX.B.1.a.

[383] *See supra* note 67 and accompanying text.

statement.  However, as discussed above, there are potential gaps or inconsistencies in these protections that the proposed amendments are intended to address.[384]

Another mechanism that could help investors overcome the adverse selection problem is the potential signal of deal quality implied by the presence of PIPE investors.[385]  These investors, who are generally institutional investors, are often afforded an opportunity to gain considerable insight into the details of a de-SPAC transaction and the future financial prospects of the target company (subject to confidentiality agreements) for purposes of evaluating whether to participate in a PIPE that often occurs close in time to a de-SPAC transaction.  Public SPAC investors could benefit from the participation of PIPE investors in a de-SPAC transaction in a number of ways.  At present, some PIPE investments in connection with de-SPAC transactions function as a backstop to offset high levels of redemption, thereby ensuring a de-SPAC transaction does not fail to meet the minimum cash requirement necessary to complete its intended business combination.  In other cases, PIPE investments enable the SPAC to acquire a larger target, or one with a higher valuation, giving SPAC IPO investors access to a different type of target company than they might otherwise be able to acquire.[386]  On the other hand, the presence of PIPE investors in a de-SPAC transaction may not benefit public SPAC investors because they typically invest at a discount.  When a de-SPAC redemption rate is high, the PIPE discount can exacerbate the dilution of the equity position of the SPAC's non-redeeming

---

[384] *See supra* Sections III.C & III.F.

[385] *See, e.g.,* Mike Hopkins & Donald G. Ross, *Key Drivers of Private Equity Firm Certification at Initial Public Offering,* 16 J. PRIVATE EQUITY, 69 (2013).

[386] This role of PIPEs has been more common, historically, *see, e.g.*, Vijay M. Jog & Chengye Sun, *Blank Check IPOs: A Home Run for Management* (SSRN Working Paper, 2007) ("the median value of the transaction in relation to gross proceeds is approximately 178 percent, meaning that the size of the acquisition is higher than the proceeds raised through the IPO since many [blank check companies] raised additional debt to finance the acquisitions"), and could be a contributing factor to the differences we continue to observe between average capital raised via SPAC IPO (*see infra* Section IX.B.6.a) and PIPE financing (*see infra*  Section IX.B.2.c) and the average consideration paid per SPAC target (*see infra* Section IX.B.2.c).

shareholders.  Additionally, because PIPEs may, in some cases, involve the purchase of only

warrants, similar misalignments of incentives with respect to a de-SPAC transaction may occur

with this category of warrant-only holders as those previously discussed in that they may have

incentives to pursue riskier targets than would be optimal for a non-redeeming SPAC

shareholder.  As such, the PIPE's financial participation in a de-SPAC transaction may not be a

reliable indication that the transaction would benefit unaffiliated SPAC investors.

Therefore, while a number of the mechanisms associated with a SPAC transaction

structure could mitigate adverse selection concerns for investors and could, theoretically,

improve the process by which private companies may become publicly traded, many of their

potential benefits over the traditional IPO process may be mitigated by countervailing conflicts

of interest.  As a result of the complexity inherent in the SPAC structure, investors may lack or

otherwise be unable to readily decipher critical information regarding certain financial incentives

(such as contingent sponsor or IPO underwriter compensation or the potential dilutive effects of

PIPE financing) of the SPAC, the target company, their respective affiliates, or other parties in a

manner necessary to properly assess the value of an investment position.

There is also a question of whether investors, particularly retail investors, fully

understand the costs involved in de-SPAC transactions and how these costs may affect investors'

post-de-SPAC transaction returns on their original investments.  Specifically, investors may not

fully anticipate the dilutive effects of sponsor compensation (the "promote"), PIPE financing,

and outstanding warrants following de-SPAC transactions.  In a similar vein, the potential

uncertainty regarding the availability of the PSLRA safe harbor and the applicability of the

guidance of Item 10(b) of Regulation S-K to projections of a target company in a de-SPAC

transaction may result in the use of unreasonable or aspirational projections in connection with

de-SPAC transactions that may misrepresent the benefits and risks involved in such transactions. Furthermore, while the SPAC vehicle may allow a private company to go public without using the traditional IPO process, the disclosure regarding the private company provided in connection with a de-SPAC transaction may be less complete or less reliable than that provided in a traditional IPO for reasons discussed in the release, including, among other reasons, the lack of due diligence by traditional gatekeepers, such as underwriters.[387] By strengthening investor protection, the proposed rules could increase investors' confidence in SPAC transactions, while keeping this alternative route of going public attractive for private companies.

In addition to the SPAC-specific items that are of central concern to this proposal, we are also proposing amendments to address further areas of incongruity in requirements that guide the disclosures and liabilities in the broader context of shell-company mergers and the use of projections. For example, proposed Rule 145a would help investors in reporting shell companies more consistently receive the full protections of the Securities Act disclosure and liability provisions in business combinations involving shell companies, regardless of the transaction structure. Reporting shell companies would have to register offerings subject to proposed Rule 145a by filing a Securities Act registration statement unless there is an applicable exemption. Additionally, we are proposing new Article 15 of Regulation S-X and amendments to our forms, schedules, and rules to more closely align the financial statement reporting requirements in business combinations involving a shell company and a private operating company with those in traditional initial public offerings. For example, we are proposing to align the number of fiscal years required to be included in the financial statements for a private company that will be the

---

[387]  Although as discussed above, a court could find that many parties to a de-SPAC transaction may meet the definition of "underwriter," all of these issues may be compounded by the lack of a designated underwriter in de-SPAC transactions that could perform due diligence and would be subject to liability under Section 11 of the Securities Act.

predecessor(s) in a shell company combination with the financial statements required to be included in a Securities Act registration statement for an initial public offering of equity securities in proposed Regulation S-X Rule 15-01(b).  Other proposed amendments would codify certain current staff guidance for transactions involving shell companies.

In our analysis below, we first discuss the proposed provisions that pertain to specialized disclosure requirements for SPACs in registered offerings and for de-SPAC transactions and then address the proposals concerning liability related to de-SPAC transactions and the PSLRA safe harbor.  We then analyze the impact of the proposed new rules and amendments that would apply to shell companies and to the use of projections in Commission filings.  Finally, we discuss the proposed safe harbor for SPACs from being deemed an investment company under the Investment Company Act.  Where appropriate, we discuss the interactions between the proposed new rules and amendments.

### B.    Baseline and Affected Parties

To assess the economic impact of the proposed rules, the Commission uses as its baseline the current regulatory framework and existing market practices, including Commission staff guidance and other staff positions.  We discuss in this section those parties likely to be affected by the proposed rules and some of the relevant regulatory and market baselines.  The remainder of the discussion of the regulatory and market baselines is integrated into our analysis of the benefits and costs of the proposed rules to aid comprehension and minimize repetition.[388]

### 1.    SPAC Initial Public Offerings

The parties most likely to be directly affected by the proposed rules regarding specialized disclosure requirements for SPACs in initial public offerings and other registered offerings are

---

[388] *See also supra* Sections I-IV for further discussion of existing regulatory framework and market practices.

existing or potential sponsors intending to organize a new SPAC, SPACs, prospective investors in such offerings, and any other market participants whose service or activities involve analysis of the information, data, and disclosures related to SPACs and their sponsors in these offerings. In 2021, there were approximately 620 SPAC initial public offerings.

In addition, these proposed amendments would necessarily have secondary impacts on the prospects or opportunities of private companies that would be potential targets of such newly organized SPACs if, as a result of their adoption, a different number or type of SPAC sponsors and their affiliates participate in the market. Similarly, given that proposed Rule 140a clarifies the underwriter status of SPAC IPO underwriters at the de-SPAC transaction stage, this proposed rule may affect the number and type of potential targets that might be selected for acquisition by potentially reducing the number of SPAC IPOs underwriters are willing to support or by potentially deterring SPAC IPO underwriters from directly or indirectly participating in the de-SPAC transaction or any related financing transaction.[389] Other potentially affected parties include those parties who provide advisory or other services to sponsors of SPACs in connection with these registered offerings.

### a. SPAC Initial Public Offerings and Exchange Listing

SPACs initial public offerings on national securities exchanges have greatly increased in recent years. Moreover, SPAC listings have migrated from the over-the-counter market to three national securities exchanges: first NYSE American (formerly AMEX), then Nasdaq and NYSE (see Table 1).[390]

---

[389] *See* Jessica Bai, Angela Ma, and Miles Zheng, *Reaching for Yield in the Going-Public Market: Evidence from SPACs* (SSRN Working Paper, 2021).

[390] SPACs first were listed on the AMEX in 2005. The Commission approved the NYSE's proposed rule change to adopt listing standards to permit the listing of SPACs on May 6, 2008, and approved NASDAQ's proposal to adopt listing standards to permit the listing of SPACs on July 25, 2008. *See* Release No. 34-57785 (May 6, 2008) [73 FR

**Table 1. Number of SPAC IPOs, 1990-2021[a]**

|  | 1990-2000 | 2001-2005 | 2006-2010 | 2011-2015 | 2016-2020 | 2021 |
|---|---|---|---|---|---|---|
| Total | 18 | 41 | 128 | 66 | 400 | 620 |
| NASDAQ | 18 | 0 | 3 | 56 | 248 | 434 |
| NYSE | - | - | 1 | 0 | 147 | 183 |
| AMEX | - | 6 | 78 | 0 | 5 | 3 |
| OTC | - | 35 | 46 | 10 | - | - |

[a] Estimates are based on all SPACs identified by Dealogic, SPAC Insider, Audit Analytics, and staff manual review, that conducted an initial public offering with a confirmed pricing date as of December 30, 2021.

NYSE, Nasdaq, and NYSE American have rules setting forth listing requirements for a company whose business plan is to complete an IPO and engage in a de-SPAC transaction.[391] Among other things, all three exchanges permit the initial listing of SPACs only if at least 90% of the gross proceeds from the IPO and any concurrent sale by the SPAC of equity securities will be deposited in a trust account.[392]  These exchanges further require that within three years, for NYSE, or 36 months, for Nasdaq and NYSE American, of the effectiveness of its IPO registration statement (or such shorter period specified in the registration statement under Nasdaq and NYSE American rules or its constitutive documents or by contract under NYSE rules), the

---

[391]   NYSE Listed Company Manual Section 102.06; Nasdaq Listing Rule IM-5101-2; NYSE American Company Guide Section 119.  The Rules of the CBOE BZX Exchange, Inc., provide another example of listing requirements that are substantially similar to those describe in this section.  *See* CBOE BZX Rule 14.2(b).

[392]   NYSE Listed Company Manual Section 102.06; Nasdaq Listing Rule IM-5101-2(a); NYSE American Company Guide Section 119(a).

27597 (May 13, 2008)] (SR-NYSE-2008-17); Release No. 34-58228 (July 25, 2008) [73 FR 44794 (July 31, 2008)] (SR-NASDAQ-2008-013).  *See also* Release No. 34-63366 (Nov. 23, 2010) [75 FR 74119 (Nov. 30, 2010)] (SR-NYSEAMEX-2010-103) (notice of filing and immediate effectiveness of proposed rule change to adopt additional criteria for the listing of SPACs).

SPAC complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the net assets in the account excluding certain costs.[393]  NYSE, Nasdaq, and NYSE American require that a de-SPAC transaction meeting the 80% requirement be approved by a majority of the SPAC's independent directors,[394] and all three exchanges require, if a shareholder vote is held, that a majority of the shares voted at the shareholder meeting approve the de-SPAC transaction meeting the 80% requirement.[395]  In addition, if a de-SPAC transaction meeting the 80% requirement is approved and consummated, public shareholders voting against the transaction must have the right to convert their shares of common stock into a pro rata share of the aggregate amount then in the trust account net taxes and working capital disbursements.[396]  If a shareholder vote on a de-SPAC transaction is not held, the SPAC must provide all shareholders with the opportunity to redeem all their shares for cash equal to their pro rata share of the aggregate amount then in the trust account net of taxes and working capital disbursements, pursuant to Rule 13e-4 and Regulation 14E under the Exchange Act, which regulate issuer tender offers.[397]

### b. *SPAC Sponsors*

Historically, it has been suggested that one reason a SPAC vehicle might provide a more attractive route to the public markets was the benefit of the leadership and professional advice by

---

[393]  NYSE Listed Company Manual Section 102.06(e); Nasdaq Listing Rule IM-5101-2(b); NYSE American Company Guide Section 119(b).

[394]  NYSE Listed Company Manual Section 102.06(d); Nasdaq Listing Rule IM-5101-2(c); NYSE American Company Guide Section 119(c).

[395]  NYSE Listed Company Manual Section 102.06(a); Nasdaq Listing Rule IM-5101-2(d); NYSE American Company Guide Section 119 (d).

[396]  NYSE Listed Company Manual Section 102.06(b); Nasdaq Listing Rule IM-5101-2(d); NYSE American Company Guide Section 119(d).

[397]  NYSE Listed Company Manual Section 102.06(c); Nasdaq Listing Rule IM-5101-2(e); NYSE American Company Guide Section 119(e).

one or more individuals comprising the SPAC sponsor, including in some cases beyond the de-SPAC and into the life of the target as public operating company.[398]  Although the majority of sponsors are financial institutions, a sizable fraction (47%) of SPACs are sponsored by individuals.

**Figure 1. Distribution of SPACs by Sponsor Type, 2019-2021[a]**



[a] Data presents the average composition of SPAC offerings by sponsor type as categorized by SPAC Insider.  *See* SPAC Insider, *1H 2021 SPAC Report* (2021).  Note, sponsor composition data for 2021 SPAC sponsorship reflects only data through end second quarter.

### c.   SPAC IPO Underwriters

During the period 1990-2021, the average number of underwriters participating in a SPAC IPO was 2.5.[399]  Approximately 99% of these SPAC IPOs were done via a firm

---

[398] *See* Robert Berger, *SPACs: An Alternative Way to Access the Public Markets*, 20 J. APPLIED CORPORATE FIN. 68 (2008) ("Though privately negotiated, tailored transactions, SPACs can provide companies with access to the public markets in ways that a traditional IPO cannot.  SPAC mergers typically exhibit … specialized SPAC management teams that add experience that is difficult to replicate.").

[399] This estimate is based on staff analysis of data as described in Table 1, note a.

commitment offering.[400]  The average fee charged by SPAC IPO underwriters during this time

was approximately 5.6%.[401]  This reflects a decline from the underwriting fees associated with

the earliest SPACs (approximately 7-7.5%),[402] when underwriters typically received their full

compensation at the time of the SPAC IPO.[403]  As mentioned above, a portion of this fee is

typically deferred until, and conditioned upon, the completion of the de-SPAC transaction.[404]  In

a typical SPAC underwriting, this deferred fee is placed in the SPAC trust or escrow account.

During the period 1990-2021, we estimate that the average size of the deferred underwriter fee

was 3.4%.[405]  We do not observe significant differences in the structure or level of underwriter

fees and deferred fees, as disclosed at the IPO stage, between SPACs that have completed a de-

SPAC transaction and those that have not.  We observe that among SPACs that have completed a

de-SPAC transaction the average number of underwriters was 3.1, which is slightly higher than

the average number of underwriters per SPAC IPO.[406]  SPAC underwriters may provide other

services to the SPAC or its eventual target after the IPO as well.  For example, the SPAC

underwriter may help the SPAC identify potential targets, provide financial advisory services to

the SPAC or the target, or act as a PIPE placement agent.

### d.  Warrants

---

[400]  SPACs that conduct a firm commitment IPO and raise more than $5 million in the offering are not subject to the requirements of Securities Act Rule 419.  *See supra* note 12.

[401]  This estimate is based on staff analysis of data as described in Table 1, note a.

[402]  *See, e.g.*, Lola Miranda Hale, *SPAC: A Financing Tool with Something for Everyone*, 18 J. CORP. ACCT. & FIN. 67 (2007) ("The underwriting discounts are typically around 7-7.5 percent of the public offering price").

[403]  *See* Yochanan Shachmurove & Milos Vulanovic, *Specified Purpose Acquisition Company IPOs, in* THE OXFORD HANDBOOK OF IPOs (Douglas Cumming ed., 2018).

[404]  *See supra* Section III.E.3.

[405]  This estimate is based on staff analysis of data as described in Table 1, note a, and may be positively skewed because the data features a greater proportion of deals occurring between 2019 and 2021.

[406]  Based on staff analysis of data as described in Table 1, note a.  We note that timing differences in where a SPAC might currently be, relative to its dissolution date, might result in overestimation of this difference.

SPAC IPOs most often register the offering of a unit composed of a common share, warrants, or fractions thereof, and—in some cases—rights.[407]  In their earliest form, SPAC units usually included two in-the-money warrants exercisable for full shares at the later of completion of the de-SPAC transaction or one year after the effective date of the IPO registration statement.[408]  These warrants could thus become highly dilutive to the equity shareholders given that warrants may begin trading separately from the unit common share once a Form 8-K containing the balance sheet of IPO proceeds has been filed.[409]  Shareholders could experience equity dilution if redeeming shareholders retain and later exercise their warrants.

---

[407]  *See, e.g.* Gül Okutan Nilsson, *Incentive Structure of Special Purpose Acquisition Companies*, 19 EUR BUS ORG Law Review (2018) ("[R]ecent SPACs seem to be experimenting with issuing certain 'rights' [. . .] defined as the 'right to receive one-tenth of a SPAC share upon consummation of the business combination' Unlike in the case of warrants, shareholders are not required to pay for receiving these shares. 'Rights can also trade separately and even the shareholders who convert their shares can keep them.  If the business combination cannot be completed, rights expire worthless.").

[408]  *See, e.g.*, Hale, *supra* note 402 ("The typical structure involves the offering of a unit consisting of common stock and one or two separate warrants for common stock.  In a two-warrant unit, the unit price is $6, including one share of common stock and two warrants.[. . .]  Typically, each warrant entitles the holder to purchase one share of common stock at a price of $5 each."); Carol Boyer & Glenn Baigent, *SPACs as Alternative Investments: An Examination of Performance and Factors that Drive Prices*, 11 J. PRIVATE EQUITY 8 (2008) ("SPACs typically sell in units that are priced at $6, and each unit is composed of one common share and two warrants that give investors the right to buy two more shares for $5 each.").

[409]  Historically, this typically occurred around 90 days after the initial public offering.  Over the past decade, the usual number of days has decreased to approximately 60.  *See, e.g.*, Anh L. Tran, *Blank Check Acquisitions* (SSRN Working Paper, 2010);James S. Murray, *The Regulation and Pricing of Special Purpose Acquisition Corporation IPOs* (SSRN Working Paper, 2014); James S. Murray, *Innovation, Imitation and Regulation in Finance: The Evolution of Special Purpose Acquisition Corporations*, 6 REV. INTEGRATIVE BUS. & ECON. 1 (2017).

**Figure 2. Warrants offered in SPAC IPO Units, 1990 – 2021[a]**



[a] The estimated distribution is based on the warrant offering information presented in either the IPO prospectus or the Form S-1 or Form F-1 registration filed in connection with all SPACs identified by Dealogic, SPAC Insider, Audit Analytics, and staff manual review, that conducted an initial public offering with a confirmed pricing date as of December 30, 2021.

As SPAC offerings have evolved, however, the highly dilutive aspects of the warrant component of a SPAC offering unit appear to have somewhat attenuated.  As indicated in Figure 2, many SPACs offer units with smaller warrant components.  The majority of SPACs that have conducted an IPO in the past three years offered units with fractional warrants or units where warrants represented only fractional shares.  The dilutive capacity of these warrants is further tempered by the fact that in current practice, warrants (or fractions thereof) are only offered at exercise prices higher than the SPAC IPO offering price.  However, the reduced dilution attributable to warrants as a component of SPAC IPO units does not imply that current SPAC IPOs offer a security that is inherently less exposed to potential dilution or that warrants purchased separately from units, such as in sponsor compensation or PIPE financing transactions, are not still a significant source of dilution.  Furthermore, while warrant features have in some respects become less dilutive, maximum allowable redemptions have generally increased, creating the possibility for non-redeeming shareholders to experience greater dilution

184

albeit from a different source.  The emergent size and significance of PIPE financing in de-SPAC transactions[410] has presented yet another potential source of dilution.

#### e.   Time to Complete a De-SPAC Transaction

Because SPACs are not blank check companies issuing penny stock, they have not been subject to Rule 419's requirements, including the requirement that an acquisition occur by a date 18 months after the effective date of the blank check company's initial registration statement.[411] Nevertheless, SPACs use, as a matter of practice, features of Rule 419 that would appear to enhance protections for investors, including a pre-specified intended lifespan before dissolution that is communicated to investors at the time of the initial public offering.  Table 2 documents the average proposed lifespans (in months) that SPACs in each period disclosed in their initial public offering registration materials as well as the average actual number of months used by those SPACs that successfully completed a de-SPAC transaction, by cohort.  We note that since 2006, the typical SPAC generally pre-commits to a lifespan at least two months, on average, longer than the 18-month limit in Rule 419 and approximately 13 months shorter than the exchange listing 36-month limit.[412]

---

[410]  *See infra* Section IX.B.2.c.

[411]  *See supra* note 12.  *See also* Rule 419(e)(2)(iv) under the Securities Act ("If a consummated acquisition(s) meeting the requirements [of Rule 419] has not occurred by a date 18 months after the effective date of the initial registration statement, funds held in the escrow or trust account shall be returned [to investors.]").

[412]  *See supra* Sections VI.B.3 & IX.B.1.a.

**Table 2. Average Proposed Acquisition Periods in SPAC IPOs (months), 1990-2021[a]**

|  | 1990-2000 | 2001-2005 | 2006-2010 | 2011-2015 | 2016-2020 | 2021 |
|---|---|---|---|---|---|---|
| Proposed Acquisition Period | - | 17.25 | 20.84 | 20.58 | 21.98 | 20.45 |
| Proposed Extension | - | 6.30 | 6.50 | 5.11 | 6.00 | 5.34 |
| Proposed Period with Extension | - | 23.55 | 24.40 | 23.40 | 22.90 | 21.71 |
| Realized Average Acquisition Period[b] | 19.25 | 20.11 | 19.83 | 22.15 | 15.32 | 8.58 |

[a] Averages reported here are estimated over the subsample of SPAC IPOs (*see supra* Table 1 note a) after offerings withdrawn after the IPO pricing date have been removed.  Proposed acquisition periods and proposed extension data is drawn from information as provided by the SPAC in its initial registration materials including prospectuses and Form S-1 or Form F-1. SPACs that disclose they would hold a shareholder vote to approve an extension period but did not pre-commit to specified extension period are treated as having such data missing for purposes of computing averages.
[b] Data on realized average acquisition period for IPO cohorts 2016-2020 and 2021 reflect a downward bias due to the outstanding proportion of SPACs that conducted an IPO between 2019 and 2021 that have not yet completed their proposed acquisition period or approved extensions.  *See infra* note 457.

### 2.    De-SPAC Transactions

The primary parties affected by the proposed disclosure requirements at the de-SPAC transaction stage include SPACs, sponsors of SPACs, investors, potential PIPE investors, and target private operating companies.  Additionally, the proposed rules to amend or otherwise clarify the existing liability framework would affect SPACs, target companies, investors in SPACs, and the underwriters that SPACs use at the SPAC IPO and the de-SPAC stages.[413]

We are mindful that parties may be differentially affected for a number of reasons.  For example, to the extent that regulatory changes we are proposing, if adopted, would become effective while some current SPACs are in the process of completing a de-SPAC transaction,

---

[413] *See, e.g.*, Luisa Beltran, *SPACs Are Scrambling to Find Mergers.  What That Means for Investors*, BARRONS, Feb. 24, 2022.

these SPACs may incur greater unanticipated transaction costs to comply with the full set of new requirements.  Other SPACs that have not yet found a target may find themselves ex-post to have inefficiently entered the market as compared to a SPAC that completes an IPO with knowledge of the costs associated with the proposed amendments.  However, the fact that some of the proposed amendments may reduce costs or simply codify existing best practices may offset some of the potentially more costly elements of other amendments, thus the differential impact of the proposed amendments affecting parties at the de-SPAC transaction stage is expected to vary.

Based on staff analysis of SPACs that registered a distribution of securities between 1990 and 2021, it appears that approximately half of all SPACs following their initial public offerings have announced a subsequent de-SPAC transaction, and about one third have completed their de-SPAC transaction.  It is possible that SPACs currently searching for targets may still identify targets, complete de-SPAC transactions, and thereby increase the fractions of SPACs with announcements and completed transactions.  However, the overall success rate of approximately one-third is generally consistent with previous research findings over more limited historical subsamples,[414] suggesting that the number or proportion of SPACs and related parties that would directly incur the costs, or experience the benefits, of our de-SPAC-related proposals may be smaller than the population of parties affected by our proposed amendments pertaining to a SPAC's initial registration and public offering.

Of the SPAC initial public offerings in 2020 and 2021, a majority have not yet filed a Form 8-K announcing that the SPAC has found a target company, or else have not filed a Form

---

[414]  Studies performed in 2016 or later reviewing the 2003–2013 cohort of SPACs find that approximately 51.5% of SPACs that had an initial public offering during the decade successfully complete a de-SPAC transaction and 21.6% were still publicly traded three years later in 2016.  *See, e.g.*, Milos Vulanovic, *SPACs: Post-Merger Survival*, 43 MANAGERIAL FIN. 679, 679-699 (2017); Kamal Ghosh Ray & Sangita Ghosh Ray, *Can SPACs Ensure M&A Success?*, 16 ADVANCES IN MERGERS & ACQUISITIONS 83, 83-97 (2017).

8-K that would follow within 4 days of a completed a de-SPAC transaction.  As of December 31, 2021, approximately 77 of 248 SPAC IPOs in 2020 (31%) and an additional 495 of 613 SPAC IPOs in 2021 (81%) had not yet announced a target or have withdrawn an announced business combination and resumed searching.  Some market participants have opined that, of recently listed SPACs that have not yet secured a target, a greater proportion are likely to liquidate without completing an acquisition.[415]  This may be due to factors such as changing market conditions (increased volatility, increasing interest or inflation rates, etc.) and an increasingly limited number of viable target private companies (particularly companies with valuations in the range that would match the 80% requirement of most SPACs).

**Table 3. SPAC Outcomes, 1990-2021[a]**

| Filed | IPO Priced | Merger Announced | Merger Completed | Liquidated |
|-------|-----------|------------------|------------------|-----------|
| 1672 | 1273 | 653 | 475 | 96 |

[a] Estimates reported here are based on the respective subsamples of SPAC IPOs (*see supra* Table 1 note a) that reflect all confirmed, completed activity as of December 31, 2021.

a.    *Filings in Connection with a De-SPAC Transaction*

Like any merger or acquisition activity pursued by other public reporting companies, the timing and types of filings that accompany a de-SPAC transaction are usually a function of the way the business combination is structured and the form of consideration employed.  Such transactions may require providing existing shareholders information in advance of a vote.  Others may simply require providing shareholders with information and a specified period of time in which to redeem shares, if desired.  Similarly, such transactions may include an offer of

---

[415] *See, e.g.,* Jemima McEvoy, *Take Back The SPAC: More And More Companies Are Canceling High-Profile Deals To Go Public*, Forbes, Dec. 22, 2021.

securities as a part of the merger or exchange offer, and if so, may require the filing of a registration statement.  The cumulative effects of our proposals would vary in impact on individual de-SPAC transactions based on their unique deal structure and the disclosures they would thus already be obligated or otherwise incentivized to provide.

A recent review of 462 de-SPAC transactions completed in 2020 and 2021 found that approximately 99% of transactions were accompanied by proxy disclosures and 81.0% involved a related filing of a registration statement on either Form S-4 or Form F-4.[416]  Of the 81.0% of de-SPAC transactions that involved the filing of a registration statement, 85.4% were accompanied by a proxy statement on Schedule 14A, and the remaining 14.6% were accompanied by an information statement on Schedule 14C as a result of a consent solicitation.[417]

b.    *Target Form 10 Information in Connection with De-SPAC Transactions*

If a shell company that has Exchange Act reporting obligations, including a SPAC, acquires a target that is not subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act, after the business combination, it must file a Form 8-K that includes the same disclosures about the target company that would have been provided if the target had instead registered a class of securities under Section 12 of the Exchange Act on Form 10.[418]  This Form 10 information in a Form 8-K must be filed within four business days after the completion of a

---

[416]  *See* Michael Levitt, Valerie Jacob, Sebastian Fain, Pamela Marcogliese, Paul Tiger, & Andrea Basham, *2021 De-SPAC Debrief*, Freshfields (Jan. 24, 2022), *available at* https://blog.freshfields.us/post/102hgzy/2021-de-spac-debrief.  We note that the scope of this study is limited to 2020 and 2021.

[417]  *Id.*

[418]  *See supra* Section III A.

de-SPAC transaction.[419]  Because we are proposing to require these disclosures to instead be included filings related to the de-SPAC transaction that occur prior to the consummation of the proposed business combination, whether in a proxy, information, or registration statement or Schedule TO, any SPAC that would otherwise file Form 10 information about its target in a Form 8-K following a de-SPAC transaction would be affected.

**Figure 3. Number of Business Days to File Form 8-K After De-SPAC Transaction[a]**



[a] Data represents the percent of filed Forms 8-K that could be identified, based on staff review, as filed in connection with a de-SPAC transaction that occurred between January 1, 2006 and December 31, 2021, and does not include de-SPAC transactions unaccompanied by an 8-K filing.  Staff noted that de-SPAC transactions unaccompanied by a Form 8-K containing Form 10 information were otherwise accompanied by a Form 20-F and/or Form 6-K when the combined company was a foreign private issuer (FPI) and, in the remaining cases where the combined company was not an FPI, the de-SPAC transaction was accompanied by either a long form (Form 10-12B) or a short form (Form 8-A12B) registration.

As illustrated in Figure 3, staff review of Forms 8-K filed in connection with approximately 300 de-SPAC transactions completed between January 1, 2006 and December 31, 2021 found that approximately 47% of combined companies filed the Form 8-K on the fourth business day after the de-SPAC transaction and approximately 88% of combined companies filed

---

[419] *See* Shell Company Adopting Release, *supra* note 211, at 15-17, 21 (adopting amendments requiring the entity surviving a merger with a shell company to file its report on Form 8-K within four business days after completion of the merger and limiting the use of Form S-8 to register offerings of securities).

the Form 8-K within the 4-business day time limit.  However, as discussed below in Section

C.1.b.8, some registrants currently may voluntarily disclose Form 10 information before filing

the Form 8-K given the staff's observations regarding incorporation by reference of this

information into the Form 8-K from filings made in connection with the de-SPAC transaction.

c.    *PIPES in Connection with De-SPAC Transactions*

PIPEs have supported de-SPAC transactions since their general increased market

presence began in 2005.[420]  However, in some recent SPACs, PIPEs have played a larger role

than they have historically played, and this has given rise to concern about the potential dilutive

effects of PIPEs and how well those might be understood by other investors.

According to a recent study analyzing the 47 registered de-SPAC transactions that

occurred between January 2019 and June 2020, approximately 65% of the cash delivered in these

merger transactions was contributed by public investors, and the amount typically contributed by

third-party PIPE investors was approximately 25%, with the remaining funding provided by the

sponsor.[421]  In such cases, while the equity position of the PIPE investors in the combined

company following a de-SPAC transaction was dilutive, it did not eclipse the ownership stake of

the SPAC IPO shareholders.  Because PIPE investors may receive confidential information with

which to make an investment decision (including one-on-one conversations with the target's

management, which may convey soft information) and may also engage in extended and detailed

due diligence,[422] their participation has at times been considered a benefit to SPAC IPO

---

[420] *See* Meghan Leerskov, *Shell Mergers and SPACs: A Statistical Overview of Alternative Public Offering Methods*, *in* THE ISSUER'S GUIDE TO PIPES: NEW MARKETS, DEAL STRUCTURES, AND GLOBAL OPPORTUNITIES FOR PRIVATE INVESTMENTS IN PUBLIC EQUITY 281 (Steven Dresner ed., 2015).

[421] *See* Klausner, Ohlrogge, & Ruan, *supra* note 17.  The authors analyzed data for the 47 SEC-registered SPACs that merged, and thereby brought companies public, between Jan. 2019 and June 2020.

[422] *Id.*

investors, providing a meaningful indicator of the expected future financial performance of a proposed de-SPAC transaction.

As the SPAC market has evolved, so too have the role and the structure of PIPEs that support, and in some cases enable, de-SPAC transactions.  In 2021, according to one study, approximately 95% of de-SPAC transactions included PIPE financings and the average and median amounts raised in PIPE financings (respectively approximately $300 million and $200 million) were similar to the average size of the SPAC trust account at the time of the IPO.[423] This may reflect that in more recent SPACs, in addition to enabling larger deals, some PIPEs may provide capital to enhance deal certainty.[424] In this alternative role, the financing raised via PIPE investment may ensure that a deal that otherwise may fail due to a high redemption rate can proceed to completion.  In these cases,[425] the ownership stake of the PIPE investors in the combined company may exceed that of the non-redeeming SPAC investors.[426]

PIPE investors may, therefore, come to have a larger stake in the combined company than SPAC IPO investors may have anticipated when making an initial investment.  As a result, SPAC IPO investors may thus find that they hold a smaller stake in the combined company than

---

[423] *See* Levitt et al., *supra* note 416.  The difference between average and median PIPEs in this sample reflect that the data is positively skewed, implying that while some deals may involve low or no additional financing via PIPEs, other deals feature large investments outside the SPAC IPO process.

[424] We note that while there may be more instances in which PIPE financing functions to ensure that the cash requirements of a de-SPAC transaction are met in recent years, the difference between the average and median amount of PIPE financing raised (respectively approximately $300 million and $200 million) and the average and median consideration paid to target shareholders (respectively approximately $2 billion and $1.25 billions) suggests that many PIPE offerings in connections with a de-SPAC transaction still appear to facilitate larger acquisitions rather than replace SPAC share redemptions.  *See* Levitt et al., *supra* note 416.

[425] This outcome would also occur if the PIPE investments simply exceeded the size of the SPAC IPO proceeds without redemptions, but such cases have not been commonly observed.

[426] In a review of PIPE finance raised in connection with de-SPAC transactions that occurred between Jan. 2018 and June 2021, the Commission staff found that while PIPE proceeds ranged, on average from 60% to 88% of SPAC IPO proceeds, net of redemptions, these proceeds represented up to 137% on average (in calendar year 2019) of SPAC IPO proceeds at the consummation of the de-SPAC transaction.

they would find optimal.  Further, they may not be able to purchase an ownership claim in the combined company at the same price as a PIPE investor when PIPEs are offered at a discount to the open market price.  Although PIPE discounts may offset differences in the securities' liquidity, discounts to PIPE investors contribute to the dilution of SPAC investors.

Staff review of PIPEs in connection with de-SPAC transactions that occurred between January 2018 and June 2021 found the average and median discount to PIPE investors were respectively 1.8% and 2.4% when estimated over all PIPEs and slightly higher (respectively 4.4% and 2.4%) for PIPE offerings without warrants.[427]  These results appear generally consistent with a recent study that was more narrowly scoped to the height of the SPAC boom that found, between 2019 and June 2020, that the median discount received by PIPE investors was 5.5% relative to the market value of the publicly traded securities, and, in 37% of SPACs with PIPE deals, the PIPE was at a 10% discount or more.[428] This level of discount appears to be more broadly consistent with estimated discounts associated with PIPE financing outside the SPAC context as, by comparison, a recent study indicates that the average discount for PIPE investors is 11.2%, and for the subsample of PIPES that do not include warrants, the average discount is 5.7%.[429]  While PIPE discounts may, on average, be smaller in the context of SPACs than in other PIPE financing, it is nevertheless a concern that the dilution they may cause may not be adequately anticipated by SPAC IPO investors.

---

[427] These estimates are based on staff analysis of data as described in Table 1, note a, and additional data from PrivateRaise.

[428] *See* Klausner, Ohlrogge, and Ruan, *supra* note 17.

[429] *See* Jongha Lim, Michael Schwert, & Michael Weisbach, *The Economics of PIPEs*, 45 J. FIN. INTERMEDIATION 100832 (2021).  These results are based on a sample of 3001 PIPE transactions by U.S. firms listed on NYSE or NASDAQ between 2001 and 2015.

d.      *Use of Projections in Connection with De-SPAC Transactions*

Proposed Item 1609 of Regulation S-K would apply to projections used in de-SPAC transactions.  Hence, proposed Item 1609 would potentially affect preparers and users of financial projections related to de-SPAC transactions, including SPACs, their sponsors, target companies, their controlling shareholders and management, and current and prospective investors.

Three recent papers discuss the use of projections by SPACs and target private operating companies in de-SPAC transactions.  Chapman, Frankel, and Martin (2021) collected data on 420 SPACs with IPO dates from 2015 to 2020.[430]  They found that 249 (59.29%) de-SPAC transactions were accompanied by at least one forecast.  Dambra, Even-Tov, and George (2022) focus on de-SPAC transactions between January 1, 2010, and December 31, 2020.  They restrict their sample to de-SPAC acquisitions with a single target and exclude SPACs that either delisted before the merger effective date, that traded on the OTC market, or focused on the biotech industry, yielding a sample of 142 observations.[431]  They identify 128 target private companies (90.1%) that provided at least one form of forecast (*e.g.*, revenue or net income) in investor presentations.  Blankespoor, Hendricks, Miller, and Stockbridge (2022) reviewed a sample of 963 SPAC IPOs completed between January 1, 2000, and July 1, 2021.  They removed firms "that are still seeking a merger target, have liquidated, are foreign, or have not publicly filed their roadshow", and arrived at a sample of 389 SPACs.  Of this sample, 312 (80.21%) SPACs provided a revenue forecast.  These studies suggest that the use of projections is fairly common in the de-SPAC transactions and may have become increasingly common over time.

---

[430]  *See* Chapman, Frankel, and Martin, *supra* note 291.

[431]  *See* Dambra, *supra* note 33.

e.   *Use of Fairness Opinions*

According to one source, in 2021, only 15% of de-SPAC transactions disclosed that they were supported by fairness opinions.[432]   In contrast, a study of mergers and acquisitions more broadly found that 85% of bidders obtain fairness opinions.[433]   The results indicate that deals in which bidders obtain fairness opinions may be associated with higher stock price reactions to the deal announcement and also better post-merger operating performance.[434]   This study suggests that, for mergers and acquisitions in which a proxy vote is required, a fairness opinion obtained by the bidder can mitigate information risks and enhance communications between bidder boards of directors and their shareholders.[435]

f.   *SPAC Filer Status*

Figure 4 below shows the proportion of SPACs that claimed smaller reporting company or EGC status, or both, in their first annual report after the initial public offering.  Since 2016, almost all SPACs in their initial public offerings have claimed either smaller reporting company or EGC status, with the majority claiming both.  For example, in 2021, 399 SPACs in their initial public offerings claimed both smaller reporting company and EGC status, while 48 only claimed EGC status.

---

[432]   *See* Levitt, Jacob, Fain, Marcogliese, Tiger, & Basham, *supra* note 416.

[433]   This finding is based on deals that occurred between 1995 and 2015, involving a publicly traded bidder that seeks to acquire a majority of the target's shares.  As discussed by the authors, it is difficult to estimate the fraction of deals that involve a fairness opinion since the use of fairness opinions is disclosed only if bidders are required to file proxy statements to solicit a shareholder vote.  They note that listing rules of the NYSE, Amex, and NASDAQ require a bidder shareholder vote only when the bidder plans to issue 20% or more new equity to finance a deal.  In other words, if the bidder issues less than 20% equity or uses cash to finance the deal, the bidder would not be required to disclose the fairness opinion even if the firm had obtained one.  *See* Tingting Liu, *The Wealth Effects of Fairness Opinions in Takeovers,* 53 FIN. REV. 533 (2018) (finding positive wealth effects from fairness opinions after the SEC approved Rule 2290 in Oct. 2007 which regulates the identification and disclosure of conflicts of interest of investment banks rendering fairness opinions.)

[434]   *Id.*

[435]   *Id.*

**Figure 4. Annual SPAC Cohorts by Smaller Reporting and Emerging Growth Company Statuses Reported at Original Registration Stage**[a]



[a] Data presented here reflects the self-reported status disclosed by SPACs as of the Form S-1, Form F-1, or an amendment to either that was filed most proximate in time to the date of the initial public offering.

> g.    *Changes in Jurisdiction of the Combined Company*

As we consider the potential economic effects of the proposed new rules and amendments, we take into consideration elements of the both the economic and the regulatory baseline, which would include accounting for variations between the applicable legal frameworks in the jurisdictions in which SPACs are incorporated or organized.  Table 4 presents information on the jurisdiction of incorporation or organization for each SPAC that conducted its initial public offering after 1990 and completed a de-SPAC transaction before 2022.  The first two columns state the percentage of SPACs that were originally incorporated or organized in each of six listed jurisdictions.  The second two columns state—for each originating jurisdiction—the percentage of combined companies that were incorporated or organized in the listed jurisdictions following a de-SPAC transaction.

While the majority of SPACs that subsequently consummate a de-SPAC transaction remain incorporated in the same location, Table 4 indicates that the jurisdiction of incorporation or organization of the combined company may change in connection with the de-SPAC transaction.  As a result, SPACs may face changes in prevailing legal standards that arise from a change in jurisdiction of incorporation or organization.  To the extent that different jurisdictions have different disclosure requirements and provide differing levels of investor protections, the baseline regulatory regime will vary across SPACs and may change upon the de-SPAC transaction.

**Table 4 Distribution of Combined Company Jurisdiction of Incorporation or Organization by SPAC Jurisdiction of Incorporation or Organization, 1990-2021[a]**

| At IPO | | Post de-SPAC transaction | |
|---|---|---|---|
| Incorporation | % of de-SPACs | Incorporation | % of IPOs |
| Delaware | 71.88% | Delaware | 84.68% |
| | | Cayman Islands | 4.03% |
| | | Bermuda | 2.02% |
| | | Israel | 1.61% |
| | | New York | 0.81% |
| | | Utah | 0.81% |
| | | Luxembourg | 0.81% |
| | | Bahamas | 0.40% |
| | | British Columbia | 0.40% |
| | | British Virgin Islands | 0.40% |
| | | Illinois | 0.40% |
| | | India | 0.40% |
| | | Jersey | 0.40% |
| | | Marshall Islands | 0.40% |
| | | Maryland | 0.40% |
| | | Nevada | 0.40% |
| | | Ohio | 0.40% |
| | | Ontario | 0.40% |
| | | Quebec | 0.40% |
| | | Virginia | 0.40% |
| Cayman Islands | 23.48% | Delaware | 54.32% |
| | | Cayman Islands | 33.33% |

| | | Netherlands | 3.70% |
|---|---|---|---|
| | | Israel | 2.47% |
| | | Luxembourg | 2.47% |
| | | British Virgin Islands | 1.23% |
| | | New York | 1.23% |
| | | Ontario | 1.23% |
| British Virgin Islands | 3.77% | British Virgin Islands | 46.15% |
| | | Delaware | 15.38% |
| | | Cayman Islands | 7.69% |
| | | Ireland | 7.69% |
| | | Mexico | 7.69% |
| | | Singapore | 7.69% |
| | | United Kingdom | 7.69% |
| Massachusetts | 0.29% | Massachusetts | 100.00% |
| Nevada | 0.29% | Cayman Islands | 100.00% |
| Marshall Islands | 0.29% | Nevada | 100.00% |

[a] Estimates reported here are based on the subsample of SPAC IPOs (see *supra* Table 1 note a) after offerings withdrawn after the IPO pricing date and SPACs with a missing merger completion date have been removed.  State of incorporation data is obtained from a combination of sources, including Dealogic, Audit Analytics, and SEC filings available on EDGAR.  These estimates reflect all confirmed, completed activity as of December 31, 2021.

### 3.   *Blank Check Companies*

We are also proposing an amendment to the definition of "blank check company" for purposes of the PSLRA safe harbor provisions.[436]  The proposed amendment would affect SPACs and certain other blank check companies that may not already be excluded from the PSLRA safe harbor, as well as investors and other market participants whose access to the informational content of forward-looking statements, or potential remedies in the case of material omissions or misstatements, would otherwise differ.[437]  We estimate that in addition to

---

[436]  *See supra* Section III.D.

[437]  Although the PSLRA safe harbor may currently affect private litigation against some SPAC and blank check companies, those companies are subject to state and federal enforcement actions.

potentially affected SPACs, as previously discussed,[438] approximately 30 non-SPAC entities that self-identified as blank check companies but did not self-identify as penny stock issuers may also be affected by the proposed amendment.[439]  Because such non-SPAC blank check companies may not be subject to the same limitations on duration as SPACs, the number of filings or disclosures they might make under the presumed protections of the safe harbor may be greater. However, due to the nature of a blank check company as a development stage company with no specific plan or purpose other than to merge with or acquire an unidentified company or companies, or other entity, or person,[440] it is unlikely that the nature of the forward-looking statements such a registrant might produce would differ in substance from the informational content provided by SPACs and therefore should not have a differential impact on investors or other market participants.

### 4.   Shell-Company Business Combinations

Proposed Securities Act Rule 145a and proposed Article 15 of Regulation S-X would affect SPACs and other shell companies (other than business combination related shell

---

[438]   *See supra* Sections IX.B.1.a & IX.B.2.

[439]   This estimate is based on staff review of all registrants, by unique CIK, that filed at least one periodic or current report between 2019 and 2021 and, as of its most recent filing, identifies its SIC code as 6770.  We exclude CIKs that have already been identified as SPACs and those associated with filings that self-identify as penny stock issuers under Rule 419.  We note that this estimate may represent an upper bound on the number of additional affected parties because it is based on registrants' self-reported SIC and penny stock issuer status.  Studies have reported that self-reported SIC codes may contain errors that could cause a higher number of issuers to be counted as affected parties than in effect would be.  *See, e.g.*, Murat Aydogdu, Chander Shekar, & Violet Torbey, *Shell Companies as IPO Alternatives: An Analysis of Trading Activity Around Reverse Mergers*, 17 APPLIED FIN. ECON. 1335 (2007) ("Not all firms that use SIC [code] 6770 are actually blank checks.  For instance, companies are required to file Form 12 after an acquisition to notify the SEC of their new SIC code.  Many fail to file as they acquire operations in a business with a more descriptive SIC code, yet they continue to use 6770.").  Our estimate does not seek to reclassify potential errors in this case because we are not able to distinguish when the classification error would represent a mistake made by a registrant that knows it is not a blank check company versus when the registrant is mistaken in its belief that it is a blank check company when it may not be.  In the latter case, even if mistaken about its blank check company status as a registrant, the party would still be affected by the proposed amendment because they may currently make, or believe they are able to make, forward looking statements under the PSLRA safe harbor, and would not if the proposed amendment is adopted.

[440]   *See* the definition of "blank check company" in Rule 419(a)(2)(i) of the Securities Act.

companies) involved in business combination transactions.  Proposed Rule 145a would impact

the disclosures reporting shell company investors may receive and potential sources of liability.

Proposed Article 15 of Regulation S-X would impact the financial statements associated with

business combinations involving shell companies and, thus, would also affect parties that are

typically associated with the preparation, review, and dissemination of financial statements and

the information they contain.[441]  Table 5 below illustrates that the proportion of SPAC to non-

SPAC reporting shell-company business combinations has shifted due to the increasing number

of SPACs entering the market.  It also shows that, in 2021, more than one-third of all targets

acquired by a reporting shell company appear to merge with a non-SPAC entity.

### Table 5. Distribution by Year of Shell-Mergers Reported on Form 8-K[a]

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| SPAC | 9.5% | 8.8% | 17.8% | 30.2% | 42.2% | 65.2% |
| Non-SPAC | 90.5% | 91.2% | 82.2% | 69.8% | 57.8% | 34.8% |

[a] Based on Form 8-Ks by calendar year of filing that contain Item 5.06 (Change in Shell Company Status) disclosures, excluding filings by asset-backed securities issuers.

We estimate that in addition to existing SPACs that have yet to complete a de-SPAC

transaction, approximately 160 additional existing reporting shell companies may be affected by

---

[441]  We acknowledge the possibility of a situation in which a previously non-public shell company files an initial registrant statement. The financial statements included in the registration statement would be required to comply with Regulation S-X, including the proposed amendments in Rule 15-01.  As we currently lack the data necessary to estimate the number of shell companies that are private, at present, that could be impacted by proposed Article 15, they are not included in the estimates discussed in this analysis.  However, the extent to which this may impact our conclusions is limited because, based on staff observation and experience with common transaction structures, we believe it is unlikely proposed Article 15 will impact many such shell companies.

the proposed amendments.[442]  Almost all of these non-SPAC reporting shell companies trade on

the OTC market[443] and tend to be smaller than SPACs in terms of market capitalization and total

assets.[444] We further estimate that approximately 11.0% (18) of these shells would also be

affected by the proposed amendment to redefine the term "blank check company" for purposes

of the PSLRA.[445]

Our estimate of approximately 160 shell companies represents an upper bound on the

number of potentially affected shell companies because some of these shell companies could

engage in transactions pursuant to an exemption from registration, or otherwise may engage in

transactions that would not require registration.  For example, if a shell company were to acquire

another shell company, the acquiring shell would not be affected by proposed Rule 145a or

proposed Article 15.  Similarly, a shell company that obtains a fairness determination from a

court or authorized governmental entity might also be exempt.[446]  Given that a more precise

estimate would require us to make assumptions about what proportion of future shell company

mergers may be exempt or not require registration, we request additional data or comments that

would help inform our expectations about how many shell companies that are not SPACs would

also be involved in transactions that would be affected by the proposed rules.

---

[442]  This estimate is based on staff review of all registrants' self-reported status as a shell company on the cover page of the most recent annual report (Forms 10-K, 20-F, or 40-F) or an amendment thereto filed in calendar year 2021 by unique CIKs of entities that are not already identified as SPACs.

[443]  Based on staff review of periodic filings,  approximately 72.7% of these shells trade OTC, 26.1% do not trade, and 0.6% each appear to have traded on Nasdaq Global Market and NYSE Market, respectively.

[444]  As of yearend 2021, the average market capitalization of non-SPACs shell companies was $154,731,262.50 while the average market capitalization of SPACs was $306,204,218.60.  Based on the most recent periodic disclosure filed per registrant before Dec. 31, 2021, the average total asset position of a non-SPAC shell was $33,666,553.41 while the average of SPAC total assets was $309,570,778.30.

[445]  This estimate is based on a cross-tabulation, by unique CIK, of potentially affected parties identified as blank check companies (*see supra* note 439) and as shell companies (*see supra* note 442).

[446]  *See* Section 3(a)(10) of the Securities Act; Staff Legal Bulletin No. 3A (CF) (June 18, 2008), *available at* https://www.sec.gov/corpfin/staff-legal-bulletin-3a.

5.    *Projections Under Item 10(b) of Regulation S-K*

The proposed amendments to Item 10(b) would update the Commission's view on factors to be considered in formulating and disclosing financial projections and would specify the application of Item 10(b) to financial projections prepared by parties other than management.  To the extent that parties elect to follow the updated guidance set forth in the proposed amendments, it would affect registrants and other entities providing financial projections in Commission filings, such as a target firm involved in a business combination with a reporting registrant.  A recent study examined management earnings forecasts by focusing on public companies from 2000 to 2018.[447]  Drawing management earnings forecast data from IBES Guidance, they find that management provides earnings forecasts in 15,295 (30.8%) out of 49,595 firm-years.  The proposed amendments to Item 10(b) would also affect investors and other users of the financial projections included in Commission filings, to the extent that parties elect to follow the updated guidance.

6.    *Investment Company Act Safe Harbor*

The proposed safe harbor would affect all current and future SPACs, sponsors, investors, and potential target companies.  For statistics on these affected parties in the SPAC market, see

---

[447]  *See* Claude Francoeur, Yuntian Li, Zvi Singer, & Jing Zhang. *Earnings Forecasts of Female CEOs: Quality and Consequences*, REV. ACCT. STUD. (2022).  IBES is a database that includes quantitative (numeric) company earnings forecasts collected from press releases and transcripts of corporate events.  To the extent that some of the management earnings forecasts in the IBES database are not included in SEC filings, these figures may overstate the activity that would be affected.  However, because the study sample is drawn from a period after the adoption of Regulation FD, we believe the likelihood an IBES record would not also be present in an SEC filing is low.  It is more likely that these figures may understate the number of affected projections, because the database does not include all public reporting companies, and because management may provide financial projections that are not captured by the IBES database.  *See, e.g.,* Zahn Bozanic, Darren T. Roulstone, and Andrew Van Buskirk, *Management earnings forecasts and other forward-looking statements*, 65 J. ACCT & ECON., 1 (2018) (indicating that approximately 33% of Form 8-K filings of earnings announcements include at least one quantitative forecast.)

our discussion above.[448]  For a description of Section 3(a)(1)(A) of the Investment Company Act

under the Securities Act, see our discussion above.[449]

### a. Nature and Management of SPAC Assets

Most SPACs hold a majority of their assets in a trust (or escrow) account, which is also

required by current listing standards.[450]  For example, Table 6 shows that, on average,

approximately 90% of the initial offering proceeds raised in a SPAC IPO in 2021 were deposited

in trust accounts.

**Table 6. Average SPAC IPO Capital Raised and Amounts in Trust, 2001-2021[a]**

|  | 2001-2005 | 2006-2010 | 2011-2015 | 2016-2020 | 2021 |
|---|---|---|---|---|---|
| IPO Initial Offering[b] | 45.82 | 134.08 | 121.63 | 272.93 | 265.22 |
| IPO Offering w Overallotment[c] | 56.87 | 212.95 | 160.40 | 337.54 | 330.75 |
| Trust/Initial Offering | 88.53% | 97.38% | 94.66% | 91.46% | 89.55% |

[a] Averages reported here are estimated over the subsample of SPAC IPOs (*see supra* Table 1 note a) after offerings withdrawn after the IPO pricing date have been removed.

[b] In millions of dollars.

[c] In millions of dollars, includes exercise of overallotment as reported in Dealogic.

It is also our understanding that SPAC assets, particularly those held in the trust account,

are largely invested in Government securities or Government money market funds.[451]  We also

understand that SPACs generally disclose in their IPO prospectuses that any income earned on

assets in the trust account will be used toward the de-SPAC transaction, after possible deductions

for tax payments.  Some SPACs also disclose that a portion of the interest income could be used

toward any potential dissolution expenses.

---

[448]  *See supra* Sections IX.B.1 and IX.B.2

[449]  *See supra* Section VI.A.1.

[450]  *See supra* note 392 and accompanying text.

[451]  *See, e.g.,* Rodrigues & Stegemoller, *supra* note 17.

b.    *SPAC Activities*

Currently, the typical SPAC discloses in its IPO prospectuses that it is formed as a blank check company for the purpose of effecting a business combination with one or more businesses. In addition, SPACs usually provide disclosures in their IPO prospectuses indicating that they believe they do not meet the investment company definition under Section 3(a).  They further typically disclose to prospective investors that if they are determined to be an investment company in the future, the costs and logistics of compliance with the Investment Company Act would be prohibitive.

Current exchange listing standards and SPACs' own disclosures in their initial public offering registration statements generally require that SPACs must combine with a target that is unidentified at the time of their initial public offerings.[452]  As a result of exchange rules and their own disclosed commitments to investors, SPACs generally have a limited period to find a target and negotiate the terms of a de-SPAC transaction agreement.[453]  Because of the incentives provided to sponsors by the SPAC structure to complete a de-SPAC transaction, the limited period provided for a SPAC to search for a target and complete a transaction deal may cause some SPACs to pursue comparatively less attractive targets as they get closer to their de-SPAC transaction deadlines.[454]  In addition, the limited period to search for a target and complete a de-

---

[452] *See* Nasdaq Listing Rule IM-5101-2 (listing standards for companies with a business plan to "engage in a merger or acquisition with one or more unidentified companies"); NYSE American Company Guide Section 119 (similar).

[453] This limited period may go beyond the pre-committed lifespan SPACs disclose in their IPO registration statements.  As we discuss in *infra* Section IX.B.6.c, SPACs currently may pre-commit to hold a vote on a pre-specified extension period, if needed, to complete a de-SPAC transaction.  SPACs may also ask shareholders ex-post to vote for an extension of the lifespan of the SPAC, even if they did not pre-commit to such a vote.  Based on the sample of SPACs analyzed in *infra* Section IX.B.6.c, the vast majority of SPACs conclude a de-SPAC transaction or liquidate the SPAC within 36 months of their IPO date.

[454] There is some evidence consistent with such incentives.  *See, e.g.*, Dimitrova, *supra* note 30 (finding that four-year post-IPO buy-and-hold abnormal return is on average 8.8% lower if the acquisition is announced at the end of the (self-imposed) two-year deadline instead of at the estimated earlier optimal time).

SPAC transaction may increase the bargaining power of target companies in negotiations with SPACs compared to other potential buyers that do not face such regulatory or self-imposed time constraints.

Most SPACs tend to pursue only one target company for a de-SPAC transaction.  Of the 483 de-SPAC transactions that occurred over the 1990 – 2021 period involving SEC registered SPACs, 3.3% (16/483) of transactions had 2 or more targets (14 transactions had 2 targets, 2 had 3 targets).[455]

> ### c. Duration Statistics: Announcement and Completion of De-SPAC Transactions

To rely on the proposed safe harbor from Investment Company status, a SPAC would be required to announce a de-SPAC transaction no later than 18 months after the effective date of the registration statement for the SPAC's initial public offering, and complete the transaction no later than 24 months after the date of the initial public offering.  For the sake of comparison to other current requirements, this is a shorter period than the 36 months a SPAC can remain listed under current exchange rules as discussed above.[456]

Below we provide statistics on the timing of announcements and completion of de-SPAC transactions for a sample of SPACs with effective IPO dates between January 1, 2016 and December 31 2019.  We chose December 31, 2019, as the end date to ensure that at there is at least a 24-month history available for each SPAC included in the sample in order to reduce potential reverse survivorship bias in the estimates.[457]

---

[455]  Based on data from Dealogic M&A module as of Jan. 2022.

[456]  *See supra* note 393 and accompanying text.

[457]  Note that the number of SPAC IPOs increased significantly in the 2020-2021 period.  To the extent this increase has increased competition for target companies, it may affect the time it takes for more recent SPACs to announce or complete a de-SPAC transaction, or their ability to complete a de-SPAC transaction at all.  As of Dec. 31, 2021, approximately 77 of 248 SPAC IPOs in 2020 (31%) and an additional 495 of 613 SPAC IPOs in 2021 (81%) had

We have data on 152 SPAC initial public offerings between January 1, 2016 and December 31, 2019.[458]  Among these SPACs, all disclosed in their IPO prospectus that they would be limited to a 24 month lifespan or less, where almost 59% (89 of 152) disclosed that they would be limited to a 24 month period, and the rest to a shorter time period, in some cases as short as 12 months (18, or 12%, of cases).  In around 14% of the SPACs (22 of 152), there was disclosure in their IPO prospectus about a pre-commitment to hold a vote on an optional extension period ranging from three to 24 months.  There were five cases in which the combination of the initial lifespan and pre-committed extension period exceeded a 24-month potential total lifespan for the SPAC.  However, we recognize that SPACs may, and some currently do, ask shareholders to vote for an extension of the lifespan of the SPAC even if they did not pre-commit to such a vote or a specified extension period in the event of a vote.

As of December 31, 2021, approximately 96% (146 of 152) of the SPACs in the sample had announced an agreement to enter into a de-SPAC transaction, and approximately 91% had completed a de-SPAC transaction.  Among the 13 cases (9%) in the sample where SPACs had not completed a de-SPAC transaction at this time, seven SPACs had been formally liquidated,[459] whereas six SPACs were still active (four of which had announced a de-SPAC transaction).  As of December 31, 2021, the lifespan of the six still active SPACs ranged between 25 to 37 months since the IPO date.

Overall, approximately 59% (89 of 152) of the SPACs in the sample announced an agreement to enter into a de-SPAC transaction no later than 18-months after the date of the initial

---

not yet announced a target or have withdrawn an announced business combination and resumed searching (*see supra* Section IX.B.2).  S*ee also supra* note 413 and accompanying text.

[458]  Based on data from Dealogic M&A module as of Jan. 2022.

[459]  In two of these cases, a de-SPAC transaction was announced but later withdrawn.

public offering, and 88% (134 of 152) announced a transaction agreement no later than 24 months after the IPO date.  Figure 5 shows the distribution of the timing of announcements for de-SPAC transaction agreements expressed in event-time relative to the IPO effective date for the 146 sample SPACs that had made such an announcement by December 31, 2021.  The longest time to an announcement was 39 months, and the shortest was four months.

**Figure 5: Distribution of De-SPAC Transaction Agreement Announcements (In SPAC IPO Event Time).**



Approximately 65% (99 of 152) of the SPACs in the sample had completed a de-SPAC transaction no later than 24 months after the IPO date, whereas only 31% (47 of 152) of the SPACs in the sample had completed a de-SPAC transaction no later than 18 months after the

IPO date.  Figure 6 shows the distribution of the timing of de-SPAC transactions expressed in event-time relative to the IPO effective date for the 139 SPACs in the sample that completed de-SPAC transactions by December 31, 2021.  The longest time to completion was 43 months, and the shortest was eight months.

**Figure 6: Distribution of Completed De-SPAC Transactions (In SPAC IPO Event Time).**



Among the 139 SPACs in the sample that completed a de-SPAC transaction by December 31, 2021, the average and median times between the announcement and the completion of the transaction were respectively 150 days (approximately 5 months) and 142 days (approximately 4.7 months).  The time between announcement and completion of the merger was less than 6 months in 78% of the cases, and the shortest time observed in the sample was

less than two months (50 days).  For the subsample of 99 SPACs that completed the de-SPAC

transactions in no more than 24 months since the IPO date, the average and median times

between the announcement and the completion of the transaction were respectively 142 days

(approximately 4.7 months) and 125 days (approximately 4.1 months).  For this subsample,

approximately 79% of the de-SPAC transactions occurred less than 6 months after the

announcement, and there were 12 cases in which the announcement of the transaction agreement

was made more than 18 months after the IPO date.

### C.      Benefits and Costs of the Proposed Rules

#### 1.      *Disclosure-Related Proposals*

##### a. *SPAC Initial Public Offerings and Other Registered Offerings*

###### 1.  *Definitions (Item 1601)*

We are proposing Item 1601 to identify certain parties and transactions to which the

requirements of the subpart, as well as other parts of this proposal, would apply.  Defining the

terms "special purpose acquisition company," "de-SPAC transaction," "SPAC sponsor," and

"target company" as proposed would establish the scope of the issuers and transactions subject to

the requirements of Subpart 1600, and thereby provide both registrants and investors with notice

of the associated obligations.  The definitions may impose costs if the new definitions are not

consistent with current understanding and consequently cause confusion for registrants, investors

and market participants.  Both the costs and benefits would be small to the extent that the new

definitions are consistent with widely accepted views.

###### 2.  *Prospectus Cover Page and Prospectus Summary Disclosures (Item 1602)*

Proposed Item 1602 would require a prospectus filed in connection with a SPAC's initial

public offering to disclose information on certain features unique to SPAC offerings and the

potential associated risks, in addition to the information currently required by Item 501 and Item 503 of Regulation S-K, on the prospectus cover page and in the prospectus summary, respectively, as discussed above.[460]   The proposed additional disclosures may reduce SPAC investors' information processing costs and improve their investment decisions.   Investors in SPACs vary in financial sophistication and ability to process the information provided in SPAC IPO prospectuses.   We expect that the potential benefits may especially accrue to investors that are less financially sophisticated.

Specifically, because investors are likely to allocate their attention selectively,[461] requiring disclosure regarding important features and associated risks of SPAC investments on the prospectus cover page (including cross-references to the locations of the more detailed related disclosures) and prospectus summary may increase the likelihood that investors pay attention to the information by making it more salient.[462]   In addition, the proposed additional disclosures in the prospectus summary may further reduce information processing costs, particularly for less financially sophisticated investors, by providing information in plain English about important SPAC features in a concise format.[463]

---

[460]   *See supra* Section II.E for more information about current disclosure requirements.

[461]   *See, e.g.,* George Loewenstein, Cass R. Sunstein, & Russell Golman, *Disclosure: Psychology Changes Everything,* 6 ANN. REV. ECON. 391 (2014).

[462]   Salience detection is a key feature of human cognition allowing individuals to focus their limited mental resources on a subset of the available information and can cause them to over-weight this information in their decision making processes.   *See, e.g.*, DANIEL KAHNEMAN, THINKING, FAST AND SLOW (2013); SUSAN FISKE & SHELLEY E. TAYLOR, SOCIAL COGNITION: FROM BRAINS TO CULTURE (3d ed. 2017).   Moreover, for financial disclosures, research suggests that increasing signal salience is particularly helpful in reducing limited attention of individuals with lower education levels and financial literacy.   *See, e.g.*, Victor Stango & Jonathan Zinman, *Limited and Varying Consumer Attention: Evidence from Shocks to the Salience of Bank Overdraft Fees*, 27 REV. OF FIN. STUD. 990 (2014).

[463]   Existing research notes that individuals bear costs in absorbing information and that the ability of individuals to process information is not unbounded.   *See* RICHARD NISBETT & LEE ROSS, HUMAN INFERENCE: STRATEGIES AND SHORTCOMINGS OF SOCIAL JUDGMENT (1980); David Hirshleifer & Siew Hong Teoh, *Limited Attention, Information Disclosure, and Financial Reporting*, 36 J. ACCT. & ECON. 337 (2003).   Thus, summary disclosure may provide benefits by focusing investors' attention and reducing information processing costs.

Proposed Item 1602(b)(6) would require tabular disclosure in the prospectus summary regarding the nature and amount of the compensation received or to be received by the SPAC sponsor, its affiliates and promoters, and the extent to which this compensation may result in a material dilution of the purchasers' equity interests. There is empirical evidence that visualization improves individual perception of information.[464] For example, one experimental study shows that tabular reports can lead to better decision making.[465] Because sponsors' compensation may be a material cost to SPAC investors, the tabular format of these required disclosures may help investors (especially those that are less financially sophisticated) more easily process the financial implications of compensation of the SPAC sponsor, its affiliates and promoters, thereby potentially incrementally improving their investment decisions.[466]

Additionally, the proposed rules and amendments would standardize this disclosure across all registration statements filed for SPAC initial public offerings, which may make it easier and less costly for investors to compare terms across offerings and thereby promote better investment decisions.

Finally, to the extent the proposed additional disclosures on the cover page and in the prospectus summary would increase investors' awareness of sponsors' incentives and potential conflicts of interest, it may have an incremental disciplining effect on sponsors' behavior. For example, to the extent sponsors would face potentially greater scrutiny by more attentive

---

[464] *See* JOHN HATTIE, VISIBLE LEARNING: A SYNTHESIS OF OVER 800 META-ANALYSES RELATING TO ACHIEVEMENT (2008).

[465] *See* Izak Benbasat & Albert Dexter, *An Investigation of the Effectiveness of Color and Graphical Information Presentation Under Varying Time Constraints*, 10-1 MIS Q. 59 (1986).

[466] *See infra* Section IX.C.1.a.4 for the discussion of proposed Item 1602(a)(4), which would require that the prospectus cover page include a simplified dilution table depicting the estimated remaining pro forma net tangible book value per share that would be realized at quartile intervals up to the maximum redemption threshold.

investors, they may take some additional care in finding and negotiating terms with target companies, or take steps to mitigate the extent of any disclosed conflict of interests.

The proposed additional disclosures that would be required to be included on the prospectus cover page and in the prospectus summary may increase compliance costs for SPACs to the extent that they would need to provide additional information in their IPO prospectuses than they currently provide.  We believe that SPACs should have this information readily available and in some cases may already be disclosing it, such as the time frame for the SPAC to consummate a de-SPAC transaction.  Thus, we expect that any compliance costs resulting from these proposed items would not be significant.

There could also be some potential costs for investors.  In particular, there is a risk that, by requiring more items to be added to the cover page and the prospectus summary, the salience of the current required disclosures may be reduced because they will have to compete with the new required disclosures for investors' attention compared to the baseline.  In addition, because Item 501(b) of Regulation S-K limits the information on the outside cover page to one page, there is a risk that the amount of information required to be included could generally impair the readability of the cover page.  As a result, some investors may pay less attention to the cover page as a whole.

### 3. Sponsors and Conflicts of Interest (Item 1603)

Proposed Item 1603(a) would require disclosure of certain information regarding a SPAC's sponsor, its affiliates and any promoters, both at the SPAC initial public offering stage and at the de-SPAC transaction stage.  To the extent that such disclosures are not already provided or are partially provided, this proposed disclosure requirement would provide investors with information related to the experience and incentives (due to characteristics of the

212

compensation structure, for example) of the sponsor.[467]  Investors may benefit from such disclosure, as it could allow them to better evaluate the circumstances that may impact their investment decision in a specific SPAC.  The proposed disclosure is likely to be beneficial to investors who may consider investing in a SPAC at a point in time that precedes the existence and disclosure of information about an acquisition target, or to investors seeking to evaluate a proposed de-SPAC transaction.[468]

Proposed Item 1603(b) would require disclosure of conflicts of interest at both the SPAC initial public offering stage and at the de-SPAC transaction stage.  This disclosure would also be required in any Schedules TO filed in connection with a redemption.  We believe that this proposed disclosure requirement would benefit investors by enabling them to better assess any actual or potential material conflicts of interest held by sponsors, its affiliates, officers and directors of the SPAC, and/or promoters.  Such disclosure could allow investors to more accurately assess the potential risk associated with the conflicts of interest in a SPAC and thus make better investment decisions.

Further, disclosure under proposed Item 1603(c) would provide investors information about the fiduciary duties that a SPAC's officers and directors owe to other companies.  We expect that this disclosure would allow the SPAC's shareholders and prospective investors to assess the extent to which the officers and directors may face outside obligations, including the possibility that they might be compelled to act in the interest of another company that compete with the SPAC.  In addition, to the extent that a SPAC's officers and directors owe fiduciary duties to other companies, these obligations may limit the attention that they are able to provide

---

[467]  *See supra* Section II.B for more information about current disclosure requirements.

[468]  Academic literature provides some evidence that characteristics of the SPAC sponsor, such as experience or network may be indicative of its ability to select and execute quality transactions.  *See, e.g.*, Lin, *supra* note 30.

to the SPAC.  We expect that these disclosures would benefit investors by allowing them to better assess the actions of the officers and directors in managing the SPACs activities, including a proposed de-SPAC transaction.

Proposed Item 1603(a) may increase compliance costs for SPACs, mainly in the form of collecting, preparing, and filing the required information for disclosure on sponsors, their affiliates and any promoters.  We do not expect, however, such costs to be substantial because most of this information should be readily available, and some of it is currently being provided by SPACs.

With respect to the conflicts of interest disclosures required by Item 1603(b), SPACs could bear direct costs associated with: (i) reviewing and preparing disclosures describing any such conflicts of interest; (ii) developing and maintaining methods for tracking any such conflicts of interest; and (iii) seeking legal or other advice.  While the direct costs associated with Item 1603(b) disclosure requirements would depend on the extent to which a SPAC already provides this disclosure under current practices, we expect these costs to generally be low.  As a baseline matter, the common practice of a SPAC disclosing the presence of actual or potential conflicts of interest as a material risk factor predates SPACs listing on national exchanges.[469] Therefore, it would appear that most SPACs are generally aware of these actual or potential conflicts and would therefore only bear costs insofar as our proposed requirements would involve providing greater detail or specificity in the disclosures of conflicts of interest.

Similarly, we do not expect the disclosures of a SPAC officer or director's fiduciary duties to other companies, as would be required by proposed Item 1603(c) to be very costly to prepare.  Given the significance of a fiduciary relationship, it is unlikely that a director or officer

---

[469] For examples of such disclosures, *see* Jog & Sun, *supra* note 386.

– and, by extension, the SPAC – would not already know what relationships would require disclosure.  The incremental costs to produce, track, or review records also should be low because signed, written documents typically accompany the entrance into a relationship that engenders a fiduciary duty.

### 4.   Dilution (Items 1602(a)(4) and 1602(c))

As discussed above,[470] SPAC shares may experience dilution from various transactions by a number of parties or combinations of parties at various stages of a SPAC's lifecycle.  For example, sponsors typically obtain their "promote" at a nominal value (*e.g.*, $25,000) with most of their compensation typically contingent on the completion of a de-SPAC transaction.  When sponsors receive compensation at the de-SPAC transaction stage, their compensation comes out of the stakes of SPAC investors who do not redeem their shares, leading to an interactive effect between redemptions and the promote that magnifies the dilution.  PIPE investments, due to their typical discount to the IPO offering price and potential interactive effects with redemptions, can further dilute non-redeeming SPAC investors.  Finally, investors that redeem their shares typically get to keep their warrants.  Future exercises of these warrants further dilutes non-redeeming SPAC shareholders' equity.  Because most of these potentially dilutive transactions may occur after the SPAC's initial public offering and both the direct and indirect dilutive effects can be unique to the specific SPAC's structure, they may be difficult for prospective investors and other interested market participants to identify, anticipate, or adequately assess.  In the absence of a more complete appreciation of these dilutive effects, the decision to invest, vote, or redeem, or the price at which one might be willing to enter or exit a position, may lack relevant information and, as a consequence, be suboptimal.  SPAC investors who remain investors in the

---

[470]  *See supra* Section II.D for more information about existing disclosure requirements under Item 506 of Reg S-K.

combined company absorb the above-mentioned dilution effects.  To the extent that investors may not understand the extent of the dilution, or may exhibit inertia regarding the decision to redeem, the dilution may not be reflected in market prices at the time of the target acquisition.[471]

Proposed Item 1602(c) would require that registration statements filed by SPACs, other than for de-SPAC transactions, describe all material potential sources of future dilution following the SPAC's initial public offering and include tabular disclosure of the amount of potential future dilution from the public offering price that will be absorbed by non-redeeming SPAC shareholders, to the extent known and quantifiable.  The proposed rule would benefit investors by providing them with more detailed information on the potential impact of dilution on the value of their SPAC shares, thus enabling them to better understand the effects of dilution on their investments and ultimately make better investment decisions.

We are further proposing to require that registration statements on Form S-1 or Form F-1 filed by SPACs, including for an initial public offering, include a simplified dilution table depicting the estimated remaining pro forma net tangible book value per share that would be realized at quartile intervals up to the maximum redemption threshold.  Given the empirical evidence that visualization improves individual perception of information and that dilution that may occur due to redemption may be a significant cost to investors,[472] we expect that the tabular format of this disclosure will help investors (especially those that are less financially sophisticated) more easily process the financial implications of dilution and potentially improve their investment decisions.  Moreover, the tabular presentation may provide investors with this information in a format that might more accurately represent the dilution that they might

---

[471] *See* Gahng, Ritter, & Zhang, *supra* note 23; Klausner, Ohlrogge, & Ruan, *supra* note 17.

[472] *See* Hattie, *supra* note 464, and Benbasat & Dexter, *supra* note 465.

experience if they choose to invest in the SPAC, as compared to current disclosures.[473]  For example, Figure 7 shows the average maximum allowable number of shares eligible to be redeemed prior to the de-SPAC transaction disclosed by SPACs in their registration statements. As shown, the maximum potential dilution is fairly stable over time, on average about 90% of net tangible book value per share.  Figure 7 also presents the average realized redemptions in de-SPAC transactions, which appear to vary considerably over time.  Thus, despite the fact that SPACs are currently disclosing the maximum potential dilution that may occur as a function of redemptions, this information may not be as useful for investors as a presentation of the same information in a scenario table at quartile intervals of redemption, given that actual redemptions in connection with a de-SPAC transaction rarely reach the maximum allowable amount.  The proposed amendments would provide investors with more granular information about potential dilution, which could allow them to better anticipate the effects of such dilution on future returns.[474]  Additionally, the tabular format of the disclosure would standardize the dilution information, allowing investors to more easily analyze it and compare it across SPACs.

---

[473] *See supra* note 74.

[474] *See* Klausner, *supra* note 71.

**Figure 7. Dilution Disclosures in IPO Registration Statements vs. Realized Redemptions at de-SPAC**



We expect the incremental costs of these proposed disclosure requirements to be, in most cases, low.  First, registrants should already have the underlying information at their disposal and are therefore unlikely to incur significant additional costs to procure the necessary data.  Second, while the proposed rules would require registrants to account for potential future sources of dilution and analyze several levels of redemption, which may require the services or input of quantitative specialists (analysts, forecasters, or other consultants), the material sources and the levels of dilution are generally common across SPAC offerings (thus a standard approach based on best practices may emerge, reducing costs over time) and are known and quantifiable.  For example, sources of dilution may include shareholder redemptions, sponsor compensation, underwriting fees, outstanding warrants and convertible securities, and PIPE financings.  For proposed Item 1602(a)(4), registrants will be required to analyze only four levels of redemption (*i.e.*, 25%, 50%, 75%, and maximum redemption).  Third, many initial registration statements filed by SPACs already include disclosures regarding dilution.  Thus, the additional burden of these disclosures becoming a formal requirement may be relatively modest.  We therefore expect

that the proposed disclosure requirements should benefit the market broadly and investors in particular, insofar as the enhanced information on potential sources of dilution improves price formation.

## 5.    Structured Data Requirement (Item 1610)

Proposed Item 1610 would require all disclosures in proposed Items 1601-1609 of Regulation S-K to be tagged in Inline XBRL.[475]  We expect that this requirement would augment the informational benefits of the proposed new disclosure requirements by making them more easily retrievable and usable for aggregation, comparison, filtering, and other analysis.  XBRL requirements for public operating company financial statement disclosures have been observed to mitigate information asymmetry by reducing information processing costs, thereby making the disclosures easier to access and analyze.[476]  This reduction in information processing cost has been observed to facilitate the monitoring of companies by external parties, and, as a result, to influence behavior of companies, including their disclosure choices.[477]

---

[475]  *See supra* Section II.G.

[476]  *See, e.g.*, Joung W. Kim, Jee-Hae Lim, & Won Gyun No, *The Effect of First Wave Mandatory XBRL Reporting Across the Financial Information Environment*, 26 J. INFO. SYS. 127, 127-53 (2012) (finding evidence that "mandatory XBRL disclosure decreases information risk and information asymmetry in both general and uncertain information environments"); Yuyun Huang, Jerry T. Parwada, Yuan George Shan, & Joey Wenling Yang, *Insider Profitability and Public Information: Evidence From the XBRL Mandate* (SSRN Working Paper, 2020) (finding that XBRL levels the playing field between insiders and non-insiders, in line with the hypothesis that "the adoption of XBRL enhances the processing of financial information by investors and hence reduces information asymmetry").

[477]  *See, e.g.*, Jeff Zeyun Chen, Hyun A. Hong, Jeong-Bon Kim, & Ji Woo Ryou, *Information processing costs and corporate tax avoidance: Evidence from the SEC's XBRL mandate,* 40 J. ACCT. & PUB. POLICY 106822 (2021) (finding XBRL reporting decreases likelihood of firm tax avoidance because "XBRL reporting reduces the cost of IRS monitoring in terms of information processing, which dampens managerial incentives to engage in tax avoidance behavior"); Paul A. Griffin, Hyun A. Hong, Jeong-Bon Kim, & Jee-Hae Lim, *The SEC's XBRL Mandate and Credit Risk: Evidence on a Link between Credit Default Swap Pricing and XBRL Disclosure* (2014 Am. Acct. Assoc. Annual Meeting Aug. 6, 2014) (finding XBRL reporting enables better outside monitoring of firms by creditors, leading to a reduction in firm default risk); Elizabeth Blankespoor, *The Impact of Information Processing Costs on Firm Disclosure Choice: Evidence from the XBRL Mandate*, 57 J. ACCT. RESEARCH 919 (2019) (finding "firms increase their quantitative footnote disclosures upon implementation of XBRL detailed tagging requirements designed to reduce information users' processing costs," and "both regulatory and non-regulatory market participants play a role in monitoring firm disclosures," suggesting "that the processing costs of market participants can be significant enough to impact firms' disclosure decisions").

While these observations are specific to operating company financial statement disclosures and not to disclosures outside the financial statements, such as the proposed specialized disclosure requirements applicable to SPACs, they indicate that the proposed Inline XBRL requirements could directly or indirectly (*i.e.*, through information intermediaries, such as financial media, data aggregators, and academic researchers) provide investors with increased insight into the proposed specialized SPAC disclosures at specific SPACs, and allow them to compare it to information provided by other SPACs at the time of their initial public offerings, perhaps through filtering by criteria, such as offering size or the name of the sponsor.[478]  Also, like Inline XBRL financial statements (including footnotes), the proposed SPAC specialized disclosures would include tagged narrative disclosures in addition to tagged quantitative disclosures.[479]  Tagging narrative disclosures can facilitate analytical benefits, such as automatic comparison/redlining of these disclosures against that provided by other SPACs in their initial public offerings and the performance of targeted assessments of specific SPAC specialized disclosures.[480]

We expect the proposed requirement to tag SPAC specialized disclosures in Inline XBRL would impose compliance costs on SPACs at an earlier stage of their life cycle than under the current baseline.  Currently, SPACs are required to tag financial statements (including footnotes)

---

[478]  *See, e.g.*, Nina Trentmann, *Companies Adjust Earnings for Covid-19 Costs, but Are They Still a One-Time Expense?*, WALL ST. J., Sept. 24, 2020 (citing an XBRL research software provider as a source for the analysis described in the article); *Bloomberg Lists BSE XBRL Data*, XBRL.ORG (2018); Rani Hoitash & Udi Hoitash, *Measuring Accounting Reporting Complexity with XBRL*, 93 ACCT. REV. 259, 259-287 (2018).

[479]  For example, proposed Item 1603 would consist largely of narrative disclosure regarding the SPAC sponsor, but would also include quantitative disclosure regarding the compensation paid (or to be paid) to the SPAC sponsor, its affiliates, and any promoters for all services rendered in all capacities to the SPAC and its affiliates.

[480]  To illustrate, using the search term "warrant" to search through the text of all SPAC registration statements for initial public offerings to determine how many such initial public offerings disclosed the inclusion of warrants within SPAC sponsor compensation could return many narrative disclosures outside of the discussion (*e.g.*, disclosures related to warrants offered to investors as part of the initial public offering).

and cover page information in certain registration statements and periodic reports in Inline

XBRL.  However, SPACs are not obligated to tag any disclosures until they file their first post-

IPO periodic report on Form 10-Q, Form 20-F, or Form 40-F.  Various preparation solutions

have been developed and used by operating companies to fulfill XBRL requirements, and some

evidence suggests that, for smaller companies, XBRL compliance costs have decreased over

time.[481]  Generally, registrants without prior experience using such compliance solutions often

incur initial implementation costs associated with Inline XBRL tagging, such as costs associated

with licensing Inline XBRL compliance software and training staff to use the software to tag the

disclosures.  Because SPACs typically operate as shell companies with no or nominal operations,

it may be more likely that SPACs outsource their tagging obligations to a third-party service

provider, and thus avoid the aforementioned software licensing and training costs.  They would,

however, incur the costs of retaining such third party services.

### b. *De-SPAC Transactions*[482]

#### 1. *Prospectus Cover Page, Summary, and Disclosure of Dilution (Item 1604)*

---

[481] An AICPA survey of 1,032 reporting companies with $75 million or less in market capitalization in 2018 found an average cost of $5,850 per year, a median cost of $2,500 per year, and a maximum cost of $51,500 per year for fully outsourced XBRL creation and filing, representing a 45% decline in average cost and a 69% decline in median cost since 2014.  *See* Michael Cohn, *AICPA Sees 45% Drop in XBRL Costs for Small Companies*, ACCT. TODAY (Aug. 15, 2018) (stating that a 2018 NASDAQ survey of 151 listed registrants found an average XBRL compliance cost of $20,000 per quarter, a median XBRL compliance cost of $7,500 per quarter, and a maximum, XBRL compliance cost of $350,000 per quarter in XBRL costs per quarter), *available at* https://www.accountingtoday.com/news/aicpa-sees-45-drop-in-xbrl-costs-for-small-reporting-companies (retrieved from Factiva database); Letter from Nasdaq, Inc., Mar. 21, 2019, to the Request for Comment on Earnings Releases and Quarterly Reports; Release No. 33-10588 (Dec. 18, 2018) [83 FR 65601 (Dec. 21, 2018)].

[482] The benefits of proposed Item 1603 in connection with disclosures regarding sponsors and conflicts of interest in connection with a de-SPAC transaction on a proxy, information, or registration statement or Schedule TO are expected to be largely the same as the effects of those disclosures made in connection with a SPAC IPO, though they may be incrementally higher in so far as the disclosures could also guide voting and redemption decisions at the de-SPAC transaction stage, which would not occur in connection with a SPAC IPO.  *See supra* Section IX.C.1.a.3. We would similarly expect the costs of compliance with Item 1603 to be comparable at the de-SPAC transaction stage as in connection with a SPAC IPO.  However, to the extent that Item 1603 would require SPACs to disclose

In connection with a de-SPAC transaction, many SPACs currently register an offering of securities using a Form S-4 or F-4.  We expect most de-SPAC transactions to include a Securities Act registration statement going forward.  Proposed Items 1604(a) and 1604(b) would require any prospectus accompanying a registration statement at the de-SPAC transaction stage to include certain information unique to the de-SPAC transaction on the cover page and in the summary, in a style and substance comparable to the additional disclosures that proposed Item 1602 would require at the initial public offering stage.[483]  In addition, proposed Item 1604(c) would require disclosure in the prospectus of each material potential source of additional dilution that non-redeeming shareholders may experience by electing not to redeem their shares in connection with the de-SPAC transaction, a sensitivity analysis in tabular format that expresses the amount of potential dilution under a range of reasonably likely redemption levels, and a description of the model, methods, assumptions, estimates, and parameters necessary to understand the sensitivity analysis disclosure.[484]

We expect the proposed Items 1604(a) and 1604(b) would have similar potential direct benefits to investors as those we discussed for proposed Item 1602 above.[485]  That is, we expect that including the additional disclosures on the de-SPAC transaction prospectus cover page and in the prospectus summary may increase the likelihood that investors pay attention to and process this information by making it more salient.  Additionally, the proposed additions to the de-SPAC transaction prospectus summary may reduce information-processing costs of investors, particularly less financially sophisticated investors, by providing certain SPAC-specific

---

certain information in connection with their IPOs, the costs of making those same disclosures at the de-SPAC transaction stage should be lower because the materials necessary would have largely already been prepared.

[483]  *See supra* Section II.E for more information about the regulatory baseline.

[484]  *See supra* Section II.D for more information about the regulatory baseline.

[485]  *See* discussion in *supra* Section IX.C.1.a.2.

disclosures concisely and in plain English.  Moreover, like for proposed Item 1602(b)(6), proposed Item 1604(b)(4) would require tabular disclosure in the prospectus summary regarding the terms and amount of the compensation received or to be received by the SPAC sponsor and its affiliates in connection with the de-SPAC transaction or any related financing transaction, and whether that compensation has resulted or may result in a material dilution of the equity interests of unaffiliated security holders of the SPAC.  Presenting this information in tabular format may further help reduce information-processing costs for some investors.[486]  Additionally, proposed Items 1604(a) and 1604(b) would standardize the required information across all registration statements filed for de-SPAC transactions, making it potentially easier and less costly for investors to compare terms across transactions.  Overall, because of the aforementioned potential effects on investors' attention and information processing costs, the proposed additional disclosures on the prospectus cover page and in prospectus summary may help improve investors' investment decisions.

Certain items that proposed Items 1604(a) and 1604(b) would require SPACs to include on the prospectus cover page and in the summary may potentially benefit investors through incrementally improved SPAC governance.  For example, the inclusion of disclosures regarding material potential or actual conflicts of interest could increase investors' attention to such issues. In turn, this may have an ex ante disciplining effect on sponsors that would mitigate the potential costs to investors of conflicts of interests.  In addition, the SPAC would be required to state whether it reasonably believes that the de-SPAC transaction is fair or unfair to unaffiliated security holders, the bases for such belief, and whether the SPAC or SPAC sponsor received any report, opinion, or appraisal from an outside party regarding the fairness of the de-SPAC

---

[486]  *See supra* notes 464-465 and accompanying text.

transaction.  Prominent disclosure of these items may increase investor attention to the fairness or unfairness of the transaction, which may incentivize sponsors to avoid transactions that could potentially be viewed as unfair.[487]

As with proposed Item 1602, the additional items that proposed Items 1604(a) and 1604(b) would require to be included on the de-SPAC transaction prospectus cover page and in the prospectus summary may increase compliance costs for SPACs to the extent that they would need to provide additional information compared to what they currently provide.  To the extent that SPACs already disclose some of this information or have most of this information readily available, these costs would be mitigated.

There could also be some potential costs to investors from proposed Items 1604(a) and 1604(b).  In particular, as with proposed Item 1602, there is a risk that, by requiring more items to be added to the cover page and the summary, the salience of the current required disclosures may be reduced because they will have to compete with the new required disclosures for investors' attention compared to the baseline.  In addition, because Item 501(b) of Regulation S-K limits the information on the outside cover page to one page, there is a risk that the amount of information required to be included could generally impair the readability of the cover page.  As a result, some investors may pay less attention to the cover page as a whole.

We expect proposed Item 1604(c) would benefit investors by providing them with detailed information on the potential impact of dilution on the value of their SPAC shares in connection with the de-SPAC transaction, thus enabling them to better understand the effects of dilution on their investments and ultimately make better investment decisions.  Besides requiring

---

[487] Here we are considering the potential incremental benefits of the placement of this information on the cover page and in the summary.  For a discussion of the incremental informational value of these disclosures, see *infra* Section IX.C.1.b.3.

disclosure of each material potential source of future dilution that non-redeeming shareholders may experience, proposed Item 1604(c) also would require sensitivity analysis disclosure in tabular format that expresses the amount of potential dilution under a range of reasonably likely redemption levels.  This sensitivity analysis may provide investors with information that could more accurately represent the dilution that they might experience if they choose not to redeem their shares as compared to current disclosures.[488]  Such more granular information about potential dilution may allow investors to better anticipate the effects of the dilution on future returns.  In addition, as discussed above,[489] we expect that the tabular format of this disclosure will further help investors (especially those that are less financially sophisticated) more easily process the financial implications of dilution.

We expect some incremental compliance costs of proposed Item 1604(c) to the extent registrants are not already providing disclosures similar in nature to what is required by the proposed amendment.  In particular, the proposed rules would require registrants to engage in a sensitivity analysis to account for potential future sources of dilution and analyze several levels of redemption, which may require the services or input of quantitative specialists (analysts, forecasters, or other consultants).  However, we expect the compliance costs of providing this disclosure would be mitigated by several factors.  First, registrants should already have the underlying information at their disposal and are therefore unlikely to incur significant additional costs to procure the necessary data.  Second, material sources and the levels of dilution are generally common across SPAC offerings (thus a standard approach based on best practices may emerge, reducing costs over time), and are known and quantifiable.  For example, sources of

---

[488]  *See supra* note 74.

[489]  *See supra* notes 464 and 465, and accompanying text.

dilution may include shareholder redemptions, sponsor compensation, underwriting fees, outstanding warrants and convertible securities, and PIPE financings.  Third, although proposed Item 1604(c) does not specify the number of redemption levels to be analyzed, the fact that this disclosure could be calculated in a manner consistent with the methodologies and assumptions used in the disclosures provided pursuant to Item 506 elsewhere in the prospectus may reduce incremental costs.  Thus, depending on how significant these mitigating factors are, the additional burden to registrants of this disclosure may be limited.

2. *Background, Material Terms, and Effects of the De-SPAC Transaction (Item 1605)*

Proposed Items 1605(a), (b) and (c) of Regulation S-K would require disclosure of the background (*e.g.*, description of any contacts, negotiations, or transactions concerning the transaction), material terms, and effects of the de-SPAC transaction and any related financing transaction.  In addition, proposed Item 1605(d) would require disclosure of any material interests of a SPAC's sponsor, officers, and directors in a de-SPAC transaction or any related financing transaction, including fiduciary or contractual obligations to other entities and any interest in, or affiliation with, the target company.[490]  Such disclosure would benefit investors by providing them with more detailed information about significant aspects of de-SPAC transactions, thereby enabling them to make more informed decisions.  For example, some of the proposed disclosures may enable investors to better assess whether the de-SPAC transaction or any related financing transaction has been structured in a manner that would benefit, for example, the SPAC's sponsor to the detriment of unaffiliated security holders of the SPAC.

---

[490] *See supra* Section II.F.1 for information about the regulatory baseline.

Proposed Item 1605(e) would require disclosure as to whether or not security holders are entitled to any redemption or appraisal rights, and if so, a summary of the redemption or appraisal rights. These disclosures would help investors to better assess the impact of any redemption or appraisal rights on a proposed de-SPAC transaction, including whether the existence of such rights might lead some investors to redeem their securities after voting in favor of a de-SPAC transaction.

The proposed disclosures could increase the compliance costs for de-SPAC transactions. The magnitude of these costs would depend on the amount of information that SPACs and target companies are already disclosing in connection with de-SPAC transactions. To the extent that registrants already disclose some of this information or have most of this information readily available, these costs would be mitigated.

### 3. Fairness of the De-SPAC Transaction and Reports, Opinions, Appraisals and Negotiations (Items 1606 and 1607)

Proposed Item 1606(a) would require a statement from a SPAC as to whether it reasonably believes that the de-SPAC transaction and any related financing transaction are fair or unfair to the SPAC's unaffiliated security holders, as well as disclosures regarding whether any director voted against or abstained from voting on, approval of the de-SPAC transaction or any related financing transaction. In addition, proposed Item 1606(b) would require a discussion of the material factors upon which the statement as to the fairness or unfairness of the transaction is based. Proposed Items 1606(c) through 1606(e) would provide additional information about the de-SPAC transaction and any related financing transaction, including whether a majority of unaffiliated security holders is required to approve the transaction(s), the involvement of any unaffiliated representative acting on behalf of unaffiliated shareholders, and whether the transaction(s) were approved by a majority of directors of the SPAC who are not employees of

the SPAC.  These proposed rules could allow investors to better evaluate potential conflicts of interest and misaligned incentives in connection with the decision to proceed with a de-SPAC transaction, which in turn would assist them in assessing the fairness of a particular de-SPAC transaction and any related financing transaction to unaffiliated security holders.[491]

As discussed in the baseline, SPACs rarely report the use of a fairness opinion when evaluations of prospective target are disclosed in de-SPAC-related filings.[492]  A recent review of de-SPAC transactions in 2021 reported that approximately 85% did not disclose that a fairness opinion was obtained in connection with a de-SPAC transaction.[493]  To the extent that the proposed required disclosures with respect to the fairness or unfairness of the proposed business combination would increase the use of fairness opinions, the cost of obtaining such services would present a new cost to the transaction that would likely be passed along to shareholders. The average costs for fairness opinions obtained by SPAC acquirers where such information was presented in an itemized format in SEC filings was approximately $270,000.00.[494]

Thus, SPACs may incur additional costs associated with proposed Item 1606(a) to the extent that, in response to this proposed item, SPACs newly seek to obtain fairness opinions.  In addition, there is some potential for indirect costs to SPACs if they respond by providing for approval by unaffiliated security holders or directors, or retain an unaffiliated representative to act on behalf of unaffiliated security holders for purposes of negotiating the terms of a de-SPAC transaction of any related financing transaction.  However, some costs to collecting or producing

---

[491] *See supra* Sections II.F.2 and II.F.3 for additional information about the regulatory baseline.

[492] *See supra* Section IX.B.2.e.

[493] *See* Levitt, Jacob, Fain, Marcogliese, Tiger, & Basham, *supra* note 416.

[494] As calculated over the observations in the baseline sample (reference first table in de-SPAC baseline (or its footnotes)) where data is available in the Dealogic M&A module or SDC Platinum database.

the newly required disclosures may be mitigated by other components of the regulatory baseline, which in this case includes the requirements imposed by self-regulatory organizations such a listing standards and FINRA rules.[495]

In particular, if the SPAC obtained its fairness opinion from a FINRA member, some of the disclosures responsive to proposed Item 1606(a) may already be prepared and provided to the SPAC because of existing FINRA requirements.  Specifically, FINRA Rule 5150 requires its members (*i.e.*, broker-dealers or underwriters) to provide specified disclosures in a fairness opinion if it knows, or has reason to know, that the opinion will be provided to shareholders.[496] Some of the information that is required to be disclosed includes the following: (1) whether the FINRA member will receive any additional significant payment or compensation contingent on the completion of the merger transaction;[497] (2) if the FINRA member independently verified information provided by the company requesting the opinion, a description of the information that was verified;[498] and (3) whether or not the fairness opinion addresses the fairness of the compensation to be received by the company's officers, directors  or employees relative to the compensation to the public shareholders of the company.[499]

Proposed Item 1607(a) would require disclosure about whether or not the SPAC or its sponsor has received any report, opinion, or appraisal obtained from an outside party relating to the consideration or the fairness of the consideration to be offered to security holders or the fairness of the de-SPAC transaction or any related financing transaction to the SPAC, the

---

[495] For example, see existing FINRA Rule 5150 requirements for disclosures required of a broker-dealer when providing a fairness opinion in the role of financial advisor.

[496] *Id.*

[497] FINRA Rule 5150(a)(2).

[498] FINRA Rule 5150(a)(4).

[499] FINRA Rule 5150(a)(6).

sponsor or security holders who are not affiliates.  Proposed Item 1607(c) would require any

such report, opinion, or appraisal to be filed as an exhibit to the Form S-4, Form F-4, and

Schedule TO for the de-SPAC transaction or included in the Schedule 14A or 14C for the

transaction, as applicable.  In addition, under proposed Item 1607(b), investors would receive

information regarding, among other things, the outside party, including its qualifications and

certain material relationships with the SPAC, its sponsors and their affiliates.  We expect that

these disclosures would benefit investors by providing relevant information about the fairness of

a de-SPAC transaction and any related financing transaction.  In addition, by providing more

information to investors, these disclosures may lead to improved market participation, liquidity,

and price efficiency.  We expect that these disclosures would increase the costs associated with

the de-SPAC transaction.  However, those costs should be mitigated because the disclosure

requirement does not require preparation of additional reports, appraisals and opinions, rather, it

requires disclosure of documents that were obtained by management.

### 4.    Proposed Item 1608 of Regulation S-K

We are proposing Item 1608 of Regulation S-K to codify a staff position that a Schedule

TO filed in connection with a de-SPAC transaction should contain substantially the same

information about a target private operating company that is required under the proxy rules and

clarify that a SPAC must comply with the procedural requirements of the tender offer rules when

conducting the transaction for which the Schedule TO is filed.[500]  For example, proposed Item

1608 would clarify that SPACs that file a Schedule TO for a redemption must comply with the

procedural requirements of Rule 13e-4 and Regulation 14E, such as the requirement to keep the

redemption period open for at least 20 business days.

---

[500]  *See supra* Section II.F.4

We expect that both the benefits and costs associated with this proposal to present modest changes from current practice, if any, because, historically, relatively few de-SPAC transactions have involved the filing of a Schedule TO alone and because, due to the staff position, most of the proposed disclosures are currently already provided.  Between 2000 and 2021, of the approximately 575 registrants that filed a proxy statement on Schedule 14A, an information statement on Schedule 14C, a Schedule TO, or a registration statement on Form S-4 or F-4 that could relate to a de-SPAC transaction, a small portion of those registrants (approximately 7.1% or 41) filed a Schedule TO.[501]  A smaller portion of these Schedule TO filings (approximately 20% or 8) occurred alone (*i.e.*, without the concurrent filing of a proxy statement, information statement, or registration statement that would provide additional disclosures regarding the de-SPAC transaction) (see Figure 8).  However, given that the staff has historically expressed the view that a Schedule TO should include the same information about the target company that would be required in a Schedule 14A, in view of the requirements of Item 11 of Schedule TO

---

[501]  Staff review of SPACs that conducted an IPO between 2000 and 2021 and subsequently filed any type of potential de-SPAC transaction related filing (SC TO, SC13E4F, PRE 14A, PRE 14C, DEFA14A, DEFA14C, DEFM14A, DEFM 14C, DEF 14A, DEF 14C, S-4, or F-4) found that only approximately 7.1% of such SPACS, by unique CIK, filed a Schedule TO.  It appears that the historic use of a Schedule TO in connection with a de-SPAC transaction corresponds to a period when share redemption was more limited and de-SPAC transactions were more commonly targeted by hedge funds engaged in 'greenmailing.'  *See, e.g.*, Lucian Bebchuk, Alon Brav, Wei Jiang, Thomas Keusch, *Dancing with Activists*, 137 J. FIN. ECON. 1 (2020) (describing 'greenmail' as an event in which a company targeted by an activist shareholder such as a hedge fund, purchases shares from the activist at a premium to the market price).  In the SPAC context, the activists were most commonly hedge funds that would threaten to prevent an acquisition by voting against a de-SPAC transaction and redeeming a large enough block of shares to cross the SPAC's redemption threshold if the SPAC refused to buy back its shares at a premium.  *See, e.g.*, Leerskov, *supra* note 420 ("Many of these funds are arbitrage investors …turning a profit by voting against an acquisition, therefore recouping their initial investment while holding the associated warrants against any possible upside from a successful acquisition.  Additionally, more investors began threatening to veto potential SPAC mergers in 2006 and 2007 unless they received deal sweeteners.  Mostly, investors asked to be bought out at a premium in exchange for their votes in favor of a merger.").  This activity decreased, as did the use of a Schedule TO in connection with a de-SPAC transaction, as SPAC redemption thresholds increased in the early 2000s from approximately 20% on average to approximately 80% on average.  *See, e.g.*, Milan Lakicevic, Yochana Shachmrove, & Milos Vulanovic, *Institutional Changes of Specified Purpose Acquisition Companies (SPACs)*, 28 N. AM. J. ECON. & FIN. 149 (2014) (20.47% to 84.24% from 2003-2006 to 2009-2012); Rodrigues, *supra* note 67 (20.0% to 74.4% from 2003-2011); Vulanovic, *supra* note 414 (20% to 81.52% from 2003-2013).  As such, historic use may be a poor predictor for estimates of future usage.

and Item 1011(c) of Regulation M-A and the importance of this information in making a redemption decision, the proposed rule is unlikely to result in a meaningful difference in the nature or amount of information provided by registrants.[502]

**Figure 8. De-SPAC Transactions Involving Schedule TO, 2000-2021**



Finally, of the registrants that filed only a Schedule TO, 75% were foreign private issuers that originally registered an offering of shares via a Form F-1, while the remaining 25% were registrants incorporated or organized in a foreign jurisdiction that originally registered an offering of shares using a Form S-1.  It is possible that, holding all else constant, any benefits or costs accruing as the result of proposed Item 1608 would do so to SPACs that are similar to these entities that may either not hold a shareholder vote or else hold a vote that is not subject to federal proxy rules.  However, it is unclear what proportion of future SPACs would be of this

---

[502] *See supra* note 103.

type, since in the event proposed Rule 145a is also adopted, the number of SPACs may be less likely to file Schedules TO.

> 5.   *Enhanced Projections Disclosure Requirements (Item 1609)*

Proposed Item 1609 complements the proposed amendments to Item 10(b) of Regulation S-K,[503] and pertains to projections made in connection with an anticipated de-SPAC transaction.[504]  Proposed Item 1609 would require a registrant to disclose who prepared the projections and the purposes for which the projections were prepared.  It would also require a discussion of all material bases of the disclosed projections and all material assumptions underlying projections, and any factors that may impact such assumptions.  Furthermore, the proposed rule would require the board or management of the SPAC or target company to confirm at the date of the filing whether the projections reflect their current view, and if not, the purpose of disclosing the projections and the reasons for any continued reliance by management or the board on the projections.

In general, we expect that proposed Item 1609 would allow investors to better evaluate and use projections in connection with de-SPAC transactions.  The required disclosure of preparers' identity and purposes for which the projections were prepared would help reveal potential conflicts of interest and the qualifications of the preparers' projection ability.  The requirement to discuss material assumptions and underlying rationales would also inform investors about the verifiability of the projections.  The proposed requirement to disclose whether the projections still reflect the views of management or the board should provide investors with further insight into the reliability and utility of those projections.  Overall, the

---

[503]  *See supra* Section V.B.1; *infra* Section IX.C.4.

[504]  *See supra* Section III.D & Section VI.  For additional information about the regulatory baseline for Item 1609, see *supra* Section V.B.2.

proposed disclosure under Item 1609 should benefit investors by helping them assess whether and to what extent they should rely on projections used in a de-SPAC transaction in making voting, redemption, and investment decisions.[505]

Proposed Item 1609, by requiring projection providers to identify themselves and related parties to confirm their reliance on the projections, would likely also increase the preparers' sense of accountability, and potentially increase their incentives to make reliable projections.[506] In turn, investors could benefit from potentially improved projections in their investment decisions.  The enhanced disclosure transparency about projections and the plausible improved projection accuracy would, in turn, facilitate more efficient allocation of capital.[507]

We do not expect the direct compliance costs to be substantial since companies should have the required information (*e.g.*, the party that provides the projections and the assumptions of growth rates or discount multiples) readily available at their disposal.  To the extent that proposed Item 1609 increases contextual information related to SPAC projections, investors

---

[505]  D. Eric Hirst, Lisa Koonce, & Shankar Venkatram, *How Disaggregation Enhances the Credibility of Management Earnings Forecasts*, 45 J. ACCT. RESEARCH 811 (2007)), experimentally show that disaggregated forecasts, which include forecasts of individual income statement line items, *e.g.*, revenue and costs, are more credible to investors than aggregated forecasts that provide only the bottom-line earnings forecasts.  Furthermore, Zahn Bozanic, Darren T. Roulston, & Andrew Van Buskirk, *Management Earnings Forecasts and Other Forward-looking Statements*, 65 J. ACCT. & ECON. 1 (2018), demonstrate that non-earnings-forecast forward-looking statements can generate significant responses from both investors and analysts.  Their findings indicate that the forward-looking statements, even statements unrelated to earnings, can provide value-relevant information to the capital market participants.

[506]  Auditing literature provides evidence that audit quality increases and misreporting decreases when engaging partners are required to sign the audit report or when their identities are disclosed.  Joseph V. Carcello & Chan Li, *Costs and Benefits of Requiring an Engagement Partner Signature: Recent Experience in the United Kingdom*, 88 ACCT. REV. 1511 (2013), document evidence that audit quality and audit fees increase in the first year when engaging partners are required to sign the audit report in the United Kingdom.  Allen D. Blay, Eric S. Gooden, Mark J. Mellon, & Douglas E. Stevens, *Can Social Norm Activation Improve Audit Quality? Evidence from an Experimental Audit Market*, 156 J. BUS. ETHICS 513 (2019), experimentally demonstrate that PCAOB's requirement of disclosing engaging partners' identity can reduce misreporting.

[507]  *See* Amy P. Hutton, Gregory S. Miller, & Gregory S. Skinner, *The Role of Supplementary Statements with Management Earnings Forecasts*, 41 J. ACCT. RESEARCH 867,867-890 (2003).  They find that good news earnings forecasts are positively associated with investor reaction (*i.e.*, have information content) only when the forecasts are accompanied by verifiable supplementary forward-looking disclosures.

would incur incremental costs in processing the added information.[508]  Potentially heightened accountability under proposed Item 1609 may also dampen the willingness of the managements and boards of SPACs and target companies to provide projections, which may decrease the amount of forward-looking information made available to investors and thus increases valuation uncertainty.  To the extent that proposed Item 1609 dampens the willingness to provide projections, it would likely reduce projections without reasonable bases more than those with reasonable bases.  Thus, the incremental costs of proposed Item 1609 would likely be justified by the incremental benefit of increased investor protection against materially misleading or speculative projections in connection with de-SPAC transactions.

### 6.  Structured Data Requirement

As with the proposed specialized disclosure requirements applicable to SPACs at the IPO stage as discussed above, proposed Item 1610 would also require that the proposed disclosures prepared in compliance with respective sections of Regulation S-K Subpart 1600 applicable to de-SPAC transactions be tagged in Inline XBRL.[509]  For the same reasons discussed above, we expect that the tagging requirement for de-SPAC transaction disclosures would augment the informational benefits to investors resulting from the proposed new disclosure requirements.[510]  For example, tagging the disclosure of terms and amounts of the compensation received or to be received by a SPAC's sponsor and its affiliates in connection with a de-SPAC transaction, and the potential dilutive effects related to such compensation, could allow investors to make

---

[508]  *See* Elizabeth Blankespoor, Ed deHaan, & Iván Marinovic, *Disclosure Processing Costs, Investors' Information Choice, and Equity Market Outcomes: A review*, 70 J. Acct. & Econ. 1, 1-46 (2020).  They suggest that it is costly to process firms' disclosures, even for the most sophisticated investors, and they conceptualize processing costs as awareness cost, acquisition cost, and integration cost.

[509]  *See supra* Section II.G.

[510]  *See supra* Section IX.C.1.a.5.

quantitative and qualitative comparisons to similar disclosure in other de-SPAC transactions or make it easier to compare these disclosures – including numeric values – to those presented at the SPAC's IPO stage.[511]

Unlike the proposed Inline XBRL tagging requirement for SPAC specialized disclosures which would apply to registration statements for initial public offerings, the proposed tagging requirement for de-SPAC transaction disclosures would not impose a tagging obligation on registrants that were not previously subject to tagging obligations, because SPACs are already subject to Inline XBRL tagging obligations as of their first periodic report on Form 10-Q, Form 20-F, or Form 40-F.[512]  As such, the Inline XBRL tagging requirement for de-SPAC transaction disclosures would be limited to the cost of selecting, applying, and reviewing Inline XBRL tags to a new set of disclosures, or paying a third party to do so.  As previously noted, there is some indication that these costs have trended downward in the years since the initial adoption of XBRL requirements for SEC filings.[513]

### 7. Minimum Dissemination Period

The proposed minimum dissemination period for prospectuses and proxy and information statements filed in connection with de-SPAC transactions is designed to ensure that SPAC shareholders have adequate time to review the information disclosed therein before making voting, investment and redemption decisions.  To the extent that this would provide investors with more time than they would otherwise have because the SPAC's jurisdiction of incorporation or organization does not provide for a minimum dissemination period before a shareholder meeting or action by consent, or has a minimum dissemination period of fewer than 20 calendar

---

[511]  *See* proposed Item 1604(a)(3) of Regulation S-K.

[512]  *See supra* note 110 and accompanying text.

[513]  *See supra* note 481 and accompanying text.

days, this may allow them to make more informed choices.  Relative to the current baseline, this proposal is likely to provide its greatest potential benefits to SPAC shareholders in de-SPAC transactions involving SPACs that do not incorporate by reference any information about the SPAC or the target, and are not incorporated in Delaware, or do not file a Schedule TO.[514] While Delaware General Corporation Law only requires that due notice of an upcoming meeting be provided 20 days prior to the event, and does not mandate a minimum period for dissemination of proxy statements or joint prospectus/proxy statements required by the federal securities laws,[515] we believe, based on staff experience reviewing filings, that the notices of the meeting mandated by Delaware law are often included in the proxy statement or joint prospectus/proxy statements, with many companies then delivering the proxy statements or joint prospectus/proxy statements in time to meet the Delaware notice requirement.[516]

While we recognize that the additional time we propose to provide to shareholders for review of de-SPAC transaction related disclosures may in effect shorten the time a SPAC may otherwise have to pursue a business combination within its limited time before dissolution, the incremental costs of formalizing a minimum review period should in most cases be low based on the existing requirements and practices discussed above and market-specific incentives.  For example, as retail ownership of its shares increases, a SPAC may face increasing pressure to communicate with its investors earlier, more extensively, and with greater frequency to ensure

---

[514]  Because a Schedule TO filed in connection with a de-SPAC transaction must already be filed 20 business days in advance of the close of the redemption period, the proposed 20 calendar day minimum dissemination period would not have an incremental effect.  Similarly, there would be no incremental effect on the dissemination of Forms S-4 or F-4 in connection with a de-SPAC transaction if the registration incorporates any information about the registrant or its target by reference because a similar 20 business day requirement applies.  *See supra* note 127.  Further, in the event that proposed Rule 145a is adopted, we anticipate the majority of de-SPAC transactions would be accompanied by an S-4 or F-4 in which incorporation by reference is highly likely to occur.

[515]  *See supra* Section II.F.5

[516]  *See supra* Section III.B for more information about the regulatory baseline.

that a quorum will be present at the shareholder meeting to approve a de-SPAC transaction and that a sufficiently high number of votes are cast in favor of the transaction.

Notwithstanding this, we acknowledge that any costs associated with this proposal would likely increase as the dissolution date approaches, because, under such conditions, unique logistical costs like expedited printing and delivery would accrue.  It is plausible that a de-SPAC transaction would not be able to proceed due to these proposed timing requirements, which could result in negative consequences (*e.g.*, forgone returns) for sponsors and SPAC shareholders. Given the significance of a de-SPAC transaction to SPACs and targets, however, we think it is more likely that SPACs and targets will account for the proposed dissemination period in establishing a timeline for their business combination.  Another potential cost of the minimum dissemination period is that it could cause SPACs to enter into sub-optimal deals earlier in the process to avoid the risk of failing to acquire a company later in the window.  However, given the state of current market practices as discussed above, we expect the incremental costs on this aspect of deal-formation uniquely attributable to the proposed minimum dissemination period are minimal.

> 8. *Aligning Non-Financial Disclosures in De-SPAC Disclosure Documents*

We are proposing that, if the target company in a de-SPAC transaction is not subject to the reporting requirements of Section 13(a) or 15(d) of the Exchange Act, the registration statement or schedule filed in connection with the de-SPAC must include disclosures relating to the target company that would be provided in a Form S-1 or F-1 for an initial public offering.[517] Currently, this information is required to be included in a Form 8-K with Form 10 information

---

[517] *See supra* Section III A.

that must be filed within 4 business days after the completion of a de-SPAC transaction.  In contrast, the proposed disclosure requirements would require that target company information be provided to shareholders before they make voting, investment, or redemption decisions in connection with the de-SPAC transaction.  This could reduce potential opportunities to engage in regulatory arbitrage, minimize differences in informational content, timing, and presentation, and potentially provide investors with more information about the target company when making such decisions.  The benefits of such alignment to unaffiliated investors would depend on the ability of investors to otherwise procure such information prior to the filing of the Form 8-K with Form 10 information.

We expect that a SPAC or its sponsors would absorb the related costs if the proposed additional information necessitates earlier or increased information production and dissemination, although a portion of these costs may accrue to non-redeeming shareholders if costs are paid from the trust or escrow account of the SPAC.  Generally, we expect that such costs will be low to the extent that SPACs disclose this information about the target company prior to the completion of the de-SPAC transaction; however, we recognize that some items may be more costly to disclose earlier than others.

The costs and benefits of these proposed disclosures depend on the baseline level of information available that is required to be disclosed in the Form 8-K with Form 10 information that is currently disclosed in advance of the filing of the Form 8-K.  To assess the extent to which registrants may already disclose Form 10 information about the target company in a different Commission filing before filing the Form 8-K, the staff examined the frequency and scope of incorporation by reference in such 8-K filings, finding that 95% of the 8-K filers incorporated at

least one of the required Form 10 items by reference.[518]  Most of the Form 8-K filings that incorporated items by reference referred to disclosures previously filed in a proxy or information statement (88% of filers), and 46% of these filings incorporated disclosures from a registration statement filed in connection with the de-SPAC transaction.[519]



**Figure 9. Incorporation by Reference in Form 8-K by Regulation S-K Disclosure Item[a]**



[a] Data here represents the frequency of incorporation by reference per item that would be affected by the proposed amendment as a percent of Forms 8-K filed in connection with a de-SPAC transaction (described in Figure 3 note a) that incorporated any item by reference.

Figure 9 shows the information that is incorporated by reference in the Forms 8-K filed in connection with de-SPAC transactions, as identified by the item requirement of Regulation S-K. Disclosures pursuant to Items 101 (description of business), Item 102 (description of property),

---

[518]  Items 2.01(f), 5.01(a)(8), and 9.01(c) of Form 8-K each provide that if any required disclosure under these items has been previously reported, the registrant may, in lieu of including that disclosure in the Form 8-K, identify the filing in which that disclosure is included.

[519]  Because some filers incorporate disclosure by reference from more than one source, the total percentage of usage across sources exceeds 100%.

and Item 103 (legal proceedings) of Regulation S-K are most commonly incorporated by reference.  Less frequently incorporated by reference are disclosures pursuant to Item 304 (changes in and disagreements with accountants on accounting and financial disclosure), Item 403 (security ownership of certain beneficial owners and management, assuming the completion of the de-SPAC transaction and any related financing transaction), and Item 701 (recent sales of unregistered securities) of Regulation S-K.[520]  Thus, to the extent that registrants already provide this information in the proxy statements, information statements, registration statements, and Schedules TO filed in connection with the de-SPAC transaction, the benefits and costs of compliance with this proposed rule may be mitigated.

As a result of this proposed rule, investors may obtain disclosure required by Item 403 of Regulation S-K regarding the target company's beneficial ownership structure before making a voting, redemption, or investment decision in connection with the de-SPAC transaction, which could, in some cases, represent a meaningful change to the informational environment in advance of the completion of a de-SPAC transaction, particularly when this information may be critical to an investor's ability to evaluate potential conflicts of interest.  In addition, the disclosures may allow investors to identify potential misalignments of interests between non-redeeming shareholders and other parties to the de-SPAC transaction.  This proposed requirement therefore may provide increased investor protections and generally improve the

---

[520]  While these items are less frequently incorporated by reference, their absence may not indicate missing information.  For example, filers may not have provided Item 304 or Item 701 disclosures in earlier filings because there were no changes in and disagreements with accountants or recent sales of unregistered securities to report.  When disclosures are presented in the Form 8-K, Item 304 disclosures are incorporated by reference in approximately 32% of filings and newly disclosed in 68% of filings.  Similarly, for Item 701 disclosures, the proportions of Forms 8-K that incorporate by reference and include new disclosure, are respectively approximately 35% and 65%.

information environment for investors to make a voting, redemption, or investment decision in connection with the de-SPAC transaction.

Because a SPAC and its intended target should have access to this information in advance of a de-SPAC transaction, we do not anticipate significant costs to preparing such information and incorporating it into disclosures disseminated at an earlier stage in the de-SPAC transaction process.

We believe that the proposed additional information is unlikely to impose significant changes to the information that a SPAC would otherwise disclose or the costs for incremental changes relative to current market practice.  To the extent that these requirements may lead to the production and dissemination of information that would not be disclosed until after the completion of the de-SPAC transaction, the availability of this information in the registration statement or schedule filed in connection with the de-SPAC transaction may improve investor decision-making.

### 9.   Re-Determination of Smaller Reporting Company Status

The main benefit from the proposed amendment to re-determine smaller reporting company status of a post-business combination company following a de-SPAC transaction would be to reduce regulatory arbitrage by requiring a target company going public through a de-SPAC transaction to provide similar information to investors as a comparable company conducting a traditional initial public offering.[521]  For larger target companies, this would require providing more comprehensive and more detailed disclosure to investors soon after the de-SPAC transaction.  Overall, we expect this amendment to increase investor protection by allowing investors to assess the combined company more thoroughly and sooner.  Large target companies

---

[521] *See infra* Section III.C for more information on the regulatory baseline.

may also reap the benefit of reduced cost of capital insofar as providing additional historical periods of financial statement data might further reduce information asymmetries or otherwise improve price formation.[522]

The proposed amendment would increase compliance costs compared to the current baseline for large target companies that, after combining with the SPAC, do not meet the smaller reporting company definition as of the proposed new re-determination date. Those companies may need to provide more detailed disclosure to investors soon after the de-SPAC transaction. We note, however, that some of these companies that meet the definition of emerging growth company could avail themselves of the accommodations associated with EGC reporting requirements, which could mitigate some of the disclosure costs required by the proposed amendment. We do not expect the proposed amendment to impose any costs on post-business combination companies when, at the time of the de-SPAC transaction, neither the SPAC nor the target company meet the smaller reporting company definition.

2.    *Liability-Related Proposals*

In addition to the proposals discussed above pertaining to disclosures, we are proposing to clarify and amend the existing liability framework in an effort to resolve certain ambiguities and protect investors. In this section, we discuss the potential costs and benefits of the proposed amendment to Form S-4 and Form F-4 to require that the SPAC and the target company be treated as co-registrants when these registration statements are filed by the SPAC in connection with a de-SPAC transaction. In addition, we discuss the proposed amendment to the definition of "blank check company" for purposes of the PSLRA to remove the "penny stock" condition,

---

[522]  *See supra* note 368.

and proposed Rule 140a that would clarify the underwriter status of SPAC IPO underwriters in registered de-SPAC transactions.

a.   *Private Operating Company as Co-Registrant to Form S-4 and Form F-4*

When a de-SPAC transaction is registered on a Form S-4 or F-4, the party that files a registration statement currently depends on the structure of the merger or acquisition.  While the result of any de-SPAC transaction involving a registered offering would be that the target company becomes a public reporting company, the liability it and its officers and directors face for disclosures in the registration statement that inform investors' decisions regarding the de-SPAC transaction is largely a function of how the transaction is structured.  For example, when the de-SPAC transaction is structured such that the SPAC registers the offering of its shares to target shareholders and the target merges into the SPAC, the SPAC would typically sign the registration statement as the registrant and the SPAC and certain officers and directors of the SPAC that sign the registration statement would incur liability for disclosures in the registration statement.  Alternatively, a de-SPAC transaction can be structured so that the target registers the offering of its shares to SPAC shareholders, such that the target would typically be the registrant, and the target and certain officers and directors of the target would sign the registration statement and incur liability for disclosures in the registration statement.[523]

We are proposing to amend Form S-4 and Form F-4 to require that the SPAC and the target company be treated as co-registrants when a registration statement is filed by the SPAC in connection with a de-SPAC transaction.  As a result, both the SPAC and the target, and certain officers and directors of the SPAC and target, would be required to sign the registration

---

[523] *See supra* Section III.C for more information about the regulatory baseline.

statement and incur potential liability for statements and omissions therein.  Treating the target as a co-registrant in this situation is intended to provide similar investor protections as if the target had entered the public market through a traditional IPO (or a de-SPAC transaction structure in which a Securities Act registration statement is filed by the target, rather than the SPAC).

The liability associated with being a co-registrant could incentivize the target company's directors and management to exercise greater care in the preparation and presentation of material information about the company, its financial condition, and its future prospects; perform more robust due diligence with respect to materials it obtains from third-party sources in connection with the de-SPAC transaction; and more closely monitor disclosures in the registration statement.  Thus, the proposed requirement could improve the reliability of the disclosure provided to investors about the target company, reduce the instances of misstatements and omissions, and generally improve investors' decision making with regard to these transactions.

The proposed co-registrant requirement would increase compliance costs for targets compared to the baseline in cases where the target would not already have been the registrant at the time of the de-SPAC transaction.  Under the proposed rule, a target and its signing officers and directors would be liable to investors for the accuracy of the disclosures in such a registration statement.  This increase in potential liability from the current baseline for targets and their signing officers and directors could impact the decision of a private company to go public via a de-SPAC transaction.  It is possible that, due to some of the ways the proposed rules would alter differences, actual or perceived, between the disclosure requirements and liabilities associated with becoming a public reporting company via a traditional IPO versus being acquired by a SPAC, some targets could reconsider a traditional initial public offering instead.  It is also

possible that other potential targets may determine that the liability costs (including, but not limited to, increased litigation risk and the potential need for new insurance coverage or higher premiums for existing coverage) associated with being a co-registrant would be too high and elect not to go public.  Given the multifaceted benefits of being a public company, however, it is unclear that the costs of being a co-registrant would be the determining factor that would discourage a target from going public through a de-SPAC transaction or outweigh other factors that typically drive the going public decision such as liquidity for company insiders and the lower cost of capital.

### b.  PSLRA Safe Harbor

Defining the term "blank check company" for purposes of the PSLRA as proposed, would make the PSLRA safe harbor unavailable for forward-looking statements made in connection with an offering by a blank check company that is not issuing "penny stock" as defined in Exchange Act Rule 3a51-1, including an offering of securities by a SPAC in connection with a de-SPAC transaction.[524]  As noted above, many commentators have raised concerns about the use of forward-looking statements that they believe to be unreasonable in de-SPAC transactions.[525]  By providing greater clarity regarding the availability of the PSLRA safe harbor, the proposed amendment should strengthen the incentives for a blank check company that is not issuing penny stock, including a SPAC, to avoid potentially unreasonable and potentially misleading forward-looking statements, and to expend more effort or care in the preparation and review of forward-looking statements.[526]  For example, if less time and effort is required to produce meaningful cautionary statements than to produce careful and robust

---

[524]  *See supra* Section IX.B.3.  *See also supra* Section III.E for more information about the regulatory baseline.

[525]  *See supra* note 33.

[526]  *See supra* note 279.

forward-looking statements, absent the proposed changes, market participants may have an incentive to underinvest in the production of reliable forward-looking statements. By increasing the potential costs to companies of making forward-looking statements, the proposed changes are expected to increase the incentives for blank check companies that are not issuing penny stock to exercise more care in making any such statements. Similar investor protection benefits may apply to registered securities offerings of non-SPAC registrants that would meet the current definition of a "blank check company" but for the "penny stock" condition.

The net economic effect of this proposed amendment, however, would depend on, among other things: (1) the extent to which practitioners currently are willing to advise their clients that the PSLRA safe harbor is available for forward-looking statements made by blank check companies that are not issuing penny stock that otherwise meet the conditions of the safe harbor; (2) the extent to which the market does not already discount the informational value of forward-looking statements; and (3) the costs associated with valuable information that may no longer be provided due to any perceived increase in the risk of potential litigation.

While amending the definition of "blank check company" in this manner would clarify that the statutory safe harbor in the PSLRA is not available for forward-looking statements made in connection with offerings by SPACs or other blank check companies that are not penny stock issuers, it could impose costs on any such companies that currently attempt to rely upon the safe harbor to communicate value-relevant information to investors through forward-looking statements. For such companies, this proposed amendment could increase the perceived risk of litigation and dissuade them from including such forward-looking information. This information could be valuable in offerings involving business combinations with private operating companies given that less historical information regarding private companies is likely otherwise

available.[527]  In addition, we note that, while there is no prohibition on the use of forward-looking statements in connection with an initial public offering, the fact that the express terms of the PSLRA provide that the safe harbor is unavailable for such statements, and the concomitant heightened litigation risks associated with providing forward-looking statements, may have created a chilling effect given that, in staff experience, projections are almost never provided to the public in connection with an IPO.  The proposed amendments similarly may lead to fewer forward-looking statements in connection with offerings by SPACs or other blank check companies that are not penny stock issuers.  This effect would likely be stronger for blank check companies affected by the proposal that are considering whether to include forward-looking statements about younger target companies with fewer observable periods of profit historically, as most of their value typically comes in the form of future growth options.  Such blank check companies that are not penny stock issuers might otherwise be the most likely to use forward-looking statements to communicate the potential for future value creation to investors at the time of a business combination.

Additionally, if the proposed amendment reduces the amount of potentially relevant information presented to investors in connection with a de-SPAC transaction or other business combination involving a blank check company that is not a penny stock issuer due to perceived litigation risk, this may negatively affect investors' ability to accurately value these companies and allocate their investments accordingly.  For blank check companies that are SPACs, such costs could be mitigated if some of the other amendments that we are concurrently proposing are

---

[527] *See* Vijay Jog & Bruce J. McConomy, 30 J. Bus. Fin. & Adver. 125 (2003) (finding that the voluntary provision of earnings forecasts in connection with Canadian IPOs (subject to a two-year horizon maximum and accompanied by a statement of opinion by a public accountant) had incremental value beyond other methods of signaling firm quality such as the use of a highly reputable underwriter or auditor, including "a favorable and noticeable impact on the degree of underpricing and the post-issue return performance" and that benefits are most pronounced for "small firms and those making conservative forecasts.").

adopted and improve the flow of relevant information to investors at the de-SPAC transaction

stage.  Similar costs may also be mitigated for investors in non-SPAC blank check companies

not issuing penny stock that would be subject to proposed Rule 145a as reporting shell-

companies.[528]  Because reporting shell company shareholders may, under proposed Rule 145a,

receive registration statement disclosures in connection with a reporting shell company's merger

activity, the proposed rule could result in incremental information about the target company

being provided to reporting shell company shareholders, to the extent that those investors would

not otherwise receive such information.

### c.   Underwriter Status and Liability in Securities Transactions

Proposed Rule 140a would clarify that a person who has acted as an underwriter in a

SPAC IPO and participates in the distribution by taking steps to facilitate the de-SPAC

transaction, or any related financing transaction, or otherwise participates (directly or indirectly)

in the de-SPAC transaction will be deemed to be engaged in the distribution of the securities of

the surviving public entity in a de-SPAC transaction within the meaning of Section 2(a)(11) of

the Securities Act.  The statutory definition of an "underwriter" under the Securities Act is broad

and does not include an element of intent; as a result, a person could perform functions that

would cause the person to meet the statutory definition of an "underwriter" within the meaning

of Section 2(a)(11) of the Securities Act without appreciating that they are doing so.  This may in

turn lead to both deal-specific and market-wide economic inefficiencies such as underinvestment

in diligence or screening.  For example, an investment banker, or financial advisor providing

services in connection with a de-SPAC transaction may not adequately fulfill their role as a

---

[528] *See supra* Section IX.B.4 and note 445.

gatekeeper for disclosures in a de-SPAC transaction registration statement if they are unaware that they are an underwriter and face potential liability as such.[529]

A key benefit from proposed Rule 140a would be the incentives that it would create for SPAC IPO underwriters that may be subject to Section 11 liability for registered de-SPAC transactions to perform due diligence to ensure the accuracy of the disclosures in these transactions. Improved due diligence would enhance investor protection by allowing investors to better evaluate the target company and, in turn, potentially make better investment decisions. We expect that clarifying the application of underwriter liability, combined with the disclosures of proposed Subpart 1600 of Regulation S-K, could significantly improve the ability of SPAC shareholders to evaluate the target company. This may allow these investors to better price the securities of the combined company and decrease the likelihood that they overvalue the target company under consideration. Additionally, more clearly defined Section 11 liability may enhance shareholders' ability to pursue a remedy, if needed.

Potential Section 11 liability may deter a SPAC IPO underwriter from participating in the de-SPAC transaction or any related financing transactions by increasing their costs. The extent to which proposed Rule 140a would impose new costs on SPAC IPO underwriters would depend heavily on the extent to which they do not already perform due diligence that would be sufficient to perfect such a defense in connection with the de-SPAC transaction or a related financing transaction. If SPAC IPO underwriters decide not to provide services in connection with the de-SPAC transaction or a related financing transaction due to proposed Rule 140a, the SPAC may incur greater monetary and non-monetary costs related to identifying, negotiating with, and hiring financial advisors. Also, because a significant portion of SPAC IPO underwriting fees

---

[529] *See supra* Section III.E.3 for more regulatory baseline information.

(typically 3.5% of IPO proceeds) is usually deferred until, and conditioned upon, the completion of the de-SPAC transaction, SPAC IPO underwriters that decide not to participate in the de-SPAC transaction as a result of this proposal may revise their compensation agreements so that they would be paid only at the time of the SPAC initial public offering.  Such a change in the timing of compensation may increase the up-front transaction costs of the initial public offering for SPAC investors and sponsors.  It is possible, however, that underwriter compensation may decrease if underwriters would not be expected to provide any services in connection with the de-SPAC transaction or any related financing transaction.

Alternatively, proposed Rule 140a may cause SPAC IPO underwriters to demand higher compensation for their participation in the de-SPAC transaction or any related financing transaction given the potential exposure to Section 11 liability.  The fees that SPAC IPO underwriters currently charge for their efforts in connection with a SPAC initial public offering generally range between 5% and 5.5% of the initial public offering proceeds, with potentially additional merger advising fees charged at the de-SPAC transaction stage.  It is difficult to predict whether these fees would increase to incentivize SPAC underwriters to participate in de-SPAC transactions or the amount of any such increase.  For comparison, the underwriter fees in the traditional initial public offering process, where underwriters have Section 11 liability, are, on average, 7% of the IPO proceeds.[530]  It is possible, however, that SPAC IPO underwriters could demand higher fees for potentially bearing Section 11 liability in connection with the de-SPAC transaction or any related financing transaction.  Any increase in the compensation of SPAC IPO underwriters would increase the transaction costs to investors and sponsors, potentially lowering their returns on their investment.

---

[530]  *See, e.g.,* Hsuan-Chi Chen & Jay Ritter, *The Seven Percent Solution*, 55 J. FIN. 1105 (2000).

Finally, to the extent that SPAC IPO underwriters decide not to participate in the de-SPAC transaction or any related financing transaction due to potential Section 11 liability, investors would not have the protection of any due diligence that SPAC IPO underwriters may have performed in connection with such transactions.  However, if SPAC IPO underwriters are able and willing to absorb some of the costs associated with potential Section 11 liability (*e.g.*, because of other benefits, such as revenues from future repeat business with sponsors), the potential cost increase for SPAC shareholders and sponsors may be small.

3.   *Shell-Company Related Proposals*

a.   *Proposed Rule 145a*

Proposed Rule 145a would deem any business combination of a reporting shell company (that is not a business combination related shell company) involving an entity that is not a shell company to involve a sale of securities under the Securities Act to the reporting shell company's shareholders.  Proposed Rule 145a is intended to address concerns regarding the use of reporting shell companies generally as a means by which private unregistered companies access the U.S. capital markets.  One reason for these concerns is that reporting shell company shareholders may not receive the Securities Act protections (including disclosure and liability) they receive in a traditional IPO because of transaction structure.  Under the proposed rule, SPACs and other reporting shell companies would have to register these deemed sales by filing a Securities Act registration statement unless there is an applicable exemption.[531]

Proposed Rule 145a would potentially provide shareholders in a reporting shell company, engaged in a business combination involving a non-shell company, with more consistent Securities Act protections, regardless of the structure used for the business combination.

---

[531]  *See supra* Section IV.A.2 for more information about the regulatory baseline.

Currently, if a reporting shell company buys a target by issuing its shares as consideration for the interests of the target shareholders, and the reporting shell company is the surviving entity, reporting shell company investors are unlikely to receive a registration statement in connection with the transaction.  In this example, the reporting shell company shareholders would not receive the protections afforded by the Securities Act, including any enhanced disclosure or liability that would be available if the transaction were registered under the Securities Act.

Proposed Rule 145a is intended to address potential disparities in the types of disclosure and liability protections available to reporting shell company shareholders depending on the transaction structure used in a reporting shell company business combination, and thus, is expected to bolster investor protection for reporting shell company shareholders.  This could be of particular benefit to shareholders in reporting shell companies that may not otherwise receive information about the intended target, or potentially even notification that a specific business combination will be entered into, until after the transaction has occurred.  Additionally, receipt of registration materials may provide a beneficial nudge to reporting shell company shareholders who might otherwise be vulnerable to inertia by calling attention to the nature in which their investment would be transformed should they continue to hold their securities.[532]  However, these informational benefits to affected reporting shell company shareholders may be mitigated to the extent that the reporting shell company is able to rely on an exemption from registration and shareholders do not receive offering materials in connection with the deemed sale.  Because it is unclear the extent to which reporting shell company shareholders may be able to anticipate which disclosure and liability protections will be available to them at the time of a business

---

[532] Investor inertia refers to the tendency to avoid trading.  *See, e.g.*, Laurent E. Calvert, John Y. Campbell, & Paolo Sodini, *Fight or Flight? Portfolio Rebalancing by Individual Investors*, 124 Q. J. ECON. 301 (2009) ("observing little aggregate rebalancing in the financial portfolio of participants").

combination (as a function of whether an exemption would be available), the extent to which proposed Rule 145a might improve price or capital formation is also unclear.

As a result of proposed Rule 145a, reporting shell companies, including SPACs, would be required to register the deemed sale of their securities to their shareholders at the time of certain business combinations, unless there is an available exemption.  Costs would increase to the extent that a business combination is not already structured in a manner that otherwise would have been considered a sale to the reporting shell company shareholders under the securities laws.  This would include all costs associated with conducting a registered offering of securities, such as preparing a Securities Act registration statement, if no exemption is available.  The proposed rule may also introduce opportunity costs in the form of transactions that might otherwise have occurred, but would be disincentivized under the new requirements.  For example, under current rules, a business combination involving a reporting shell company can be structured to avoid registration, such as through the use of cash, rather than stock, as consideration.  Because proposed Rule 145a would deem such a transaction to involve a sale to reporting shell company shareholders that would need to be registered unless there is an applicable exemption, affected parties may opt not to pursue such a transaction rather than incur the new transaction costs involved.  There may also be financial-exclusion related costs if reporting shell companies are increasingly incentivized to pursue exemptions from registration and as a consequence pre-emptively seek to place their securities with only certain types of investors such as accredited investors or non-accredited sophisticated investors.

To the extent that this proposal would apply the strict liability standard of Section 11 to transaction-related disclosures to which it would not otherwise apply, we expect there to be extra costs associated with greater care in preparation and review of any reporting shell company

registration statement.[533]  Also, there could be some costs associated with timing issues generated by SEC staff review of any registration statement.  Some of these costs may be mitigated to the extent that the reporting shell company or target is already preparing disclosure documents, particularly Securities Act registration statements, in connection with a business combination that would be covered by proposed Rule 145a.  For example, in a de-SPAC transaction, the SPAC and/or target company may already be preparing a Schedule 14A, 14C, or TO, or a Form S-4 or F-4.  Reporting shell companies and SPACs also typically prepare Forms 8-K containing Form 10 disclosures that are filed shortly after the business combination.

### b.  Financial Statement Requirements in Business Combination Transactions Involving Shell Companies

Proposed Article 15 of Regulation S-X and related amendments aim to align more closely the financial statement reporting requirements in business combinations involving a shell company and a private operating company with those in traditional initial public offerings. These amendments may reduce the potential for regulatory arbitrage by private companies that go public through a business combination with a shell company rather than a traditional initial public offering.  Furthermore, the proposed disclosure and audit requirements (*e.g.*, proposed Rule 15-01(a)) may reduce information asymmetry surrounding shell company business combinations, including de-SPAC transactions, which may in turn benefit private operating companies going public by reducing the cost of capital.[534]  The proposed rules and amendments

---

[533]  *See generally supra* Section IX.C.2 discussion on costs of increased liability.

[534]  *See* Michael Minnis, *The Value of Financial Statement Verification in Debt Financing: Evidence from Private U.S. Firms*, 49 J. ACCT. RESEARCH 457, 457-506 (2010).  Using a large sample of privately held U.S. firms, the author found that audited firms enjoy a lower interest rate than unaudited firms, and that lenders place more weight on audited financial information in setting the interest rate.  *See also* Mathieu Luypaert & Tom Van Caneghem, *Can Auditors Mitigate Information Asymmetry in M&As? An Empirical Analysis of the Method of Payment in Belgian Transactions*, 33 AUDITING 57, 57-91 (2014).  This study finds that audits can mitigate information asymmetry about the target's value, reducing the need for a contingent payment.

that clarify applicable definitions and streamline compliance processes (*e.g.*, Rule 15-01(b), (c), (d), (e)), are expected to reduce ambiguity and facilitate compliance.

The proposed rules and amendments may allow investors to more readily locate and process relevant information, reduce processing costs, and increase their confidence in the reporting provided by entities involved in these business combinations.[535]  In turn, the proposed rules and amendments may help investors to more efficiently make voting, redemption, and investment decisions.  In addition, many of the proposed rules and amendments would codify existing staff guidance or financial reporting practices.  Thus, to the extent that registrants are already preparing statements and reports consistent with the proposed rules and amendments, the incremental benefits and costs would be limited.  Below, we discuss the potential benefits and costs of each individual item under proposed Rule 15-01 of Regulation S-X and the other amendments.[536]

### 1. *Rule 15-01(a) Audit Requirements of Predecessor*

Proposed Rule 15-01(a) would align the level of audit assurance required for the target private operating company in merger transactions involving a shell company with the audit requirements for an initial public offering of equity securities.  The proposed rule would codify existing staff guidance that financial statements of the business, *i.e.*, target private operating company, in a transaction involving a shell company should be audited to the same extent as a registrant in an initial public offering; that is, an examination of the financial statements by an independent accountant in accordance with the standards of the PCAOB for the purpose of expressing an opinion thereon.

---

[535]  *See supra* note 508.

[536]  *See supra* Section IV.B for additional regulatory baseline information.

Proposed Rule 15-01(a) should benefit investors by requiring assurance over financial statements consistent with a traditional IPO.[537]  To the extent that audited financial statements may have more predictive power of future cash flows, the proposed rule also may benefit shell companies and target private operating companies by lowering their cost of capital.[538]  The proposed amendment may, however, increase the compliance costs (*e.g.*, audit costs) of the business combination.  To the extent that target private operating companies are, in practice, already including financial statements audited under PCAOB standards, the above incremental benefits and costs likely would be limited.

### 2.  *Rule 15-01(b) Number of Years of Financial Statements*

Under proposed Rule 15-01(b), a shell company registrant would be permitted to include in its Form S-4/F-4/proxy or information statement two years of statements of comprehensive income, changes in stockholders' equity, and cash flows for the private operating company for all transactions involving an EGC shell company and a private operating company that would qualify as an EGC, and this determination would not be dependent on whether the shell company has filed or was already required to file its annual report or not.

For such transactions, registrants may benefit from reduced cost of producing audited financial statements because this rule would potentially reduce the number of years of financial statements required from three years to two years.  For those transactions, this proposed rule would cause some information loss for investors.  However, at least two years' of statements of

---

[537]  *See* Phillip Lamoreaux, *Does PCAOB Inspection Access Improve Audit Quality? An Examination of Foreign Firms Listed in the United States*, 61 J. ACCT. & ECON. 313, 313-337 (2016).  The author documented that PCAOB-inspected auditors, compared to auditors not subject to PCAOB inspections, provide higher quality audits, which are reflected by more going concern opinions, more reported material weaknesses, and less earnings management.

[538]  *See* Michael Minnis, *The Value of Financial Statement Verification in Debt Financing: Evidence from Private U.S. Firms*, 49 J. ACCT. RESEARCH 457, 457-506 (2010) (finding that audited financial statements have more predictive power for future cash flows, which may explain lower cost of capital as well as greater reliance by lenders).

comprehensive income, changes in stockholders' equity, and cash flows for the private operating company would be provided, the same amount that would be required for an initial public offering.

### 3.   Rule 15-01(c) Age of Financial Statements of the Predecessor

Proposed Rule 15-01(c) would provide that the age of financial statements for a private operating company that would be the predecessor to a shell company in a registration statement or proxy statement would be based on whether the private operating company would qualify as a smaller reporting company if it were filing its own initial registration statement.  Because we believe that this proposed amendment would be consistent with existing practice, we do not expect it to have significant economic effects for registrants or investors.  This proposed rule also should help maintain consistency in disclosure requirements across the different routes of going-public, which may reduce compliance uncertainty for registrants and their predecessors and increase investor confidence.

### 4.   Rule 15-01(d) Acquisitions of Businesses by a Shell Company Registrant or Its Predecessor That Are Not or Will Not Be the Predecessor

Proposed Rule 15-01(d) would require application of Rules 3-05 or 8-04 (or Rule 3-14 as it relates to a real estate operation), the Regulation S-X provisions related to financial statements of an acquired business, to acquisitions of businesses by a shell company registrant, or its predecessor, that are not or will not be the predecessor to the registrant.  Given our understanding that this proposed amendment codifies current market practices, we believe that the incremental benefits and costs should be limited.

We also are proposing to amend Rule 1-02(w) of Regulation S-X to require that the significance of the acquired business be calculated using the private operating company's

financial information as the denominator instead of that of the shell company registrant.  The current use of the shell company registrant, which has nominal activity, for the denominator results in limited to no sliding scale for business acquisitions, including those made by the private operating company that will be the predecessor to the shell company because every acquisition would be significant and thus require financial statements.  Therefore, the proposed amendment may alleviate registrants' compliance burden to the extent that it would not result in disclosure related to insignificant acquisitions.  Although, the proposed amendment may reduce the information available to investors about business acquisitions by the private operating company that will be the predecessor to the shell company, it may also reduce investors' information processing costs by focusing on financial statements of acquired businesses that are significant rather than all acquired businesses.

This proposed amendment to Rule 11-01(d) may change the application of Rule 11-01(b)(3) such that subsequent business acquisitions may be tested against pro forma amounts that combine the SPAC and the private operating company.  This may result in fewer subsequent acquisitions being significant because the denominator of the significance tests, including the combined total assets of the private operating company and SPACs, are larger than only the private company's total assets.  Accordingly, registrants' compliance burden would likely be reduced.  We also believe any potential costs to investors as a result of decreases in disclosure may be mitigated by the fact that registrants must otherwise disclose material information about the acquisition that is necessary to make the required statements not misleading.

Proposed Rule 15-01(d)(2) would require a shell company that omits from a registration statement or proxy statement the financial statements of a recently acquired business that is not or will not be its predecessor pursuant to Rule 3-05(b)(4)(i) file those financial statements in an

Item 2.01(f) Form 8-K.  The proposed amendment would alleviate any ambiguity regarding the timing in which these financial statements are required to be filed, which would facilitate compliance for the registrant.  This amendment also should help ensure that investors receive predictable and timely disclosure about the acquired business.

5.   *Rule 15-01(e) Financial Statements of a Shell Company Registrant After the Combination with Predecessor*

Proposed Rule 15-01(e) would allow a registrant to exclude the pre-acquisition financial statements of a shell company (including a SPAC) for periods prior to the acquisition once the following conditions have been met: (1) the financial statements of the shell company have been filed for all required periods through the acquisition date, and (2) the financial statements of the registrant include the period in which the acquisition was consummated.  The proposed rule could reduce disclosure that may no longer be relevant or meaningful to investors when the pre-business combination financial statements of the shell company are included in previous filings and the historical financial statements of the shell company likely are no longer representative of the combined company.  Thus, this proposed rule should reduce compliance costs related to filing previous year financial statements of a shell company.  Investors may also benefit from the increased efficiency in processing business combination filings.

6.   *Other Amendments*

We are proposing additional amendments to Regulation S-X, as well as an amendment to Form 8-K.[539]  The proposed amendment to Rule 11-01(d) would state that a SPAC is a business for purposes of the rule, which may cause an issuer that is not a SPAC to be required to file financial statements of the SPAC in a resale registration statement on Form S-1.  This proposed

---

[539]  *See supra* Section IV.B.6 for additional regulatory baseline information.

amendment may facilitate the compliance process for companies engaging in an acquisition with a SPAC and alleviate their compliance burden.  Investors also would likely benefit from having the financial statements of the SPAC, particularly when they underpin adjustments to pro forma financial information in a transaction when an operating company is the legal acquirer of a SPAC.  As a result of the proposed amendment, a registrant may incur additional compliance costs if it is required to provide financial statements of the SPAC in a resale registration statement.  However, any additional costs should be mitigated to the extent that financial statements of the SPAC were previously prepared, audited, and filed with the Commission.

The proposed revision to Item 2.01(f) of Form 8-K, which would apply to all shell companies, clarifies that the information provided in the Form 8-K should relate to the "acquired business" and not the "registrant," as currently stated in the Form.  The proposed amendment is intended to eliminate any potential misunderstanding as to the entity for which Item 2.01(f) disclosure is necessary.  The increased clarity may reduce registrants' compliance costs to the extent there is currently any confusion.  In turn, investors may also benefit from the timely disclosure of information about "acquired businesses" due to registrants' more consistent application of Item 2.01(f).

We are also proposing amendments to Rules 3-01, 8-02, and 10-01(a)(1) of Regulation S-X to clarify that the requirement of "financial statements" would apply to both the registrant and its predecessors rather than only to the registrant alone, as the existing rules may unintentionally imply for the balance sheet in Rules 3-01 and 8-02 and financial statements for Rule 10-01(a)(1). Because these proposed amendments would codify existing financial reporting practices, they should not impact registrants' compliance costs.

4.    *Enhanced Projections Disclosure (Amendments to Item 10(b) of Regulation S-K)*

Item 10(b) of Regulation S-K sets forth the Commission's views on important factors to be considered in formulating and disclosing projections in certain filings with the Commission. The proposed amendments would update this guidance.[540]  More specifically, the proposed amendments would state that the guidelines also apply to projections of future economic performance of persons other than the registrant, such as the target company in a business combination transaction, that are included in the registrant's filings.  The proposed amendments to Item 10(b) would also state that projections that are not based on historical financial results or operational history should be clearly distinguished from projected measures based on historical financial results or operational history.  In addition, the proposed amendments would state that it generally would be misleading to present projections that are based on historical financial results or operational history without presenting such historical financial measure or operational history with equal or greater prominence.  Finally, for projections based on a non-GAAP measure, the proposed amendments to Item 10(b) would state that the presentation should include a clear definition or explanation of the non-GAAP measure, a description of the most closely related GAAP measure, and an explanation why the non-GAAP measure was selected instead of a GAAP measure.  To the extent that registrants conform projections included in Commission filings to some or all of the proposed amendments to the guidance set forth in Item 10(b), investors would have additional information to evaluate the reasonableness of the projections and make more informed investment decisions.  For example, the proposals related to historical financial results or operational history could inform investors about potential biases in

---

[540]  *See supra* Section V.B.1 for additional regulatory baseline information.

assumptions underlying different financial projections and help them more efficiently process the underlying assumptions of the financial projections in making their investment decisions.[541] These benefits would be mitigated to the extent that registrants are already providing this information, or include projections of future economic performance that do not follow some or all of the proposed amendments.

In addition, to the extent that registrants have not previously applied the Commission's guidance in Item 10(b) to third-party projections included in the registrant's filings, and choose to do so as a result of the proposed amendments, investors may benefit from improved care and presentation with respect to any third-party projections in a registrant's filing.  These benefits would be mitigated to the extent that registrants already follow the Commission's guidance set forth in Item 10(b) for third party projections included in their filings, or choose not to do so.  To the extent that registrants follow the guidance in the proposed amendments to Item 10(b), the incremental compliance costs are likely to be limited.  Registrants should already have information about historical financial results or operational history and GAAP financial measures, and should be able to easily obtain this information in connection with any included third-party estimates.  Moreover, potential liability for false or misleading projections is likely to shape disclosure practices with respect to third-party projections in addition to the existing guidance in Item 10(b).

The proposed amendments to Item 10(b) could discourage registrants from including projections in their filings, which would provide investors with less information for their

---

[541] *See* Anne Beyer, Daniel A. Cohen, Thomas Z. Lys, & Beverly R. Walther, *The Financial Reporting Environment: Review of the Recent Literature*, 50 J. ACCT. & ECON. 296, 296-343 (2010) (By employing a sample from 1994 to 2007, this article shows management forecasts providing over half of accounting-based information to the market.  In summary, the management forecast literature suggests that earnings projections and realizations both provide value-relevant information to the market.).

investment decisions.  In addition, the proposed additional contextual disclosure, to the extent included by registrants, could increase investors' processing cost of any included financial projections.

   *5.   Investment Company Act Safe Harbor*

   As discussed above, whether a SPAC meets the definition of investment company under Section 3(a)(1)(A) of the Investment Company Act in the period between its IPO and either the completion of its de-SPAC transaction or its dissolution is a question of facts and circumstances.[542]  Currently, SPACs typically provide disclosures indicating that they believe they do not meet the investment company definition under Section 3(a).  They further typically disclose to prospective investors that if they are determined to be an investment company in the future, the costs and logistics of compliance with the Investment Company Act would be prohibitive.  We are, however, concerned that SPACs may fail to recognize when their activities raise the investor protection concerns addressed by the Investment Company Act.  To assist SPACs in focusing on, and appreciating when, they may be subject to investment company regulation, we are proposing Rule 3a-10, which would provide a safe harbor from the definition of "investment company" under Section 3(a)(1)(A) of the Investment Company Act that we believe would enhance investor protection.[543]

   We have designed the proposed conditions of the safe harbor to align with the structures and practices that we preliminarily believe would distinguish a SPAC that is likely to raise investor protection concerns under the Investment Company Act from those that we believe generally do not.[544]  Specifically, the proposed rule would promote investor protection by

---

[542]  *See supra* Section VI.A.

[543]  *See supra* Section VI.

[544]  *See supra* note 295 for a description of investor protection concerns addressed by the Investment Company Act.

highlighting to SPACs and their sponsors the potential Investment Company Act concerns that

SPAC activities may raise, such that investors would benefit from a reduced risk that the SPACs

they invest in will engage in activities typically associated with investment companies but

without the investor protections provided by the Investment Company Act.  This may, in turn,

reduce the possibility for regulatory arbitrage, which may be used by some SPACs in an attempt

to operate like an investment company without investment company registration.[545]  A reduction

of the possibility of regulatory arbitrage would also reduce costs related to potential uncertainty

about a SPAC's legal status and promote confidence in the SPAC market among market

participants.  Finally, a reduction in the possibility of regulatory arbitrage would potentially

promote competition among all companies engaging in investment management activities

regulated by the Investment Company Act.

In terms of expected investor protection benefits for investors in SPACs that would rely

on the proposed safe harbor, the safe harbor conditions are designed to ensure that SPACs do not

engage in activities that would make them investment companies.  For example, the proposed

conditions on the nature and management of SPAC assets are designed to ensure that a SPAC

relying on the safe harbor would not engage in portfolio management practices resembling those

that management investment companies employ.[546]

In addition, the proposed conditions for SPAC activities are designed to ensure that

SPACs relying on the safe harbor would have a business purpose aimed at completing a single

de-SPAC transaction, after which the surviving company would be primarily engaged in the

---

[545]  The significant compliance costs of investment company registration under the Investment Company Act may give some SPACs an incentive to try to engage in such regulatory arbitrage.

[546]  *See supra* Section VI.B.1.

business of the target company or companies and have at least one class of exchange listed securities.[547]  As a result, a SPAC relying on the safe harbor would not be engaging in activities that raise investor protection concerns addressed by the Investment Company Act.

Finally, the proposed duration conditions are designed to ensure that a SPAC relying on the safe harbor would have a limited time period to announce and complete a de-SPAC transaction before being required to distribute the SPACs assets in cash to investors.[548]  The proposed 18-month condition for the announcement of a de-SPAC agreement and condition that the de-SPAC transaction close within 24 months would potentially reduce the risk that investors may come to view a SPAC holding securities for a prolonged period as a fund-like investment, thereby necessitating the regulatory protections of the Investment Company Act.  We recognize that most SPACs are listed on a national securities exchange and as such are subject to exchange listing standards requiring that the SPAC completes a de-SPAC transaction within 36-months (or three years) of the effectiveness of its IPO registration statement.[549]  For such SPACs the proposed safe harbor duration condition would have reduced benefits since the exchange rules already provide a limit on the duration of the SPAC, albeit 12 months longer that the proposed limit.

Beyond providing investor protection benefits, we expect that the proposed safe harbor could reduce compliance costs for some market participants.  Specifically, because registering as an investment company and complying with the associated Investment Company Act requirements would be potentially cost-prohibitive for most SPACs, we expect registrants, sponsors, and investors would all benefit from the additional certainty regarding a SPAC's status

[547] *See supra* Section VI.B.2.

[548] *See supra* Section VI.B.3.

[549] *See supra* note 393 and accompanying text.

266

to the extent it meets the conditions of the safe harbor.  Such benefits would directly accrue for SPACs that already meet the conditions of the proposed safe harbor, or for future SPACs that would meet the conditions even in the absence of the proposed safe harbor.  Because of the compliance costs and significant operational changes involved with investment company registration, we expect that most SPACs that do not presently meet the conditions of the proposed safe harbor would seek to fall within the safe harbor by making changes to their operations in order to meet the safe harbor conditions.  However, for some SPACs that currently do not meet such conditions, there may be potentially meaningful costs related to bringing the operations in line with the new safe harbor (discussed in more detail below).[550]  We also expect that most future SPACs that would otherwise under the baseline have run operations not meeting the safe harbor conditions would take advantage of the legal certainty conferred by the proposed safe harbor and elect to meet the conditions.  In addition, because SPACs that operate within the boundaries of the safe harbor would be assured that they would not qualify as investment companies, there may also be an increased propensity for sponsors to launch new SPACs operating within the safe harbor conditions to the extent that they might not have otherwise chosen to create a SPAC due to the uncertainty of the Investment Company Act status.  Thus, the reduced uncertainty regarding the legal status of SPACs operating within the proposed safe harbor could facilitate capital formation.  Finally, the proposed safe harbor would also promote efficiency of a SPAC's compliance process by providing a clear framework for SPACs to determine their status under the Act.

---

[550]  As discussed in more detail below, such SPACs may alternatively seek to operate outside the safe harbor without making any operational changes or make other changes to their operations in order to avoid meeting the definition of an investment company under Section 3(a)(1)(A) of the Investment Company Act, including, for example, by avoiding investing, reinvesting or trading in securities.

To the extent the potential benefits to investors of current and future SPACs operating under the new safe harbor would be significant, we may see an increase in investor demand for SPACs that could potentially lower the cost of capital for SPACs.  In turn, a lower cost of capital could increase the size and number of SPAC IPO offerings and thereby promote capital formation.

For current or future SPACs that would meet the safe harbor conditions absent the proposed rule, we do not expect any direct costs from the proposed safe harbor.  By contrast, for SPACs currently not meeting the proposed safe harbor conditions, or for future SPACs that would otherwise not meet the safe harbor conditions, there may be costs related to SPACs changing their operations to meet the conditions or to make other changes to their operations in order to avoid falling under the definition of an investment company under Section 3(a)(1)(A) of the Investment Company Act.

In terms of potential costs of bringing SPAC operations in line with the proposed safe harbor conditions, we do not expect that the proposed safe harbor conditions with respect to the nature and management of SPAC assets would impose significant costs on SPACs and their sponsors and investors, as it is our understanding that most SPACs' assets are already held as government securities, government money-market funds, or cash items.[551]  We also understand that SPACs generally are not actively managing these assets, most of which are held in an escrow or trust account.[552]  To the extent there are some SPACs that are currently holding other types of assets, they would have to liquidate such assets and move them into an allowable asset class prior to completion of the de-SPAC transaction to rely on the proposed safe harbor, and

---

[551] *See supra* Section IX.B.6.a.

[552] *Id.*

would thereby incur some transactions costs and possibly also realize some capital losses depending on how market conditions for such assets have changed.

With respect to the proposed safe harbor conditions for SPAC activities, we do not expect the condition that SPACs have to seek to complete a single de-SPAC transaction to impose any significant costs on SPAC operations under the baseline.  It is our understanding that almost all current SPACs seek to complete one single de-SPAC transaction, albeit such a transaction may involve multiple target companies, which would still be feasible under this proposed safe harbor condition

We also do not expect the proposed condition that a SPAC wishing to rely on the safe harbor to be primarily engaged in the business of seeking to complete a de-SPAC transaction would impose any significant incremental costly constraints on SPAC activities under the baseline.  It is our understanding that most SPACs presently communicate to investors their sole intent to seek a target company to operate and that they do not intend to act as an investment company under the Investment Company Act.[553]

Adherence to the proposed duration conditions under the safe harbor is likely to impose costs on SPACs that would seek to avail themselves of the proposed safe harbor by limiting the time they have to search for a target company and complete a de-SPAC transaction compared to the baseline.  The option of waiting to invest can be valuable, and to the extent that SPACs would have to shorten the duration of their search for an appropriate target company and complete a de- SPAC transaction in order to take advantage of the safe harbor, the proposed

---

[553] *See supra* Section IX.B.6.b.

duration conditions would potentially reduce the value of this option for SPACs.[554]

Additionally, to the extent an expected value-increasing de-SPAC transaction would not occur under the proposed duration conditions, but it could have under the baseline, the proposed rules may lead to forced liquidation of the SPAC and impose associated costs on both investors  and sponsors (in particular, the loss of their respective portions of the expected value increase). However, because of the typical compensation structure of SPAC sponsors, they have strong incentives to complete a de-SPAC transaction rather than liquidating the SPAC and returning the proceeds in the trust or escrow account to the SPAC's shareholders.  Therefore, SPACs that are seeking to meet the proposed safe harbor conditions may in some cases compromise on the quality of the type of targets pursued to speed up their search, or offer to pay more for the target to complete a de-SPAC transaction sooner, compared to under the baseline.[555]  In some circumstances, the duration conditions may give sponsors of SPACs seeking to avail themselves of the proposed safe harbor increased incentives to complete a de-SPAC transaction even if liquidation would be the better choice for investors.  That is, the duration conditions may increase the agency costs of the sponsors' managerial control.  However, such agency costs would be mitigated by other provisions of this proposal, such as the proposed specialized disclosure and procedural requirements in de-SPAC transactions and the proposed amendments aligning de-SPAC transactions with traditional initial public offerings.[556]

---

[554]  The value of the option to wait derives from the fact that whereas the choice to wait is generally reversible, the choice to invest now rather than later is generally irreversible.  *See, e.g.*, Robert McDonald & Daniel Siegel, *The Value of Waiting to Invest*, 101 Q. J. ECON. 707, 707-27 (1986).

[555]  *See supra* note 454 for some evidence of such behavior under SPAC's current self-imposed duration limitations.

[556]  *See supra* Sections II.F and III.

Based on the data presented above for recent SPACs that have at least a 24-month history,[557] approximately 65% completed a de-SPAC transaction no later than 24 months after the IPO date. Thus, the proposed 24-month condition for completion of a de-SPAC transaction may be a binding constraint for a significant percentage of SPACs. For the same sample of SPACs, the condition that a SPAC would need to announce a de-SPAC transaction agreement in a Form 8-K filing no later than 18 months after the IPO date would have been met by approximately 59% of the SPACs.[558] Therefore, unconditionally, the 18-month announcement condition is potentially binding for a larger percentage of SPACs than the 24-month de-SPAC transaction completion condition. The data also show that if a sample SPAC had met the 24-month transaction completion condition, around 12% of such SPACs (12 of 99 cases) would not have met the 18-month announcement condition. Conversely, among the sample SPACs meeting the 18 month announcement condition, only approximately 2.2% of such SPACs (2 cases of 89) would not have met the 24 month condition. Among all sample SPACs, around 57% (87 of 152) would have met both the 18-month and the 24-month deadlines. Thus, we expect that the combined effect of the two proposed duration conditions would be to force a significant proportion of SPACs that would seek to take advantage of the safe harbor to conclude their search for a target sooner than they would have under the baseline or forgo a de-SPAC transaction, either of which could potentially impose costs on SPACs and their investors and sponsors, as discussed above.

A SPAC that seeks to rely on the proposed safe harbor would also be required to distribute its assets in cash to investors as soon as reasonably practicable if it does not meet

---

[557] *See supra* Section IX.B.6.c.

[558] *Id.*

either the 18 month deadline or the 24 month deadline.  Because a SPAC would be required to hold only liquid assets such as cash items, government securities, or government money market funds, to rely on the proposed safe harbor, we do not expect SPACs to incur significant incremental cost from this condition in terms of direct transaction costs.  Moreover, a SPAC already must plan for the distribution of its assets back to the investors if not used in a de-SPAC transaction.  Therefore, this condition should also not impose a new significant burden on a SPAC.

The proposed duration conditions may lead SPACs to complete less profitable de-SPAC transactions, or fail to complete a de-SPAC transaction at all.  To the extent investors anticipate this, there may be a reduction in investor demand that leads to fewer SPAC initial public offerings and/or less capital being raised in these offerings, which could potentially reduce capital formation depending on the type of investments SPAC investors would shift their funds to instead.  In addition, an increase in SPACs that liquidate without a de-SPAC transaction and/or a reduction of capital raised through SPACs may ultimately result in fewer publicly traded operating companies and therefore a reduced investment opportunity set for investors.  Such negative investment opportunity effects may be mitigated to the extent potential SPAC targets would instead go public through initial public offerings without SPAC involvement.

The proposed duration conditions may also affect the bargaining environment in de-SPAC transactions.  Knowing that SPACs would face a regulatory imposed deadline for when to announce an agreement in order to qualify for the safe harbor, target companies may deliberately prolong negotiations so that they can attempt to extract better terms as the regulatory imposed deadlines approaches.  Such strategic behavior by targets may reduce returns to SPAC investors further, but may not be an economic loss per se if the transaction is still completed, as the

immediate effect in such a case would be a pure wealth transfer from SPAC investors to target company owners.  The potential for an increase in target bargaining power would be mitigated by the fact that most SPACs' securities are listed on a national securities exchange and therefore already subject to the exchanges' required deadlines (36 months or 3 years) for completion of a business combination.  However, to the extent target company bargaining power would increase and lead to worse terms in de-SPAC transactions for investors it could potentially reduce *ex ante* demand among investors for SPAC investments, which could reduce the number of operating companies ultimately being traded in public markets, all else being equal.  However, such effects would be mitigated if potential target operating companies instead access public capital markets in alternative ways.

Any SPAC that would find the proposed safe harbor conditions too costly to comply with could seek to not rely on the safe harbor and instead choose to bear the legal uncertainty of operating outside of it.  Besides the direct compliance costs associated with being an investment company, a SPAC that operates as an investment company would also potentially be subject to delisting, as current exchange rules do not appear to provide for SPACs to operate as an investment company and maintain their listing.

As an alternative to relying on the proposed safe harbor, it is possible that current or future SPACs would seek to avoid being considered an investment company under the Investment Company Act by holding different assets than are commonly held today.  However, holding different assets (such as cash items) may provide a lower return than holding the types of assets permitted under the safe harbor conditions.  Thus, the possibility of switching assets to

cash items to avoid being an investment company may not fully mitigate the potential costs imposed on the SPAC market from the proposed safe harbor conditions.[559]

### D.   Effects on Efficiency, Competition, and Capital Formation

*1.   Efficiency*

The proposed rules and amendments would enhance and standardize disclosure about specific aspects inherent to the SPAC structure at both the SPAC initial public offering stage and the de-SPAC transaction stage.  Requiring the SPAC and the target company to provide such disclosure may in some cases afford market participants greater access to information relevant to voting, redemption, and investment decisions.  By increasing the standardization and comparability of disclosures, the proposed rules may make it easier for investors to properly and efficiently process information about SPACs and for market prices to reflect such information. In addition, invested capital may be more likely to be more efficiently deployed.

Additionally, the proposed rules would increase the incentives for issuers and underwriters to exercise the care necessary to ensure accuracy in disclosures by affirming the underwriter status of SPAC IPO underwriters in connection with de-SPAC transactions and proposing a new definition of "blank check company" for purposes of the PSLRA safe harbor. In addition, the proposed rules regarding shell company business combination transactions would make certain disclosures and liabilities more consistent with traditional IPOs, which could benefit investors and potentially decrease the cost of capital for shell companies.  To the extent that disclosure accuracy is improved, investors would have access to more reliable information when making their investing decisions, which would lead to an increase in market efficiency.

---

[559]  As indicated in *supra* note 314, if a SPAC were to significantly change its asset composition contrary to its original representations, it would raise questions whether the initial representations were false and misleading.

2. *Competition*

By improving the informational environment at the SPAC initial public offering and the de-SPAC stages through changes in disclosure requirements and the scope of liability, the proposed rules and amendments could encourage greater competition between SPAC sponsors and SPAC underwriters, in both SPAC IPO and de-SPAC activities.  For example, by standardizing and increasing the comparability between the disclosures provided by SPACs, the proposed rules and amendments may lead to improved investor awareness and more efficient information processing.  To the extent that the proposed rules and amendments lead to an increase in competition between shell company mergers, including de-SPAC transactions, and traditional initial public offerings, they may bring down the costs of capital raising through these approaches.

If the proposed rules and amendments create significant costs that lead to a reduction in shell company mergers and overall initial public offering activity in the SPAC market, this could reduce competition for investment opportunities.  Such a reduction could result in higher fees in both the traditional IPO and SPAC markets.  Additionally, if some of the proposed new rules and amendments disincentivize underwriters and PIPE investors from participating in de-SPAC transactions and related financings, it could reduce competition among service and capital providers in the SPAC market and lead to higher fees.

To the extent that the proposed safe harbor from the Investment Company Act would reduce the costs of compliance, it may encourage additional sponsor participation in the SPAC market and thus encourage competition among SPACs.  However, for potential SPACs that would not meet the safe harbor conditions, the proposed safe harbor may increase the costs of

sponsoring a SPAC, and thus the proposed rule may have an adverse effect on competition among SPACs.

### 3. Capital Formation

Enhanced disclosure at both the SPAC initial public offering and the de-SPAC stages, combined with a stronger incentive to perform better due diligence in the de-SPAC transaction stage, would likely improve investor protection at both stages.  In addition, the proposed rules and amendments for shell company mergers would likely improve investor protection.  For example, proposed Rule 145a would help shareholders of reporting shell companies more consistently receive the full protections of the Securities Act disclosure and liability provisions in business combinations involving reporting shell companies, regardless of the transaction structure.  Increased protections could incentivize more investors to invest in shell companies, including SPACs, thus enhancing capital formation.  In addition, to the extent that the proposed safe harbor from the Investment Company Act reduces regulatory uncertainty and thus encourages participation in SPACs, it may also lead to an increase in capital formation.[560]

If the proposed rules and amendments create significant costs for shell companies, including SPACs, this may limit the number of private companies that go public through shell companies, including a de-SPAC transaction mechanism, or at all.[561]  Given the potential increase in the cost of going public through a shell company merger such as a de-SPAC transaction compared to the current baseline, it is possible that some private companies could

---

[560]  As discussed in *supra* Section IX.C.5, an increase in investor demand for SPACs could potentially lower the cost of capital for SPAC, which may increase the size and number of SPAC IPO offerings.

[561]  For example, as discussed in more detail in *supra* Section IX.C.5, for SPACs that would take advantage of the proposed Investment Company Act Safe Harbor, the duration requirements could potentially lead investors to anticipate less profitable de-SPAC transactions or a lower likelihood of completion of de-SPAC transactions, which, in turn, could reduce investor demand for SPAC initial public offerings.  Moreover, an increase in SPACs that liquidate without a de-SPAC transaction and/or a reduction of capital raised through SPACs may ultimately result in fewer publicly traded operating companies and therefore a reduced investment opportunity set for investors.

consider the traditional initial public offering channel a more viable alternative.  We are not able

to estimate how many companies would consider using a traditional initial public offering

mechanism if the cost of the overall SPAC transaction structure increases.  It is possible,

however, that a significant increase in the cost of shell company mergers and de-SPAC

transactions could deter some private companies from going public, and thus potentially reduce

overall initial public offering activity and capital formation.

### E.  Reasonable Alternatives

#### 1.  *Disclosure-Related Proposals*

##### a. *Require Disclosure of Policies and Procedures That Address Conflicts of Interest*

As an alternative to Item 1603 as proposed, we could include a complementary

requirement to describe any policies and procedures used or to be used by a SPAC to minimize

potential or actual conflicts of interest related to disclosures provided in response to proposed

Items 1603(b) and 1603(c).  Such information could assist investors in gauging the economic

significance, or lack thereof, of the various conflicts of interest given the presence, absence and

likely degree of effectiveness of the policies and procedures designed to address or ameliorate

them.  On the other hand, requiring this information would increase compliance costs for SPACs

and may cause some of these companies to adopt policies and procedures that would not be

efficient or cost-effective given their particular organizational structure.  In this regard, we note

that there could be incentives to provide such disclosure voluntarily, as it would indicate to

investors the degree to which conflicts of interest may be ameliorated.

##### b.  *Certain Reports, Opinions, or Appraisals*

We are proposing to require the filing of reports, opinions, or appraisals provided to the

SPAC or its sponsor relating to valuation and/or fairness of a de-SPAC transaction or related

277

financing transactions (Item 1607) as exhibits to registration statements and schedules provided in connection with a de-SPAC transaction.  We are also proposing to require disclosures summarizing the negotiation, report, opinion, or appraisal and certain additional disclosures, such as for example, information about who prepared the report, opinion, or appraisal, and how they were selected. .As an alternative, we could require disclosure of only a summary of the reports, opinions, appraisals, and negotiations.  This could reduce some of the costs of compliance to the extent that it is more costly to obtain a report that will become public.  At the same time, this alternative would reduce the benefits of the disclosure, as investors and market participants would have less information available to assess the quality and robustness of the analysis underlying such report, opinion, or appraisal.

   *c. Require a Fixed Re-Determination Date to Measure Public Float for Smaller Reporting Company Status*

    When re-determining a post-business combination company's eligibility for smaller reporting company status, instead of requiring the public float threshold to be measured as of a date within four days after the consummation of the de-SPAC transaction, we could alternatively require the re-determination to occur on a fixed date, such as the consummation date or on the fourth day after consummation.  A fixed re-determination date would have the benefit of establishing a consistent date for all post-business combination companies to use and remove any management judgment in the selection of a re-determination date, while still requiring that the re-determination of smaller reporting company status occur before the post-business combination company makes its first filing.  However, reduced flexibility regarding the time frame within which the required re-determination must be made could increase costs for post-business combination companies without substantial additional benefits for investors.

> d.  *Re-Determine Smaller Reporting Company Status of a Post-Business Combination Company Without a Public Float Test*

As another alternative, we considered whether the re-determination for smaller reporting company status of the combined company following a de-SPAC transaction should require only a re-measurement of the revenue component of smaller reporting company test and not its public float component.  Generally, smaller reporting company status is re-determined on an annual basis based on the issuer's public float as well as annual revenues.  Revenues of the combined company may be more relevant to smaller reporting company status than public float because, generally, the target company has generated revenue while the SPAC has not done so.  Accordingly, the revenue test may be the more determinative factor than the public float test in determining whether the combined company following de-SPAC transaction remains a smaller reporting company because, based on staff experience, the public float of most SPACs and subsequent combined companies typically is between $250 and $700 million, which exceeds the public float threshold for smaller reporting company status.  Also, the public float component of this test is measured as of the last business day of the issuer's most recently completed second fiscal quarter.  Given that the public float re-measurement likely would not occur at the end of the second fiscal quarter when the annual public float measurement occurs, the combined company may have to measure its public float more than one time during the same fiscal year, which may impose additional burdens for the company.

However, compared to public float, revenue, if used as a sole basis of the significance test, may be subject to a greater degree of managerial discretion.[562]  Also, using revenue alone may expose a large number of investors to business-specific risks because SPAC targets may

---

[562]  *See* Jenny Zha Giedt, *Modelling Receivables and Deferred Revenues to Detect Revenue Management*, 54 (2) ABACUS 181, 181–209 (2018) (focusing on the SEC Accounting and Auditing Enforcement Releases, *i.e.*, AAER, from 1982 to 2016, and documenting that forty-seven percent of all financial misstatements are related to revenue).

represent nascent industries that could feature extended pre- or low-revenue periods but, as indicated above, may have a public float following a de-SPAC transaction that would exceed the threshold for smaller reporting company status.  Thus, we believe it is appropriate that these companies should take the public float into account in re-determining smaller reporting company status following the consummation of a de-SPAC transaction.

### e.   Structured Data Requirement

We could change the scope of the proposed Inline XBRL tagging requirements for the proposed SPAC disclosures, such as by excluding certain subsets of registrants or disclosures. For example, the tagging requirements could exclude the SPAC initial public offering disclosures.  Under such an alternative, SPACs would submit initial public offering disclosures in unstructured HTML or ASCII and would not incur Inline XBRL compliance costs until their first periodic filing on Form 10-Q, 20-F, or 40-F.[563]  This could make it incrementally easier for SPACs to consummate an initial public offering.  However, narrowing the scope of the proposed tagging requirements, whether based on filing, offering size, or other criteria, would diminish the extent of any informational benefits that would accrue as a result of the proposed disclosure requirements by making the excluded disclosures comparatively costlier to process and analyze.

As another alternative, we could require only the quantitative SPAC-related disclosures to be tagged in Inline XBRL.  Excluding qualitative disclosures from the tagging requirements could provide some incremental cost savings for registrants compared to the proposal, because incrementally less time would be required to select and review the particular tags to apply to

---

[563]  The Commission's EDGAR electronic filing system generally requires filers to use ASCII or HTML for their document submissions, subject to certain exceptions.  *See* EDGAR Filer Manual (Volume II) version 61 (Mar. 2022), at 5-1; 17 CFR 232.301 (incorporating EDGAR Filer Manual into Regulation S-T).  *See also* 17 CFR 232.101 (setting forth the obligation to file electronically on EDGAR).

quantitative disclosures.  However, we expect these incremental cost savings would be low, because SPACs would be subject to similar Inline XBRL requirements, including requirements to tag quantitative and qualitative disclosures, in other Commission filings.[564]  Moreover, narrowing the scope of tagging requirements to exclude qualitative information would diminish the extent of informational benefits that would accrue to investors by inhibiting the efficient extraction and searching of narrative SPAC-related disclosures (*e.g.*, disclosures regarding conflicts of interest, fairness determinations, and financial projections), thus creating the need to manually review search results drawn from entire documents to find these disclosures.[565]  Such an alternative would also inhibit the automatic comparison of narrative disclosures against prior periods.  It also may be harder for investors to perform a targeted assessment of a filing for particular types of narrative SPAC-related disclosures because they would need to assess the entire filing for relevant information.

2.     *Liability-Related Proposals*

a.  *PSLRA Safe Harbor*

As an alternative to addressing the use of projections in de-SPAC transactions and other business combinations involving blank check companies that are not penny stock issuers by proposing to amend the "blank check company" definition, we could have issued interpretive guidance stating that the PSLRA safe harbor for forward-looking statements is not available because business combinations with shell companies that are not penny stock issuers are "initial

---

[564]  *See supra* Section IX.C.1.a.5.

[565]  To illustrate, without Inline XBRL, using a search string such as "dilution" to search through the text of all de-SPAC filings, so as to determine the extent to which dilutive effects are among the material factors being considered by SPACs at arriving at fairness determinations, could return many narrative disclosures outside of the fairness determination disclosure that would be required by proposed Item 1606(b) of Regulation S-K, such as disclosures in the risk factors section or in the description of stock incentive plans.  However, if Inline XBRL is used, it would enable a user to search for the term "dilution" exclusively within the proposed fairness determination disclosure, thereby likely reducing the number of irrelevant results.

public offerings" by target private operating companies for purposes of the PSLRA. This alternative would avoid some of the complexity associated with defining blank check companies for purposes of the PSLRA, but issuing guidance rather than a rule may result in weaker incentives for SPACs or target companies to take greater care in preparing forward-looking statements, such as projections, in de-SPAC transactions and thus result in fewer investor protection benefits than the proposed rule.

### b. Issuing Guidance on Underwriter Status

Instead of proposing Rule 140a, the Commission could issue guidance that would describe the factors that should be considered in determining underwriter status in connection with de-SPAC transactions, which could potentially be relevant for parties other than SPAC IPO underwriters. Issuing guidance rather than designating an underwriter by rule within the context of these transactions might prompt the full range of parties involved in facilitating de-SPAC transactions to consider their potential liability and thus take greater care in performing their designated functions. This could result in more robust investor protections overall. On the other hand, compared to the proposed rule, this alternative would rely on the judgment of de-SPAC participants to apply the guidance and may result in weaker incentives for those parties that are potentially subject to Section 11 liability to perform robust due diligence. As a result of such weaker incentives, there could be a reduced impact on the accuracy of the disclosure in de-SPAC transactions and investor protection benefits.

### 3. Expanding Disclosure in Reporting Shell Company Business Combinations

Proposed Rule 145a would deem any business combination of a reporting shell company (that is not a business combination-related shell company) involving another entity that is not a shell company to involve a sale of securities to the reporting shell company's shareholders. As

an alternative, instead of deeming all such transactions to be a sale that would need to be registered under the Securities Act, absent an applicable exemption, we could expand the disclosure requirements applicable to reporting shell company business combinations such that the disclosure requirements would be the same as what would have been required if the transaction was registered under the Securities Act.  Under this alternative, regardless of the document that is filed with the Commission (e.g., proxy or information statement, Schedule TO, or Form 8-K), the set of disclosures investors receive would be the same as they would receive had a registration statement been filed for the transaction.  This would ensure that the reporting shell company's shareholders receive the same information regardless of how the transaction is structured and would reduce regulatory arbitrage opportunities stemming from different disclosure requirements in different documents that may be filed with the Commission to report a shell company business combination.  As a registration statement would not necessarily be required in all transaction structures, the costs of such an alternative would also be less that the costs of liability associated with the purchase and sale of securities and potential Securities Act registration of shell company business combinations under proposed Rule 145a, to the extent no exemption is available for the transaction.

However, merely expanding the set of disclosures investors receive regardless of transaction structure does not provide investors with the same level of protection because the liability standards differ based on the type of filing that is required.  Only by deeming the transaction to be a sale would investors necessarily receive the protections that apply in connection with a purchase and sale of securities under the federal securities laws, such as the availability of private actions under Section 10(b) and Rule 10b-5.  In addition, to the extent there is not an available exemption for the reporting shell company business combination, only

with Securities Act registration do investors receive the full panoply of available protections under that Act that they would receive in a traditional IPO, such as a private right of action under Section 11.

### 4. Enhanced Projections Disclosures

The proposed amendments to Item 10(b) of Regulation S-K present our updated views on projected performance measures and include a statement that projections based on a non-GAAP financial measure should include a clear definition or explanation of the non-GAAP measure, and a description of the GAAP financial measure to which it is most closely related. As an alternative to this guidance, we could adopt a rule requiring firms, when providing projections, to present a reconciliation of projections based on a non-GAAP measure to those based on the nearest GAAP measure. While the reconciliation would further help investors understand the bases of projections involving non-GAAP measures, it would likely also increase compliance costs and in turn might reduce the provision of otherwise useful projections.

### 5. Investment Company Act Safe Harbor

#### a. Shorter Duration Limitations

As an alternative, we considered shorter duration limitations by instead requiring a SPAC to announce a transaction no later than 12-months from the IPO registration date, and to complete a de-SPAC transaction or liquidate the SPAC no later than 18-months after the IPO registrations date. The benefit of this alternative is that it would further decrease the possibility of regulatory arbitrage. It would also reduce the risk that investors may come to view a SPAC holding securities as a fund-like investment, and the related risk of investor protection concerns. We expect this alternative would impose the same type of costs we discussed above for the proposed duration conditions, but at a greater magnitude. Based on a sample of SPACs with

effective IPO dates from January 1, 2016 to June 30, 2020 (*i.e.*, a sample of SPACs with at least an 18-month history since the IPO date as of December 31, 2021; 189 SPACs in total), we find that approximately 36% of the SPACs in the sample announced a transaction agreement no later than 12-months after the date of the initial public offering and 40% of the SPACs had completed a de-SPAC transaction no later than 18-months after the date of the initial public offering.  The proportion of SPACs in the sample that both announced a de-SPAC transaction by 12-months and completed the de-SPAC transaction by 18-months was approximately 33%, which is a significantly lower proportion compared to 57% of sample SPACs that would have managed to meet both of the proposed duration conditions, as discussed above.  Thus, we expect that costs would be greater under this alternative by forcing a greater proportion of SPACs to conclude their search for a target or liquidate earlier than they may otherwise do.  In addition, because of the tighter deadlines this alternative would impose, those SPACs that would be at risk of not being able to meet the proposed longer duration conditions would likely be at comparatively greater risk of not meeting the deadlines under this alternative, which may also increase the costs such SPACs would face in trying to meet these alternative duration conditions.

### b.  No Announcement Condition

We also considered an alternative that would keep the 24-month condition for completion of a de-SPAC transaction, but remove the duration condition for the announcement of a transaction.  This alternative would increase the proportion of SPACs meeting the duration condition to 65% compared to 57% under the proposal.  The benefit of this alternative would thus be to increase the proportion of SPACs not having to potentially sub-optimally come to a merger agreement earlier (or, in some circumstances, potentially inefficiently liquidating the SPAC), while still imposing a firm 24-month maximum lifespan for SPACs seeking to take

advantage of the proposed safe harbor.  However, by not imposing an 18-month announcement condition investors would lose any investor protection benefits that may be associated with an earlier signal of a SPAC's intent to complete a de-SPAC transaction than they might receive under this alternative.

### c.  Longer Duration Limitations

As an alternative, we could require a longer duration before a SPAC would have to complete a de-SPAC transaction.  For example, if we increase this duration to no later than 36 months after the IPO date (with no announcement condition), less than 4% of the sample SPACs that completed a de-SPAC transition would not have met such a condition.  As discussed above, the national securities exchanges already require SPACs to complete a de-SPAC transaction within 36 months (or 3 years).  Thus, based on both the recent evidence and the current exchange rules for SPACs, we expect that this alternative would not impose the potential costs of a truncated search period for a target company for most SPACs, in particular SPACs with exchange-traded securities.  However, as discussed above, the longer the SPAC operates with its assets invested in securities and its income derived from securities, the more likely investors will come to view the SPAC as a fund-like investment and the more likely the SPAC appears to be deviating from its stated business purpose.  In turn, this may raise investor protection concerns and increase the possibility of regulatory arbitrage compared to the proposed duration conditions.

### F.    Requests for Comment

155.  Because of the potential for one or more of the proposed amendments to have interactive effects, we are requesting public input on the extent to which such interactive effects are likely to conflict with the overall aims of this rulemaking, if adopted as proposed.

156.   Have we correctly characterized the benefits and costs from the proposed new disclosure requirements at the SPAC IPO stage?  Are there any other benefits or costs that should be considered?  Please provide supportive data to the extent available.

157.   Our analysis suggests the proposed rules and amendments would generally strengthen the investor protection in SPAC transactions at the initial public offering stage.  Are there any significant costs or benefits associated with adopting these rules and amendments that we have not considered that would lead to a different characterization?  Please provide supportive data to the extent available.

158.   Have we correctly characterized the benefits and costs from the proposed new disclosure requirements at the de-SPAC transaction stage and the alignment of disclosure requirements in the de-SPAC disclosure documents with IPOs?  Are there any other benefits or costs that should be considered?  Please provide supportive data to the extent available.

159.   Our analysis suggests the proposed rules and amendments would generally strengthen investor protection in de-SPAC transactions.  Are there any significant costs or benefits associated with adopting these rules and amendments that we have not considered that would lead to a different characterization?  Please provide supportive data to the extent available.

160.   Have we correctly characterized the benefits and costs from proposed Item 1608 holding all other aspects of the proposed amendments constant?  Have we correctly characterized the benefits and costs that would accrue given the potential interactive effects with proposed Rule 145a?  Are there other interactive effects with respect to other proposed

items that, had we considered, would substantially alter our assessment of the associated costs, benefit, or anticipated effects on efficiency, competition, or capital formation?

161. Have we correctly characterized the benefits and costs from the proposed amendments to the enhanced projections disclosure requirements (Item 1609 of Regulation S-K)?  Are there any other benefits and costs that should be considered?  Please provide supportive data to the extent available.

162. Would the effects of the proposed amendments related to the PSLRA safe harbor have significant interactive effects with proposed Item 1609 of Regulation S-K such that our estimates of the incremental costs and benefits of adopting Item 1609 should be revised? Please provide either qualitative or quantitative data to the extent available.

163. How, and to what extent, would investors benefit from the proposed requirement to tag the SPAC specialized disclosures in Inline XBRL?  What would be the costs of the proposed requirement to registrants?  Should we consider alternative tagging requirements for the proposed SPAC disclosures?  If so, what would be their benefits and costs?

164. Have we correctly characterized the benefits and costs from the proposed re-determination of smaller reporting company status?  Are there any other benefits and costs that should be considered?  Please provide supportive data to the extent available.

165. For the re-determination of a post-business combination company's smaller reporting company status, what would be the benefits and costs of requiring a fixed date to measure public float?  If the benefits outweigh the costs of requiring a fixed date, do the relative benefits and costs of different possible fixed dates indicate that one approach would be preferential?

166.   What would be the costs and benefits of relying solely on revenues to re-determine a post-business combination company's smaller reporting company status rather than including the public float?

167.   Have we correctly characterized the benefits and costs from the proposal to require target companies to be co-registrants to Form S-4 and F-4?  Are there any other benefits and costs that should be considered?  Please provide supportive data to the extent available.

168.   Would the relative benefits and costs associated with the proposed amendments related to de-SPAC-transaction disclosures and liability have additional effects on the calculus of pursuing a de-SPAC business combination versus a traditional IPO that we have not considered?  In terms of the market choice to utilize a de-SPAC transaction versus a traditional IPO, would the change in relative benefits and costs associated with the proposed rules and amendments be beneficial or detrimental in terms of their effects on efficiency, competition and capital formation?  Please provide supportive evidence or data to the extent available.

169.   Have we correctly characterized the benefits and costs from the proposed amendments related to the PSLRA safe harbor?  Are there any other benefits and costs that should be considered?  Please provide supportive data to the extent available.

170.    With respect to the proposed changes to the definition of "blank check company" for purposes of the PSLRA safe harbor, are there any additional benefits and costs that would apply primarily to blank check companies that are not penny stock issuers and not SPACs?  Please provide supportive data to the extent available.

171.   Have we correctly characterized the benefits and costs of the underwriter status and liability proposals?  Are there any other benefits and costs for SPACs, SPAC IPO

underwriters, target companies and investors that should be considered?  Please provide supportive data to the extent available.

172.   Have we correctly characterized the scope and scale of both SPAC and non-SPAC shell companies that would be affected by proposed Rule 145a?  Please provide data or analysis to the extent available.

173.   Have we correctly characterized the benefits and costs of proposed Rule 145a?  Are there any other benefits and costs that should be considered?  Are there any additional benefits and costs that would apply primarily to non-SPAC shell companies that are not business-combination related shell companies?  Please provide supportive data to the extent available.

174.   As noted above, we are unable to estimate the number of shell companies that are currently private that could be impacted by proposed Article 15 of Regulation S-X.  We request data on the number of these entities that may be impacted by the proposed rule.  Would analysis of the economic effects on these currently private entities broadly impact the balance of costs and benefits to adopting Article 15 of Regulation S-X as proposed?

175.   Have we correctly characterized the benefits and costs of proposed new Article 15 of Regulation S-X and the related proposed amendments?  Are there any other benefits and costs that should be considered?   Please provide supportive data to the extent available.

176.   Have we correctly characterized the benefits and costs to proposed Rule 15-01(b)? Are there additional costs, particularly to investors, of permitting a shell company registrant to include in its Form S-4/F-4/proxy or information statement two (rather than three) years of statements of comprehensive income, changes in stockholders' equity, and cash flows for the private operating company for all transactions involving an EGC shell

company and a private operating company that would qualify as an EGC that would affect our assessment of the likely effects of this proposed rule on investor protection?

177.   Have we correctly characterized the benefits and costs of the enhanced projection guidance (amendments to Item 10(b) of Regulation S-K)?  Are there any other benefits and costs that should be considered?  Please provide supportive data to the extent available.

178.   Have we correctly characterized the benefits and costs of the proposed Investment Company Act safe harbor?  Are there any other benefits and costs that should be considered?  Please provide supportive data to the extent available.

179.   Is it feasible for SPACs to hold most of their assets in cash accounts rather than Government securities or Government money market funds?  What would be the costs to SPACs of holding their assets in cash?  How costly would it be for SPACs that are currently invested in Government securities or Government funds to switch to cash?  Please provide supportive data or estimates to the extent available.

180.   Have we correctly characterized the effects on efficiency, competition and capital formation from the proposed rules and amendments?  Are there any effects that should be considered?  Please provide supportive data to the extent available.

## X.   PAPERWORK REDUCTION ACT

### A.   Summary of the Collections of Information

Certain provisions of our rules, schedules, and forms that would be affected by the proposed new rules and amendments contain "collection of information" requirements within the meaning of the PRA.[566]  We are submitting the proposed new rules and amendments to the

---

[566]  44 U.S.C. 3501 *et seq.*

Office of Management and Budget ("OMB") for review and approval in accordance with the PRA and its implementing regulations.[567]  The hours and costs associated with preparing, filing and sending the schedules and forms, and retaining records constitute reporting and cost burdens imposed by each collection of information.[568]  An agency may not conduct or sponsor, and a person is not required to comply with, a collection of information requirement unless it displays a currently valid OMB control number.  The titles for the collections of information are:

- Regulation 14A (Commission Rules 14a-1 through 14a-21 and Schedule 14A) (OMB Control No. 3235-0059);

- Regulation 14C (Commission Rules 14c-1 through 14c-7 and Schedule 14C) (OMB Control No. 3235-0057);

- Schedule TO (OMB Control No. 3235-0515);

- Form S-1 (OMB Control No. 3235-0065);

- Form S-4 (OMB Control No. 3235-0324);

- Form F-1 (OMB Control No. 3235-0258);

- Form F-4 (OMB Control No. 3235-0325);

- Form 10-K (OMB Control No. 3235-0063);

- Form 10-Q (OMB Control No. 3235-0070); and

- Rule 3a-10 under the Investment Company Act (a proposed new collection of information).[569]

---

[567]  44 U.S.C. 3507(d) and 5 CFR 1320.11.

[568]  The paperwork burdens for Regulation S-X, Regulation S-K, Regulation C, Regulation 12B, and Regulation S-T are imposed through the forms, schedules and reports that are subject to the requirements in these regulations and are reflected in the analysis of those documents.

[569]  We estimate that there would be a negligible or no change in burden to Form 20-F and Form 8-K as a result of the proposed amendments to Regulation S-X, in that these proposed amendments would be codifying existing

The forms, schedules, and regulations listed above were adopted under the Securities Act, the Exchange Act, and/or the Investment Company Act.  These regulations, schedules, and forms set forth the disclosure requirements for registration statements, annual and quarterly reports, current reports, proxy and information statements, and tender offer statements filed by registrants to provide investors with information to make informed investment, voting, and redemption decisions.  In addition, we are proposing a new requirement that certain entities adopt a board resolution in order to rely on the safe harbor provided by proposed Rule 3a-10 of the Investment Company Act.  Compliance with these information collections is mandatory to the extent applicable to each registrant.[570]  Other than the proposed new collection of information (Rule 3a-10 under the Investment Company Act), responses to these information collections are not kept confidential, and there is no mandatory retention period for the information disclosed. Responses to the information collection under the Investment Company Act are kept confidential, subject to the provisions of applicable law.

A description of the proposed new rules and amendments, including the need for the information and its use, as well as a description of the likely respondents, can be found in Sections II through VI above, and a discussion of the economic effects of the proposed new rules and amendments can be found in Section IX above.

**B.      Estimates of the Effects of the Proposed New Rules and Amendments on the Collections of Information**

---

interpretations of existing rules.  Accordingly, we are not making any revisions to the PRA burden estimates for Form 20-F and Form 8-K at this time.

[570]  Registrants claiming smaller reporting company status have the option to comply with the scaled disclosures available to them on an item-by-item basis.  In addition, if an entity determines not to rely on the safe harbor provided in Rule 3a-10 of the Investment Company Act, it would not be required to adopt the board resolution contemplated in that proposed rule.

The following Table 1 summarizes the estimated effects of the proposed new rules and amendments on the paperwork burdens associated with the affected forms and schedules.

## PRA Table 1. Estimated Paperwork Burden Effects of the Proposed New Rules and Amendments Applicable to SPACs

| Proposed Requirement and Effects | Affected Forms and Schedules | Estimated Effect Per Affected Response[*] |
|---|---|---|
| **Item 1602: Registered offerings by special purpose acquisition companies**<br><br>• Require certain information on the prospectus cover page and in the prospectus summary of registration statements for offerings by SPACs other than de-SPAC transactions.<br><br>• Require enhanced dilution disclosure in these registration statements. | Form S-1 and F-1 | • 1 hour increase in compliance burden per Form S-1 or F-1 |
| **Item 1603: SPAC sponsor; conflicts of interest**<br><br>• Require certain disclosure regarding the sponsor and its affiliates and any promoters of SPACs.<br><br>• Require disclosure regarding conflicts of interest between the sponsor or its affiliates or promoters and unaffiliated security holders. | • Forms S-1, F-1, S-4, and F-4<br><br>• Schedules 14A and 14C<br><br>• Schedule TO | • 2 hour increase in compliance burden per Form S-1, F-1, S-4 or F-4<br><br>• 2 hour increase in compliance burden per Schedule 14A or 14C<br><br>• 2 hour increase in compliance burden per Schedule TO |
| **Item 1604: De-SPAC transactions**<br><br>• Require certain information on the prospectus cover page and in the prospectus summary of registration statements for de-SPAC transactions.<br><br>• Require enhanced dilution disclosure in these registration statements. | • Forms S-4, and F-4<br><br>• Schedules 14A and 14C<br><br>• Schedule TO | • 1 hour increase in compliance burden per Form S-4 or F-4<br><br>• 1 hour increase in compliance burden per Schedule 14A or 14C<br><br>• 1 hour increase in compliance burden per Schedule TO |

| Proposed Requirement and Effects | Affected Forms and Schedules | Estimated Effect Per Affected Response* |
|---|---|---|
| **Item 1605: Background of and reasons for the de-SPAC transaction; terms of the de-SPAC transaction; effects**<br><br>• Require disclosure on the background, material terms and effects of the de-SPAC transaction. | • Forms S-4, and F-4<br><br>• Schedules 14A and 14C<br><br>• Schedule TO | • 1 hour increase in compliance burden per Form S-4 or F-4<br><br>• 1 hour increase in compliance burden per Schedule 14A or 14C<br><br>• 1 hour increase in compliance burden per Schedule TO |
| **Item 1606: Fairness of the de-SPAC transaction and any related financing transaction**<br><br>• Require disclosure on whether a SPAC reasonably believes that a de-SPAC transaction and any related financing transactions are fair or unfair to investors.<br><br>• Require a discussion of the bases for this reasonable belief. | • Forms S-4 and F-4<br><br>• Schedules 14A and 14C<br><br>• Schedule TO | • 4 hour increase in compliance burden per Form S-4 or F-4<br><br>• 4 hour increase in compliance burden per Schedule 14A or 14C<br><br>• 4 hour increase in compliance burden per Schedule TO |
| **Item 1607: Reports, opinions, appraisals and negotiations**<br><br>• Require disclosure regarding any report, opinion or appraisal received by a SPAC or its sponsor from an outside party relating to the fairness of a de-SPAC transaction or any related financing transaction, including disclosure on the qualifications of the outside party, method of selection, and certain material relationships that existed during the past two years. | • Forms S-4 and F-4<br><br>• Schedules 14A and 14C<br><br>• Schedule TO | • 1 hour increase in compliance burden per Form S-4 or F-4<br><br>• 1 hour increase in compliance burden per Schedule 14A or 14C<br><br>• 1 hour increase in compliance burden per Schedule TO |
| **Item 1608: Tender offer filing obligations in de-SPAC transactions**<br><br>• Require additional disclosures in a Schedule TO filed in connection with a de-SPAC transaction. | • Schedule TO | • 3 hour increase in compliance burden per Schedule TO |

| Proposed Requirement and Effects | Affected Forms and Schedules | Estimated Effect Per Affected Response[*] |
|---|---|---|
| **Item 1609: Financial projections in de-SPAC transactions**<br><br>• Require additional disclosures regarding financial projections disclosed in a disclosure document for a de-SPAC transaction. | • Forms S-4 and F-4<br><br>• Schedules 14A and 14C<br><br>• Schedule TO | • 2 hour increase in compliance burden per Form S-4 or F-4<br><br>• 2 hour increase in compliance burden per Schedule 14A or 14C<br><br>• 2 hour increase in compliance burden per Schedule TO |
| **Item 1610: Structured data requirement**<br><br>• Require information disclosed pursuant to Subpart 1600 to be tagged in a structured, machine-readable data language. | • Forms S-1, F-1, S-4, and F-4<br><br>• Schedules 14A and 14C<br><br>• Schedule TO | • 1 hour increase in compliance burden per Form S-1, F-1, S-4 or F-4<br><br>• 1 hour increase in compliance burden per Schedule 14A or 14C<br><br>• 1 hour increase in compliance burden per Schedule TO |
| **Proposed Amendments to Regulation S-X**<br><br>Amend financial statement requirements and the forms and schedules filed in connection with business combination transactions involving shell companies (other than business combination related shell companies), including de-SPAC transactions, to more closely align required disclosures about the target private operating company with those required in a Form S-1 or F-1 for an initial public offering, including:<br><br>• Expanding the circumstances in which target companies may report two years, instead of three years, of audited financial statements (resulting in a net decrease in burden) (proposed Rule 15-01(b)); and<br><br>• Further aligning the requirements for audited financial statements in these transactions with those required in a registered initial public offering (resulting in a net decrease in burden) (proposed Rule 15-01(c), (d) and (e)). | • Forms S-4 and F-4<br><br>• Schedules 14A and 14C<br><br>• Schedule TO | • 50 hour net decrease in compliance burden per affected Form S-4 or F-4**<br><br>• 50 hour net decrease in compliance burden per affected Schedule 14A or 14C**<br><br>• 50 hour net decrease in compliance burden per affected Schedule TO** |

| Proposed Requirement and Effects | Affected Forms and Schedules | Estimated Effect Per Affected Response[*] |
|---|---|---|
| **Proposed Amendments to Align Non-Financial Statement Disclosures in De-SPAC Transactions**<br><br>• Amend the forms and schedules filed in connection with de-SPAC transactions to more closely align required non-financial statement disclosures about the target private operating company with those required in a Form S-1 or F-1 for an initial public offering. | • Forms S-4 and F-4<br><br>• Schedules 14A and 14C<br><br>• Schedule TO | • 8 hour increase in compliance burden per Form S-4 or F-4<br><br>• 8 hour increase in compliance burden per Schedule 14A or 14C<br><br>• 8 hour increase in compliance burden per Schedule TO |
| **Proposed Amendment to Forms S-4 and F-4**<br><br>• Amend Form S-4 and Form F-4 to require that the SPAC and the target private operating company be treated as co-registrants when the Form S-4 or Form F-4 is filed by the SPAC in connection with a de-SPAC transaction | • Forms S-4 and F-4 | • 100 hour increase in compliance burden per Form S-4 or F-4*** |
| **Proposed Rule 3a-10 under the Investment Company Act**<br><br>• Require the board of directors of a SPAC relying on Rule 3a-10 to adopt an appropriate resolution evidencing that SPAC is primarily engaged in the business of seeking to complete a single de-SPAC transaction. | • None | • 1 hour increase in compliance burden per SPAC |

Notes:

\* Estimated effect expressed as increase or decrease of burden hours on average and, as applicable, derived from Commission staff review of samples of relevant sections of the affected forms.

\*\* We arrive at an estimate for these amendments to Regulation S-X on the assumption that approximately 30% of affected responses would require one fewer year of audited financial statements under proposed Rule 15-01(b) than under the current rules from registrants that would not otherwise have prepared financial statements for such year.  Coupled with an incremental increase in burden for the proposed amendments to Regulation S-X other than proposed Rule 15-01(b), when this decrease is spread across all affected responses, we arrive at a net burden decrease of 50 hours.

\*\*\* The estimated 100 hour increase in burden is based on an estimate of the additional time that a target company, as a co-registrant, would spend on preparing disclosures in a Form S-4 or F-4 filed by a SPAC for a de-SPAC transaction.

In addition, we are proposing to require that a post-business combination company re-determine whether it is a smaller reporting company (SRC) following a de-SPAC transaction. As proposed, the post-business combination company would be required to reflect this re-

determination in its first periodic report after the de-SPAC transaction and in Commission filings thereafter until its next annual re-determination of SRC status.  We estimate that the proposed re-determination of SRC status would result in increased burdens in filing Forms 10-K, Forms 10-Q, Schedules 14A, Schedules 14C, and Forms S-1 for those post-business combination companies that would lose SRC status, which takes into account the increased incremental burden in providing disclosures pursuant to non-SRC disclosure requirements.  The following Table 2 sets forth our estimates regarding the increase in compliance burden when a post-business combination company loses SRC status:

**PRA Table 2. Increase in Compliance Burden After Losing SRC Status**

| Form / Schedule | Estimated Increase in Internal Hours per Filing | Estimated Increase in Outside Professional Hours per Filing | Estimated Increase in Outside Professional Costs per Filing |
|---|---|---|---|
| Form 10-K[*] | 439 | 147 | $58,800 |
| Form 10-Q[*] | 36.57 | 11.88 | $4,752 |
| Schedule 14A[**] | 0.75 | 0.25 | $100 |
| Schedule 14C[***] | 0.75 | 0.25 | $100 |
| Form S-1[*] | 5.75 | 17.25 | $6,900 |

Notes:

[*] The estimated increases in compliance burdens are based on the difference between the current estimates for the applicable form and the estimated burden for SRCs in filing the form.  We estimate the compliance burden for an SRC in filing these forms using the same methodology as in 2018 when the Commission amended the smaller reporting company definition.  *See Smaller Reporting Company Definition*, Release No. 33-10513 (June 28, 2018) [83 FR 31992 (July 10, 2018)], at section V.

[**] In regard to Schedule 14A, we estimate that a company that loses SRC status would experience an increased compliance burden of 0.75 internal burden hours and a cost of $100 (0.25 professional hours x $400/hour) per schedule, based on our estimate of the compliance burden for 17 CFR 229.407(d)(5) and (e)(4) and (5) (Item 407(d)(5) and (e)(4) and (5) of Regulation S-K), with which smaller reporting companies are not required to comply.

[***] Similar to Schedule 14A, we estimate that, in regard to Schedule 14C, a company that loses SRC status would experience an increased compliance burden of 0.75 burden hours and a cost of $100 (0.25 professional hours x $400/hour) per report, based on our estimate of the compliance burden for Item 407(d)(5) and (e)(4) and (5) of Regulation S-K.

## C.    Incremental and Aggregate Burden and Cost Estimates

We estimate below the incremental and aggregate increase in paperwork burden as a result of the proposed new rules and amendments.  These estimates represent the average burden for all respondents, both large and small.  In deriving our estimates, we recognize that the burdens will likely vary among individual respondents based on a number of factors, including the size and complexity of their business.  These estimates include the time and the cost of preparing and reviewing disclosure, filing documents, and retaining records.  We believe that some registrants will experience costs in excess of this average and some registrants will experience less than the average costs.  Our methodologies for deriving these estimates are discussed below.

Our estimates represent the burden for all SPACs that file registration statements with the Commission for registered offerings and all registrants that file disclosure documents in connection with a de-SPAC transaction or a business combination involving a shell company or a reporting shell company.[571]  Additionally, our estimates take into account an expected increase in the number of Securities Act registration statements as a result of proposed Rule 145a.  Based on a review of Commission filings during the period 2011 – 2021 and an analysis of the effects of the proposed new rules and amendments,[572] the staff estimates that:

- SPACs will file an average of 90 registration statements each year for registered offerings on Form S-1 and 8 registration statements on Form F-1, other than for de-SPAC transactions;

---

[571]  Throughout this release and as stated earlier, we use "shell company" and "reporting shell company" in lieu of the phrases "shell company, other than a business combination related shell company" and "reporting shell company, other than a business combination related shell company."

[572]  We based our estimates, in part, on a review of Commission filings over a 10-year period because we believe that this longer timeframe would more accurately reflect the average number of registration statements filed by SPACs and disclosure documents for de-SPAC transactions in a given year.

- An average of 30 registration statements on Form S-4 and 4 registration statements on Form F-4, 30 definitive proxy statements on Schedule 14A, 4 definitive information statements on Schedule 14C, and 2 tender offer statements on Schedule TO will be filed each year in connection with de-SPAC transactions; and

- An average of 20 registration statements on Form S-4 and 2 registration statements on Form F-4 will be filed each year for business combination transactions involving a reporting shell company and a non-shell company, other than de-SPAC transactions.[573]

For purposes of the PRA, the burden is allocated between internal burden hours and outside professional costs.  The portion of the burden carried by outside professionals is reflected as a cost, while the portion of the burden carried by the company internally is reflected in hours.  The following Table 3 sets forth the percentage estimates we use for the burden allocation for each form and schedule, consistent with current OMB estimates and recent Commission rulemakings.  We estimate that the average cost of retaining outside professionals is $400 per hour.[574]

**PRA Table 3.  Standard Estimated Burden Allocation for Specified Forms, Schedules, and Records**

| Form / Schedule / Record Type | Internal | Outside Professionals |
|---|---|---|
| Forms S-1, F-1, S-4, and F-4 | 25% | 75% |
| Schedules 14A and 14C | 75% | 25% |
| Schedule TO | 25% | 75% |
| Form 10-K and Form 10-Q | 75% | 25% |

---

[573]  This estimate represents the upper bound of the estimated number of Forms S-4 and F-4 filed for these transactions.

[574]  We recognize that the costs of retaining outside professionals may vary depending on the nature of the professional services, but for purposes of this PRA analysis, we estimate that such costs would be an average of $400 per hour.  This is the rate we typically estimate for outside legal services used in connection with public company reporting.

| Resolution prepared in accordance with Rule 3a-10 | 50% | 50% |
|---|---|---|

The following Table 4 summarizes the estimated effects of the proposed new rules and amendments, other than Rule 145a, on the paperwork burdens associated with the affected forms, schedules, and records:

**PRA Table 4. Calculation of the Incremental Change in Burden Estimates of Current Responses Resulting from the Proposed New Rules and Amendments, Other Than Rule 145a**

| Form / Schedule / Record | Number of Estimated Affected Responses | Estimated Burden Hour Increase or Decrease / Affected Response | Total Incremental Increase or Decrease in Burden Hours | Estimated Increase or Decrease in Internal Burden Hours | Estimated Increase or Decrease in Outside Professional Hours | Total Increase or Decrease in Outside Professional Costs |
|---|---|---|---|---|---|---|
| | (A) | (B) | (C) = (A) * (B) | (D) = (C) * (Allocation %) | (E) = (C) * (Allocation %) | (F) = (E) * $400 |
| Schedule 14A | 30 | (30) | (900) | (675) | (225) | ($90,000) |
| Schedule 14C | 4 | (30) | (120) | (90) | (30) | ($12,000) |
| Schedule TO | 2 | (27) | (54) | (14) | (41) | ($16,200) |
| Form S-1 | 90 | 6 | 540 | 135 | 405 | $108,000 |
| Form S-4 | 30 | 95 | 2,850 | 713 | 2,138 | $855,000 |
| Form F-1 | 8 | 6 | 48 | 12 | 36 | $9,600 |
| Form F-4 | 4 | 95 | 380 | 95 | 285 | $114,000 |
| Resolution prepared in accordance with Rule 3a-10[+] | 98 | 1 | 98 | 49 | 49 | $19,600 |
| Total | 266 | 112 | 2,842 | 225 | 2,617 | $988,000 |

Notes:
+ As discussed above, we believe that proposed Rule 3a-10 would offer market participants a number of benefits, including the reduction of compliance costs for some market participants.  As a result, while no SPAC would be required to rely on Rule 3a-10, for purposes of this analysis, we assume that all SPACs conducting an initial

public offering subsequent to adoption of the proposed rule would rely on proposed Rule 3a-10 and, therefore, prepare a board resolution in accordance with the conditions of Rule 3a-10.

The following Table 5 summarizes the estimated effects of proposed Rule 145a on the paperwork burdens associated with the affected forms:

**PRA Table 5. Calculation of the Change in Burden Estimates of the Affected Forms Resulting from Proposed Rule 145a**

| Form / Schedule / Record | Estimated Increase in the Number of Responses | Estimated Burden Per Form | Total Incremental Increase or Decrease in Burden Hours | Estimated Increase in Internal Burden Hours | Estimated Increase in Outside Professional Hours | Total Increase in Outside Professional Costs |
|---|---|---|---|---|---|---|
| | (A) | (B) | (C) = (A) * (B) | (D) = (C) * (Allocation %) | (E) = (C) * (Allocation %) | (F) = (E) * $400 |
| Form S-4 | 20 | 3,826 | 76,512 | 19,128 | 57,384 | $22,953,551 |
| Form F-4 | 2 | 1,441 | 2,882 | 720 | 2,161 | $864,554 |
| Total | 22 | 5,267 | 79,394 | 19,848 | 59,545 | $23,818,105 |

In addition, we estimate that an average of 50 fewer post-business combination companies following a de-SPAC transaction will qualify as smaller reporting companies than under the current rules until the next annual re-determination date.[575]  While we cannot predict with certainty the number of these post-business combination companies, we estimate for purposes of our PRA calculations that currently all post-business combination companies qualify as SRCs following de-SPAC transactions in which the SPAC is the legal acquirer and that 80% of these companies that are eligible to use the scaled SRC disclosure provisions do so.[576]  We

---

[575]  This estimate is based, in part, on our estimate of the number of de-SPAC transactions in which the SPAC is the legal acquirer.

[576]  This estimated realization rate is based on the same methodology and data set forth in Release No. 33-10513, Section V.D.  Though the estimated realization rate in Release No. 33-10513 preceded the effective date of the amendments to the smaller reporting company definition in 2018, we expect that the current realization rate for eligible companies using the scaled SRC disclosure provisions to be generally consistent with the estimated realization rate in 2018.

estimate that these registrants would file, on average, one Form 10-K, 1.5 Forms 10-Q, one Schedule 14A, and one registration statement on Form S-1 prior to the next re-determination of SRC status.

The following Table 6 summarizes the estimated effects of the proposed re-determination of SRC status on the paperwork burdens associated with the affected forms and schedules:

**PRA Table 6. Calculation of the Incremental Change in Burden Estimates of Current Responses Resulting from the Proposed Re-Determination of SRC Status**

| Form / Schedule / Record | Number of Estimated Affected Responses | Estimated Burden Hour Increase or Decrease / Affected Response | Total Incremental Increase or Decrease in Burden Hours | Estimated Increase or Decrease in Internal Burden Hours | Estimated Increase or Decrease in Outside Professional Hours | Total Increase or Decrease in Outside Professional Costs |
|---|---|---|---|---|---|---|
| | (A) | (B) | (C) = (A) * (B) | (D) = (C) * (Allocation %) | (E) = (C) * (Allocation %) | (F) = (E) * $400 |
| Schedule 14A | 40 | 1 | 40 | 30 | 10 | $4,000 |
| Schedule 14C | 4 | 1 | 4 | 3 | 1 | $400 |
| Form S-1 | 40 | 23 | 920 | 230 | 690 | $276,000 |
| Form 10-K | 40 | 586 | 23,440 | 17,560 | 5,880 | $2,352,000 |
| Form 10-Q | 60 | 48 | 2,880 | 2,194 | 713 | $285,120 |
| Total | 184 | 659 | 27,284 | 20,017 | 7,294 | $2,917,520 |

The following Table 7 summarizes the requested paperwork burden changes to existing information collections, including the estimated total reporting burdens and costs, under the proposed new rules and amendments.

**PRA Table 7.  Requested Paperwork Burden under the Proposed New Rules and Amendments[+]**

| Form / Schedule | Current Burden | | | Program Change | | | Requested Change in Burden | | |
|---|---|---|---|---|---|---|---|---|---|
| | Current Annual Responses | Current Burden Hours | Current Cost Burden | Number of Affected Responses | Estimated Increase or Decrease | Increase or Decrease in Outside | Annual Responses | Burden Hours | Cost Burden |

| | (A) | (B) | (C) | (D) | in Outside Prof. Hours (E) | Professional Costs (F) | (G) = (A) | (H) = (B) + (E) | (I) = (C) + (F) |
|---|---|---|---|---|---|---|---|---|---|
| Schedule 14A | 6,369 | 777,590 | $103,678,712 | ++ | (645) | ($86,000) | 6,369 | 776,945 | $103,592,712 |
| Schedule 14C | 569 | 56,356 | $7,514,944 | 4 | (90) | ($12,000) | 569 | 56,266 | $7,502,944 |
| Schedule TO | 1,378 | 29,972 | $11,988,600 | 2 | (14) | ($16,200) | 1,378 | 29,959 | $11,972,400 |
| Form S-1 | 898 | 146,062 | $178,916,043 | +++ | 320 | $384,000 | 898 | 178,916,363 | $179,300,043 |
| Form S-4 | 588 | 562,362 | $677,255,579 | ++++ | 19,840 | $23,890,904 | 608 | 563,075 | $701,146,483 |
| Form F-1 | 66 | 26,707 | $32,293,375 | 8 | 12 | $14,400 | 66 | 26,719 | $32,307,775 |
| Form F-4 | 39 | 14,049 | $17,073,825 | ++++ | 815 | $989,581 | 41 | 14,144 | $18,063,406 |
| Form 10-K | 8,272 | 14,188,040 | $1,893,793,119 | 40 | 17,560 | $2,352,000 | 8,292 | 14,205,600 | $1,896,145,119 |
| Form 10-Q | 22,925 | 3,182,333 | $421,490,754 | 60 | 2,194 | $285,120 | 22,925 | 3,184,527 | $421,775,874 |
| Total | 41,124 | 18,983,471 | $3,334,004,951 | 370 | 20,190 | $3,944,320 | 41,124 | 197,773,642 | $3,347,949,271 |

+ Figures in this table have been rounded to the nearest whole number.

++See PRA Tables 4 and 6 for the number of affected responses for Schedule 14A.

+++ See PRA Tables 4 and 6 for the number of affected responses for Form S-1.

++++ See PRA Tables 4 and 5 for the number of affected responses for Form S-4 and Form F-4.

## D.    Request for Comment

Pursuant to 44 U.S.C. 3506(c)(2)(B), we request comment in order to:

- Evaluate whether the proposed changes to the collections of information are necessary for the proper performance of the functions of the Commission, including whether the information will have practical utility;

- Evaluate the accuracy of our estimates of the additional burden hours that would result from adoption of the proposed new rules and amendments;

- Determine whether there are ways to enhance the quality, utility, and clarity of the information to be collected;

- Evaluate whether there are ways to minimize the burden of the collections of information on those who respond, including through the use of automated collection techniques or other forms of information technology; and

- Evaluate whether the proposed new rules and amendments would have any effects on any other collection of information not previously identified in this section.

Any member of the public may direct to us any comments concerning the accuracy of these burden estimates and any suggestions for reducing these burdens.  Persons submitting comments on the collection of information requirements should direct their comments to the Office of Management and Budget, Attention: Desk Officer for the U.S. Securities and Exchange Commission, Office of Information and Regulatory Affairs, Washington, DC 20503, and send a copy to, Vanessa A. Countryman, Secretary, U.S. Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549-1090, with reference to File No. S7-13-22.  Requests for materials submitted to OMB by the Commission with regard to the collection of information should be in writing, refer to File No. S7-13-22 and be submitted to the U.S. Securities and Exchange Commission, Office of FOIA Services, 100 F Street NE, Washington DC 20549-2736.  OMB is required to make a decision concerning the collections of information between 30 and 60 days after publication of this release.  Consequently, a comment to OMB is best assured of having its full effect if the OMB receives it within 30 days of publication.

## XI.    SMALL BUSINESS REGULATORY ENFORCEMENT FAIRNESS ACT

For purposes of the Small Business Regulatory Enforcement Fairness Act of 1996 ("SBREFA"),[577] the Commission must advise the OMB as to whether a proposed regulation

---

[577] Pub. L. No. 104-121, Tit. II, 110 Stat. 857 (1996).

constitutes a "major" rule.  Under SBREFA, a rule is considered "major" where, if adopted, it results or is likely to result in:

- An annual effect on the economy of $100 million or more (either in the form of an increase or a decrease);

- A major increase in costs or prices for consumers or individual industries; or

- Significant adverse effects on competition, investment or innovation.

If a rule is "major," its effectiveness will generally be delayed for 60 days pending Congressional review.

We request comment on whether our proposed amendments would be a "major rule" for purposes of SBREFA.  We solicit comment and empirical data on:

- The potential effect on the U.S. economy on an annual basis;

- Any potential increase in costs or prices for consumers or individual industries; and

- Any potential effect on competition, investment or innovation.

We request those submitting comments to provide empirical data and other factual support for their views to the extent possible.

## XII.   INITIAL REGULATORY FLEXIBILITY ANALYSIS AND CERTIFICATION

The Regulatory Flexibility Act[578] requires an agency, when issuing a rulemaking proposal, to prepare and make available for public comment an Initial Regulatory Flexibility Analysis ("IRFA") that describes the impact of the proposed rule on small entities, unless the Commission certifies that the rule, if adopted, would not have a significant economic impact on a substantial number of small entities.[579]  This IRFA has been prepared in accordance with the

---

[578]  5 U.S.C. 601 *et seq.*

[579]  5 U.S.C. 603(a); 5 U.S.C. 605(b).

Regulatory Flexibility Act.  It relates to the proposed new rules and amendments described in Sections II through VI above.

A.       **Reasons for, and Objectives of, the Proposed Action**

As discussed throughout the release, we are proposing new Subpart 1600 of Regulation S-K and amendments to existing forms and schedules to require specialized disclosures in registered offerings by SPACs, including initial public offerings, and in disclosure documents for de-SPAC transactions with respect to, among other things, compensation paid to sponsors, conflicts of interest, and dilution.  For de-SPAC transactions, we are also proposing to require disclosure of a fairness determination, additional disclosures on the target private operating company, a re-determination of smaller reporting company status following the completion of a de-SPAC transaction, and a minimum dissemination period for certain disclosure documents in these transactions.  These proposed rules and amendments would be applicable to, depending on the circumstances, registration statements on Forms S-1, F-1, S-4 and F-4 filed under the Securities Act and Schedules 14A, 14C and TO under the Exchange Act.  The proposed rules would also clarify the underwriter status of SPAC IPO underwriters in connection with de-SPAC transactions and would require that the target company be named as a co-registrant in a Form S-4 or F-4 filed by a SPAC for a de-SPAC transaction.  Further, we are proposing to amend the definition of "blank check company" for purposes of the PSLRA such that the safe harbor under the PSLRA for forward-looking information would not be available to SPACs and certain other blank check companies; to update and expand our guidance in Item 10(b) of Regulation S-K regarding the use of projections in Commission filings;[580] and to require additional disclosure

---

[580]  Item 10(b) sets forth guidelines representing the Commission's views on important factors to be considered in formulating and disclosing management's projections of future economic performance in Commission filings.

when projections are disclosed in connection with de-SPAC transactions.

In regard to business combination transactions involving a reporting shell company,[581] we are proposing Securities Act Rule 145a to deem these transactions with a non-shell company to involve a sale of securities to the shell company's shareholders.  In addition, we are proposing amendments to the financial statement reporting requirements for transactions involving shell companies in Regulation S-X.  Finally, we are proposing a new safe harbor, Rule 3a-10, under the Investment Company Act that would provide that a SPAC that satisfies the conditions of the safe harbor would not be an investment company and therefore would not be subject to regulation as an investment company under the Investment Company Act.

The need for and objectives of the proposed rules and amendments are discussed in more detail in Sections II – VI above.  We discuss the economic impact, including the estimated costs and burdens, of the proposed rules and amendments on all registrants, including small entities, in Sections IX and X above.

### B.      Legal Basis

We are proposing the new rules and rule amendments under the authority set forth in Sections 6, 7, 10, 19(a), and 28 of the Securities Act; Sections 3, 12, 13, 14, 15, 23(a), and 36 of the Exchange Act; and Sections 6(c) and 38(a) of the Investment Company Act.

### C.      Regulatory Flexibility Act Certification

Pursuant to Section 605(b) of the Regulatory Flexibility Act, the Commission hereby certifies that proposed Rule 3a-10 under the Investment Company Act would not, if adopted,

---

[581]  Throughout this release and as stated earlier, we use "shell company" and "reporting shell company" in lieu of the phrases "shell company, other than a business combination related shell company" and "reporting shell company, other than a business combination related shell company."

have a significant economic impact on a substantial number of small entities.[582]   Based on information available to the Commission, there were 861 initial public offerings conducted by SPACs in 2020 and 2021, of which 6 were for SPACs that sold $50 million or less in units.[583] As a result, we believe that approximately 0.7% of SPACs directly affected by proposed Rule 3a-10 would be small entities.[584]   Accordingly, the Commission believes that proposed Rule 3a-10 would not, if adopted, have a significant economic impact on a substantial number of small entities.

### D.   Small Entities Subject to the Proposed Rules and Amendments

The proposed rules and amendments would apply to registrants that are small entities. The Regulatory Flexibility Act defines "small entity" to mean "small business," "small organization," or "small governmental jurisdiction."[585]   17 CFR 230.157 (Securities Act Rule 157) defines an issuer, other than an investment company, to be a "small business" or "small organization" for purposes of the Regulatory Flexibility Act if it had total assets of $5 million or less on the last day of its most recent fiscal year and is engaged or proposing to engage in an offering of securities not exceeding $5 million.   17 CFR 240.0-10(a) (Exchange Act Rule 0-10(a)) defines an issuer, other than an investment company, to be a "small business" or "small organization" if it had total assets of $5 million or less on the last day of its most recent fiscal year.   An investment company is a small entity if, together with other investment companies in

---

[582]   The definition of "small entity" is set forth in Section XII.D below.

[583]   Based on data from Dealogic M&A module as of Jan. 2022.

[584]   While no SPAC would be required to rely on proposed Rule 3a-10, for purposes of this analysis, we assume that all SPACs conducting an initial public offering subsequent to adoption of the proposed rule would rely on proposed Rule 3a-10.

[585]   5 U.S.C. 601(6).

the same group of related investment companies, it has net assets of $50 million or less as of the end of its most recent fiscal year.[586]

The proposed specialized disclosure and other requirements applicable to SPACs would not apply to issuers that raise less than $5 million at the time of their initial public offerings.[587] However, we acknowledge that there may be instances where a SPAC may be a small entity at the time of a subsequent registered offering or at the time of a de-SPAC transaction.[588]  While we are not aware to date of any such instances, we request comment on the number of these small entities.  In addition, due to data limitations, we are unable to estimate the number of potential target private operating companies in de-SPAC transactions that may be small entities;[589] therefore, we request comment on the number of these small entities.

In regard to proposed Rule 145a and the proposed amendments to Regulation S-X, we estimate that there are 163 reporting shell companies that are small entities.[590]  However, due to data limitations, we are unable to estimate the number of private operating companies and private shell companies that are small entities that may engage in a business combination transaction.[591]  We request comment on the number of these small entities.

---

[586] See 17 CFR 270.0-10(a).

[587] *See supra* note 12 and the discussion of the proposed definition of "special purpose acquisition company" in Section II.A.

[588] As noted above, the vast majority of initial public offerings by SPACs in 2020 and 2021 raised more than $50 million.  In 2020, the smallest amount raised in an initial public offering by a SPAC was $40 million, and, in 2021, the smallest amount raised in an initial public offering by a SPAC was $44 million.  When viewed over a 10-year period, we do not expect the outcome to be different due to how SPACs are structured to address Rule 419.  *See supra* note 12.  Further, with respect to proposed Rule 140a, we do not expect any underwriters in SPAC initial public offerings to be small entities.

[589] In this regard, we note that exchange listing requirements and provisions in the governing instruments of many SPACs, along with how SPACs are structured to avoid the application of Rule 419, make it less likely that SPACs would merge with or acquire a small entity.  *See supra* notes 12 and 13.

[590] This estimate does not include business combination related shell companies.

[591] We believe that it is unlikely that a reporting company would engage in a business combination transaction with a shell company such that it would be subject to proposed Rule 145a.  Therefore, we are not estimating the number of reporting companies for purposes of this analysis.

### E.       Reporting, Recordkeeping, and Other Compliance Requirements

We expect that the proposed specialized disclosure and other requirements applicable to

SPACs and target private operating companies would have an incremental effect on reporting,

recordkeeping and other compliance burdens for registrants, including small entities.  These

proposed requirements would increase compliance costs for registrants, and compliance with

these proposed requirements would require the use of professional skills, including accounting,

legal, and technical skills.  We generally expect that the nature of any benefits and costs

associated with the proposed rules and amendments to be similar for large and small entities.

We also anticipate that the economic benefits and costs likely could vary among small entities

based on a number of factors, such as the nature and conduct of their businesses, which makes it

difficult to project the economic impact on small entities with precision.[592]  The proposed rules

and amendments are discussed in detail in Sections II – VI above.  We discuss the economic

effect, including the estimated costs and burdens, of the proposed rules and amendments on all

registrants, including small entities, in Section IX above.

Proposed Rule 145a, in deeming certain business combination transactions involving a

reporting shell company to involve a sale of securities to the reporting shell company's

shareholders, may impose reporting, recordkeeping, or compliance requirements and related

costs on small entities that are reporting shell companies to the extent such a deemed sale of

securities would require such a small entity to register the transaction under the Securities Act or

comply with an exemption from registration.  These costs could also include the costs associated

with the proposed amendments to Regulation S-X, which would require an issuer in a business

---

[592]  We do not expect the proposed re-determination of smaller reporting company status following a de-SPAC transaction to have any effect on small entities because we do not expect any small entities to lose smaller reporting company following this re-determination, based on the public float and revenue thresholds in the smaller reporting company definition.

combination transaction involving a shell company to comply with financial statement reporting requirements that would align with those applicable in traditional initial public offerings.  The proposed changes to the financial statement requirements would increase compliance costs for small entities when these transactions are registered under the Securities Act, although we do not expect the increase in incremental compliance costs resulting from the proposed amendments to be significant because the proposed amendments would codify existing staff guidance on financial statement requirements for these transactions.

### F.      Duplicative, Overlapping or Conflicting Federal Rules

The proposed disclosure requirements in Subpart 1600 may partially duplicate and overlap with a number of existing disclosure requirements under Regulation S-K that are currently applicable to SPAC registered offerings and in de-SPAC transactions.  To the extent that the disclosure requirements in proposed Subpart 1600 overlap with these existing disclosure requirements, the requirements of proposed Subpart 1600 would be controlling.  Other than these proposed disclosure requirements, the Commission believes that the proposed new rules and amendments would not duplicate, overlap or conflict with other federal rules.

### G.      Significant Alternatives

The Regulatory Flexibility Act directs us to consider alternatives that would accomplish our stated objectives, while minimizing any significant adverse impact on small entities. Accordingly, we considered several alternatives, including the following:

- Establishing different compliance or reporting requirements or timetables that take into account the resources available to small entities;

- Clarifying, consolidating or simplifying compliance and reporting requirements under the rules for small entities;

- Using performance rather than design standards; and

- Exempting small entities from all or part of the requirements.

The proposed specialized disclosure and other requirements with respect to SPAC registered offerings and de-SPAC transactions are intended to improve the usefulness and clarity of the information provided to investors so that they can make better informed decisions as to whether to purchase securities in SPAC registered offerings, or in secondary trading markets, and in voting, investment and redemption decisions in connection with de-SPAC transactions. They are also intended to enhance investor protections as well as provide additional clarity regarding the legal obligations of target companies and others in connection with a de-SPAC transaction. We believe that these proposed requirements are equally appropriate for SPACs of all sizes that are engaged in a registered offering and for SPACs and target private operating companies that are engaged in a de-SPAC transaction. As a result, we do not believe that it is appropriate to propose different compliance or reporting requirements for small entities; clarify, consolidate or simplify compliance and reporting requirements for small entities; or to exempt small entities from these requirements. As noted above, in our view, a private operating company's method of becoming a public company should not negatively impact investor protection.

With respect to using performance rather than design standards, these proposed requirements use primarily design standards in order to promote uniform compliance requirements for all registrants. Further, we believe that the proposed requirements would be more beneficial to investors if there are specific disclosure requirements that apply to all registrants, regardless of size, for the reasons discussed above.

Proposed Rule 145a would deem business combinations involving a reporting shell

company and a non-shell company to involve a sale of securities to the reporting shell company's shareholders.  Given that proposed Rule 145a is intended to address potential disparities in the disclosure and liability protections available to reporting shell company shareholders, we do not believe that it is appropriate to propose different compliance or reporting requirements for small entities; clarify, consolidate or simplify compliance and reporting requirements for small entities; or to exempt small entities from the proposed rule.

The proposed amendments to Regulation S-X would generally codify existing staff guidance on financial statement requirements for certain business combinations involving shell companies, and, based on staff analysis of disclosures in these transactions, we believe that most companies already report consistent with this staff guidance.  Further, the amendments are not expected to have any significant adverse effect on small entities (and are, in fact, expected to relieve burdens for some of these entities).  Accordingly, we do not believe that it is necessary to exempt small entities from all or part of the proposed amendments to Regulation S-X; establish different compliance or reporting requirements for such entities; or clarify, consolidate or simplify compliance and reporting requirements for small entities.  Likewise, while we primarily use design standards to promote consistency, we do not believe it is necessary to use performance standards in connection with this aspect of the proposed rules.

### H.    Request for Comment

We encourage the submission of comments with respect to any aspect of this IRFA and certifications.  In particular, we request comments regarding:

- The number of small entities that may be affected by the proposed rules and amendments;

- The existence or nature of the potential impact of the proposed rules and amendments on small entities discussed in the analysis;

- How the proposed amendments could further lower the burden on small entities; and

- How to quantify the impact of the proposed rules and amendments.

Commenters are asked to describe the nature of any impact and provide empirical data supporting the extent of the impact.  Comments will be considered in the preparation of the Final Regulatory Flexibility Analysis, if the proposed rules and amendments are adopted, and will be placed in the same public file as comments on the proposed rules and amendments themselves.

## STATUTORY AUTHORITY AND TEXT OF PROPOSED RULE AND FORM AMENDMENTS

We are proposing the rule and form amendments contained in this document under the authority set forth in Sections 6, 7, 10, 19(a), and 28 of the Securities Act; Sections 3, 12, 13, 14, 15, 23(a), and 36 of the Exchange Act; and Sections 6(c) and 38(a) of the Investment Company Act.

## List of Subjects

## 17 CFR Parts 210

Accountants, Accounting, Banks, Banking, Employee benefit plans, Holding companies, Insurance companies, Investment companies, Oil and gas exploration, Reporting and recordkeeping requirements, Securities, Utilities.

## 17 CFR Parts 229, 230, 232, 239, 240, and 249

Administrative practice and procedure, Reporting and recordkeeping requirements, Securities.

## 17 CFR Part 270

Investment companies, Reporting and recordkeeping requirements, Securities.

In accordance with the foregoing, we are proposing to amend title 17, chapter II of the Code of Federal Regulations as follows:

**PART 210 – FORM AND CONTENT OF AND REQUIREMENTS FOR FINANCIAL STATEMENTS, SECURITIES ACT OF 1933, SECURITIES EXCHANGE ACT OF 1934, INVESTMENT COMPANY ACT OF 1940, INVESTMENT ADVISERS ACT OF 1940, AND ENERGY POLICY AND CONSERVATION ACT OF 1975**

1.      The authority citation for part 210 continues to read as follows:

**Authority:** 15 U.S.C. 77f, 77g, 77h, 77j, 77s, 77z-2, 77z-3, 77aa(25), 77aa(26), 77nn(25), 77nn(26), 78c, 78j-1, 78*l*, 78m, 78n, 78o(d), 78q, 78u-5, 78w, 78*ll*, 78mm, 80a-8, 80a-20, 80a-29, 80a-30, 80a-31, 80a-37(a), 80b-3, 80b-11, 7202 and 7262, and sec. 102(c), Pub. L. 112-106, 126 Stat. 310 (2012), unless otherwise noted.

2.      Amend § 210.1-02 by revising paragraph (d) and paragraph (w)(1) introductory text to read as follows:

**§ 210.1-02 Definitions of terms used in Regulation S-X (17 CFR part 210).**

\* \* \* \* \*

(d) *Audit (or examination).*  The term *audit* (or *examination*), when used in regard to financial statements of issuers as defined by Section 2(a)(7) of the Sarbanes-Oxley Act of 2002, means an examination of the financial statements by an independent accountant in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB") for the purpose of expressing an opinion thereon.  See § 210.15-01(a) for definition of an audit when used in regard to financial statements of a company that will be a predecessor to an issuer that is a shell company (other than a business combination related shell company). When used in regard to financial statements of entities that are not issuers as defined by Section 2(a)(7) of the Sarbanes-Oxley Act of 2002, the term means an examination of the financial statements by an independent accountant in accordance with either the standards of the PCAOB

or U.S. generally accepted auditing standards ("U.S. GAAS") as specified or permitted in the

regulations and forms applicable to those entities for the purpose of expressing an opinion

thereon.  The standards of the PCAOB and U.S. GAAS may be modified or supplemented by the

Commission.

*   *   *   *   *

(w) * * *

(1) The term *significant subsidiary* means a subsidiary, including its subsidiaries, which

meets any of the conditions in paragraph (w)(1)(i), (ii), or (iii) of this section; however if the

registrant is a registered investment company or a business development company, the tested

subsidiary meets any of the conditions in paragraph (w)(2) of this section instead of any of the

conditions in this paragraph (w)(1).  In either an acquisition by a shell company (other than a

business combination related shell company) of a business that is not the predecessor or an

acquisition by the shell company's predecessor, use the predecessor's financial statements

instead of the registrant and the subsidiaries consolidated in applying the significance tests in

paragraphs (w)(1)(i), (ii), and (iii) of this section.

*   *   *   *   *

3.      Amend § 210.3-01 by revising paragraph (a) to read as follows:

**§ 210.3-01 Consolidated balance sheets.**

(a) There shall be filed, for the registrant and its subsidiaries consolidated and for its

predecessors, audited balance sheets as of the end of each of the two most recent fiscal years.  If

the registrant has been in existence for less than one fiscal year, there shall be filed an audited

balance sheet as of a date within 135 days of the date of filing the registration statement.

*   *   *   *   *

4.      Amend § 210.3-05 by revising paragraph (b)(4)(ii) to read as follows:

**§ 210.3-05 Financial statements of businesses acquired or to be acquired.**

\*   \*   \*   \*   \*

(b) \*   \*   \*

(4) \*   \*   \*

(ii) A registrant, other than a foreign private issuer required to file reports on Form 6-K (§ 249.306 of this chapter) or a shell company (other than a business combination related shell company), that omits from its initial registration statement financial statements of a recently consummated business acquisition pursuant to paragraph (b)(4)(i) of this section must file those financial statements and any pro forma information specified by §§ 210.11-01 through 210.11-03 (Article 11) under cover of Form 8-K (§ 249.308 of this chapter) no later than 75 days after consummation of the acquisition.  A shell company (other than a business combination related shell company) that acquires a business, which is not or will not be its predecessor, that omits from a registration statement or proxy statement the financial statements of that recently consummated business acquisition pursuant to (b)(4)(i) of this section shall refer to § 210.15-01(d)(2).

\*   \*   \*   \*   \*

5.      Amend § 210.3-14 by revising paragraph (b)(3)(ii) to read as follows:

**§ 210.3-14 Special instructions for financial statements of real estate operations acquired or to be acquired.**

\*   \*   \*   \*   \*

(b) \*   \*   \*

(3) \*   \*   \*

(ii) A registrant, other than a foreign private issuer required to file reports on Form 6-K (§ 249.306 of this chapter) or shell company (other than a business combination related shell company), that omits from its initial registration statement financial statements of a recently consummated acquisition of a real estate operation pursuant to paragraph (b)(3)(i) of this section must file those financial statements and any pro forma information specified by §§ 210.11-01 through 210.11-03 (Article 11) under cover of Form 8-K (§ 249.308 of this chapter) no later than 75 days after consummation of the acquisition.  A shell company (other than a business combination related shell company) that acquires a real estate operation, which is not or will not be its predecessor that omits from a registration statement or proxy statement the financial statements of a recently consummated business acquisition pursuant to (b)(4)(i) of this section shall refer to § 210.15-01(d)(2).

*   *   *   *   *

6.      Amend § 210.8-02 by revising it to read as follows:

## § 210.8-02 Annual financial statements.

Smaller reporting companies shall file an audited balance sheet for the registrant and for its predecessors as of the end of each of the most recent two fiscal years, or as of a date within 135 days if the issuer has existed for a period of less than one fiscal year, and audited statements of comprehensive income, cash flows and changes in stockholders' equity for each of the two fiscal years preceding the date of the most recent audited balance sheet (or such shorter period as the registrant has been in business).

7.      Amend § 210.10-01 by revising paragraph (a)(1) to read as follows:

## § 210.10-01 Interim financial statements.

(a) *  *  *

(1) Interim financial statements required by this rule need only be provided as to the registrant and its subsidiaries consolidated and its predecessors and may be unaudited.  Separate statements of other entities which may otherwise be required by this regulation may be omitted.

* * * * *

8.    Amend § 210.11-01 by revising paragraph (d) introductory text to read as follows:

**§ 210.11-01 Presentation requirements.**

* * * * *

(d) For purposes of this rule, the term business should be evaluated in light of the facts and circumstances involved and whether there is sufficient continuity of the acquired entity's operations prior to and after the transactions so that disclosure of prior financial information is material to an understanding of future operations.  A presumption exists that a separate entity, a subsidiary, or a division is a business.  A special purpose acquisition company, as defined in § 229.1601(a), is a business for purposes of this rule.  However, a lesser component of an entity may also constitute a business.  Among the facts and circumstances which should be considered in evaluating whether an acquisition of a lesser component of an entity constitutes a business are the following:

* * * * *

9.    Amend part 210 by adding an undesignated center heading and § 210.15-01 to read as follows:

Acquisitions of Businesses by a Shell Company (Other Than a Business Combination Related Shell Company)

Sec.

210.15-01 Acquisitions of businesses by a shell company (other than a business combination related shell company).

## § 210.15-01 Acquisitions of businesses by a shell company (other than a business combination related shell company).

(a) *Audit requirements of predecessor.*  The term *audit* (or *examination*), when used in regard to financial statements of a business that is or will be a predecessor to a shell company (other than a business combination related shell company), means an examination of the financial statements by an independent accountant in accordance with the standards of the PCAOB for the purpose of expressing an opinion thereon.

(b) *Financial statements.*  When the registrant is a shell company (other than a business combination related shell company) and the financial statements of a business that will be a predecessor to the registrant are required in a registration statement or proxy statement, the registrant must file financial statements of the business in accordance with §§ 210.3-01 to 210.3-12 and 210.10-01 (Articles 3 and 10 of Regulation S-X) as if the filing were a Securities Act registration statement for the initial public offering of the business's equity securities.  The financial statements of the business may be filed pursuant to §§ 210.8-01 to 210.8-08 (Article 8) when that business would qualify to be a smaller reporting company based on its annual revenues as of the most recently completed fiscal year, if it were filing a registration statement itself.

(c) *Age of financial statements of the predecessor.*  The financial statements of a business that will be a predecessor to a shell company (other than a business combination related shell company) shall comply with the requirements in § 210.3-12 (§ 210.8-08 when that business would qualify to be a smaller reporting company based on its annual revenues as of the most

recently completed fiscal year, if it were filing a registration statement itself) in determining the age of financial statements of the predecessor business in the registration statement or proxy statement of the registrant.

(d) *Acquisitions of businesses by a shell company or its predecessor that are not or will not be the predecessor.* Registrants shall apply § 210.3-05 (§ 210.8-04 when that business would qualify to be a smaller reporting company based on its annual revenues as of the most recently completed fiscal year if it were filing a registration statement itself) to acquisitions of businesses by a shell company (other than a business combination related shell company) or its predecessor that are not or will not be the predecessor to the registrant.

(1) See § 210.1-02(w)(1) for rules on applying the significance tests to acquisitions of businesses by a shell company (other than a business combination related shell company) or its predecessor that are not or will not be the predecessor.

(2) A shell company (other than a business combination related shell company) that omits from a registration statement or proxy statement the financial statements of a recently acquired business that is not or will not be its predecessor pursuant to Rule 3-05(b)(4)(i) of Regulation S-X (§ 210.1-02(b)(4)(i)) must file those financial statements in its Form 8-K filed pursuant to Item 2.01(f).

(e) *Financial statements of shell company.* After a shell company (other than a business combination related shell company) acquires a business that is its predecessor, the financial statements of the shell company for periods prior to consummation of the acquisition are not required to be included in a filing once the financial statements of the predecessor have been filed for all required periods through the acquisition date and the financial statements of the registrant include the period in which the acquisition was consummated.

**PART 229—STANDARD INSTRUCTIONS FOR FILING FORMS UNDER SECURITIES ACT OF 1933, SECURITIES EXCHANGE ACT OF 1934 AND ENERGY POLICY AND CONSERVATION ACT OF 1975—REGULATION S-K**

10.     The authority citation for part 229 continues to read as follows:

**Authority:** 15 U.S.C. 77e, 77f, 77g, 77h, 77j, 77k, 77s, 77z-2, 77z-3, 77aa(25), 77aa(26), 77ddd, 77eee, 77ggg, 77hhh, 77iii, 77jjj, 77nnn, 77sss, 78c, 78i, 78j, 78j-3, 78*l*, 78m, 78n, 78n-1, 78o, 78u-5, 78w, 78*ll*, 78mm, 80a-8, 80a-9, 80a-20, 80a-29, 80a-30, 80a-31(c), 80a-37, 80a-38(a), 80a-39, 80b-11 and 7201 *et seq.*; 18 U.S.C. 1350; sec. 953(b), Pub. L. 111-203, 124 Stat. 1904 (2010); and sec. 102(c), Pub. L. 112-106, 126 Stat. 310 (2012).

11.     Amend § 229.10 by:

a.     Revising paragraph (b); and

b.     Adding paragraph (f)(2)(iv).

The revisions and additions read as follows.

**§ 229.10 (Item 10) General**

\*   \*   \*   \*   \*

(b) *Commission policy on projections.*  The Commission encourages the use in documents specified in Rule 175 under the Securities Act (§ 230.175 of this chapter) and Rule 3b-6 under the Exchange Act (§ 240.3b-6 of this chapter) of management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format. The guidelines set forth herein represent the Commission's views on important factors to be considered in formulating and disclosing such projections.  These guidelines also apply to projections of future economic performance of persons other than the registrant, such as the

target company in a business combination transaction, that are included in the registrant's Commission filings.

(1) *Basis for projections.*  The Commission believes that management must have the option to present in Commission filings its good faith assessment of a registrant's future performance.  Management, however, must have a reasonable basis for such an assessment. Although a history of operations or experience in projecting may be among the factors providing a basis for management's assessment, the Commission does not believe that a registrant always must have had such a history or experience in order to formulate projections with a reasonable basis.  An outside review of management's projections may furnish additional support for having a reasonable basis for a projection.  If management decides to include a report of such a review in a Commission filing, there also should be disclosure of the qualifications of the reviewer, the extent of the review, the relationship between the reviewer and the registrant, and other material factors concerning the process by which any outside review was sought or obtained.  Moreover, in the case of a registration statement under the Securities Act, the reviewer would be deemed an expert and an appropriate consent must be filed with the registration statement.

(2) *Format for projections.*

(i) In determining the appropriate format for projections included in Commission filings, consideration must be given to, among other things, the financial items to be projected, the period to be covered, and the manner of presentation to be used.  Although traditionally projections have been given for three financial items generally considered to be of primary importance to investors (revenues, net income (loss) and earnings (loss) per share), projection information need not necessarily be limited to these three items.  However, management should take care to assure that the choice of items projected is not susceptible of misleading inferences

through selective projection of only favorable items. Revenues, net income (loss) and earnings (loss) per share usually are presented together in order to avoid any misleading inferences that may arise when the individual items reflect contradictory trends. There may be instances, however, when it is appropriate to present earnings (loss) from continuing operations in addition to or in lieu of net income (loss). It generally would be misleading to present sales or revenue projections without one of the foregoing measures of income. The period that appropriately may be covered by a projection depends to a large extent on the particular circumstances of the company involved. For certain companies in certain industries, a projection covering a two or three year period may be entirely reasonable. Other companies may not have a reasonable basis for projections beyond the current year. Accordingly, management should select the period most appropriate in the circumstances. In addition, management, in making a projection, should disclose what, in its opinion, is the most probable specific amount or the most reasonable range for each financial item projected based on the selected assumptions. Ranges, however, should not be so wide as to make the disclosures meaningless. Moreover, several projections based on varying assumptions may be judged by management to be more meaningful than a single number or range and would be permitted.

(ii) The presentation of projected measures that are not based on historical financial results or operational history should be clearly distinguished from projected measures that are based on historical financial results or operational history.

(iii) It generally would be misleading to present projections that are based on historical financial results or operational history without presenting such historical financial measure or operational history with equal or greater prominence.

(iv) The presentation of projections that include non-GAAP financial measures should include a clear definition or explanation of those financial measures, a description of the Generally Accepted Accounting Principles (GAAP) financial measure to which it is most closely related, and an explanation why the non-GAAP measure was selected instead of a GAAP measure.

\*  \*  \*  \*  \*

(f) \*  \*  \*

\*  \*  \*  \*  \*

(2) \*  \*  \*

(iv) Upon the consummation of a de-SPAC transaction, as defined in Item 1601(a) of Regulation S-K (17 CFR 229.1601(a)), an issuer must re-determine its status as a smaller reporting company pursuant to the thresholds set forth in paragraph (f)(1) of this section prior to its first filing, other than pursuant to Items 2.01(f), 5.01(a)(8), and/or 9.01(c) of Form 8-K, following the de-SPAC transaction and reflect this re-determination in its next periodic report.

(A) Public float is measured as of a date within four business days after the consummation of the de-SPAC transaction and is computed by multiplying the aggregate worldwide number of shares of its voting and non-voting common equity held by non-affiliates as of that date by the price at which the common equity was last sold, or the average of the bid and asked prices of common equity, in the principal market for the common equity; and

(B) Annual revenues are the annual revenues of the target company, as defined in Item 1601(d) of Regulation S-K (17 CFR 229.1601(d)), as of the most recently completed fiscal year reported in the Form 8-K filed pursuant to Items 2.01(f), 5.01(a)(8), and/or 9.01(c) of Form 8-K.

\*  \*  \*  \*  \*

12.     Amend § 229.601 by adding paragraph (b)(101)(i)(D) to read as follows:

**§ 229.601 (Item 601) Exhibits.**

\* \* \* \* \*

(b) \* \* \*

(101) \* \* \*

(i) \* \* \*

(D) Any filing that is subject to the exceptions listed in paragraphs (A), (B), or (C), and

contains any disclosure required by subpart 229.1600 of this part, must include an Interactive

Data File consisting solely of that disclosure.

\* \* \* \* \*

13.     Amend part 229 to add a new subpart 229.1600 to read as follows:

Subpart 229.1600—Special Purpose Acquisition Companies

Sec.

229.1601 (Item 1601) Definitions.

229.1602 (Item 1602) Registered offerings by special purpose acquisition companies.

229.1603 (Item 1603) SPAC sponsor; conflicts of interest.

229.1604 (Item 1604) De-SPAC transactions.

229.1605 (Item 1605) Background of and reasons for the de-SPAC transaction; terms of

the de-SPAC transaction; effects.

229.1606 (Item 1606) Fairness of the de-SPAC transaction and any related financing

transaction.

229.1607 (Item 1607) Reports, opinions, appraisals and negotiations.

229.1608 (Item 1608) Tender offer filing obligations in de-SPAC transactions.

229.1609 (Item 1609) Financial projections in de-SPAC transactions.

229.1610 (Item 1610) Structured data requirement.

**Subpart 229.1600—Special Purpose Acquisition Companies**

**§ 229.1601 (Item 1601) Definitions.**

For the purposes of this subpart 229.1600:

(a) *De-SPAC transaction*.  The term *de-SPAC transaction* means a business combination such as a merger, consolidation, exchange of securities, acquisition of assets, or similar transaction involving a special purpose acquisition company and one or more target companies (contemporaneously, in the case of more than one target company).

(b) *Special purpose acquisition company (SPAC)*.  The term *special purpose acquisition company* means a company that has indicated that its business plan is to:

(1) Register a primary offering of securities that is not subject to the requirements of § 230.419 (Rule 419 under the Securities Act);

(2) Complete a de-SPAC transaction within a specified time frame; and

(3) Return all remaining proceeds from the registered offering and any concurrent offerings to its shareholders if the company does not complete a de-SPAC transaction within the specified time frame.

(c) *SPAC sponsor*.  The term *SPAC sponsor* means the entity and/or person(s) primarily responsible for organizing, directing or managing the business and affairs of a special purpose acquisition company, other than in their capacities as directors or officers of the special purpose acquisition company as applicable.

(d) *Target company*.  The term *target company* means an operating company, business or assets.

**§ 229.1602 (Item 1602) Registered offerings by special purpose acquisition companies.**

(a) *Forepart of registration statement and outside cover page of the prospectus.*  In addition to the information required by § 229.501 (Item 501 of Regulation S-K), provide the following information on the outside front cover page of the prospectus in plain English as required by § 230.421(d) of this chapter:

(1) State the time frame for the special purpose acquisition company to consummate a de-SPAC transaction and whether this time frame may be extended.

(2) State whether security holders will have the opportunity to redeem the securities offered and whether the redemptions will be subject to any limitations.

(3) State the amount of the compensation received or to be received by the SPAC sponsor and its affiliates, and whether this compensation may result in a material dilution of the purchasers' equity interests.  Provide a cross-reference, highlighted by prominent type or in another manner, to the locations of related disclosures in the prospectus.

(4) Disclose in the tabular format specified below the estimated remaining pro forma net tangible book value per share at quartile intervals up to the maximum redemption threshold, consistent with the methodologies and assumptions used in the disclosure provided pursuant to § 229.506 (Item 506 of Regulation S-K), and provide a cross-reference, highlighted by prominent type or in another manner, to the locations of related disclosures in the prospectus:

| Remaining Pro Forma Net Tangible Book Value per Share | | | | |
|---|---|---|---|---|
| Offering Price of _____ | 25% of Maximum Redemption | 50% of Maximum Redemption | 75% of Maximum Redemption | Maximum Redemption |
| | | | | |

*Instruction 1 to Item 1602(a)(4).*  If the offering includes an over-allotment option, include separate rows in the tabular disclosure showing remaining pro forma net tangible book value per share with and without the exercise of the over-allotment option.

(5) State whether there may be actual or potential conflicts of interest between the SPAC sponsor or its affiliates or promoters and purchasers in the offering.  Provide a cross-reference, highlighted by prominent type or in another manner, to the locations of related disclosures in the prospectus.

(b) *Prospectus summary.*  The information required by § 229.503(a) (Item 503(a) of Regulation S-K) shall include, but not be limited to, a brief description of the following in plain English as required by § 230.421(d) of this chapter:

(1) The manner in which the special purpose acquisition company will identify and evaluate potential business combination candidates and whether it will solicit shareholder approval for the de-SPAC transaction;

(2) The material terms of the trust or escrow account and the amount or percentage of the gross offering proceeds that the special purpose acquisition company will place in the trust or escrow account;

(3) The material terms of the securities being offered, including redemption rights, and whether the securities are the same class as those held by the SPAC sponsor and its affiliates;

(4) The period of time in which the special purpose acquisition company intends to consummate a de-SPAC transaction and its plans in the event that it does not consummate a de-SPAC transaction within this time period, including whether, and if so, how, it may extend the time period; any limitations on extensions, including the number of times; the consequences to

the SPAC sponsor of not completing an extension of this time period; and whether security holders will have voting or redemption rights with respect to such an extension;

(5) Any plans to seek additional financings and how the terms of additional financings may impact unaffiliated security holders;

(6) In a tabular format, the nature and amount of the compensation received or to be received by the SPAC sponsor, its affiliates and promoters, and the extent to which this compensation may result in a material dilution of the purchasers' equity interests; and

(7) Any material actual or potential conflicts of interest between the SPAC sponsor or its affiliates or promoters and purchasers in the offering, including those that may arise in determining whether to pursue a de-SPAC transaction.

(c) *Dilution*.  In addition to the disclosure required by § 229.506 (Item 506 of Regulation S-K), describe material potential sources of future dilution following the registered offering by the special purpose acquisition company.  Disclose in tabular format the amount of future dilution from the public offering price that will be absorbed by purchasers of the securities being offered, to the extent known and quantifiable.

**§ 229.1603 (Item 1603) SPAC sponsor; conflicts of interest.**

(a) *SPAC sponsor, its affiliates and promoters.*  Provide the following information about the SPAC sponsor, its affiliates and promoters of the special purpose acquisition company:

(1) State the SPAC sponsor's name and describe the SPAC sponsor's form of organization.

(2) Describe the general character of the SPAC sponsor's business.

(3) Describe the experience of the SPAC sponsor, its affiliates and any promoters in organizing special purpose acquisition companies and the extent to which the SPAC sponsor, its affiliates and the promoters are involved in other special purpose acquisition companies.

(4) Describe the material roles and responsibilities of the SPAC sponsor, its affiliates and any promoters in directing and managing the special purpose acquisition company's activities.

(5) Describe any agreement, arrangement or understanding between the SPAC sponsor and the special purpose acquisition company, its executive officers, directors or affiliates in determining whether to proceed with a de-SPAC transaction.

(6) Disclose the nature (*e.g.*, cash, shares of stock, warrants and rights) and amounts of all compensation that has or will be awarded to, earned by, or paid to the SPAC sponsor, its affiliates and any promoters for all services rendered in all capacities to the special purpose acquisition company and its affiliates.  In addition, disclose the nature and amounts of any reimbursements to be paid to the SPAC sponsor, its affiliates and any promoters upon the completion of a de-SPAC transaction.

(7) Identify the controlling persons of the SPAC sponsor.  Disclose, as of the most recent practicable date, the persons who have direct and indirect material interests in the SPAC sponsor, as well as the nature and amount of their interests.  Provide an organizational chart that shows the relationship between the special purpose acquisition company, the SPAC sponsor, and the SPAC sponsor's affiliates.

(8) Describe any agreement, arrangement or understanding, including any payments, between the SPAC sponsor and unaffiliated security holders of the special purpose acquisition company regarding the redemption of outstanding securities of the special purpose acquisition company.

(9) Disclose, in a tabular format to the extent practicable, the material terms of any agreement, arrangement or understanding regarding restrictions on whether and when the SPAC sponsor and its affiliates may sell securities of the special purpose acquisition company, including the date(s) on which the agreement, arrangement or understanding may expire; the natural persons and entities subject to such an agreement, arrangement or understanding; any exceptions under such an agreement, arrangement or understanding; and any terms that would result in an earlier expiration of such an agreement, arrangement or understanding.

(b) *Conflicts of interest.*  Describe any actual or potential material conflict of interest, including any material conflict of interest in determining whether to proceed with a de-SPAC transaction and any material conflict of interest arising from the manner in which the special purpose acquisition company compensates the SPAC sponsor, executive officers and directors or the manner in which the SPAC sponsor compensates its executive officers and directors, between:

(1) The SPAC sponsor or its affiliates or the special purpose acquisition company's officers, directors, or promoters; and

(2) Unaffiliated security holders.

(c) Briefly describe the fiduciary duties of each officer and director of the special purpose acquisition company to other companies to which they have fiduciary duties.

### § 229.1604 (Item 1604) De-SPAC transactions.

(a) *Forepart of registration statement and outside cover page of the prospectus.*  In addition to the information required by § 229.501 (Item 501 of Regulation S-K), provide the following information on the outside front cover page of the prospectus in plain English as required by § 230.421(d) of this chapter:

(1) State whether the special purpose acquisition company reasonably believes that the de-SPAC transaction is fair or unfair to unaffiliated security holders, and whether the special purpose acquisition company or the SPAC sponsor has received a report, opinion or appraisal from an outside party regarding the fairness of the transaction.

(2) Describe briefly any material financing transactions that have occurred since the initial public offering of the special purpose acquisition company or will occur in connection with the consummation of the de-SPAC transaction.

(3) State the amount of the compensation received or to be received by the SPAC sponsor, its affiliates and promoters in connection with the de-SPAC transaction or any related financing transaction, and whether this compensation may result in a material dilution of the equity interests of non-redeeming shareholders who hold the securities until the consummation of the de-SPAC transaction.  Provide a cross-reference, highlighted by prominent type or in another manner, to the locations of related disclosures in the prospectus.

(4) State whether there may be material actual or potential conflicts of interest between the SPAC sponsor or its affiliates or promoters and unaffiliated security holders in connection with the de-SPAC transaction.  Provide a cross-reference, highlighted by prominent type or in another manner, to the locations of related disclosures in the prospectus.

(b) *Prospectus summary.*  The information required by § 229.503(a) (Item 503(a) of Regulation S-K) shall include, but not be limited to, a brief description of the following in plain English as required by § 230.421(d) of this chapter:

(1) The background and material terms of the de-SPAC transaction;

(2) Whether the special purpose acquisition company reasonably believes that the de-SPAC transaction is fair or unfair to unaffiliated security holders, the bases for such belief, and

whether the special purpose acquisition company or the SPAC sponsor has received any report, opinion or appraisal from an outside party concerning the fairness of the de-SPAC transaction;

(3) Any material actual or potential conflicts of interest between the SPAC sponsor or its affiliates or promoters and unaffiliated security holders in connection with the de-SPAC transaction;

(4) In a tabular format, the terms and amount of the compensation received or to be received by the SPAC sponsor and its affiliates in connection with the de-SPAC transaction or any related financing transaction, and whether that compensation has resulted or may result in a material dilution of the equity interests of unaffiliated security holders of the special purpose acquisition company;

(5) The material terms of any financing transactions that have occurred or will occur in connection with the consummation of the de-SPAC transaction, the anticipated use of proceeds from these financing transactions and the dilutive impact, if any, of these financing transactions on unaffiliated security holders; and

(6) The rights of security holders to redeem the outstanding securities of the special purpose acquisition company and the potential impact of redemptions on the value of the securities owned by non-redeeming shareholders.

(c) *Dilution.*  Describe each material potential source of future dilution that non-redeeming shareholders may experience by electing not to tender their shares in connection with the de-SPAC transaction.

(1) Provide sensitivity analysis disclosure in tabular format that expresses the amount of potential dilution under a range of reasonably likely redemption levels.  At each redemption level in the sensitivity analysis, quantify the dilutive impact on non-redeeming shareholders of each

source of dilution, such as the amount of compensation paid or to be paid to the SPAC sponsor, the terms of outstanding warrants and convertible securities, and underwriting and other fees. For each redemption level in the sensitivity analysis, state the company valuation at or above which the potential dilution results in the amount of the non-redeeming shareholders' interest per share being at least the initial public offering price per share of common stock.

(2) Provide a description of the model, methods, assumptions, estimates, and parameters necessary to understand the sensitivity analysis disclosure.

**§ 229.1605 (Item 1605) Background of and reasons for the de-SPAC transaction; terms of the de-SPAC transaction; effects.**

(a) Furnish a summary of the background of the de-SPAC transaction.  Such summary shall include, but not be limited to, a description of any contacts, negotiations or transactions that have occurred concerning the de-SPAC transaction.

(b) State the material terms of the de-SPAC transaction, including but not limited to:

(1) A brief description of the de-SPAC transaction;

(2) A brief description of any related financing transaction, including any payments from the SPAC sponsor to investors in connection with the financing transaction;

(3) A reasonably detailed discussion of the reasons for engaging in the de-SPAC transaction and for the structure and timing of the de-SPAC transaction and any related financing transaction;

(4) An explanation of any material differences in the rights of security holders of the combined company as a result of the de-SPAC transaction after the completion of the de-SPAC transaction;

(5) A brief statement as to the accounting treatment of the de-SPAC transaction, if material; and

(6) The Federal income tax consequences of the de-SPAC transaction, if material.

(c) Describe the effects of the de-SPAC transaction and any related financing transaction on the special purpose acquisition company and its affiliates, the SPAC sponsor and its affiliates, the target company and its affiliates, and unaffiliated security holders of the special purpose acquisition company.  The description must include a reasonably detailed discussion of both the benefits and detriments of the de-SPAC transaction and any related financing transaction to the special purpose acquisition company and its affiliates, the SPAC sponsor and its affiliates, the target company and its affiliates, and unaffiliated security holders.  The benefits and detriments of the de-SPAC transaction and any related financing transaction must be quantified to the extent practicable.

(d) Disclose any material interests in the de-SPAC transaction or any related financing transaction held by the SPAC sponsor and the special purpose acquisition company's officers and directors, including fiduciary or contractual obligations to other entities as well as any interest in, or affiliation with, the target company.

(e) State whether or not security holders are entitled to any redemption or appraisal rights.  If so, summarize the redemption or appraisal rights.  If there are no redemption or appraisal rights available for security holders who object to the de-SPAC transaction, briefly outline any other rights that may be available to security holders.

## § 229.1606 (Item 1606) Fairness of the de-SPAC transaction and any related financing transaction.

(a) *Fairness*.  State whether the special purpose acquisition company reasonably believes that the de-SPAC transaction and any related financing transaction are fair or unfair to unaffiliated security holders of the special purpose acquisition company.  If any director voted against, or abstained from voting on, approval of the de-SPAC transaction or any related financing transaction, identify the director, and indicate, if known, after making reasonable inquiry, the reasons for the vote against the transaction or abstention.

(b) *Factors considered in determining fairness*.  Discuss in reasonable detail the material factors upon which the belief stated in paragraph (a) of this section is based and, to the extent practicable, the weight assigned to each factor.  Such factors shall include, but not be limited to, the valuation of the target company, the consideration of any financial projections, any report, opinion or appraisal described in § 229.1607 (Item 1607 of Regulation S-K), and the dilutive effects described in § 229.1604(c) (Item 1604(c) of Regulation S-K).

(c) *Approval of security holders*.  State whether or not the de-SPAC transaction or any related financing transaction is structured so that approval of at least a majority of unaffiliated security holders is required.

(d) *Unaffiliated representative*.  State whether or not a majority of directors who are not employees of the special purpose acquisition company has retained an unaffiliated representative to act solely on behalf of unaffiliated security holders for purposes of negotiating the terms of the de-SPAC transaction or any related financing transaction and/or preparing a report concerning the fairness of the de-SPAC transaction or any related financing transaction.

(e) *Approval of directors*.  State whether or not the de-SPAC transaction or any related financing transaction was approved by a majority of the directors of the special purpose acquisition company who are not employees of the special purpose acquisition company.

*Instruction 1 to Item 1606:* A statement that the special purpose acquisition company has no reasonable belief as to the fairness or unfairness of the de-SPAC transaction or any related financing transaction to unaffiliated security holders will not be considered sufficient disclosure in response to paragraph (a) of this section.

**§ 229.1607 (Item 1607) Reports, opinions, appraisals and negotiations.**

(a) *Report, opinion or appraisal.*  State whether or not the special purpose acquisition company or SPAC sponsor has received any report, opinion or appraisal from an outside party relating to the consideration or the fairness of the consideration to be offered to security holders or the fairness of the de-SPAC transaction or any related financing transaction to the special purpose acquisition company, SPAC sponsor or security holders who are not affiliates.

(b) *Preparer and summary of the report, opinion or appraisal.*  For each report, opinion or appraisal described in response to paragraph (a) of this section or any negotiation or report described in response to § 229.1606(d) (Item 1606(d) of Regulation S-K) concerning the terms of the transaction:

(1) Identify the outside party and/or unaffiliated representative;

(2) Briefly describe the qualifications of the outside party and/or unaffiliated representative;

(3) Describe the method of selection of the outside party and/or unaffiliated representative;

(4) Describe any material relationship that existed during the past two years or is mutually understood to be contemplated and any compensation received or to be received as a result of the relationship between:

(i) The outside party, its affiliates, and/or unaffiliated representative; and

(ii) The special purpose acquisition company, the SPAC sponsor and/or their respective affiliates,

(5) State whether the special purpose acquisition company or SPAC sponsor determined the amount of consideration to be paid to the target company or its security holders, or the valuation of the target company, or whether the outside party recommended the amount of consideration to be paid or the valuation of the target company; and

(6) Furnish a summary concerning the negotiation, report, opinion or appraisal.  The summary must include, but need not be limited to, the procedures followed; the findings and recommendations; the bases for and methods of arriving at such findings and recommendations; instructions received from the special purpose acquisition company or SPAC sponsor; and any limitation imposed by the special purpose acquisition company or SPAC sponsor on the scope of the investigation.

*Instruction 1 to Item 1607(b):* The information called for by paragraphs (b)(1), (2), and (3) of this section must be given with respect to the firm that provides the report, opinion, or appraisal rather than the employees of the firm that prepared the report.

(c) All reports, opinions or appraisals referred to in paragraph (a) of this section shall be, as applicable, filed as exhibits to the registration statement or schedule or included in the schedule if the schedule does not have exhibit filing requirements.

## § 229.1608 (Item 1608) Tender offer filing obligations in de-SPAC transactions.

If the special purpose acquisition company files a Schedule TO (§ 240.14d-100) pursuant to § 240.13e-4(c)(2) (Rule 13e-4(c)(2)) for any redemption of securities offered to security holders, such Schedule TO must provide the information required by General Instruction L.2. to Form S-4, General Instruction I.2. to Form F-4, and Item 14(f) of Schedule 14A, as applicable, in

addition to the information otherwise required by Schedule TO.  Such redemption shall be conducted in compliance with all other provisions of Rule 13e-4 and Regulation 14E.

**§ 229.1609 (Item 1609) Financial projections in de-SPAC transactions.**

(a) With respect to any projections disclosed in the filing, disclose the purpose for which the projections were prepared and the party that prepared the projections.

(b) Disclose all material bases of the disclosed projections and all material assumptions underlying the projections, and any factors that may impact such assumptions.  The disclosure referred to in this section should include a discussion of any material growth rates or discount multiples used in preparing the projections, and the reasons for selecting such growth rates or discount multiples.

(c) If the projections relate to the performance of the special purpose acquisition company, state whether the projections reflect the view of the special purpose acquisition company's management or board about its future performance as of the date of the filing.  If the projections relate to the target company, disclose whether the target company has affirmed to the special purpose acquisition company that its projections reflect the view of the target company's management or board about its future performance as of the date of the filing.  If the projections no longer reflects the views of the special purpose acquisition company's or the target company's management or board regarding the future performance of their respective companies as the date of the filing, state the purpose of disclosing the projections and the reasons for any continued reliance by the management or board on the projections.

**§ 229.1610 (Item 1610) Structured data requirement.**

Provide the disclosure required by this subpart 229.1600 in an Interactive Data File in accordance with Rule 405 of Regulation S-T and the EDGAR Filer Manual.

**PART 230—GENERAL RULES AND REGULATIONS, SECURITIES ACT OF 1933**

14.    The general authority citation for part 230 continues to read as follows:

**Authority**: 15 U.S.C. 77b, 77b note, 77c, 77d, 77f, 77g, 77h, 77j, 77r, 77s, 77z-3, 77sss, 78c, 78d, 78j, 78*l*, 78m, 78n, 78o, 78o-7 note, 78t, 78w, 78*ll*(d), 78mm, 80a-8, 80a-24, 80a-28, 80a-29, 80a-30, and 80a-37, and Pub. L. No. 112-106, sec. 201(a), sec. 401, 126 Stat. 313 (2012), unless otherwise noted.

*    *    *    *    *

15.    Revise § 230.137(d)(1) to read as follows:

**§ 230.137 Publications or distributions of research reports by brokers or dealers that are not participating in an issuer's registered distribution of securities.**

*    *    *    *    *

(d) *  *  *

(1) A blank check company issuing penny stock, as defined in § 230.405 (Rule 405);

*    *    *    *    *

16.    Revise § 230.138(a)(4)(i) to read as follows:

**§ 230.138 Publications or distributions of research reports by brokers or dealers about securities other than those they are distributing.**

(a) *  *  *

(4) *  *  *

(i) A blank check company issuing penny stock, as defined in § 230.405 (Rule 405);

*    *    *    *    *

17.    Revise § 230.139(a)(1)(ii)(A)  to read as follows:

**§ 230.139 Publications or distributions of research reports by brokers or dealers distributing securities.**

(a) *  *  *

(1) *  *  *

(ii) *  *  *

(A) A blank check company issuing penny stock, as defined in § 230.405 (Rule 405);

*  *  *  *  *

18.     Add § 230.140a to read as follows:

**§ 230.140a Definition of "distribution" in section 2(a)(11) for certain parties**

A person who has acted as an underwriter of the securities of a special purpose acquisition company and takes steps to facilitate the de-SPAC transaction, or any related financing transaction, or otherwise participates (directly or indirectly) in the de-SPAC transaction will be deemed to be engaged in the distribution of the securities of the surviving public entity in a de-SPAC transaction within the meaning of section 2(a)(11) of the Act.  Terms used in this subsection have the same definitions as in Item 1601 of Regulation S-K (17 CFR 229.1601).

19.     Add § 230.145a to read as follows:

**§ 230.145a Business combinations with reporting shell companies**

With respect to a reporting shell company's shareholders, any direct or indirect business combination of a reporting shell company that is not a business combination related shell company involving another entity that is not a shell company, as those terms are defined in § 230.405, is deemed to involve an offer, offer to sell, offer for sale, or sale within the meaning of section 2(a)(3) of the Act.  For purposes of this rule, a reporting shell company is a company

other than an asset-backed issuer as defined in Item 1101(b) of Regulation AB (§ 229.1101(b) of this chapter), that has:

(1) No or nominal operations;

(2) Either:

(i) No or nominal assets;

(ii) Assets consisting solely of cash and cash equivalents; or

(iii) Assets consisting of any amount of cash and cash equivalents and nominal other assets; and

(3) an obligation to file reports under Section 13 (15 U.S.C. 78m) or Section 15(d) (15 U.S.C. 78o(d)) of the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.).

*   *   *   *   *

     20.      Revise § 230.163A by:

a.      Removing the preliminary note;

b.      Adding an introductory paragraph; and

c.      Revising paragraph (b)(3)(i).

The revision and addition read as follows:

**§ 230.163A Exemption from section 5(c) of the Act for certain communications made by or on behalf of issuers more than 30 days before a registration statement is filed.**

Attempted compliance with this section does not act as an exclusive election and the issuer also may claim the availability of any other applicable exemption or exclusion.  Reliance on this section does not affect the availability of any other exemption or exclusion from the requirements of section 5 of the Act.

*   *   *   *   *

(b) * * *

(3) * * *

(i) A blank check company issuing penny stock, as defined in § 230.405 (Rule 405);

* * * * *

21.    Revise § 230.164 by:

a.    Removing the preliminary notes;

b.    Adding an introductory paragraph; and

c.    Revising paragraph (e)(2)(i).

The revision and addition read as follows:

## § 230.164 Post-filing free writing prospectuses in connection with certain registered offerings.

This section is not available for any communication that, although in technical compliance with this section, is part of a plan or scheme to evade the requirements of section 5 of the Act.  Attempted compliance with this section does not act as an exclusive election and the person relying on this section also may claim the availability of any other applicable exemption or exclusion.  Reliance on this section does not affect the availability of any other exemption or exclusion from the requirements of section 5 of the Act.

* * * * *

(e) * * *

(2) * * *

(i) A blank check company issuing penny stock, as defined in § 230.405 (Rule 405);

* * * * *

22.    Amend § 230.174 by revising the heading and paragraph (g) to read as follows:

**§ 230.174 Delivery of prospectus by dealers; exemptions under section 4(a)(3) of the Act.**

\* \* \* \* \*

(g) If the registration statement relates to an offering of securities of a blank check company issuing penny stock, as defined in Rule 405 (§ 230.405), the statutory period for prospectus delivery specified in section 4(a)(3) of the Act shall not terminate until 90 days after the date funds and securities are released from the escrow or trust account pursuant to Rule 419 under the Act (17 CFR 230.419).

\* \* \* \* \*

23.     Amend § 230.405 by:

a.      Adding the definition for "blank check company" in alphabetical order;

b.      Adding the definition for "blank check company issuing penny stock" in alphabetical order;

c.      Revising paragraph (1)(ii)(A) in the definition for "ineligible issuer"; and

d.      Adding paragraph (3)(iv) to the definition for "smaller reporting company".

The additions and revisions read as follows:

**§ 230.405 Definitions of terms.**

\* \* \* \* \*

*Blank check company.*  The term *blank check company* means a company that has no specific business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company or companies, or other entity or person.

\* \* \* \* \*

*Blank check company issuing penny stock*.  The term *blank check company issuing penny stock* means a company that is subject to § 230.419 of this chapter.

346

\* \* \* \* \*

*Ineligible issuer*. (1) \* \* \*

(ii) \* \* \*

(A) A blank check company issuing penny stock (as defined in § 230.405);

\* \* \* \* \*

*Smaller reporting company*. \* \* \*

(3) \* \* \*

(iv) Upon the consummation of a de-SPAC transaction, as defined in § 229.1601(a) (Item 1601(a) of Regulation S-K), an issuer must re-determine its status as a smaller reporting company pursuant to the thresholds set forth in paragraphs (1) and (2) of this definition prior to its first filing, other than pursuant to Items 2.01(f), 5.01(a)(8), and/or 9.01(c) of Form 8-K, following the de-SPAC transaction and reflect this re-determination in its next periodic report.

(A) Public float is measured as of a date within four business days after the consummation of the de-SPAC transaction and is computed by multiplying the aggregate worldwide number of shares of its voting and non-voting common equity held by non-affiliates as of that date by the price at which the common equity was last sold, or the average of the bid and asked prices of common equity, in the principal market for the common equity; and

(B) Annual revenues are the annual revenues of the target company, as defined in § 229.1601(d) (Item 1601(d) of Regulation S-K), as of the most recently completed fiscal year reported in the Form 8-K filed pursuant to Items 2.01(f), 5.01(a)(8), and/or 9.01(c) of Form 8-K.

\* \* \* \* \*

24.     Amend § 230.419 by:

a.      Revising the heading;

b.        Revising paragraph (a)(1);

c.        Removing paragraph (a)(2);

d.        Redesignating paragraph (a)(3) as paragraph (a)(2); and

e.        Revising paragraph (b)(1)(i).

The additions and revisions read as follows:

## § 230.419 Offerings by blank check companies issuing penny stock.

(a) * * *

(1) The provisions of this section shall apply to every registration statement filed under the Act relating to an offering by a blank check company that:

(i) Is a development stage company; and

(ii) Is issuing "penny stock," as defined in § 240.3a51-1 of this chapter (Rule 3a51-1) under the Securities Exchange Act of 1934 ("Exchange Act").

* * * * *

(b) * * *

(1) * * *

(i) Except as otherwise provided in this section or prohibited by other applicable law, all securities issued in connection with an offering by a blank check company subject to this section and the gross proceeds from the offering shall be deposited promptly into:

* * * * *

25.        Revise § 230.430B(b)(2)(iv)(A) to read as follows:

## § 230.430B Prospectus in a registration statement after effective date.

(b) * * *

(2) * * *

348

(iv) * * *

(A) A blank check company issuing penny stock, as defined in § 230.405 (Rule 405);

* * * * *

26.    Revise § 230.437a(a)(1) to read as follows:

**§ 230.437a Written consents.**

(a) * * *

(1) Are not a blank check company issuing penny stock, as defined in § 230.405 (Rule 405); and

* * * * *

## PART 232 — REGULATION S-T — GENERAL RULES AND REGULATIONS FOR ELECTRONIC FILINGS

27.    The general authority citation for part 232 continues to read in part as follows:

**Authority:** 15 U.S.C. 77c, 77f, 77g, 77h, 77j, 77s(a), 77z-3, 77sss(a), 78c(b), 78*l*, 78m, 78n, 78o(d), 78w(a), 78*ll*, 80a-6(c), 80a-8, 80a-29, 80a-30, 80a-37, 7201 *et seq.*; and 18 U.S.C. 1350, unless otherwise noted.

* * * * *

28.    Amend § 232.405 by:

a.    Revising the introductory text and paragraphs (a)(2) and (a)(4);

b.    In paragraph (b)(1)(i), removing "and" from the end of the paragraph;

c.    In paragraph (b)(1)(ii), removing the period and replacing it with "; and";

d.    Adding paragraph (b)(1)(iii);

e.    Adding paragraph (b)(4); and

f.    Revising Note 1 to § 232.405.

349

The additions and revisions read as follows:

## § 232.405 Interactive Data File Submissions.

This section applies to electronic filers that submit Interactive Data Files.  Section 229.601(b)(101) of this chapter (Item 601(b)(101) of Regulation S-K), paragraph (101) of Part II – Information Not Required to be Delivered to Offerees or Purchasers of Form F-10 (§ 239.40 of this chapter), Note D.5 of Exchange Act Rule 14a-101 (§ 240.14a-101 of this chapter), General Instruction L of Exchange Act Rule 14d-100 (240.14d-100 of this chapter), paragraph 101 of the Instructions as to Exhibits of Form 20-F (§ 249.220f of this chapter), paragraph B.(15) of the General Instructions to Form 40-F (§ 249.240f of this chapter), paragraph C.(6) of the General Instructions to Form 6-K (§ 249.306 of this chapter), General Instruction C.3.(g) of Form N-1A (§§ 239.15A and 274.11A of this chapter), General Instruction I of Form N-2 (§§ 239.14 and 274.11a-1 of this chapter), General Instruction C.3.(h) of Form N-3 (§§ 239.17a and 274.11b of this chapter), General Instruction C.3.(h) of Form N-4 (§§ 239.17b and 274.11c of this chapter), General Instruction C.3.(h) of Form N-6 (§§ 239.17c and 274.11d of this chapter), and General Instruction C.4 of Form N-CSR (§§ 249.331 and 274.128 of this chapter) specify when electronic filers are required or permitted to submit an Interactive Data File (§ 232.11), as further described in note 1 to this section.  This section imposes content, format, and submission requirements for an Interactive Data File, but does not change the substantive content requirements for the financial and other disclosures in the Related Official Filing (§ 232.11).

(a) *   *   *

(2) Be submitted only by an electronic filer either required or permitted to submit an Interactive Data File as specified by § 229.601(b)(101) of this chapter (Item 601(b)(101) of Regulation S-K), paragraph (101) of Part II – Information Not Required to be Delivered to

Offerees or Purchasers of Form F-10 (§ 239.40 of this chapter), Note D.5 of Exchange Act Rule 14a-101 (§ 240.14a-101 of this chapter), General Instruction L of Exchange Act Rule 14d-100 (240.14d-100 of this chapter), paragraph 101 of the Instructions as to Exhibits of Form 20-F (§ 249.220f of this chapter), paragraph B.(15) of the General Instructions to Form 40-F (§ 249.240f of this chapter), paragraph C.(6) of the General Instructions to Form 6-K (§ 249.306 of this chapter), General Instruction C.3.(g) of Form N-1A (§§ 239.15A and 274.11A of this chapter), General Instruction I of Form N-2 (§§ 239.14 and 274.11a-1 of this chapter), General Instruction C.3.(h) of Form N-3 (§§ 239.17a and 274.11b of this chapter), General Instruction C.3.(h) of Form N-4 (§§ 239.17b and 274.11c of this chapter), General Instruction C.3.(h) of Form N-6 (§§ 239.17c and 274.11d of this chapter), or General Instruction C.4 of Form N-CSR (§§ 249.331 and 274.128 of this chapter), as applicable;

\*   \*   \*   \*   \*

(4) Be submitted in accordance with the EDGAR Filer Manual and, as applicable, Item 601(b)(101) of Regulation S-K (§ 229.601(b)(101) of this chapter), paragraph (101) of Part II - Information Not Required to be Delivered to Offerees or Purchasers of Form F-10 (§ 239.40 of this chapter), Note D.5 of Exchange Act Rule 14a-101 (§ 240.14a-101 of this chapter), General Instruction L of Exchange Act Rule 14d-100 (240.14d-100 of this chapter), paragraph 101 of the Instructions as to Exhibits of Form 20-F (§ 249.220f of this chapter), paragraph B.(15) of the General Instructions to Form 40-F (§ 249.240f of this chapter), paragraph C.(6) of the General Instructions to Form 6-K (§ 249.306 of this chapter), General Instruction C.3.(g) of Form N-1A (§§ 239.15A and 274.11A of this chapter), General Instruction I of Form N-2 (§§ 239.14 and 274.11a-1 of this chapter), General Instruction C.3.(h) of Form N-3 (§§ 239.17a and 274.11b of this chapter), General Instruction C.3.(h) of Form N-4 (§§ 239.17b and 274.11c of this chapter),

General Instruction C.3.(h) of Form N-6 (§§ 239.17c and 274.11d of this chapter); or General

Instruction C.4 of Form N-CSR (§§ 249.331 and 274.128 of this chapter).

*   *   *   *   *

(b)   *   *   *

(1)   *   *   *

(iii) The disclosure set forth in paragraph (4) of this section.

*   *   *   *   *

(4) The disclosure provided under Regulation S-K (17 CFR 229) and related provisions

that is required to be tagged, including, as applicable:

(a) The information required by Subpart 1600 of Regulation S-K (§ 229.1601 through

§ 229.1610 of this chapter).

*   *   *   *   *

Note 1 to § 232.405: Section 229.601(b)(101) of this chapter (Item 601(b)(101) of

Regulation S-K) specifies the circumstances under which an Interactive Data File must be

submitted and the circumstances under which it is permitted to be submitted, with respect to

§ 239.11 of this chapter (Form S-1), § 239.13 of this chapter (Form S-3), § 239.25 of this chapter

(Form S-4), § 239.18 of this chapter (Form S-11), § 239.31 of this chapter (Form F-1), § 239.33

of this chapter (Form F-3), § 239.34 of this chapter (Form F-4), § 249.310 of this chapter (Form

10-K), § 249.308a of this chapter (Form 10-Q), and § 249.308 of this chapter (Form 8-K).  Note

D.5 of Section 240.14a-101 of this chapter (Note D.5 of Exchange Act Rule 14a-101) specifies

the circumstances under which an Interactive Data File must be submitted with respect to

§ 240.14a-101 of this chapter (Schedule 14A).  General Instruction L of Section 240.14d-100 of

this chapter (General Instruction L) of Exchange Act Rule 14d-100) specifies the circumstances

under which an Interactive Data File must be submitted with respect to § 240.14d-100 of this chapter (Schedule TO).  Paragraph (101) of Part II – Information not Required to be Delivered to Offerees or Purchasers of § 239.40 of this chapter (Form F-10) specifies the circumstances under which an Interactive Data File must be submitted and the circumstances under which it is permitted to be submitted, with respect to Form F-10.  Paragraph 101 of the Instructions as to Exhibits of § 249.220f of this chapter (Form 20-F) specifies the circumstances under which an Interactive Data File must be submitted and the circumstances under which it is permitted to be submitted, with respect to Form 20-F.  Paragraph B.(15) of the General Instructions to § 249.240f of this chapter (Form 40-F) and Paragraph C.(6) of the General Instructions to § 249.306 of this chapter (Form 6-K) specify the circumstances under which an Interactive Data File must be submitted and the circumstances under which it is permitted to be submitted, with respect to § 249.240f of this chapter (Form 40-F) and § 249.306 of this chapter (Form 6-K). Section 229.601(b)(101) (Item 601(b)(101) of Regulation S-K), paragraph (101) of Part II – Information not Required to be Delivered to Offerees or Purchasers of Form F-10, paragraph 101 of the Instructions as to Exhibits of Form 20-F, paragraph B.(15) of the General Instructions to Form 40-F, and paragraph C.(6) of the General Instructions to Form 6-K all prohibit submission of an Interactive Data File by an issuer that prepares its financial statements in accordance with 17 CFR 210.6-01 through 210.6-10 (Article 6 of Regulation S-X).  For an issuer that is a management investment company or separate account registered under the Investment Company Act of 1940 (15 U.S.C. 80a *et seq.*) or a business development company as defined in Section 2(a)(48) of the Investment Company Act of 1940 (15 U.S.C. 80a-2(a)(48)), General Instruction C.3.(g) of Form N-1A (§§ 239.15A and 274.11A of this chapter), General Instruction I of Form N-2 (§§ 239.14 and 274.11a-1 of this chapter), General Instruction C.3.(h) of Form N-3

(§§ 239.17a and 274.11b of this chapter), General Instruction C.3.(h) of Form N-4 (§§ 239.17b and 274.11c of this chapter), General Instruction C.3.(h) of Form N-6 (§§ 239.17c and 274.11d of this chapter), and General Instruction C.4 of Form N-CSR (§§ 249.331 and 274.128 of this chapter), as applicable, specifies the circumstances under which an Interactive Data File must be submitted.

## PART 239—FORMS PRESCRIBED UNDER THE SECURITIES ACT OF 1933

29.     The general authority citation for part 239 continues to read as follows:

**Authority:** 15 U.S.C. 77c, 77f, 77g, 77h, 77j, 77s, 77z-2, 77z-3, 77sss, 78c, 78*l*, 78m,78n, 78o(d), 78o-7 note, 78u-5, 78w(a), 78*ll*, 78mm, 80a-2(a), 80a-3, 80a-8, 80a-9, 80a-10, 80a-13, 80a-24, 80a-26, 80a-29, 80a-30, and 80a-37; and sec. 107, Pub. L. 112-106, 126 Stat. 312, unless otherwise noted.

\* \* \* \* \*

30.     Amend Form S-1 (referenced in § 239.11) by adding General Instruction VIII to read as follows:

**Note: The text of Form S-1 does not, and this amendment will not, appear in the Code of Federal Regulations.**

### FORM S-1

\* \* \* \* \*

### GENERAL INSTRUCTIONS

\* \* \* \* \*

## VIII. Offering by a Special Purpose Acquisition Company.

If a registration statement on this Form S-1 is being used to register an offering of securities of a special purpose acquisition company, as defined in Item 1601(b) of Regulation S-K (17 CFR

229.1601(b)), other than in connection with a de-SPAC transaction, as defined in Item 1601(a) of

Regulation S-K (17 CFR 229.1601(a)), the registrant must furnish in the prospectus the

information required by Items 1602 and 1603 of Regulation S-K (17 CFR 229.1602 and

229.1603), in the manner set forth by the structured data provision of Item 1610 of Regulation S-

K (17 CFR 229.1610), in addition to the Items that are otherwise required by this Form.  If the

securities to be registered on this Form will be issued in a de-SPAC transaction, attention is

directed to the requirements of Form S-4 applicable to de-SPAC transactions, including, but not

limited to, General Instruction L.

     31.     Amend Form S-4 (referenced in § 239.25) by:

     a.     Adding General Instruction L;

     b.     Revising paragraph (b)(7) introductory text of Item 17 and Instruction 1 of

paragraph (b)(7) of Item 17; and

     c.     Revising Instruction 1 to the signature block.

The addition and revisions read as follows:

**Note: The text of Form S-4 does not, and this amendment will not, appear in the Code of**

**Federal Regulations.**

**FORM S-4**

\*   \*   \*   \*   \*

**GENERAL INSTRUCTIONS**

\*   \*   \*   \*   \*

**L. De-SPAC Transactions.**

     1. If securities to be registered on this Form will be issued in a de-SPAC transaction, as

defined in Item 1601(a) of Regulation S-K (17 CFR 229.1601(a)), then the disclosure provisions

of Items 1603 through 1607 and 1609 of Regulation S-K (17 CFR 229.1603 through 229.1607 and 229.1609), as well as the structured data provision of Item 1610 of Regulation S-K (17 CFR 229.1610), shall apply in addition to the provisions of this Form.  To the extent that the applicable disclosure requirements of Subpart 229.1600 are inconsistent with the disclosure requirements of this Form, the requirements of Subpart 229.1600 are controlling.  If the securities to be registered on this Form will be issued by a special purpose acquisition company, as defined in Item 1601(b) of Regulation S-K (17 CFR 229.1601(b)), in a de-SPAC transaction, the term "registrant" for purposes of the disclosure requirements of this Form shall mean the special purpose acquisition company.

2. If the target company, as defined in Item 1601(d) of Regulation S-K (17 CFR 229.1601(d)), in a de-SPAC transaction is not subject to the reporting requirements of either Section 13(a) or 15(d) of the Exchange Act, provide the following additional information with respect to the target company:

a. Item 101 of Regulation S-K (§ 229.101 of this chapter), description of business;

b. Item 102 of Regulation S-K (§ 229.102 of this chapter), description of property;

c. Item 103 of Regulation S-K (§ 229.103 of this chapter), legal proceedings;

d. Item 304 of Regulation S-K (§ 229.304 of this chapter), changes in and disagreements with accountants on accounting and financial disclosure;

e. Item 403 of Regulation S-K (§ 229.403 of this chapter), security ownership of certain beneficial owners and management, assuming the completion of the de-SPAC transaction and any related financing transaction; and

f. Item 701 of Regulation S-K (§ 229.701 of this chapter), recent sales of unregistered securities.

If the target company is a foreign private issuer, as defined in Rule 405 (§ 230.405 of this chapter), information with respect to the target company may be provided in accordance with Items 3.C, 4, 6.E, 7.A, 8.A.7, and 9.E of Form 20-F, in lieu of the information specified above.

3. If securities to be registered on this Form will be issued in a de-SPAC transaction, as defined in Item 1601(a) of Regulation S-K (17 CFR 229.1601(a)), the prospectus must be distributed to security holders no later than the lesser of 20 calendar days prior to the date on which action is to be taken or the maximum number of days permitted for disseminating the prospectus under the applicable laws of the jurisdiction of incorporation or organization.

\*   \*   \*   \*   \*

**Item 17. Information with Respect to Companies Other Than S-3 Companies.**

\*   \*   \*   \*   \*

(7) Financial statements that would be required in an annual report sent to security holders under Rules 14a-3(b)(1) and (b)(2) (§ 240.14b-3 of this chapter), if an annual report was required.  In a de-SPAC transaction, provide the financial statements required by § 240.15-01 (Rule 15-01 of Regulation S-X).  If the registrant's security holders are not voting, the transaction is not a roll-up transaction (as described by Item 901 of Regulation S-K (§ 229.901 of this chapter)), and:

\*   \*   \*   \*   \*

**Instructions:**

1. The financial statements required by paragraph for the latest fiscal year need be audited only to the extent practicable.  The financial statements for the fiscal years before the latest fiscal year need not be audited if theywere not previously audited.  If the company being acquired will be a predecessor to a registrant that is a shell company, see § 210.15-01(a).

\*   \*   \*   \*   \*

## SIGNATURES

\*   \*   \*   \*   \*

*Instructions.*

1. The registration statement shall be signed by the registrant, its principal executive officer or officers, its principal financial officer, its controller or principal accounting officer, and by at least a majority of the board of directors or persons performing similar functions.  If the registrant is a foreign person, the registration statement shall also be signed by its authorized representative in the United States.  Where the registrant is a limited partnership, the registration statement shall be signed by a majority of the board of directors of any corporate general partner signing the registration statement.  If the securities to be registered on this Form will be issued by the special purpose acquisition company in a de-SPAC transaction, as such terms are defined in Items 1601(b) and (a) of Regulation S-K, the term "registrant" for purposes of this instruction shall mean the special purpose acquisition and the target company, as such term is defined in Item 1601(d) of Regulation S-K.

\*   \*   \*   \*   \*

    32.    Amend Form F-1 (referenced in § 239.31) by adding General Instruction VII to read as follows:

**Note: The text of Form F-1 does not, and this amendment will not, appear in the Code of Federal Regulations.**

## FORM F-1

\*   \*   \*   \*   \*

## GENERAL INSTRUCTIONS

\* \* \* \* \*

**VII. Offering by a Special Purpose Acquisition Company.**

If a registration statement on this Form F-1 is being used to register an offering of securities of a special purpose acquisition company, as defined in Item 1601(b) of Regulation S-K (17 CFR 229.1601(b)), other than in connection with a de-SPAC transaction, as defined in Item 1601(a) of Regulation S-K (17 CFR 229.1601(a)), the registrant must furnish in the prospectus the information required by Items 1602 and 1603 of Regulation S-K (17 CFR 229.1602 and 229.1603), in the manner set forth by the structured data provision of Item 1610 of Regulation S-K (17 CFR 229.1610), in addition to the Items that are otherwise required by this Form.  If the securities to be registered on this Form will be issued in a de-SPAC transaction, attention is directed to the requirements of Form F-4 applicable to de-SPAC transactions, including, but not limited to, General Instruction I.

\* \* \* \* \*

33.      Amend Form F-4 (referenced in § 239.34) by:

a.      Adding General Instruction I;

b.      Revising Instruction 1 to paragraph (b)(5) of Item 17; and

c.      Revising the Instructions to paragraph (b)(5) and (b)(6) of Item 17; and

d.      Revising Instruction 1 to the signature block.

The revisions and addition read as follows:

**Note: The text of Form F-4 does not, and this amendment will not, appear in the Code of Federal Regulations.**

**FORM F-4**

\* \* \* \* \*

# GENERAL INSTRUCTIONS

\*   \*   \*   \*   \*

## I. De-SPAC Transactions.

1. If securities to be registered on this Form will be issued in a de-SPAC transaction, as defined in Item 1601(a) of Regulation S-K (17 CFR 229.1601(a)), then the disclosure provisions of Items 1603 through 1607 and 1609 of Regulation S-K (17 CFR 229.1603 through 229.1607 and 1609), as well as the structured data provision of Item 1610 of Regulation S-K (17 CFR 229.1610), shall apply in addition to the provisions of this Form.  To the extent that the disclosure requirements of Subpart 229.1600 are inconsistent with the disclosure requirements of this Form, the requirements of Subpart 229.1600 are controlling.  If the securities to be registered on this Form will be issued by a special purpose acquisition company, as defined in Item 1601(b) of Regulation S-K (17 CFR 229.1601(b)), in a de-SPAC transaction, the term "registrant" for purposes of the disclosure requirements of this Form shall mean the special purpose acquisition company.

2. If the target company, as defined in Item 1601(d) of Regulation S-K (17 CFR 229.1601(d)), in a de-SPAC transaction is not subject to the reporting requirements of either Section 13(a) or 15(d) of the Exchange Act, provide the following additional information with respect to the company:

a. Item 101 of Regulation S-K (§ 229.101 of this chapter), description of business;

b. Item 102 of Regulation S-K (§ 229.102 of this chapter), description of property;

c. Item 103 of Regulation S-K (§ 229.103 of this chapter), legal proceedings;

d. Item 403 of Regulation S-K (§ 229.403 of this chapter), security ownership of certain beneficial owners and management, assuming the completion of the de-SPAC transaction and any related financing transaction; and

e. Item 701 of Regulation S-K (§ 229.701 of this chapter), recent sales of unregistered securities.

If the target company is a foreign private issuer, as defined in Rule 405 (§ 230.405 of this chapter), information with respect to the target company may be provided in accordance with Items 3.C, 4, 6.E, 7.A, 8.A.7, and 9.E of Form 20-F, in lieu of the information specified above.

3. If securities to be registered on this Form will be issued in a de-SPAC transaction, as defined in Item 1601(a) of Regulation S-K (17 CFR 229.1601(a)), the prospectus must be distributed to security holders no later than the lesser of 20 calendar days prior to the date on which action is to be taken or the maximum number of days permitted for disseminating the prospectus under the applicable laws of the jurisdiction of incorporation or organization.

\* \* \* \* \*

## PART I

\* \* \* \* \*

## Item 17. Information with Respect to Foreign Companies Other Than F-3 Companies.

\* \* \* \* \*

*Instructions:*

1. The financial statements required by this paragraph for the latest fiscal year need be audited only to the extent practicable.  The financial statements for the fiscal years before the latest fiscal year need not be audited if they were not previously audited.  If the foreign company being acquired will be a predecessor to a registrant that is a shell company, see § 210.15-01(a).

\*   \*   \*   \*   \*

*Instructions to paragraph (b)(5) and (b)(6):*

If the financial statements required by paragraphs (b)(5) and (b)(6) are prepared on the basis of a comprehensive body of accounting principles other than U.S. GAAP, provide a reconciliation to U.S. GAAP in accordance with Item 18 of Form 20-F (§ 249.220f of this chapter) if the foreign business being acquired will be a predecessor to the issuer that is a shell company or, in all other circumstances, with Item 17 of Form 20-F (§ 249.220f of this chapter) unless a reconciliation is unavailable or not obtainable without unreasonable cost or expense.  At a minimum, provide a narrative description of all material variations in accounting principles, practices and methods used in preparing the non-U.S. GAAP financial statements from those accepted in the U.S. when the financial statements are prepared on a basis other than U.S. GAAP.

### SIGNATURES

\*   \*   \*   \*   \*

Instructions

1. The registration statement shall be signed by the registrant, its principal executive officer or officers, its principal financial officer, its controller or principal accounting officer, at least a majority of the board of directors or persons performing similar functions and its authorized representative in the United States.  Where registrant is a limited partnership, the registration statement shall be signed by a majority of the board of directors of any corporate general partner signing the registration statement.  If the securities to be registered on this Form will be issued by the special purpose acquisition company in a de-SPAC transaction, as such terms are defined in Items 1601(b) and (a) of Regulation S-K, the term "registrant" for purposes of this instruction

362

shall mean the special purpose acquisition and the target company, as such term is defined in Item 1601(d) of Regulation S-K.

* * * * *

## PART 240—GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934

34.    The general authority citation for part 240 continues to read as follows:

**Authority:** 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z-2, 77z-3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78c-3, 78c-5, 78d, 78e, 78f, 78g, 78i, 78j, 78j-1, 78k, 78k-1, 78*l*, 78m, 78n, 78n-1, 78o, 78o4, 78o-10, 78p, 78q, 78q-1, 78s, 78u-5, 78w, 78x, 78*ll*, 78mm, 80a-20, 80a-23, 80a-29, 80a-37, 80b-3, 80b-4, 80b-11, 7201 *et seq.*, and 8302; 7 U.S.C. 2(c)(2)(E); 12 U.S.C. 5221(e)(3); 18 U.S.C. 1350; Pub. L. 111-203, 939A, 124 Stat. 1887 (2010); and sec. 503 and 602, Pub. L. 112-106, 126 Stat. 326 (2012), unless otherwise noted.

* * * * *

35.    Amend § 240.12b-2 by adding paragraph (3)(iv) to the definition of "smaller reporting company" to read as follows:

## § 240.12b-2 Definitions.

* * * * *

*Smaller reporting company.* *   *   *

(3) *   *   *

(iv) Upon the consummation of a de-SPAC transaction, as defined in Item 1601(a) of Regulation S-K (17 CFR 229.1601(a)), an issuer must re-determine its status as a smaller reporting company pursuant to the thresholds set forth in paragraphs (1) and (2) of this definition prior to its first filing, other than pursuant to Items 2.01(f), 5.01(a)(8), and/or 9.01(c) of Form 8-

363

K, following the de-SPAC transaction and reflect this re-determination in in its next periodic report.

(A) Public float is measured as of a date within 4 business days after the consummation of the de-SPAC transaction and is computed by multiplying the aggregate worldwide number of shares of its voting and non-voting common equity held by non-affiliates as of that date by the price at which the common equity was last sold, or the average of the bid and asked prices of common equity, in the principal market for the common equity; and

(B) Annual revenues are the annual revenues of the target company, as defined in Item 1601(d) of Regulation S-K (17 CFR 229.1601(d)), as of the most recently completed fiscal year reported in the Form 8-K filed pursuant to Items 2.01(f), 5.01(a)(8), and/or 9.01(c) of Form 8-K.

\*   \*   \*   \*   \*

36.    Revise § 240.14a-6 by adding paragraph (q) to read as follows:

**§ 240.14a-6 Filing requirements.**

\*   \*   \*   \*   \*

(q) *De-SPAC transactions*.  If a transaction is a de-SPAC transaction, as defined in § 229.1601(a) of this chapter (Item 1601(a) of Regulation S-K), the proxy statement of the special purpose acquisition company as defined in § 229.1601(b) of this chapter (Item 1601(b) of Regulation S-K) must be distributed to security holders no later than the lesser of 20 calendar days prior to the date on which the meeting of security holders is held or action is taken, or the maximum number of days permitted for disseminating the proxy statement under the applicable laws of the jurisdiction of incorporation or organization.

37.    Revise § 240.14a-101 by adding paragraph D.5 to the Notes and paragraph (f) to Item 14 to read as follows:

\* \* \* \* \*

**§ 240.14a-101 Schedule 14A. Information required in proxy statement.**

\* \* \* \* \*

Notes \* \* \*

D. \* \* \*

5. *Interactive Data File.* An Interactive Data File must be included in accordance with § 232.405 of this chapter (Rule 405 of Regulation S-T) and the EDGAR Filer Manual where applicable pursuant to Item 14(f) of this Schedule and § 229.1610 of this chapter (Item 1610 of Regulation S-K).

\* \* \* \* \*

**Item 14.** \* \* \*

\* \* \* \* \*

(f) *De-SPAC transactions.* (1) If the transaction is a de-SPAC transaction, as defined in § 229.1601(a) (Item 1601(a) of Regulation S-K), then the disclosure provisions of §§ 229.1603 through 229.1607 and 229.1609 (Items 1603 through 1607 and 1609 of Regulation S-K), as well as the structured data provision of § 229.1610 (Item 1610 of Regulation S-K), shall apply to the transaction in addition to the provisions of this schedule. To the extent that the disclosure requirements of Subpart 229.1600 are inconsistent with the disclosure requirements of this schedule, the requirements of Subpart 229.1600 are controlling.

(2) Provide the following additional information for the target company:

(i) Information required by § 229.101 of this chapter (Item 101 of Regulation S-K), description of business;

(ii) Information required by § 229.102 of this chapter (Item 102 of Regulation S-K), description of property;

(iii) Information required by § 229.103 of this chapter (Item 103 of Regulation S-K), legal proceedings;

(iv) Section 229.304 of this chapter (Item 304 of Regulation S-K), changes in and disagreements with accountants on accounting and financial disclosure;

(v) Information required by § 229.403 of this chapter (Item 403 of Regulation S-K), security ownership of certain beneficial owners and management, assuming the completion of the de-SPAC transaction and any related financing transaction;

(vi) Information required by § 229.701 of this chapter (Item 701 of Regulation S-K), recent sales of unregistered securities; and

(vii) If any directors are appointed without action by the security holders of the special purpose acquisition company, §§ 229.103(c)(2), 229.401, and 229.404(a) and (b) of this chapter (Items 103(c)(2), 401, and 404(a) and (b) of Regulation S-K).

*   *   *   *   *

38.     Revise § 240.14c-2 by adding paragraph (e) to read as follows:

**§ 240.14c-2 Distribution of information statement.**

*   *   *   *   *

(e) If a transaction is a de-SPAC transaction, as defined in § 229.1601(a) of this chapter (Item 1601(a) of Regulation S-K), the information statement of the special purpose acquisition company as defined in § 229.1601(b) (Item 1601(b) of Regulation S-K) must be distributed to security holders no later than the lesser of 20 calendar days prior to the date on which the meeting of security holders is held or action is taken, or the maximum number of days permitted

for disseminating the information statement under the applicable laws of the jurisdiction of incorporation or organization.

      39.      Revise § 240.14d-100 by:

      a.      Redesignating General Instruction K as General Instruction M; and

      b.      Adding new General Instructions K and L.

The additions read as follows:

\*   \*   \*   \*   \*

**§ 240.14d-100 Schedule TO. Tender offer statement under section 14(d)(1) or 13(e)(1) of the Securities Exchange Act of 1934.**

\*   \*   \*   \*   \*

*General Instructions:*

\*   \*   \*   \*   \*

**K. De-SPAC Transactions.**  If the filing relates to a de-SPAC transaction, as defined in § 229.1601(a) of this chapter (Item 1601(a) of Regulation S-K), then the disclosure provisions of §§ 229.1603 through 229.1609 of this chapter (Items 1603 through 1609 of Regulation S-K), as well as the structured data provision of § 229.1610 of this chapter (Item 1610 of Regulation S-K), shall apply to the transaction in addition to the provisions of this statement.  To the extent that the disclosure requirements of Subpart 229.1600 of this chapter are inconsistent with the disclosure requirements of this filing, the requirements of Subpart 229.1600 of this chapter are controlling.

**L. Interactive Data File.**  An Interactive Data File must be included in accordance with § 232.405 of this chapter (Rule 405 of Regulation S-T) and the EDGAR Filer Manual where

applicable pursuant to Item 14(f) of § 240.14a-101 of this chapter (Schedule 14A) and § 229.1610 of this chapter (Item 1610 of Regulation S-K).

* * * * *

## PART 249—FORMS, SECURITIES EXCHANGE ACT OF 1934

40.     The authority citation for part 249 continues to read, in part, as follows:

**Authority:** 15 U.S.C. 78a *et seq.* and 7201 *et seq.*; 12 U.S.C. 5461 *et seq.*; 18 U.S.C. 1350; Sec. 953(b), Pub. L. 111-203, 124 Stat. 1904; Sec. 102(a)(3), Pub. L. 112-106, 126 Stat. 309 (2012); Sec. 107, Pub. L. 112-106, 126 Stat. 313 (2012), and Sec. 72001, Pub. L. 114-94, 129 Stat. 1312 (2015), unless otherwise noted.

Section 249.220f is also issued under secs. 3(a), 202, 208, 302, 306(a), 401(a), 401(b), 406 and 407, Pub. L. 107-204, 116 Stat. 745, and secs. 2 and 3, Pub. L. 116-222, 134 Stat. 1063.

* * * * *

Section 249.308 is also issued under 15 U.S.C. 80a-29 and 80a-37.

* * * * *

41.     Amend Form 20-F (referenced in § 249.220f) by adding Instruction 4 to Item 8 to read as follows:

**Note: The text of Form 20-F does not, and this amendment will not, appear in the Code of Federal Regulations.**

**FORM 20-F**

* * * * *

Item 8. Financial Information

* * * * *

Instructions to Item 8:

\*   \*   \*   \*   \*

4. When the issuer is a shell company that will acquire a business that will be its predecessor, provide the information required by § 240.15-01 (Rule 15-01 of Regulation S-X).

\*   \*   \*   \*   \*

42.     Amend Form 8-K (referenced in § 249.308) by revising paragraph (f) of Item 2.01 by removing the phrase "the registrant were filing a general form for registration of securities on Form 10" and adding in its place "the acquired business were filing a general form for registration of securities on Form 10".   The revision reads as follows:

**Note: The text of Form 8-K does not, and this amendment will not, appear in the Code of Federal Regulations.**

### FORM 8-K

\*   \*   \*   \*   \*

**Item 2.01 Completion of Acquisition or Disposition of Assets.**

\*   \*   \*   \*   \*

(f) if the registrant was a shell company, other than a business combination related shell company, as those terms are defined in Rule 12b-2 under the Exchange Act (17 CFR 240.12b-2), immediately before the transaction in which the registrant acquired a business, disclose the information that would be required if the acquired business were filing a general form for registration of securities on Form 10 under the Exchange Act reflecting all classes of the registrant's securities subject to the reporting requirements of Section 13 (15 U.S.C. 78m) or Section 15(d) (15 U.S.C. 78o(d)) of such Act upon consummation of the transaction. Notwithstanding General Instruction B.3. to Form 8-K, if any disclosure required by this Item 2.01(f) is previously reported, as that term is defined in Rule 12b-2 under the Exchange Act (17

CFR 240.12b-2), the registrant may identify the filing in which that disclosure is included instead of including that disclosure in this report.

\* \* \* \* \*

**Part 270—RULES AND REGULATIONS, INVESTMENT COMPANY ACT OF 1940**

43. The authority citation for part 270 continues to read in part as follows:

**Authority:** 15 U.S.C. 80a-1 *et seq.*, 80a-34(d), 80a-37, 80a-39, and Pub. L. 111-203, sec. 939A, 124 Stat. 1376, unless otherwise noted.

44. Add § 270.3a-10 to read as follows:

**§ 270.3a-10 Special Purpose Acquisition Companies**

(a) Notwithstanding section 3(a)(1)(A) of the Act, a special purpose acquisition company ("SPAC") will not be deemed to be an investment company; *provided that:*

(1) The SPAC's assets consist solely of Government securities, securities issued by government money market funds as defined in § 270.2a-7(a)(14), and cash items prior to completion of the de-SPAC transaction;

(2) The assets set forth in paragraph (a)(1) of this section are not at any time acquired or disposed of for the primary purpose of recognizing gains or decreasing losses resulting from market value changes;

(3) The SPAC:

(i) Seeks to complete a single de-SPAC transaction as a result of which:

(A) The surviving company, either directly or through a primarily controlled company, will be primarily engaged in the business of the target company or companies, which business is not that of an investment company, and

(B) The surviving company will have at least one class of securities listed for trading on a national securities exchange;

(ii) Files a Form 8-K with the Commission, no later than 18 months after the effective date of its initial registration statement, disclosing an agreement to engage in the de-SPAC transaction with at least one target company; and

(iii) Completes the de-SPAC transaction no later than 24 months after the effective date of its initial registration statement.

(4) Any assets of the SPAC:

(i) That are not used in connection with the de-SPAC transaction; or

(ii) In the event of a failure of the SPAC to file a Form 8-K within the time frame set forth in paragraph (a)(3)(ii) of this section or complete a de-SPAC transaction within the time frame set forth in paragraph (a)(3)(iii) of this section

will be distributed in cash to investors as soon as reasonably practicable thereafter;

(5) The SPAC is primarily engaged in the business of seeking to complete a single de-SPAC transaction, as set forth in paragraphs (a)(3) of this section and evidenced by:

(i) The activities of its officers, directors and employees;

(ii) Its public representations of policies;

(iii) Its historical development; and

(iv) An appropriate resolution of its board of directors, which resolution or action has been recorded contemporaneously in its minute books or comparable documents; and

(6) The SPAC does not hold itself out as being primarily engaged in the business of investing, reinvesting or trading in securities.

(b) For purposes of this section:

371

(1) *Initial registration statement* means the registration statement that the SPAC filed under the Securities Act of 1933 for its initial public offering.

(2) *Primarily controlled company* means an issuer that:

(i) Is controlled within the meaning of section 2(a)(9) of the Act by the surviving company following a de-SPAC transaction with a degree of control that is greater than that of any other person; and

(ii) Is not an investment company.

(3) *Surviving company* means the public company issuer that survives a de-SPAC transaction and in which the shareholders of the SPAC immediately prior to the de-SPAC transaction will own equity interests immediately following the de-SPAC transaction.

(4) *De-SPAC transaction* has the same meaning as defined in § 229.1601(a) of this chapter (Item 1601(a) of Regulation S-K).

(5) *Special purpose acquisition company* has the same meaning as defined in § 229.1601(b) of this chapter (Item 1601(b) of Regulation S-K).

(6) *Target company* has the same meaning as defined in § 229.1601(d) of this chapter (Item 1601(d) of Regulation S-K).

By the Commission.

Dated: March 30, 2022.

Vanessa A. Countryman,

Secretary.